# United States District Court
## Northern District of Texas
## Amarillo Division

| | |
|---|---|
| STATE OF TEXAS,<br>　　*Plaintiff,*<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity<br>　　as Secretary of Homeland Security;<br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>UR JADDOU, in her official capacity as Director<br>　　of U.S. Citizenship and Immigration<br>　　Services;<br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES;<br>CHRISTOPHER MAGNUS, in his official capacity<br>　　as Commissioner of U.S. Customs & Border<br>　　Protection;<br>U.S. CUSTOMS & BORDER PROTECTION;<br>TAE JOHNSON, in his official capacity as Acting<br>　　Director of U.S. Immigration & Customs<br>　　Enforcement;<br>U.S. IMMIGRATION & CUSTOMS ENFORCEMENT;<br>MERRICK GARLAND, in his official capacity as<br>　　Attorney General of the United States;<br>U.S. DEPARTMENT OF JUSTICE;<br>DAVID NEAL; in his official capacity as Director<br>　　of the Executive Office for Immigration<br>　　Review;<br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW;<br>JOSEPH R. BIDEN, JR., in his official capacity as<br>　　President of the United States; and<br>UNITED STATES OF AMERICA;<br>　　*Defendants.* | Civil Action No.  2:22-cv-94 |

## Complaint

1.      Unsatisfied with releasing over 836,225 illegal aliens into the United States within fifteen months—not counting the number of unaccompanied alien children released separately, and aliens who have evaded apprehension—on March 29, 2022, the Defendants promulgated an Interim Final Rule to release *even more* illegal aliens into our country. *See* Dept. of Homeland Sec., *Interim Final Rule: Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022). The rule is set to take effect on May 31, 2022.

2.      The Interim Rule violates the Administrative Procedure Act ("APA"), the Homeland Security Act, and the Immigration and Nationality Act ("INA"), and it violates the Appointments Clause in Article II, Section 2, Clause 2 of the United States Constitution.

3.      The State of Texas respectfully requests that this Court issue declaratory, preliminary, and permanent injunctive relief.

## I. Parties

**A. Plaintiff.**

4.      Plaintiff State of Texas is a sovereign State of the United States of America.

**B. Defendants.**

5.      Defendant U.S. Department of Homeland Security (DHS) oversees the Defendants, U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE), which are constituent agencies of DHS. DHS and its constituent agencies enforce the INA.

6.      Defendant Alejandro Mayorkas is the Secretary of DHS. Texas sues him in his official capacity.

7.     Defendant Ur Jaddou is the Director of USCIS. Texas sues her in her official capacity.

8.     Defendant Christopher Magnus is the Commissioner of CBP. Texas sues him in his official capacity.

9.     Defendant Tae Johnson is the Acting Director of ICE. Texas sues him in his official capacity.

10.     Defendant U.S. Department of Justice (DOJ) oversees Defendant Executive Office for Immigration Review (EOIR) as a constituent agency of DOJ. EOIR, through statutory authority and regulatory authority delegated by the Attorney General, administers portions of the INA—including by adjudicating cases in the immigration courts.

11.     Defendant Merrick Garland is the Attorney General of the United States. Texas sues him in his official capacity.

12.     Defendant David Neal is the Director of EOIR. Texas sues him in his official capacity.

13.     Defendant Joseph R. Biden, Jr., is the President of the United States. Texas sues him in his official capacity.

14.     Defendant United States of America is the federal sovereign.

## II. Jurisdiction and Venue

15.     The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and § 2201–2202 to render the declaratory and injunctive relief that Texas requests.

16.     Texas's claims are not subject to the INA's denial of jurisdiction for claims on behalf of an alien, 8 U.S.C. § 1252(g), because it is bringing this suit for the benefit

of itself and its citizens. Nor does Texas seek to "enjoin or restrain" the operation of the expedited removal authority, *id.* § 1252(f), but instead, Texas seeks to ensure the operation of such authority. *See Texas v. Biden*, 20 F.4th 928, 1003–04 (5th Cir. 2021). Nor does Texas challenge any "determinations" under the expedited removal authority and its implementation. *Id.* § 1252(e)(3)(A). Instead, Texas seeks to ensure the continued operation of the authority and its implementation.

