## United States District Court
## Northern District of Texas
## Amarillo Division

STATE OF TEXAS,
    *Plaintiff,*

v.

ALEJANDRO MAYORKAS, in his official
    capacity as Secretary of Homeland
    Security, *et al.*,
        *Defendants.*

Case 2:22-cv-00094

## <u>Brief in Support of Plaintiff's Motion for Preliminary Injunction</u>

Dated May 23, 2022.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Respectfully submitted,

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

GENE P. HAMILTON
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

# **Contents**

I. Introduction...................................................................................8

II. Facts...........................................................................................8

    A.    Expedited removal and credible fear screenings. ........................8

    B.    Immigration judges and asylum officers.....................................11

    C.    The Appointments Clause. ........................................................12

    D.    Parole...........................................................................................13

    E.    The Notice of Proposed Rulemaking and the Interim Final Rule. ...................................................................................14

        1.    The NPRM and the States' comment. ..............................14

        2.    The Interim Final Rule. ...................................................15

    F.    Costs that illegal immigration imposes upon Texas. .................17

        1.    Driver's licenses...............................................................17

        2.    Education...........................................................................17

        3.    Healthcare. .......................................................................18

        4.    Law enforcement and correctional costs .........................19

III. Standard....................................................................................20

IV. Argument...................................................................................21

    A.    Texas is Likely to Succeed on the Merits...................................21

        1.    The Interim Final Rule violates the Homeland Security Act. ..................................................................................22

        2.    The Interim Final Rule violates the Appointments Clause. .............................................................................26

        3.    The Interim Final Rule violates the parole authority. ....28

        4.    The Interim Final Rule is arbitrary and capricious. .......31

    B.    Without a preliminary injunction, Texas will suffer irreparable harm. .........................................................................................35

    C.    The balance of the equities and public interest favor Texas......37

V. Conclusion .................................................................................38

**Cases**

*Abbott Laboratories v. Gardner*
  387 U.S. 136 (1967) ..................................................................20

*Alabama Assn. of Realtors v. Dept. of Health & Human Servs.*
  141 S. Ct. 2485 (2021) ..............................................................38

*Bostock v. Clayton County*
  140 S. Ct. 1731 (2020) ..............................................................22

*Buckley v. Valeo*
  424 U.S. 1 (1976) ..........................................................13, 26, 28

*City of Arlington, Tex. v. FCC*
  569 U.S. 290 (2013) ..................................................................21

*Clark v. Martinez*
  543 U.S. 371 (2005) ..................................................................28

*Corley v. United States*
  556 U.S. 303 (2009) ..................................................................24

*Daniels Health Sciences LLC v. Vascular Health Sciences LLC*
  710 F.3d 579 (5th Cir. 2013) ......................................................38

*Dept. of Homeland Security v. Regents of the Univ. of California*
  140 S. Ct. 1891 (2020) ....................................................20, 21, 32

*Dept. of Homeland Security v. Thuraissigiam*
  140 S. Ct. 1959 (2020) ................................................................9

*Edmond v. United States*
  520 U.S. 651 (1997) ............................................................26, 27

*Encino Motorcars, LLC v. Navarro*
  579 U.S. 211 (2016) ..................................................................32

*Freytag v.Commissioner*
  501 U.S. 868 (1991) ..................................................................27

*Hibbs v. Winn*
  542 U.S. 88 (2004) ....................................................................24

*Janvey v. Alguire*
    647 F.3d 585 (5th Cir. 2011) ..........................................................................20

*Jennings v. Rodriguez*
    138 S. Ct. 830 (2018) ..................................................................................29

*Lucia v. S.E.C.*
    138 S. Ct. 2044 (2018) ........................................................................ passim

*Make the Road New York v. Wolf*
    962 F.3d 612 (D.C. Cir. 2020) ....................................................................23

*Maryland v. King*
    567 U.S. 1301 (2012) ..................................................................................35

*Michigan v. EPA*
    576 U.S. 743 (2015) ....................................................................................21

*Motor Vehicle Mfrs. Assn. of U.S. Inc. v. State Farm Mutual Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...............................................................................21, 31

*Natl. Federation of Independent Businesses v. Dept. of Labor*
    142 S. Ct. 661 (2022) ..................................................................................21

*New Prime, Inc. v. Oliveira*
    139 S. Ct. 532 (2019) ..................................................................................25

*Nken v. Holder*
    556 U.S. 418 (2009) ....................................................................................37

*Ryder v. United States*
    515 U.S. 177 (1995) ....................................................................................13

*Sturgeon v. Frost*
    577 U.S. 424 (2016) ....................................................................................24

*Texas v. Biden ("Texas MPP dist. ct.")*
    554 F. Supp. 3d 818 (N.D. Tex. 2021)........................................14, 33, 34, 36

*Texas v. Biden ("Texas MPP Stay")*
    10 F.4th 538 (5th Cir. 2021)...................................................................37, 38

*Texas v. Biden ("Texas MPP")*
20 F.4th 928 (5th Cir. 2021)......................................................14, 31, 34, 36

*Texas v. Biden ("Texas Title 42")*, No. 4:21-cv-0579
2022 WL 658579 (N.D. Tex. Mar. 4, 2022)........................................... passim

*Texas v. United States ("Texas DAPA")*
809 F.3d 134 (5th Cir. 2015) ............................................................17, 36, 37

*Texas v. United States*
524 F. Supp. 3d 598 (S.D. Tex. 2021) ...............................................20, 21, 36

*Texas v. United States*
555 F. Supp. 3d 351 (S.D. Tex. 2021) ...........................................................37

*Texas v. United States*
86 F. Supp. 3d 591 (S.D. Tex. 2015) .............................................................36

*United States v. Arthrex, Inc.*
141 S. Ct. 1970 (2021) ...............................................................................13, 27

*United States v. Escobar,* No. 2:17-cr-529
2017 WL 5749620 (S.D. Tex. Nov. 28, 2017) ...............................................37

*United States v. Martinez-Fuerte*
428 U.S. 543 (1976) .......................................................................................37

*Utility Air Regulatory Grp. v. EPA*
573 U.S. 302 (2014) .......................................................................................20

*Valley v. Rapides Parish School Bd.*
118 F.3d 1047 (5th Cir. 1997) .......................................................................37

*Wages & White Lion Investments, L.L.C. v. U.S. Food & Drug Admin.*
16 F.4th 1130 (5th Cir. 2021).........................................................................32

*Washington v. Reno*
35 F.3d 1093 (6th Cir. 1994) .........................................................................37

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ...........................................................................................37