17.    This district is a proper venue because the State of Texas resides in this district and a substantial part of the events or omissions giving rise to Texas's claims occurred here. 28 U.S.C. § 1391(e).

### III. Facts

**A. Expedited Removal of Illegal Aliens at the Border.**

18.    The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, charge DHS with enforcing the United States' immigration laws.

19.    Under the immigration laws, "several classes of aliens are 'inadmissible' and therefore 'removable.'" *Dept. of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964 (2020) (citing 8 U.S.C. §§ 1182, 1229a(e)(2)(A)). Among these are aliens who lack a valid entry document when they apply for admission. 8 U.S.C. § 1182(a)(7)(A)(i)(l). Applicants for admission include both aliens who arrive in the United States and aliens who are present in the United States without having been lawfully admitted, who are deemed to have applied for admission. 8 U.S.C. § 1225(a)(1).

20.    An inadmissible alien may be removed; the standard process involves an evidentiary hearing before an immigration judge at which the alien may present evidence and argue against removal. *Thuraissigiam*, 140 S. Ct. at 1964. However, this process is slow, and while "removal is being litigated, the alien will either be

detained, at considerable expense, or allowed to reside in this country, with the attendant risk that he or she may not later be found." *Id.*

21.    To address these problems, Congress created more expedited procedures that apply to aliens who are "present in the United States who [have] not been admitted" and to aliens "who arrive[] in the United States (whether or not at a designated port of arrival . . . )." 8 U.S.C. § 1225(a)(1). These aliens are subject to expedited removal if they (1) are inadmissible because they lack a valid entry document; (2) have not "been continuously physically present in the United States for the two years preceding their inadmissibility determination; and (3) are among those whom the Secretary of Homeland Security has designated for expedited removal. *Id.* § 1225(b)(1)(A). Once an immigration officer determines that such an alien is inadmissible, the alien must be ordered "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

22.    If the alien "indicates either an intention to apply for asylum . . . or a fear of persecution, the [immigration] officer shall refer the alien for an interview by an asylum officer." *Id.* § 1225(b)(1)(A)(i).

23.    Asylum officers conduct interviews of aliens so referred. If an asylum officer determines that an alien has a credible fear of persecution, then "the alien shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(i)-(ii).

24.    If the asylum officer "determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I). However, an alien can request a review by an immigration judge of a negative credible fear finding, which "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* § 1225(b)(1)(B)(iii)(III).

25.    Aliens "who establish credible fear generally must have their asylum claims decided through an adversarial removal proceeding" before an immigration judge. Dept. of Homeland Sec., *Proposed Rule: Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 86 Fed. Reg. 46,906, 46,908 (Aug. 20, 2020).

26.    This "system for processing protection claims made by individuals encountered at or near the border and who establish credible fear was originally adopted in 1997." 87 Fed. Reg. at 18,090.

27.    The Homeland Security Act of 2002 "charged the Secretary 'with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens,' . . . and granted the power to take all actions 'necessary for carrying out' the Secretary's authority under the immigration laws." *Id.* at 46,911.

28.    The Homeland Security Act did not transfer all immigration functions to DHS. The Attorney General retained

> such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

8 U.S.C. § 1103(g)(1). And so, for approximately 25 years, the process for aliens subject to expedited removal, but who have established a credible fear of persecution, has involved adjudication by an immigration judge.