**Statutes**

5 U.S.C. § 705 ..................................................................................38

5 U.S.C. § 706 ..................................................................................20

8 U.S.C. § 1101 .................................................................................11

8 U.S.C. § 1103 ...........................................................................11, 22

8 U.S.C. § 1158 ..................................................................9, 11, 12, 25

8 U.S.C. § 1182 ........................................................................ passim

8 U.S.C. § 1225 ........................................................................ passim

8 U.S.C. § 1229a ...................................................................... passim

**Other Authorities**

Comment of State Attorneys General
   DHS Rulemaking Docket USCIS-2021-0012, cmt. no. 4980 (Oct. 21, 2021)
   *available at* regulations.gov/comment/USCIS-2021-0012-4980 ............14, 15

David A. Martin, *Immigration Policy and the Homeland Security Act
   Reorganization: An Early Agenda for Practical Improvements*, 80
   Interpreter Releases 601, 604 (Apr. 28, 2003) ...........................................23

H.R. Rep. No. 104-469 (1996)....................................................................14, 30

**Rules**

*Inspection and Expedited Removal of Aliens; Detention and Removal of
   Aliens; Conduct of Removal Proceedings; Asylum Procedures*
   62 Fed. Reg. 10,312 (Mar. 6, 1997) .......................................................22, 24

*Procedures for Credible Fear Screening and Consideration of Asylum,
   Withholding of Removal, and CAT Protection Claims by Asylum Officers*
   86 Fed. Reg. 46,906 (Aug. 20, 2020) ............................................................14

*Procedures for Credible Fear Screening and Consideration of Asylum,
   Withholding of Removal, and CAT Protection Claims by Asylum Officers*
   87 Fed. Reg. 18,078 (Mar. 29, 2022). .................................................... passim

**Regulations**

42 C.F.R. § 440.255......................................................................18

8 C.F.R. § 1003.0.........................................................................12

8 C.F.R. § 1003.10........................................................................12

8 C.F.R. § 1208.2..............................................................10, 11, 22

8 C.F.R. § 208.1............................................................................27

8 C.F.R. § 208.14..........................................................................27

8 C.F.R. § 208.3...................................................................10, 17

8 C.F.R. § 208.9............................................................................27

8 C.F.R. § 212.5............................................................................30

8 C.F.R. § 235...............................................................................30

8 C.F.R. § 235.6............................................................................10

8. C.F.R. § 208.2...............................................................10, 11, 22

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1......................................................13

U.S. Const. art. II, § 2, cl. 2.................................................12, 13

U.S. Const. art. II, § 3 ..............................................................13

**Federal Register entries**

62 Fed. Reg. 444 (Jan. 3, 1997).................................................24

# I. Introduction

The Defendants promulgated a rule beset by fatal flaws: It contradicts Congress's commands, and it invests power in individuals who aren't authorized to wield it. They did so despite having those flaws pointed out—and despite having Texas and other States specifically identify the millions upon millions of dollars of costs that the rule would impose on them. And even that was not enough: Despite this Court having ruled otherwise not even a year ago, they proclaim that the perverse incentives they are creating can't exist; that if they can exist, they won't; and that even if they do, their new Rube Goldberg is at least no worse than what it's replacing.

This is how the Defendants' mutation of the asylum-application system comes before the Court: As if on a dare to contradict the Court's earlier rulings as thoroughly as possible. The immigration laws do not give the Defendants permission to give themselves permission to change the immigration laws to their liking—Congress has put laws into place that the Defendants must follow, and those laws do not permit wholesale usurpation of powers that must be exercised by constitutionally appointed officers. The Defendants' Interim Final Rule permitting them to grant asylum at their leisure is illegal, and the Court should enjoin them from implementing it.

# II. Facts

## A. Expedited removal and credible fear screenings.

The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, charge the Department of Homeland Security ("DHS") with enforcing the United States' immigration laws. Under those laws, "several classes of aliens are 'inadmissible' and therefore 'removable.'" *Dept. of Homeland Sec. v.*

*Thuraissigiam*, 140 S. Ct. 1959, 1964 (2020) (citing 8 U.S.C. §§ 1182, 1229a(e)(2)(A). Among these are aliens who lack a valid entry document when they apply for admission. 8 U.S.C. § 1182(a)(7)(A)(i)(l). Applicants for admission include both aliens who arrive in the United States and aliens who are present in the United States without having been lawfully admitted, who are deemed to have applied for admission. 8 U.S.C. § 1225(a)(1).

Congress created expedited procedures for removing aliens who are "present in the United States who [have] not been admitted" and to aliens "who arrive[] in the United States (whether or not at a designated port of arrival[.]" 8 U.S.C. § 1225(a)(1). These aliens are subject to expedited removal if they (1) are inadmissible because they lack a valid entry document; (2) have not been continuously physically present in the United States for the two years preceding their inadmissibility determination; and (3) are among those whom the Secretary of Homeland Security has designated for expedited removal. *Id.* § 1225(b)(1)(A). Once an immigration officer, such as a Border Patrol Agent, determines that such an alien is inadmissible, the alien must be ordered "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

If the alien "indicates either an intention to apply for asylum . . . or a fear of persecution," the officer shall refer the alien for an interview by an asylum officer[.]" *Id.* § 1225(b)(1)(A)(i). This interview, called a credible-fear interview, is the first step in the process by which the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum" who otherwise would be removed from the country. *Id.* § 1158(b)(1)(A). Asylum officers, employed by U.S. Citizenship and Immigration Services ("USCIS"), conduct these interviews. *Id.* § 1225(b)(1)(B). If the asylum officer determines after the interview that the alien has a credible fear of

9

persecution—that is, that "there is a significant possibility . . . that the alien could establish eligibility for asylum," *id.* § 1225(b)(1)(B)(v)—"the alien shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). If the asylum officer "determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I).

If the asylum officer has made a credible-fear finding for the alien, the further consideration of the asylum application occurs in a removal proceeding before an immigration judge. *Id.* § 1229a(a)(1). These proceedings are "the sole and exclusive procedure for determining whether an alien may be admitted to the United States[.]" *Id.* § 1229a(a)(3). The alien prompts this further review by filing an application for asylum, 8 C.F.R. § 208.3(a), over which the immigration judge has exclusive jurisdiction, *id.* § 208.2(c)(1), 1208.2(c)(1)(ix). Otherwise, the alien's case proceeds based on the immigration officer's mandatory referral to an immigration judge. *Id.* § 235.6(a)(2)(iii)

If the asylum officer makes a negative credible-fear finding, the alien can request review by an immigration judge, which "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination[.]" 8 U.S.C. § 1225(b)(1)(B)(iii)(III). Those aliens "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Id.* § 1225(b)(1)(B)(iii)(IV).