## B. The Parole Authority.

29.    The INA sets forth the specific instances where the government may use its authority to parole individuals into the United States who otherwise would not be lawfully permitted to enter, or who are otherwise subject to mandatory detention. *See*

8 U.S.C. § 1182(d)(5). Specifically, Congress has directed that parole may be granted only on a case-by-case basis, and even then only for "urgent humanitarian reasons or significant public benefit." *Id.* § 1182(d)(5)(A); *Texas v. Biden* (*Texas MPP*), 20 F.4th 928, 947 (5th Cir. 2021).[1]

30.     Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, **parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States.** This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

31.     Congress also emphasized that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee." 8 U.S.C. § 1182(d)(5)(B); *see also Texas MPP*, 20 F.4th at 994.

---

[1]   Indeed, a release for anything other than "urgent humanitarian reasons" or "significant public benefit"—that is, something more than a mere preference not to detain—would be an improper use of the parole authority under Section 1182 and therefore illegal. And some aliens are subject to mandatory detention without parole. For example, aliens whose asylum claims have not been adjudicated and aliens who have claimed asylum but been found not to have a credible fear of persecution must be detained until the completion of their proceedings or removal. *See* 8 U.S.C. § 1225(b)(1)(B). Accordingly, absent a proper invocation of section 1182, which must be done on a case-by-case basis, any premature release of an alien claiming asylum is illegal under section 1225.

32.     As the Fifth Circuit recently noted, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *Texas MPP*, 20 F.4th at 947. But the power is not unlimited: "DHS cannot use that power to parole aliens *en masse*; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA." *Id.* at 997.

## C. Immigration Judges.

33.     An immigration judge is "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section [240 of the INA]." 8 U.S.C. § 1101(b)(4) (emphasis added); *see also* 8 C.F.R. § 1001.1(l). The Attorney General personally appoints each immigration judge after a rigorous application and interview process.

34.     In hearings conducted to "decid[e] the inadmissibility or deportability of an alien"—which are the "sole and exclusive procedure for determining whether an alien may be admitted to . . . or . . . removed from the United States"—immigration judges are empowered with substantial authority. 8 U.S.C. § 1229a(a)(1), (3). Congress specifically directed that:

> The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this chapter.

*Id.* § 1229a(b)(1).

35.     Immigration judges' decisions are final unless appealed to the Board of Immigration Appeals. *See* 8 C.F.R. § 1241.1. The Board's decisions are final, but aliens may file petitions for review with federal circuit courts of appeals.

**D. Asylum Officers.**

36.     An "asylum officer," for the purposes of the expedited removal statute, is an immigration officer who "has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 [of the INA]" and who "is supervised by [an officer with such training] and has had substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E)

37.     Asylum officers, in contrast to immigration judges, are members of the general civil service. They are not appointed by a principal officer, such as the Director of USCIS or the Secretary of DHS. *See, e.g.*, USA Jobs, Supervisory Asylum Officer, https://www.usajobs.gov/job/650440400 (last visited April 25, 2022).

**E. The Appointments Clause.**

38.     The Appointments Clause sets forth the "exclusive means of appointing 'Officers.' Only the President, a court of law, or a head of department can do so. *See* U.S. Const. art. II, § 2, cl. 2." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018).

39.     The Supreme Court has explained:

> Under the Constitution, "[t]he executive Power" is vested in the President, who has the responsibility to "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; § 3. The President may be assisted in carrying out that responsibility by officers nominated by him and confirmed by the Senate, as well as by other officers not appointed in that manner but whose work, we have held, must be directed and supervised by an officer who has been. *Id.* § 2, cl. 2.

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1976 (2021).

40.    "Officers of the United States" are persons with "significant authority" that they exercise "pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 125-26 & n.162 (1976) (per curiam).

41.    Principal officers must be directly appointed by the President with the advice and consent of the Senate. *Arthrex*, 141 S. Ct. at 1979. Inferior officers can be appointed in the same manner or by appointment by a principal officer. *Id.* "Whether one is an 'inferior' officer depends on whether he has a superior," *Edmond v. United States*, 520 U.S. 651, 662 (1997), that is, "a superior other than the President," *Arthrex*, 141 S. Ct. at 1980.