This "system for processing protection claims made by individuals encountered at or near the border and who establish credible fear was originally adopted in 1997" following enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Appx. 14; *see* Pub. L. 104-208, 110 Stat. 3009, div. C (Sep. 30, 1996). That has remained true even

10

following the Homeland Security Act, which created DHS and charged it "with the administration and enforcement of [the asylum-application process] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

The Homeland Security Act did not transfer all immigration authority and functions to DHS. Rather, the Attorney General retained:

> such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

8 U.S.C. § 1103(g)(1). Authorities and functions exercised by EOIR before the act, that is, remained with EOIR—including the adjudication of asylum claims following a credible fear finding, as noted in the Defendants' own regulations. *See* 8 C.F.R. § 1208.2(c)(1)(ix); 8 C.F.R. § 208.2(c)(1)(ix).[1]

## B. Immigration judges and asylum officers.

Each immigration judge is "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including [hearings] under section [240 of the INA]." 8 U.S.C. § 1101(b)(4). "Immigration judges . . . act as the Attorney General's delegates in the cases that come before them" and "exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation." 8 C.F.R.

---

[1]  Asylum claims filed by unaccompanied alien children are an exception. Under the Trafficking Victims Protection Reauthorization Act of 2008, USCIS has initial jurisdiction to adjudicate those claims. *See* 8 U.S.C. § 1158(b)(3)(C).

§ 1003.10(a), (b). They operate as part of EOIR, the Director of which oversees the delegates who exercise the Attorney General's authority to determine whether aliens are removable from the United States. *See id.* § 1003.0 *et seq.*

In removal hearings, immigration judges "decid[e] the inadmissibility or deportability of [the] alien." 8 U.S.C. § 1229a(a)(1). As discussed, these hearings are the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." *Id.* § 1229a(a)(3). Beyond the power to conduct these hearings, immigration judges are empowered by Congress to "administer oaths, receive evidence, and interrogate, examine and cross-examine . . . any witnesses." Immigration judges may also issue subpoenas and impose monetary sanctions. *Id.* § 1229a(b)(1).

In contrast, asylum officers are members of the civil service who have received specialized training and possesses experience in adjudicating asylum applications. *See id.* § 1225(b)(1)(E)(i). They adjudicate asylum applications filed by aliens *not* in removal proceedings. *See id.* § 1158. Their decisions are not subject to review by, and they are not appointed by, the Director of USCIS or the Secretary of Homeland Security, and they are not appointed by the Director of USCIS or the Secretary of Homeland Security. Rather, they are supervised by officers who have "had substantial experience adjudicating asylum claims." *Id.* § 1225(b)(1)(E)(ii).

**C. The Appointments Clause.**

The Appointments Clause establishes the "exclusive means of appointing 'Officers.' Only the President, a court of law, or a head of department can do so." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018) (citing U.S. Const. art. II, § 2, cl. 2). As the Supreme Court has explained:

> Under the Constitution, '[t]he executive Power' is vested in the
> President, who has the responsibility to 'take Care that the
> Laws be faithfully executed.' Art. II, § 1, cl. 1; § 3. The
> Appointments Clause provides that he may be assisted in
> carrying out that responsibility by officers nominated by him
> and confirmed by the Senate, as well as by other officers not
> appointed in that manner but whose work, we have held, must
> be directed and supervised by an officer who has been. § 2, cl. 2.

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1976 (2021).

Officers of the United States are officers with "significant authority" that they exercise "pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 125–26 & n.162 (1976). Whether principal or inferior, unless properly appointed, an individual whose duties render them as an "officer of the United States" has no authority to act, and their actions have no legal effect. *See Buckley,* 424 U.S. at 142 ("Such functions may be discharged only by persons who are "Officers of the United States"); *Ryder v. United States*, 515 U.S. 177, 185 (1995) ("Appointments Clause challenge[s] . . . invalidate[] actions taken pursuant to defective title"); *see generally Lucia*, 138 S. Ct. 2044 (actions of an improperly appointed administrative law judge are void).

**D.  Parole.**

The Secretary of Homeland Security may parole into the United States an otherwise inadmissible alien. *See* 8 U.S.C. § 1182(d)(5). But he may do so only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit." *Id.* § 1182(d)(5)(A). Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, because:

> The text of section 212(d)(5) is clear that the parole authority
> was intended to be used on a case-by-case basis to meet specific
> needs, and not as a supplement to Congressionally-established
> immigration policy. In recent years, however, parole has been

> used increasingly to admit entire categories of aliens who do
> not qualify for admission under any other category in
> immigration law, with the intent that they will remain
> permanently in the United States. This contravenes the intent
> of section 212(d)(5), but also illustrates why further, specific
> limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

The Fifth Circuit has made it clear that this authority is reserved, as Congress said, for case-by-case considerations and is not intended to be used for classes, or masses, of people. *Texas v. Biden ("Texas MPP")*, 20 F.4th 928, 947 (5th Cir. 2021). This Court noted as much in the decision the Fifth Circuit upheld. *Texas v. Biden ("Texas MPP dist. ct.")*, 554 F. Supp. 3d 818, 852 n.11 (N.D. Tex. 2021).

## E. The Notice of Proposed Rulemaking and the Interim Final Rule.

### 1. The NPRM and the States' comment.

In August 2021, the Defendants issued a Notice of Proposed Rulemaking *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 86 Fed. Reg. 46,906 (Aug. 20, 2020). The proposed rule would make several changes in the procedures the Defendants use to receive, evaluate, and grant asylum applications. In addition, it would change the standards that the Defendants use for determining whether to grant parole to an alien who applies for asylum.

A coalition of State attorneys general, including Texas's, commented on the proposed rule. *See* Appx. 150–168, DHS Rulemaking Docket USCIS-2021-0012, cmt. no. 4980 (Oct. 21, 2021), *available at* regulations.gov/comment/USCIS-2021-0012-4980. The comment raised several concerns about the proposed rule, including that the proposed rule would:

- "[E]ncourage *more* non-citizens to seek asylum" by increasing the odds of receiving a positive credible-fear finding, thereby making "the Border crisis worse by encouraging non-citizens living abroad to make their way to the United States" and "increas[ing] the statistical likelihood of non-meritorious asylum claims and illegal entry overall." Appx. 152–53. One specific such inducement would be "treat[ing] a positive credible-fear finding . . . as a properly filed asylum application that starts the clock for eligibility to file for work authorization," thereby "speeding up the process by which a non-citizen can gain work authorization[.]" Appx. 156.