42.    Whether principal or inferior, a person not properly appointed as an Officer of the United States has no authority to act, and that purported officer's actions have no legal effect. *See Buckley*, 424 U.S. at 142 ("Such functions may be discharged only by persons who are 'Officers of the United States.'"); *Ryder v. United States*, 515 U.S. 177, 185 (1995) ("Appointments Clause challenge[s] . . . invalidate[] actions taken pursuant to defective title."); *see also Lucia*, 138 S. Ct. 2044 (actions of an improperly appointed administrative law judge are void).

**F. The NPRM.**

43.    On August 20, 2021, the Defendants published a Notice of Proposed Rulemaking ("NPRM") to make sweeping changes to the current credible-fear process and the ways in which asylum officers and the immigration courts handled protection claims for matters originating at the border. 86 Fed. Reg. at 46,906.

44.    Under the premise of reducing the immigration-court backlog, the NPRM sought to transfer much of the post-credible-fear process from the Immigration Courts to USCIS. The NPRM sought to justify this change by alleging it would "streamline" the process on the front end, placing most adjudicative burdens on USCIS.

45.    The NPRM proposed numerous other changes to the regulations related to processing asylum and related claims at the southwest border. As summarized by the Defendants in the subsequent Interim Rule, the proposed revisions "fell into five main categories."

- "First, individuals subject to expedited removal and found to have a credible fear of persecution or torture would have their claims for asylum, withholding of removal . . . or Convention Against Torture . . . protection initially adjudicated by USCIS following a nonadversarial interview before an asylum officer." 87 Fed. Reg. at 18079–80.

- "Second, individuals granted protection by USCIS would be entitled to asylum, statutory withholding of removal, or protection under the [Convention Against Torture], as appropriate, without further adjudication." *Id.* at 18,080.

- "Third, individuals not granted protection would be ordered removed by the asylum officer but would have the ability to seek prompt, de novo review with an immigration judge . . . through a newly established procedure, with appeal available to the Board of Immigration Appeals . . . and the Federal courts." *Id.*

- "Fourth, individuals placed in expedited removal proceedings would be eligible for consideration for parole . . . if DHS determined, in the exercise of its discretion and on a case-by-case basis, that parole is warranted because, inter alia, detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities)." *Id.*

- "Finally, the NPRM proposed to restore the expedited removal framework and credible fear screening processes that were in place

before various regulatory changes made from late 2018 through late 2020." *Id.*

46.    The NPRM placed nearly all administrative burdens on the government rather than the alien, including by removing any filing requirements for underlying applications for protection. 86 Fed. Reg. at 46,941.

47.    During the 60-day comment period following the NPRM, DHS received more than 5,200 comments, including comments from Texas and other states.[2]

**G. The Interim Rule**

48.    The Defendants issued an Interim Rule on March 29, 2022. 87 Fed. Reg. 18,078. The Defendants adopted much of the NPRM but made "23 changes to the regulatory provisions proposed in the NPRM, many of which were recommended or prompted by commenters." *Id.* at 18,081.

49.    The Interim Rule made the following changes to what had been proposed in the NPRM:

1. It allowed USCIS in its discretion to "reconsider a negative credible fear finding with which an [immigration judge] has concurred." *Id.*

2. It allowed aliens to provide additional information to asylum officers after their credible fear interviews. *Id.*

3. It permitted USCIS to "further consider the asylum application of [an alien] found to have a credible fear." *Id.*

4. If an alien's "case is retained by USCIS for an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on

---

[2]    *See* Letter dated October 19, 2021, *available at* https://www.ag.state.la.us/Files/Article/12970/Documents/DHSAsylumcommentletter16states-FINAL.pdf.

the applicant's eligibility for statutory withholding of removal and [Convention Against Torture] protection." *Id.* at 18,081–82.

5. "USCIS shall not schedule an Asylum Merits interview for further consideration of an asylum application" fewer than 21 days after a credible fear finding, but no later than 45 days. *Id.* at 18,082.