- "[R]evise [the] mandatory statutory language [regarding parole] by permitting DHS to consider whether parole is required 'because detention is unavailable or impracticable.'" Appx. 158.

- Impose serious social and economic costs upon the States, including the cost of "certain public benefits, such as Social Security Income, Medicaid, welfare and food stamps, employment authorization, a driver's license, and more," which "the Supreme Court and the Fifth Circuit have recognized [as] injuries to a local or state government's financial interest based on the actions of the federal government, specifically in the context of immigration." Appx. 160–61. Among these costs are "free public education to the children of unlawfully present non-citizens" and "services such as emergency medical care[.]" Appx. 162.

### 2. The Interim Final Rule.

The Defendants promulgated the Interim Final Rule on March 29, 2022, with an effective date of May 31, 2022. Appx. 001–149, *Procedures for Credible*

*Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022). As they proposed in their NPRM, they transferred authority for final adjudication of asylum claims from immigration judges to asylum officers and aggravated their already improperly expansive interpretation of their parole power. In addition, they entirely ignored the comments from Texas and its sister States.

Most prominently, the Interim Rule "establishes a new process" for granting asylum. Appx. 8. The rule arrogates to USCIS the power to cut immigration judges out of the asylum process, instead permitting USCIS to refer asylum claims to itself for what it calls so "an Asylum Merits interview," after which asylum officers themselves may grant asylum to aliens. *Id*. Despite a removal proceeding's being the "sole and exclusive procedure for determining whether an alien may be admitted to the United States," and despite that requirement that those proceedings be presided over by an immigration judge appointed by the Attorney General, 8 U.S.C. § 1229a(a)(1), (3), the asylum officer's grant is not reviewed by an immigration judge. Indeed, it is not reviewed by anyone who would qualify as an Officer of the United States unless the Director of USCIS especially orders such a review. Appx. 35–36.

Further, the new rule eliminates the current requirement that an alien file an application for asylum. Instead, the "record of the credible fear determination" will be treated as "an asylum application[.]" 87 Fed. Reg. Appx. 8. Among the effects of this change is an acceleration of an alien's ability to receive permission to work in the United States; by treating the record of the credible-fear interview as an asylum application, the Defendants allow aliens an automatic, early start on "the waiting period for eligibility to file for

employment authorization based upon a pending asylum application." Appx. 18  (citing 8 C.F.R. § 208.3(c)(3)).

In addition, the new rule makes dispositive (absent new evidence) an asylum officer's determination that an alien who does not qualify for asylum nevertheless qualifies for withholding of removal under the Convention Against Torture. *See* Appx. 28–29. This adopts an even more aggressive posture than did the NPRM, which would have allowed an immigration judge to reconsider such a determination. *See* Appx. 29.

## F.  Costs that illegal immigration imposes upon Texas.

Illegal immigration imposes millions upon millions of dollars of costs upon Texas.

### 1.  Driver's licenses.

Texas furnishes driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. Appx. 169–70. Each additional customer seeking a Texas driver's license imposes a cost on Texas. *See* Appx. 170–71. Many illegal aliens released or paroled into Texas will obtain Texas driver's licenses. Appx. 170. Because "driving is a practical necessity in most of" Texas, "there is little doubt that many" aliens present in Texas because they are paroled into the United States or are granted asylee status will obtain, at a cost to Texas, a Texas driver's license. *Texas v. United States ("Texas DAPA")*, 809 F.3d 134, 156 (5th Cir. 2015).

### 2.  Education.

Texas estimates that the average per-student, per-year funding entitlement for the 2021–22 school year is $9,211. Appx. 174. For students qualifying for bilingual education services, that cost is $11,500. *Id.* While Texas does not have direct information on the number of illegal-immigrant children

17

or children of illegal immigrants attend public school in the State, it does have information from the U.S. Department of Health and Human Service's Office of Refugee Resettlement on the number of unaccompanied minor aliens released to sponsors in Texas. Appx. 174–75. If each of those children are of school age, the cost to Texas of providing public education to them runs into the hundreds of millions of dollars—$176.42 million for Fiscal Year 2022 alone. Appx. 175. This amount increases as the number of illegal aliens in the State increases. *Id.*

### 3. Healthcare.

Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program. Appx. 182. Though these numbers are all estimates, it is a certainty that illegal aliens' use of each of these programs imposes some cost upon the State. Appx. 184.

Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. 42 C.F.R. § 440.255(c). Because claims data do not conclusively track the legal residency of patients, Texas's Health and Human Services Commission estimates, as it is required to do by State law, the portion of emergency Medicaid spending attributable to illegal aliens. Appx. 182–83. For Fiscal Year 2019, the most recent year for which data is available, that amount was $80 million. *Id.*

The Family Violence Program contracts with non-profit agencies across the State to furnish essential services to victims of family violence, including illegal aliens. Appx. 183. The Program does not ask individuals about their residency status, so, as with the Emergency Medicaid Program, HHSC

estimates the amount of spending attributable to illegal aliens. *Id.* In Fiscal Year 2019, that amount was $1 million. *Id.*

Finally, CHIP furnishes pre-natal care to certain low-income women who do not qualify for Medicaid. Appx. 183. CHIP, like the other two programs, does not require legal residency information, so HHSC estimates the amount of spending attributable to illegal aliens. *Id.* For Fiscal Year 2019, that amount was $6 million—the first time since the estimates began in Fiscal Year 2009 that the amount has been less than $30 million. Appx. 183–84.

Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. The last time that HHSC estimated this amounts was Fiscal Year 2008, when it calculated them at almost $720 million. Appx. 184.

### 4.  Law enforcement and correctional costs

The Texas Department of Criminal Justice administers the State Criminal Alien Assistance Program in conjunction with ICE and DHS. Appx. 192–93. That program pays states and localities some of the costs of incarcerating certain criminal illegal aliens. *Id.* The program does not begin paying reimbursements until the agency has incarcerated the alien for at least four consecutive days. Appx. 193. For the most recent application period, 2019–20, TDCJ reported a systemwide cost of incarcerating illegal aliens of more than $156 million. *Id.* For the 2018–19 period, TDCJ reported a systemwide cost of more than $165 million. Appx. 193–94. For Fiscal Year 2020, TDCJ estimates that it will cost roughly $11 million to furnish parole and mandatory supervision services to illegal aliens. Appx. 194.

### III. Standard

For a preliminary injunction, Texas must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011). None of the four prerequisites has a fixed quantitative value. Rather, the intensity of each in a given calculus is evaluated on a sliding scale. *Texas v. United States*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021) (citations omitted).