6. It includes language "not included in the NPRM's proposed regulatory text related to USCIS's discretion to limit the length of a statement or comment and require its submission in writing." *Id.*

7. It did not require verbatim audio or video recordings, but required "that the interview will be recorded and a verbatim transcript of the interview shall be included in the record." *Id.*

8. It specified that delays due to the unavailability of an interpreter would not count against the alien for the purposes of employment authorization and that asylum officers must generally arrange for interpreters at asylum interviews. *Id.*

9. Contrary to the NPRM's proposal, it stated that an alien's failure to appear for an asylum interview would not result in the issuance of a removal order. Instead, it "may result in referral of the [alien] to section 240 removal proceedings before an [immigration judge] as well as dismissal of the asylum application." *Id.*

10. It allowed "for consideration for parole of [aliens] in expedited removal or in expedited removal with pending credible fear determinations." *Id.*

11. It made a technical amendment. *Id.*

12. It made technical amendments, including one "to establish the regulatory authority for consideration for parole of [aliens] whose asylum applications are retained by USCIS for further consideration following a positive credible fear determination." *Id.*

13. It revised language from the NPRM to "emphasize that asylum officers' decisions on approval, denial, referral, or dismissal of an asylum application remain subject to review within USCIS, and . . . to make clear that an asylum applicant described in 8 C.F.R. 208.14(c)(4)(ii)(A), if not granted asylum, may first be placed into expedited removal and receive a positive credible fear screening before being referred to an IJ." *Id.*

50. The Interim Rule also made changes to DOJ's regulations:

14. Rather than "adopt[] the NPRM's proposal to create a new IJ review process when USCIS does not grant asylum" or "require[] the applicant to affirmatively request such review," the Interim Rule "requires DHS to refer [aliens] whose applications for asylum are not granted to section 240 removal proceedings by issuing a Notice to Appear ('NTA')." *Id.*

15. Rather than "adopt the NPRM's proposed evidentiary limitations, which would have required the [alien] to demonstrate that any additional evidence or testimony to be considered by the IJ was not duplicative of that considered by the asylum officer and was necessary to fully develop the record," the Interim Rule adopted deadlines for the submission of evidence.

16. "[S]treamlined section 240 removal proceedings for cases covered by the new [process], where the USCIS Asylum Merits interview record is transmitted to EOIR for review, will generally be adjudicated under an expedited timeline." *Id.* "Additionally, as in the NPRM, this rule does not require the respondent to complete and file a new asylum application, but instead provides that the record of the positive credible determination shall be treated as satisfying the application filing requirements subject to any supplementation or amendment[.]" *Id.*

17. It requires immigration judges to hold status conferences. *Id.* And it imposes requirements on DHS "if DHS will participate in the case." *Id.*

18. Even if an alien "choose[s] to concede removability and not seek asylum," the immigration judge must, "with a limited exception, give effect to a determination by an asylum officer that the respondent is eligible for statutory withholding of removal or protection under the [Convention Against Torture]." *Id.* Further, "DHS may not appeal [such] a grant of statutory withholding of removal or protection . . . except to argue that the IJ should have denied the application(s) based on certain evidence."

19. It "establishes standards for continuances during these streamlined section 240 removal proceedings." *Id.*

20. It allows the immigration judge, in certain circumstances, to "decide the respondent's application without holding a merits hearing, including where neither party has elected to provide testimony and DHS has declined to cross-examine the respondent or where the IJ intends to grant the application and DHS has not elected to examine the respondent or present evidence or witnesses." *Id.*

21. If "the asylum officer does not grant asylum but determines the respondent is eligible for statutory withholding of removal or [Convention Against Torture] relief, and where the IJ subsequently denies asylum and issues a removal order, the IJ shall generally give effect to the asylum officer's determination(s)." *Id.*

22. The Interim Rule sets forth all kinds of exceptions from the procedures and timelines in the new regulations, generally always inuring to the alien's benefit. *Id.*

23. The rule makes technical edits to DOJ's regulations. *Id.*

51. In summary, the Interim Rule transfers significant authority from immigration judges to asylum officers, grants those asylum officers significant

additional authority, limits immigration-judge review to denials of applications, and upends the entire adjudicatory system to the benefit of aliens.