This is an Administrative Procedure Act case. The APA is the mechanism for holding federal agencies accountable for violating the law. *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). Therefore, there is a strong presumption in favor of judicial review. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 140 (1967); *Texas v. Biden ("Texas Title 42")*, No. 4:21-cv-0579, 2022 WL 658579, at *11 (N.D. Tex. Mar. 4, 2022). Under the APA, a reviewing court decides all relevant questions of law, interprets constitutional and statutory provisions, determine the meaning or applicability of the terms of an agency action, and then holds unlawful and sets aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. 5 U.S.C. § 706(2). It is a core principle that an agency may not rewrite clear statutory terms to suit its own sense of how statutes should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

The APA requires agencies to engage in reasoned decision making. *Michigan v. EPA*, 576 U.S. 743, 750 (2015). This necessarily means that an agency's decreed result must be within the scope of its lawful authority, and the process by which it reaches that result must be logical and rational. The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the regulatory choice made. *Motor Vehicle Mfrs. Assn. of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Texas v. United States*, 524 F. Supp. 3d at 652 (citations omitted). Among other things, reasoned decision making includes consideration of whether there was legitimate reliance on the status quo prior to an agency's change in course, for "[i]t would be arbitrary and capricious to ignore such matters." *Texas Title 42*, 2022 WL 658579, at *17 (quoting *Regents,* 140 S. Ct. at 1913 (quoting another source)).

## IV. Argument

### A. Texas is Likely to Succeed on the Merits.

The Defendants' power to act, and how they may act, are authoritatively prescribed by the Constitution and by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires. *See City of Arlington, Tex. v. FCC,* 569 U.S. 290, 297 (2013). Because administrative agencies are creatures of statute, they possess only the authority that Congress has provided. *Natl. Fedn. of Indep. Bus. v. Dept. of Labor*, 142 S. Ct. 661, 665 (2022). The question in every case is, simply, whether the statutory text authorizes the agency's action, or not. *City of Arlington,* 569 U.S. at 301.

As explained below, the Interim Final Rule exceeds the Defendants' authority, violates controlling statutes, violates the Appointments Clause, and

is arbitrary and capricious. Consequently, Texas is likely to succeed on the merits.

### 1.  The Interim Final Rule violates the Homeland Security Act.

The Defendants' proposed transfer of authority to asylum officers to adjudicate asylum claims originating from the expedited removal process violates the Homeland Security Act.

### a.  The power the Interim Rule purports to grant to asylum officers is vested in immigration judges.

As described above, the Homeland Security Act mandated:

> The Attorney General *shall have such authorities and functions* under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

8 U.S.C. § 1103(g)(1) (emphasis added).

This language—that the Attorney General "shall have such authorities and functions"—is as unambiguous now as it was in 2002. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020) (a court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."). In 2002, immigration judges within EOIR had the authority to, and indeed did, adjudicate claims for asylum that originated from the credible-fear process; asylum officers did not. *See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312 (Mar. 6, 1997); 8 C.F.R. § 1208.2(c)(1)(ix); 8 C.F.R. § 208.2(c)(g1)(ix). *See also* David A. Martin,

*Immigration Policy and the Homeland Security Act Reorganization: An Early Agenda for Practical Improvements*, 80 Interpreter Releases 601, 604 (Apr. 28, 2003) (pre-Homeland Security Act, EOIR had always been a creature of DOJ regulations). The Interim Final Rule, however, violates the Homeland Security Act by stripping authority from immigration judges (operating under the authority of the Attorney General) and instead investing it in asylum officers (operating under the authority of DHS).

Congress granted EOIR the "sole and exclusive" authority to make final determinations over asylum claims originating from expedited removals. 8 U.S.C. § 1229a(a)(3). Only an immigration judge may conduct such a proceeding. *See* 8 U.S.C. § 1229a(a)(1). Congress spoke clearly when it used the phrase "sole and exclusive authority," and the Interim Final Rule cannot transfer that authority to an asylum officer in DHS without further Congressional action. *See Make the Rd. New York v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020) ("Congress's addition of the phrase . . . 'sole' doubles down on the confinement of the judgment to one decisionmaker, and one decisionmaker alone.").

### b. The purported ambiguities do not justify the Defendants' interpretation.

Nor can the Defendants retreat to purported ambiguities in the statute's language. The law commits the initial screening of affirmative asylum applications to asylum officers, after which an applicant found to have a "credible fear of persecution" is referred for "further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). The Defendants claim that the ambiguity of this phrase—which does not define who conducts that "further consideration" or how it is conducted—permits them to invest the power to grant asylum in frontline employees. Appx. 40–41. But this is doubly flawed.

23

*First*, the phrase is not ambiguous. Statutory language is read "in context," not in isolation, "with a view to [its] place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016). Here, that context is IIRIRA, which spells out how an asylum application is "further consider[ed]": "Unless otherwise specified in this chapter," a removal proceeding conducted by an immigration judge is "the sole and exclusive procedure for determining whether an alien may be admitted to the United States[.]" 8 U.S.C. § 1229a(a)(3).

Nothing in that chapter of Title 8—nothing, that is, in the Immigration and Nationality Act, as amended—specifies any other procedure—that is, specifies otherwise. Certainly the Defendants point to nothing that does so. The only authority they cite to support their theory that they have the authority to jettison twenty-five years of understanding of immigration law is an out-of-context aside from the rulemaking in which DOJ first proposed the current asylum-review regulations—the rulemaking in which DOJ determined that the consideration would be by "an immigration judge in removal proceedings[.]" *See* Appx. 40, citing 62 Fed. Reg. 444, 447 (Jan. 3, 1997). *See also* 62 Fed. Reg. 10,312, 10,320 (Mar. 6, 1997) ("the further consideration of the application for asylum by an alien who has established a credible fear of persecution will be provided for in the context of removal proceedings. . . .").

Further, the Defendants' reading would render much of the language regarding asylum applications surplusage. *See Corley v. United States*, 556 U.S. 303, 314–15 (2009) (statute must be construed to give effect to all its provisions) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). The Defendants' proposal erases from the law language indicating a judicial or quasi-judicial proceeding:

- "The burden of proof is on the applicant to establish" entitlement to asylum. 8 U.S.C. § 1158(b)(1)(B)(i).

- To qualify for asylum, an applicant's "testimony" must satisfy "the trier of fact" that it is credible, persuasive, and specific. *Id.* § 1158(b)(1)(B)(ii).

- In making that determination, "the trier of fact" may weigh "the credible testimony along with other evidence of record." *Id.*

- If "the trier of fact" determines that corroborating "evidence" is necessary, "such evidence must be provided" unless the applicant "does not have" and "cannot reasonably obtain the evidence." *Id.*

- The "trier of fact may base a credibility determination" on a number of facts gleaned from a "witness:" demeanor, candor, responsiveness, plausibility, internal and external consistency, and accuracy. *Id.* § 1158(b)(1)(B)(iii).