**H. Irreparable Harms to Texas.**

52.     Texas spends significant amounts of money providing services to illegal aliens because of the United States government's failure to enforce federal law. Those services include education services and healthcare, as well as many other social services. Federal law requires Texas to include illegal aliens in some of these programs. As the number of illegal aliens in Texas increases, the number of illegal aliens receiving such services likewise increases.

53.     For example, the Emergency Medicaid program provides health coverage for low-income children, families, seniors and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

54.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

55.     The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

56.     Texas spends hundreds of millions of dollars each year for uncompensated care provided by state public hospital districts to illegal aliens.

57.     Also, Texas spends tens of millions of dollars each year for increased law enforcement, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder, due to illegal immigration.

58.     If the Defendants are allowed to continue admitting illegal aliens into the United States in violation of federal law, then the harm will only grow over time. As DHS and federal courts have found, incentives matter: reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *See, e.g.*, *Texas v. Biden*, No. 2:21-cv-67, 2021 WL 3603341, at \*6, \*18–19 (N.D. Tex. Aug. 13, 2021); *see also, e.g.*, *Texas MPP*, 20 F.4th at 1002.

59.     This increase places a strain on Texas's resources and ability to provide essential services, such as emergency medical care, education, driver's licenses, and other public safety services.

60.     Texas cannot recover costs from the federal government for the increase in costs, which it would otherwise not incur if the federal government enforced the law. This affects Texas's sovereign interests in its territory and its ability to properly carry out such interests on behalf of the citizens of the State.

## IV. Claims for Relief

61.     The Administrative Procedure Act, 5 U.S.C. § 706, empowers the Court to decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. It also empowers—indeed, requires—the Court to hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law.

62.     The Interim Rule should be held unlawful and set aside for at least five reasons.

## A. Contrary to law—Homeland Security Act.

63.    The Defendants' use of asylum officers to adjudicate final asylum claims after a credible fear interview violates the Homeland Security Act of 2002. That act requires that aliens whom asylum officers find to have a credible fear are nonetheless detained while their asylum applications are determined before an immigration judge. The Interim Rule usurps that authority from immigration judges and invests it in asylum officers. The Interim Rule is therefore contrary to law and should be held unlawful and set aside.

## B. Contrary to law—exceeds authority authorized by statute.

64.    The Defendants' Interim Rule exceeds their lawful parole authority under 8 U.S.C. § 1182(d)(5). The Defendants' parole authority is limited to cases involving "urgent humanitarian reasons or significant public benefit," which must be determined on a case-by-case basis. *Id.* The Interim Rule, however, allows for parole merely because the Defendants determine detention to be "impracticable." The Interim Rule is therefore contrary to law and should be held unlawful and set aside.

## C. Contrary to Constitutional power—Appointments Clause.

65.    The Interim Rule should be held unlawful and set aside because it violates the Appointments Clause and is therefore contrary to Constitutional power.

66.    Asylum officers are officers with significant authority and discretion that they exercise "pursuant to the laws of the United States." *Buckley* 424 U.S. at 125–26 & n.162. They "hold a continuing office established by law." *Lucia*, 138 at 2053. They do not have "episodic" or temporary appointments. Their positions are career positions created and defined by statute. 8 U.S.C. § 1225(b)(1)(E); *see also* 8 C.F.R. § 208.1(b).

67.    The Interim Rule empowers asylum officers to preside over hearings. At the end of the hearings, the asylum officer may decide whether an alien is granted or

denied asylum. If the alien is denied, then he or she "would have the ability to seek prompt, de novo review with an immigration judge ('IJ') in EOIR through a newly established procedure, with appeal available to the Board of Immigration Appeals ('BIA') and the Federal courts." 87 Fed. Reg. at 18,080. But if the application for asylum is granted, there is no review. *See id.* ("[I]ndividuals granted protection by USCIS would be entitled to asylum, statutory withholding of removal, or protection under the CAT, as appropriate, without further adjudication.").