Non-adversarial interviews do not have "triers of fact," "testimony," or "evidence of record." And while an interviewer may talk with a witness and gather evidence, "most people" reading those terms "would have understood" them indicate a formal proceeding at least resembling a trial. *See New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019).

What to make, then, of the investiture of the asylum power in the DHS Secretary? *See* 8 U.S.C. § 1158(b)(1)(A). The statute answers that question, too: The Secretary may rule on certain applications from an asylee's spouse or children. A removal proceeding is the "sole and exclusive procedure for determining whether an alien may be admitted to the United States," *id.* § 1229a(a)(3)—but an asylee's spouse and children "may . . . be granted the same status as the alien if accompanying, or following to join, such alien." *Id.* § 1158(b)(3)(A). A following spouse and children are not physically present in or arriving in the United States, *id.* § 1158(a)(1). Instead, they are seeking,

25

from elsewhere, to share in the status that has already been granted by an immigration judge in a proceeding that was required to be heard by that immigration judge. By deciding the applicant's asylum claim, the immigration judge has already decided that the family members may be admitted; the Secretary may then verify the family members' identities and grant them asylee status.

⁂

The Interim Final Rule purports to strip authority from the officers in whom it is vested by statute because the Defendants believe that they have hit upon a better solution. The Defendants' opinion of their regulation does not override Congress's command. The Interim Final Rule should be set aside.

### 2. The Interim Final Rule violates the Appointments Clause.

The Interim Final Rule should be held unlawful and set aside because it violates the Appointments Clause.

### a. To exercise the authority granted by the Interim Rule, asylum officers would have to qualify as Officers of the United States—which they are not.

Officers have duties that are "continuing and permanent," have positions that are "continuing," and exercise "significant authority pursuant to the laws of the United States." *Lucia*, 138 S. Ct. at 2051; *see Edmond v. United States*, 520 U.S. 651, 662–63 (1997). Conversely, employees are lesser functionaries subordinate to officers of the United States that have duties that are only "occasional or temporary." *Buckley* 424 U.S. at 125–26 & n.162.

Under the Interim Rule, asylum officers would be—as their name indicates—officers, not employees. Under existing statutes and regulations—outside of the credible-fear and expedited-removal context—they have the authority to *grant* asylum, which provides a pathway to obtaining lawful

26

permanent resident status, and eventually, citizenship. *See e.g.*, 8 C.F.R. § 208.14(b) ("an asylum officer may grant, in the exercise of his or her discretion, asylum to an applicant who qualifies as a refugee. . . ."). The Interim Final Rule purports to delegate even more authority to asylum officers. Appx. 9. When deciding whether to grant asylum, asylum officers, *inter alia*, administer oaths, verify the identity of asylum applicants, present and receive evidence, question applicants and any witnesses, make credibility determinations, issue written decisions, and determine whether an applicant has met their burden of proof. *See, e.g.*, 8 C.F.R. § 208.9(b)–(c). These are the same type of quasi-judicial functions that the Supreme Court has found requires appointment as an officer. See *Lucia,* 138 S. Ct. at 2053-54; *Freytag v. Commr.*, 501 U.S. 868, 881 (1991).

Moreover, asylum officers "hold a continuing office established by law." *Lucia*, 138 S. Ct. at 2053. They do not have "episodic" or temporary appointments. Their positions are career positions created and defined by statute. 8 U.S.C. § 1225(b)(1)(E); *see also* 8 C.F.R. § 208.1(b). Additionally, their actions are not subject to oversight by a properly appointed officer; rather, they are supervised by other asylum officers with "substantial experience adjudicating asylum applications. 8 U.S.C. § 1225(b)(1)(E). *Cf. Arthrex*, 141 S. Ct. at 1976.

But officers they are not. They are not principal officers, that is, persons appointed by the President following the Senate's advice and consent. Nor are they inferior officers, that is, officers appointed by principal officers whose work is directed and supervised by a principal officer. *See Lucia,* 138 S. Ct. at 2051; *Edmond*, 520 U.S. at 663. As the Interim Rule concedes, they are not— they are "career Government employees," Appx. 33, who are "only empowered to grant asylum[] as an exercise of the Secretary's authority,' Appx. 36, whose

decisions are "subject to supervisory review," Appx. 35, by other employees, reviewed by an actual officer of the United States only upon certification by the USCIS Director herself, Appx. 35. And because they are not properly appointed, they have no power to exercise the federal government's sovereign authority—whether for affirmative filings or, as proposed in the Interim Final Rule, to adjudicate claims after a positive credible fear finding.

The Interim Final Rule, however, delegates significant duties and discretion to these employees, expanding their authority and granting them substantial discretion to actually grant aliens asylum after receiving a positive credible fear finding. Appx. 9. Because asylum officers are not properly appointed under the Appointments Clause, and yet the Interim Final Rule purports to vest them with "significant authority pursuant to the laws of the United States," it follows that the Interim Final Rule is unlawful. *Lucia*, 138 S. Ct. at 2055; *Buckley*, 424 U.S. at 126.

*Second*, even assuming that the phrase is ambiguous, the constitutional-avoidance doctrine would forbid the Defendants' interpretation. By permitting the Defendants to vest significant sovereign power in non-officers, the Defendants' interpretation would create the significant possibility of a conflict with the Appointments Clause. Yet when presented with a choice between "competing plausible interpretations of a statutory text," courts make "the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

### 3.  The Interim Final Rule violates the parole authority.

The default outcome for illegal aliens in the United States is expedited removal from the country. *See* 8 U.S.C. §§ 1182(a)(6), 1225 (b)(1)(A)(i).

However, in certain circumstances, aliens may delay removal and obtain further review of their application for admittance. For instance, as outlined above, aliens who claim asylum are entitled to a review of such claims. *Id.* at § 1225(b)(1)(A). Likewise, aliens who can prove two years of uninterrupted and ongoing physical presence in the United States may also avoid expedited removal. *Id.* at § 1225(b)(1)(A)(iii)(II).

For aliens who avoid expedited removal and remain in the United States pending further proceedings, the default outcome is detention. *Id.* at § 1225(b). For instance, an alien seeking asylum who makes an initial showing of a credible fear of persecution "shall be detained for further consideration." *Id.* at § 1225(b)(1)(B)(ii). Likewise, an alien who fails to make such a showing must also be detained pending secondary review or removal. *Id.* at § 1225(b)(2)(B)(iii). More generally, if "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained. . . ." *Id.* at § 1225(b)(2)(A). "Read most naturally, §§ 1225(b)(1) and (b)(2) mandate the detention of applicants for admission until certain proceedings have concluded." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018).