68.     Contrary to immigration judges, who are appointed by the Attorney General, asylum officers are not appointed by the Director of USCIS or the Secretary of Homeland Security. Nor are the asylum officers supervised by or directly accountable to other officers of the United States.

69.     The transfer of adjudicatory authority from properly appointed officers of the United States to those who do qualify as officers of the United States violates the Appointments Clause.

**D. Arbitrary and capricious decision-making.**

70.     The Defendants' conclusion that the asylum-application rate will not increase is unreasoned and supported by no evidence.

71.     The Defendants' conclusion that the rule will only reduce the number of cases referred to the Executive Office of Immigration Review by 11,250 to 45,000 cases a year, compared with a pending caseload of approximately 1.3 million cases, renders the underlying rationale for the rule arbitrary and capricious when considering the significant costs associated with implementing the Interim Rule.

72.     The Defendants' actual ability to remove aliens whom they parole from their custody into the United States, which increases the number of aliens determined to be removable who are on parole rather than detained, is a relevant fact that the Defendants did not consider in promulgating the Interim Rule.

73. The Defendants' conclusion that the Interim Rule does not provide incentives to file meritless asylum applications is unreasoned.

74. The Defendants failed to consider all available, reasonable alternatives, such as resuming the Migrant Protection Program that they had earlier terminated.

75. The Defendants' elimination of the obligation to file asylum applications and conclusion that evidence that "documented testimony provided under oath to an asylum officer during the credible fear interview" was superior to evidence adduced in a proceeding before an immigration judge was unreasoned and unexplainedly inconsistent with requirements imposed upon other aliens who apply for asylum.

76. The Defendants did not consider and account for Texas's reliance on their continued enforcement of federal immigration statutes.

77. For each of these reasons, the Interim Rule is arbitrary and capricious, and the Court should hold it unlawful and set it aside.

**E. Lack of notice and comment.**

78. The Interim Rule is not a logical outgrowth of the rule proposed in the NPRM. The number, scope, and content of the changes resulted in a new rule that a reasonable person reviewing the NPRM could not have concluded was under consideration. The Defendants were required to furnish notice that they were considering this new rule and to accept and consider comments on it before promulgating it. By failing to do so, they violated the APA, and the Interim Rule must therefore be held unlawful and set aside.

## V. Prayer for Relief

Texas respectfully requests that the Court:

- Stay, postpone, or preliminarily enjoin the Defendants' implementation of the Interim Final Rule;

- Following a trial on the merits, decree that the Interim Final Rule was issued in violation of the APA, hold it unlawful, set it aside, and remand it for further consideration or, in the alternative, permanently enjoin the Defendants from implementing it;
- Award Texas its attorneys' fees and costs of court; and
- Award Texas all other relief to which it may be entitled.

Dated April 28, 2022.                    Respectfully submitted.

KEN PAXTON                               */s/ Aaron F. Reitz*
Attorney General of Texas                AARON F. REITZ
                                         *Lead Counsel*
BRENT WEBSTER                            Deputy Attorney General for Legal Strategy
First Assistant Attorney General         Texas Bar No. 24105704
                                         aaron.reitz@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL           CHRISTOPHER D. HILTON
P.O. Box 12548                           Chief, General Litigation Division
Austin, Texas 78711-2548                 Texas Bar No. 24087727
(512) 936-1700                           christopher.hilton@oag.texas.gov

                                         LEIF A. OLSON
                                         Special Counsel
                                         Texas Bar No. 24032801
                                         leif.olson@oag.texas.gov

                                         GENE P. HAMILTON
                                         America First Legal Foundation
                                         300 Independence Avenue SE
                                         Washington, DC 20003
                                         (202) 964-3721
                                         info@aflegal.org

                                         *Counsel for the State of Texas*