Within this framework, Congress has provided a narrow path to parole for those aliens who avoid expedited removal and are, therefore, subject to extended detention within the United States. Specifically, § 1182(d)(5)(A) allows parole of aliens "only on a case-by-case basis for urgent humanitarian reasons or significant public health benefit." Congress limited parole to these circumstances as a direct response to regulatory overreach in the form of unfettered parole:

> The text of section 212(d)(5) is clear that the parole authority
> was intended to be used on a case-by-case basis to meet specific
> needs, and not as a supplement to Congressionally-established

immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996).

Yet, using parole to "admit entire categories of aliens who do not qualify for admission . . . with the intent that they will remain permanently in the United States" is the precise purpose of the Interim Final Rule. In particular, the Interim Final Rule amends 8 C.F.R. § 212.5(b) to expand the categories of aliens who can meet its broad parole criteria. Appx. 143. Currently, § 212.5(b) applies only to those aliens in full and lengthy removal proceedings. Under the new regulatory scheme, § 212.5(b) will also apply to aliens subject to expedited removal, including those who have already received a removal order. *Id*.; 8 C.F.R. § 235(b)(iii).

In addition to expanding the number of aliens it can parole, DHS also seeks to obviate the "case-by-case" requirement of § 1182(d)(5)(A). DHS asserts that it may parole a detained alien "in the public interest where, in light of available detention resources, and considered on a case-by-case basis, detention of any particular [alien] would limit the agency's ability to detain other [aliens] whose release may pose a greater risk of flight or danger to the community." Appx.31. DHS's suggestion that this determination could be made on a "case-by-case basis" is window dressing. Such a determination necessarily involves comparing multiple or hypothetical cases and evaluating factors that are neither related nor unique to the paroled alien. *See id.*

Additionally, the Fifth Circuit has already rejected DHS's argument that it can abandon the "case-by-case" requirement in favor of a "limited resources"

argument. *See Texas MPP*, 20 F.4th at 997. "DHS cannot use [its] power to parole aliens *en masse*; that was the whole point of the 'case-by-case' requirement that Congress added. . . . So, *the Government's proposal to parole every alien it cannot detain is the opposite of the 'case-by-case' determinations required by law.*" *Id.* (emphasis added). Apparently, DHS's response to the Fifth Circuit's admonition that it may not *en masse* parole every alien it cannot detain is to instead parole those same aliens for the same reason, but at a slightly different pace.

Finally, if DHS is concerned about the availability of "detention resources," it can—and must—look to Congress for its solution. Beyond the general rule of detention, and the limited exception of parole, Congress has provided a third option. An alien arriving on land from a country contiguous to the United States may be returned to that country pending resolution of their removal proceedings. 8 U.S.C. § 1225(b)(2)(C). Presumably, the Interim Final Rule represents DHS's efforts to ignore this option and, with it, its duty to implement duly-passed legislation. But, as the Fifth Circuit noted, "parole does not provide a way out" when DHS "can't do one thing Congress commanded (detain under § 1225(b)(2)(A)), and [doesn't] want to do one thing Congress allowed (return under § 1225(b)(2)(C)." *Texas MPP*, 20 F.4th at 996.

### 4. The Interim Final Rule is arbitrary and capricious.

The Interim Final Rule is arbitrary and capricious because the Defendants have relied on factors which Congress had not intended them to consider, entirely failed to consider an important aspect of the problem, offered explanations for its decision that run counter to the evidence, and are so implausible that it cannot be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs.*, 463 U.S. at 43.

First, the Defendants did not meaningfully consider and account for Texas's reliance on their continued enforcement of federal immigration statutes. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have "'engendered serious reliance interests that must be taken into account.'"). In short, the Defendants dismissed entirely the existence of any reliance interests whatsoever. According to the Defendants:

> The governmental commenters do not appear to have identified any reliance interests. Although some commenters identified what they believed would be burdens on or injuries to State, county, and local governments as a result of the proposed rule—claims that are addressed in the Departments' responses to comments—none clearly identified any significant reliance interests in the current state of affairs.

Appx. 32. The Defendants went as far as to say that they "perceive[d] no serious reliance interests on the part of any State, county, or local governmental entity in the currently existing provisions the NPRM implicated or that are affected by this Interim Final Rule. Even if such reliance interests exist, the Departments would nevertheless promulgate this regulation for the reasons stated in this rule." *Id.*

But the Defendants are wrong.

When it comes to the sincere consideration of reliance interests, "[i]t would be arbitrary and capricious to ignore such matters." *Regents,* 140 S. Ct. at 1913; *see also Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1139 (5th Cir. 2021). It is not necessarily incumbent upon the States to necessarily raise such interests in a comment, and the Defendants act arbitrarily for not identifying the interests on their own under the standards articulated by *Regents*. But here, the States *did* raise such issues.

*See* Appx. 159–162. The Comment identified specific and concrete social and fiscal costs that States would incur due to the increased influx of illegal aliens into the United States because of the Defendants' regulatory changes. *Id.* at 159–64.

Worse, the Defendants know about these costs and have been found capricious for ignoring them in the past. The Court itself has identified the costs that the Defendants' truculence in enforcing the immigration laws has imposed on Texas and ruled that the Defendants acted arbitrarily and capriciously in ignoring those costs rather than taking them into consideration. *See Texas MPP dist. ct.*, 554 F. Supp. 3d at 838–839, 848–851. And the Defendants have acknowledged these costs in other contexts, even while claiming that they should not have to take them into consideration. Appx. 208–210.

Further, the Defendants' conclusion that their new rule would not incentivize an increase the number of illegal aliens who attempt to enter the United States is arbitrary and capricious. Their assertion that they "do not expect this rule to encourage or cause an increase in the number of individuals seeking asylum in the United States," Appx. 37, is not merely unsupported: It directly contradicts DHS's own conclusions in an analysis that is less than two years old—conclusions finding that the availability of parole into the United States for asylum claimants who merely passed a credible-fear screening created "perverse incentives" that encouraged greater illegal immigration. *Texas MPP dist. ct.*, 554 F. Supp. 3d at 834. And, indeed, the Court held only last year DHS had arbitrarily disregarded these conclusions when it purported to find that the Migrant Protection Protocols program had not reduced the incentives for aliens to claim asylum to which they were not entitled. *Id.* at 837.

33

The Defendants, however, go even further here. They deny they are creating incentives: "The Departments disagree with the generalized belief that the availability of parole . . . acts as a pull factor," Appx. 43—and this even as they acknowledge that they plan to continue to "take . . . detention capacity into account when making parole determinations," Appx. 47, and will no longer issue a Notice to Appear before an immigration judge as a matter of course to an alien who receives a positive credible-fear finding, instead leaving the alien at liberty for at least three weeks. Appx. 5.. They speculate without basis: "[B]y more expeditiously ordering removed those who are ineligible for protection, this rule may send a stronger deterrent signal relative to the status quo." Appx. 39. And they compare apples to oranges: Asylum officers may make credible-fear findings at roughly the same rate as immigration judges approve claims for asylum, *see id.* fn.57, but that does not take into account the number of aliens who receive credible fear findings and abscond or never apply for asylum or the number of asylum officers' false positives. And those numbers are material; one would expect the immigration judges' grant rates to be significantly higher than those of the asylum officers if only the false positives were absconding—that is, if the numerator (those qualified for asylum) were remaining the same while the denominator (the total number of claimants) were shrinking.

As DHS itself found when it was not motivated to do otherwise, incentives matter. Reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *Texas MPP dist. ct.*, 554 F. Supp. 3d at 834, *affd., Texas MPP*, 20 F.4th at 1002; *Texas Title 42*, 2022 WL 658579, at *18; *Texas MPP dist. ct.*, 554 F. Supp. 3d at 848–49. The Defendants' failure to acknowledge this basic finding is arbitrary and capricious. Their excuse for doing so is that their new

rule "does not change the substantive standard for asylum eligibility." Appx. 37. But neither did MPP change the substantive standards for asylum claims— and the Court already concluded there that Defendants may not use their tunnel vision on the substance of asylum law to willfully blind themselves to the incentives that their changes to the asylum process create.

## B. Without a preliminary injunction, Texas will suffer irreparable harm.

Texas will suffer immediate and substantial irreparable injury that monetary damages could not fully repair unless the Interim Final Rule is enjoined. As described above, *supra* § II.F, it spends millions upon millions of dollars of money providing services to illegal aliens because of the United States government's failure to enforce federal law. Should the Interim Final Rule go into effect, the number of illegal aliens in Texas, and thus Texas's spending related to illegal aliens, will continue to climb.

Texas is also suffering injuries to the State's interests as *parens patriae*, grounded in the harms that Texas's local governments, each exercising Texas's delegated police power to ensure the health and welfare of their citizens, must incur due to increased illegal immigration. The State spends tens of millions of dollars each year for increased law enforcement, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder, due to illegal immigration. A rise in illegal immigration strains Texas's resources and hampers its ability to provide essential services, such as emergency medical care, education, driver's licenses, and other public safety services. The Supreme Court has ruled that increased crime causes an "ongoing and concrete harm" to the State's law enforcement and public safety interests. *Maryland v. King,* 567 U.S. 1301, 1303 (2012).

If the Interim Final Rule takes effect, then the Defendants will be allowed to admit even greater numbers of illegal aliens into the United States in violation of federal law. As DHS and federal courts have found, incentives matter: reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *Texas MPP,* 20 F.4th at 1002; *Texas Title 42*, 2022 WL 658579, at \*18; *Texas MPP dist. ct.,* 554 F. Supp. 3d at 848–49.

The injury that Texas faces cannot be remedied absent a preliminary injunction because the Defendants' sovereign immunity prevents retrospective relief. Because there is no way to recover from the federal government for Texas's costs, this injury is irreparable. *See Texas v. United States*, 524 F. Supp. 3d at 663 ("[N]o Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm."); *Texas DAPA*, 809 F.3d at 186 ("The district court found that retracting those benefits would be 'substantially difficult—if not impossible,' and the government has given us no reason to doubt that finding.") (cleaned up); *Texas v. United States,* 86 F. Supp. 3d 591, 673 (S.D. Tex. 2015) ("The Court agrees that, without a preliminary injunction, any subsequent ruling that finds [a particular immigration policy] unlawful after it is implemented would result in the States facing the substantially difficult—if not impossible—task of retracting any benefits or licenses already provided to [immigrant] beneficiaries. This genie would be impossible to put back into the bottle.").

**C. The balance of the equities and public interest favor Texas.**

This Court should consider the balance-of-equities and public-interest elements together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (merging these two elements when the Government is the nonmoving party); *Texas DAPA*, 809 F.3d at 187 (same). It should weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).

To "weigh the equities," this Court should balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). To determine whether an injunction would undermine the public interest, this Court should consider the public interests that may be injured and those that may be served by granting or denying the injunction. *Texas v. United States*, 555 F. Supp. 3d 351, 436 (S.D. Tex. 2021) (collecting cases).

The balance of the harms favors granting a preliminary injunction because Texas's harm is immediate, irreparable, and continues to occur. Texans have a significant interest in maintaining the health and safety of their state. Conversely, the Defendants face essentially no harm from maintaining the status quo. Any inefficiency resulting from an injunction inhibiting the Executive is outweighed by the financial losses Texas will incur and the damage that increased illegal immigration will do to its citizens. *United States v. Escobar,* No. 2:17-cr-529, 2017 WL 5749620, at *2 (S.D. Tex. Nov. 28, 2017) *citing United States v. Martinez-Fuerte,* 428 U.S. 543, 556–58 (1976).

Also, the public is served when the law is followed. *Texas v. Biden ("Texas MPP Stay")*, 10 F.4th 538, 559–60 (5th Cir. 2021), quoting *Washington v. Reno*, 35 F.3d 1093, 1102 (6th Cir. 1994). On the other side of the ledger, "there is

generally no public interest in the perpetuation of unlawful agency action." *Texas MPP Stay*, 10 F.4th at 560; *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013). Our system does not permit agencies to act unlawfully even in pursuit of desirable ends. *Ala. Assn. of Realtors v. Dept. of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021). The balance of the equities weighs in favor of an injunction. *Accord Texas Title 42*, 2022 WL 658579, at *19–20.

## V. Conclusion

Texas respectfully requests that the Court preliminarily enjoin the Defendants from implementing the Interim Final Rule or, in the alternative, order under 5 U.S.C. § 705 postponing the Interim Final Rule's effective date until after final judgment has been rendered. Texas further respectfully requests all other relief to which it may be entitled.

Dated May 23, 2022.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Respectfully submitted,

*/s/ Aaron F. Reitz*
AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

GENE P. HAMILTON
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003

(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

## Certificate of Service

I certify that on May 23, 2022, this brief was filed through the Court's CM/ECF system, which served it upon all counsel of record.

*/s/ Aaron F. Reitz*