UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS,
    *Plaintiff,*

v.

ALEJANDRO MAYORKAS, in his official capacity
    as Secretary of Homeland Security, *et al.*,
    *Defendants.*

Case 2:22-cv-00094

**Texas's Response to Defendants' Motion to Dismiss**

i

TABLE OF CONTENTS

Table of Contents...........................................................................................................ii

Table of Authorities....................................................................................................iv

Introduction .................................................................................................................1

Factual and Legal Background ...................................................................................2

    I.    The default presumption is that inadmissible aliens should be removed, and while their status is pending, they should be detained. ....................................................2

    II.    The Homeland Security Act and the INA empower immigration judges to make final decisions about the removability of aliens. .............................................................4

    III.    The Appointments Clause establishes the only means for appointing an officer of the United States.5

    IV.    Inadmissible aliens may only be paroled on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit."...............................................6

    V.    The Interim Final Rule ("IFR") significantly changes asylum procedures.................7

    VI.    DHS admitted that the reason for eliminating statutorily mandated judicial review overseen by DOJ was simply to eliminate backlog. ..................................................8

    VII.    Illegal immigrants impose costs upon Texas. ....................................................9

        A.    Driver's Licenses.............................................................................................9
        B.    Education......................................................................................................10
        C.    Health Care...................................................................................................11
        D.    Law Enforcement and Correctional Costs ....................................................11
Standard of Review ...................................................................................................12

Argument...................................................................................................................13

    I.    Texas Has Article III Standing to Pursue This Lawsuit. .......................................13

        A.    Texas has an injury-in-fact. ...........................................................................14
        B.    Standing is determined by facts in existence when the suit is commenced, and evidence of injury pre-dating the challenged agency action is relevant. ........................15
        C.    The injury need not be actualized—a prospective injury will suffice. ....................17
        D.    Texas can show that its injury is likely caused by the IFR and redressable by a favorable court decision...........................................................................................23
    II.    Texas has a legally cognizable injury-in-fact. .....................................................26

        A.    The IFR confers affirmative benefits and is not merely non-enforcement...........31
        B.    Texas has standing because Defendants have abdicated their statutory responsibilities.......................................................................................................34
    III.    Texas is entitled to special solicitude. ...............................................................35

        A.    Texas has a procedural right to challenge the agency action in question...............36
        B.    The challenged action affects Texas's quasi-sovereign interests. ............................37
    IV.    Texas's claims fall within the zone of interests that the Immigration and Naturalization Act is designed to protect. ...............................................................38

ii

V.     The IFR violates the Appointments Clause by giving the power of Officers to employees. ..................................................................................................................41

Conclusion..........................................................................................................................44

**CERTIFICATE OF SERVICE** ..............................................................................................45

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Mayorkas,*
    584 F. Supp. 3d 783 (D. Ariz. 2022) ................................................................19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................... 12, 13

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ...............................................................33, 34, 35

*Buckley v. Valeo,*
    424 U.S. 1 (1976)...........................................................................6, 41, 43, 44

*Carr v. Alta Verde Indus., Inc.,*
    931 F.2d 1055 (5th Cir. 1991) .................................................................15

*City of Los Angeles, Calif. v. Patel,*
    576 U.S. 409 (2015)............................................................................ 43, 44

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013).................................................................................17

*Cochran v. SEC,*
    20 F.4th 194 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC,*
    142 S. Ct. 890 (2023)......................................................................... 26, 31

*Ctr. for Individual Freedom v. Carmouche,*
    449 F.3d 655 (5th Cir. 2006)...................................................................44

*Davis v. FEC,*
    554 U.S. 724 (2008)....................................................................... 15, 16, 17

*Dep't of Com. v. New York,*
    139 S. Ct. 2251 (2019) .............................................................................24

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) .................................................................... 30, 31

*Dept. of Homeland Sec. v. Thuraissigiam,*
    140 S. Ct. 1959 (2020) ...............................................................................2

*DHS v. Regents of Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ...................................................................... 31, 32

*Edmond v. United States,*
   520 U.S. 651 (1997) ..................................................................................41, 42, 43

*Florida v. Mayorkas,*
   --- F.Supp.3d ----, 2023 WL 3398099 (N.D. Fla. May 11, 2023) ....................25

*Freytag v. Commr.,*
   501 U.S. 868 (1991) .........................................................................................41

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) .........................................................................................26

*Funk v. Stryker Corp.,*
   631 F.3d 777 (5th Cir. 2011) ...........................................................................22

*General Land Office v. Biden,*
   71 F.4th 264 (5th Cir. 2023) ......................................................................*passim*

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .........................................................................................32

*Huss v. Gayden,*
   571 F.3d 442 (5th Cir. 2009) ...........................................................................19

*Linda R.S. v. Richard D.,*
   410 U.S. 614 (1973) .........................................................................................31

*Lucas v. S.C. Coastal Council,*
   505 U.S. 1003 (1992) .......................................................................................43

*Lucia v. SEC,*
   138 S. Ct. 2044 (2018) ..............................................................................*passim*

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ...................................................................................13, 15

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .......................................................................................1, 37

*McLin v. Twenty-First Judicial District,*
   79 F.4th 411 (5th Cir. 2023) ......................................................................12, 13

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
   366 F.3d 930 (D.C. Cir. 2004) ........................................................................25

*Okpalobi v. Foster,*
   190 F.3d 337 (5th Cir. 1999) ...........................................................................44

*Pederson v. Louisiana State Univ.,*
　213 F.3d 858 (5th Cir. 2000)..................................................................................... 15, 21

*Ramming v. U.S.,*
　281 F.3d 158 (5th Cir. 2001)........................................................................................12

*Ryder v. United States,*
　515 U.S. 177 (1995)........................................................................................................6

*Suitum v. Tahoe Regional Planning Agency,*
　520 U.S. 725 (1997)......................................................................................................17

*Susan B. Anthony List v. Driehaus,*
　573 U.S. 149 (2014)................................................................................................ 17, 21

*Texas v. Biden,*
　No. 6:22-CV-00004, 2023 WL 6281319 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) ...........26

*Texas v. Biden ("Texas MPP"),*
　20 F.4th 928 (5th Cir. 2021) ...................................................................................*passim*

*Texas v. Biden ("Texas MPP dist. ct."),*
　554 F. Supp. 3d 818 (N.D. Tex. 2021).......................................................................7, 33

*Texas v. EEOC,*
　933 F.3d 433 (5th Cir. 2019)........................................................................................15

*Texas v. United States,*
　40 F.4th 205 (5th Cir. 2022), *overruled on other grounds, United States v. Texas*, 143 S.
　Ct. 1964 (2023) .............................................................................................................39

*Texas v. United States,*
　50 F.4th 498 (5th Cir. 2022) ...................................................................................*passim*

*Texas v. United States,*
　524 F. ...........................................................................................................................27

*Texas v. United States,*
　549 F. Supp. 3d 572 (S.D. Tex. 2021) (Hanen, J.).......................................................33

*Texas v. United States,*
　809 F.3d 134 (5th Cir. 2015)....................................................................................*passim*

*United States Telecom Ass'n v. FCC,*
　825 F.3d 674 (D.C. Cir. 2016) .....................................................................................17

*United States v. Arthrex, Inc.,*
　141 S. Ct. 1970 (2021) ..............................................................................................6, 42

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) ...................................43

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................................................43

*United States v. Stevens,*
    559 U.S. 460, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) ............................ 43, 44

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP),*
    412 U.S. 669 (1973) ................................................................................................18

*United States v. Texas,*
    143 S. Ct. 1964 (2023) ......................................................................................*passim*

**Statutes**

5 U.S.C. § 706 ..............................................................................................................36

8 U.S.C. § 1101(a)(18) .................................................................................................42

8 U.S.C. § 1101(b)(4) .....................................................................................................5

8 U.S.C. § 1103(a)(1) ......................................................................................................4

8 U.S.C. § 1103(g)(1) ......................................................................................................4

8 U.S.C. § 1158(b)(3)(C) .................................................................................................5

8 U.S.C. § 1158(d)(5)(A)(iii) ..........................................................................................4

8 U.S.C. § 1182(a)(7)(A)(i)(l) ........................................................................................2

8 U.S.C. § 1182(d)(5) and ............................................................................................26

8 U.S.C. § 1182(d)(5) ..............................................................................................32, 35

8 U.S.C. § 1182(d)(5)(A) ................................................................................................6

8 U.S.C. §§ 1225(a) .......................................................................................................35

8 U.S.C. § 1225(a)(1) ..................................................................................................2, 3

8 U.S.C. § 1225(b)(1)(E) .........................................................................................41, 42

8 U.S.C. § 1229a(a)(1), (3) .............................................................................................7

8 U.S.C. § 1229a(a)(1)-(a)(3) .........................................................................................5

8 U.S.C. § 1612 (2)(L) ..................................................................................................32

8 U.S.C. § 1613(a) ................................................................................................................... 32

8 U.S.C. § 1641(b)(4) .............................................................................................................. 32

Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 ....................................... 2

Pub. L. 104-208, 110 Stat. 3009, div. C (Sep. 30, 1996) ....................................................... 4

Tex. Transp. Code § 521.142(a) ............................................................................................ 10

**Other Authorities**

8 C.F.R. § 1.3(a)(4)(vi) ........................................................................................................... 32

8 C.F.R. § 208.1(b) .................................................................................................................. 41

8 C.F.R. § 208.2(c)(1)(ix) .......................................................................................................... 5

8 C.F.R. § 208.3(a) .................................................................................................................... 4

8 C.F.R. § 208.9(b)–(c) ........................................................................................................... 41

8 C.F.R. § 208.14(b) ................................................................................................................ 41

8 C.F.R. § 274a.12(c)(14) (2022) ........................................................................................... 31

8 C.F.R. § 1003.0, *et seq.* ......................................................................................................... 5

8 C.F.R. § 1003.10(a), (b) ......................................................................................................... 5

8 C.F.R. § 1208.2(c)(1)(ix) ........................................................................................................ 5

42 C.F.R. § 417.422(h) ............................................................................................................ 32

42 C.F.R. § 440.255(c) ....................................................................................................... 11, 12

87 Fed. Reg. 18,078, 18,086 (May 31, 2022) ......................................................................... 41

## INTRODUCTION

Texas's social services and criminal justice system are overwhelmed by an ever-increasing number of immigrants unlawfully present in the state. This case challenges the interim final rule ("IFR") jointly issued by the Departments of Justice and Homeland Security, entitled *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18078 (Mar. 29, 2022) because it exceeds Congress's statutory delegation, violates the APA, violates the Appointments Clause, and injures Texas in the process.

Defendants have moved to dismiss Texas's suit on the grounds that Texas lacks standing and has failed to state a claim on which relief can be granted. [1] Texas will demonstrate that it has standing to claim an injury from the increased presence of unlawful immigrants even in light of the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964 (2023) (hereinafter *Enforcement Priorities*). Texas can show a substantial risk of direct injury to its coffers at the time of the filing of the complaint, and Texas can use the U.S. Government's own numbers to prove it. As a result, Texas has a legally cognizable injury based on the costs it incurs to provide social services to immigrants who are unlawfully present in Texas. Nothing in the *Enforcement Priorities* decision precludes a finding of Texas's injury, and even if it did, Texas qualifies for the exceptions expressly stated in the decision. *See Enforcement Priorities*, 143 S. Ct. at 1973-74.

Texas is further entitled to special solicitude, which allows the state to establish standing without meeting all the normal standards for redressability and immediacy. *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 520 (2007). Texas meets this standard because it has a procedural right under the APA to challenge the IFR, and because it has a quasi-sovereign interest in the increased pressure on

---

[1] Texas recognizes that Defendants have once again raised the argument—already denied by this Court at ECF 78—that the D.C. Circuit has exclusive jurisdiction over this case in order to preserve error.  Texas has not responded to this argument as this Court has already ruled on it.

its state services that will result from the IFR. *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) ("*DACA*") (citing *Texas v. United States*, 809 F.3d 134, 151-52 (5th Cir. 2015) ("*DAPA*")).

Moreover, Texas's injury is well within the zone of interests that the Immigration and Nationality Act is trying to protect, as the Fifth Circuit has repeatedly held. *See, e.g.*, *DACA*, 50 F.4th at 521 (purpose of the INA is to "set the terms and conditions of admission to the country"); *DAPA*, 809 F.3d at 163 (purpose of the INA is to address concern of aliens receiving public benefits).

Finally, Texas will show that it has asserted a valid facial challenge to the IFR under the Appointments Clause because the asylum officers have not been properly appointed to perform the tasks that the IFR conveys on them. *See Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (citing U.S. Const. art. II, § 2, cl. 2.).

This Court should find that Texas has sufficiently alleged facts to survive a motion to dismiss and allow its claims to proceed.

FACTUAL AND LEGAL BACKGROUND

I.    **The default presumption is that inadmissible aliens should be removed, and while their status is pending, they should be detained.**

Congress has created a statutory scheme for evaluating and adjudicating asylum applications. The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, charge the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") with enforcing the United States' immigration laws. Under those laws, "several classes of aliens are 'inadmissible' and therefore 'removable.'" *Dept. of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964 (2020) (citing 8 U.S.C. §§ 1182, 1229a(e)(2)(A)). Aliens are inadmissible if they lack a valid entry document. 8 U.S.C. § 1182(a)(7)(A)(i)(l). If an alien arrives in the United States without a valid entry document or is present in the United States without having been lawfully admitted, they will be deemed applicants for admission. 8 U.S.C. § 1225(a)(1).

The default presumption is that an alien who is not admitted is removable.  Congress created expedited procedures for removing aliens who are "present in the United States who [have] not been admitted" and for removing aliens "who arrive[] in the United States (whether or not at a designated port of arrival…)" 8 U.S.C. § 1225(a)(1). An alien arriving without a valid entry document, as mentioned above, is subject to expedited removal. *Id.* § 1225(b)(1)(A). Once an immigration officer, such as a Border Patrol Agent, determines that such an alien is inadmissible, the alien must be ordered "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

This determination is not the end of the process. If an alien subject to expedited removal "indicates either an intention to apply for asylum . . . or a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer[.]" *Id.* § 1225(b)(1)(A)(ii). An asylum officer will conduct a credible-fear interview, which is statutorily the first step in the process by which the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum" who otherwise would be removed from the country. *Id.* § 1225(b)(1)(B); § 1158(b)(1)(A). If the asylum officer determines after the interview that the alien has a credible fear of persecution—that is, that "there is a significant possibility . . . that the alien could establish eligibility for asylum," *id.* § 1225(b)(1)(B)(v)—"the alien *shall be detained* for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii) (emphasis added). If the asylum officer "determines that an alien does not have a credible fear of persecution, the officer *shall order the alien removed* from the United States without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I). A negative finding is subject to review by an immigration judge. *Id.* § 1225(b)(1)(B)(iii)(III).

Nowhere does Section 1225(b)(1)(B) provide for the possibility of paroling aliens pending their asylum determinations. On the contrary, the statute provides for "Mandatory Detention: Any alien subject to the procedures under this clause *shall be detained* pending a final determination of credible fear of persecution, and if found not to have such a fear, until removed." *Id.* §

3

1225(b)(1)(B)(iii)(IV). Further confirming Congress's intent that DHS not parole aliens into the United States to reside in the country for extended periods of time was its command that "in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed." 8 U.S.C. § 1158(d)(5)(A)(iii).

## II.   The Homeland Security Act and the INA empower immigration judges to make final decisions about the removability of aliens.

Once the asylum officer has determined that the alien has a credible fear, the alien must appear in a removal proceeding before an immigration judge. *Id.* § 1229a(a)(1). These proceedings are "the sole and exclusive procedure for determining whether an alien may be admitted to the United States[.]" *Id.* § 1229a(a)(3). Either the alien prompts this further review by filing an application for asylum, 8 C.F.R. § 208.3(a), over which the immigration judge has exclusive jurisdiction, *id.* § 208.2(c)(1), 1208.2(c)(1)(ix), or the alien's case proceeds based on the immigration officer's mandatory referral to an immigration judge. *Id.* § 235.6(a)(2)(iii).

This "system for processing protection claims made by individuals encountered at or near the border and who establish credible fear was originally adopted in 1997" following enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Appx. 14; *see* Pub. L. 104-208, 110 Stat. 3009, div. C (Sep. 30, 1996). When the Homeland Security Act of 2002 created DHS and charged it "with the administration and enforcement of [the asylum-application process] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a)(1), it did not transfer all immigration authority and functions to DHS. Rather, DOJ retained all power "relating to the immigration and naturalization of aliens," that had been exercised by DOJ's Executive Office of Immigration Review ("EOIR") before the Homeland Security Act was enacted. 8 U.S.C. §

1103(g)(1), including the adjudication of asylum claims following a credible fear finding, as noted in the Defendants' own regulations. *See* 8 C.F.R. § 1208.2(c)(1)(ix); 8 C.F.R. § 208.2(c)(1)(ix).[2]

Each immigration judge is appointed by the Attorney General and operates as a part of EOIR. 8 U.S.C. § 1101(b)(4); 8 C.F.R. § 1003.0, *et seq.* "Immigration judges . . . act as the Attorney General's delegates in the cases that come before them" and "exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation." 8 C.F.R. § 1003.10(a), (b). As discussed, they "decid[e] the inadmissibility or deportability of [the] alien" in removal hearings, which are the "sole and exclusive procedure" for determining admission or deportation. 8 U.S.C. § 1229a(a)(1)-(a)(3). By contrast, asylum officers are members of the civil service with specialized training and experience. *See id.* § 1225(b)(1)(E)(i). They adjudicate asylum applications filed by aliens *not* in removal proceedings. *See id.* § 1158. Their decisions are not subject to review by, and they are not appointed by, the Director of USCIS or the Secretary of Homeland Security. Rather, they are supervised by officers who have "had substantial experience adjudicating asylum claims." *Id.* § 1225(b)(1)(E)(ii).

**III.    The Appointments Clause establishes the only means for appointing an officer of the United States.**

The Appointments Clause of the United States Constitution establishes the "exclusive means of appointing 'Officers.' Only the President, a court of law, or a head of department can do so." *Lucia*, 138 S. Ct. at 2051 (citing U.S. Const. art. II, § 2, cl. 2). As the Supreme Court has explained, the President's executive power must only be delegated to officers that are ultimately directed and supervised by an officer nominated by the President and confirmed by the Senate:

> Under the Constitution, '[t]he executive Power' is vested in the President, who has the responsibility to 'take Care that the Laws be faithfully executed.' Art. II, § 1, cl. 1; § 3. The Appointments Clause provides that he may be assisted in carrying out that responsibility by officers nominated by him and confirmed by the Senate, as well as by other officers not

---

[2] Asylum claims filed by unaccompanied alien children are an exception. Under the Trafficking Victims Protection Reauthorization Act of 2008, USCIS has initial jurisdiction to adjudicate those claims. *See* 8 U.S.C. § 1158(b)(3)(C).

appointed in that manner but whose work, we have held, must be directed and supervised by an officer who has been. § 2, cl. 2.

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1976 (2021).

Officers of the United States have "significant authority" that they exercise "pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 125–26 & n.162 (1976). Whether principal or inferior officers, individuals whose duties render them as an "officer of the United States" has no authority to act, and their actions have no legal effect, unless they have been properly appointed. *See Buckley*, 424 U.S. at 142 ("Such functions may be discharged only by persons who are "Officers of the United States"); *Ryder v. United States*, 515 U.S. 177, 185 (1995) ("Appointments Clause challenge[s] … invalidate[] actions taken pursuant to defective title"); *see generally Lucia*, 138 S. Ct. 2044 (actions of an improperly appointed administrative law judge are void).

## IV.   Inadmissible aliens may only be paroled on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit."

The Secretary of Homeland Security may parole into the United States an otherwise inadmissible alien only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, precisely to end a practice of paroling entire categories of aliens who were otherwise inadmissible:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

The Fifth Circuit has made it clear that this authority is reserved, as Congress said, for case-by-case considerations and is not intended to be used for classes, or masses, of people. *Texas v. Biden*

6

("*Texas MPP*"), 20 F.4th 928, 947 (5th Cir. 2021) (upholding this Court's decision in *Texas v. Biden* ("*Texas MPP dist. ct.*"), 554 F. Supp. 3d 818, 852 n.11 (N.D. Tex. 2021)). The IFR, however, uses parole as a "supplement to Congressionally-established immigration policy" in contravention of statutory authority.

## V.   The Interim Final Rule ("IFR") significantly changes asylum procedures.

In August 2021, the Defendants issued a Notice of Proposed Rulemaking ("NPRM"): *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 86 Fed. Reg. 46,906 (Aug. 20, 2020). A coalition of 22 states, including Texas, submitted a 15-page comment that raised general concerns, as well as five specific comments about serious deficiencies in the NPRM. Comment Submitted by 22 States, USCIS-2022-0016-12295, (Mar. 27, 2023), https://tinyurl.com/3jyd4hnd.

Notwithstanding the States' objections to the proposed rule, the Defendants promulgated the IFR on March 29, 2022, with an effective date of May 31, 2022. Appx. 001–149, *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022). The IFR failed to substantially address the States' comments.

Most prominently, the IFR "establishes a new process" for granting asylum. Appx. 8. The IFR takes power delegated by the Homeland Security Act to EOIR at DOJ and gives it to the United States Citizenship and Immigration Services ("USCIS") at DHS. The IFR allows USCIS to cut immigration judges out of the asylum review process by referring asylum claims to itself for what it calls "an Asylum Merits interview," after which asylum officers themselves may grant asylum to aliens. *Id.* Despite a removal proceeding's being the "sole and exclusive procedure for determining whether an alien may be admitted to the United States," and despite the requirement that those proceedings be presided over by an immigration judge appointed by the Attorney General, 8 U.S.C. § 1229a(a)(1), (3), the

asylum officer's grant of asylum is not reviewed by an immigration judge. Indeed, it is not reviewed by anyone who would qualify as an Officer of the United States unless the Director of USCIS directly orders such a review. Appx. 35–36. In addition, the new rule makes dispositive (absent new evidence) an asylum officer's determination that an alien who does not qualify for asylum nevertheless qualifies for withholding of removal under the Convention Against Torture, eliminating review by an immigration judge. *See* Appx. 28–29.

Further, the new rule eliminates the current requirement that an alien file an application for asylum. Instead, the "record of the credible fear determination" will be treated as "an asylum application[.]" 87 Fed. Reg. Appx. 8. Among the effects of this change is an acceleration of an alien's ability to receive permission to work in the United States; by treating the record of the credible-fear interview as an asylum application, the Defendants allow aliens an automatic, early start on "the waiting period for eligibility to file for employment authorization based upon a pending asylum application." Appx. 18 (citing 8 C.F.R. § 208.3(c)(3)).

## VI.   DHS admitted that the reason for eliminating statutorily mandated judicial review overseen by DOJ was simply to eliminate backlog.

In September 2021, DHS issued a statement essentially admitting that the reason for eliminating the statutorily mandated adjudication by an immigration judge is because the agency is simply too busy to do it by the book. The Department of Homeland Security issued a statement of *Significant Considerations for the Development of Updated Guidelines for the Enforcement of Civil Immigration Law* in September 2021. *See* Appx. 195-215. In that document, DHS stated that government agencies responsible for processing immigration cases, including ICE, CBP, and EOIR, had massive backlogs of cases, with over 1.2 million cases pending at the end of FY 2020. Appx. 200. ICE, *according to the Government's own admission*, has the resources to detain "less than 1% of the [noncitizens] in removal proceedings or subject to orders of removal." *Id.*

8

Thus, 99% of aliens who have been identified by the Government as needing to be removed are not in detention but moving freely around the United States.  This statistic says nothing about the group of aliens who are potentially removable but have simply not been identified and are also moving freely around the United States. In response to the concerns raised by various States, including Texas, that these aliens not in detention would increase the cost burden on social services as well as criminal justice, the DHS memo essentially dismissed these concerns because "any immigration policy may have indirect, downstream impacts on a significant number of actors, including, potentially, State governments, businesses, and individual citizens, and the Department, regardless of administration, cannot provide an exhaustive analysis of all of these potential impacts every time it adopts a change in immigration policy." Appx. 208. The memo went on to discuss the methodological and empirical challenges inherent in such an analysis, then concluded that the impacts of new enforcement priorities would likely be neutral to positive. Appx. 208-09. At the same time, the memo readily admits that "[u]nder no circumstance will DHS be able to arrest, detain, or remove more than a fraction of the overall removable population." Appx. 209.

Thus, DHS is well aware that a removable population that is not removed will have an impact on States, but due to the empirical challenges of measuring exactly what the impact is of leaving potentially millions of aliens in the country, DHS declined to do any real analysis.

## VII.   Illegal immigrants impose costs upon Texas.

Illegal immigration imposes hundreds of millions of dollars of cost upon Texas for social services and criminal justice.  These costs are a burden to the Texas taxpayers.

### A.  Driver's Licenses

Texas furnishes driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. Appx. 169–70. Therefore, parolees could obtain a Texas driver's license because they would have documentation that authorizes their presence in the United

9

States pending their asylum determination. *See* Tex. Transp. Code § 521.142(a) (requiring applicants for driver's licenses to present "documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States"). Migrants who enter the country through catch-and-release or by crossing the border illegally cannot obtain driver's licenses because they lack the "documentation" required by section 521.142(a).

Each additional customer seeking a Texas driver's license imposes a cost on Texas. *See* Appx. 170–71. Many parolees who come to Texas will obtain Texas driver's licenses, and their licenses are more expensive than a normal citizen's, both due to the costs of verification of their lawful presence and because the licenses must be renewed more frequently. Appx. 170-71. Because "driving is a practical necessity in most of" Texas, "there is little doubt that many" aliens present in Texas because they are paroled into the United States or are granted asylee status will obtain, at a cost to Texas, a Texas driver's license. *DAPA*, 809 F.3d at 156.

**B. Education**

Texas estimates that the average per-student, per-year funding entitlement for the 2021–22 school year is $9,211. Appx. 174. For students qualifying for bilingual education services, that cost is $11,500. *Id.* While Texas does not have direct information on the number of illegal-immigrant children or children of illegal immigrants attend public school in the State, it does have information from the U.S. Department of Health and Human Service's Office of Refugee Resettlement on the number of unaccompanied minor aliens released to sponsors in Texas. Appx. 174–75. If all of those children are of school age, the cost to Texas of providing public education to them runs into the hundreds of millions of dollars—$176.42 million for Fiscal Year 2022 alone. Appx. 175. This amount increases as the number of illegal aliens in the State increases. *Id.*

### C.  Health Care

Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program. Appx. 182. Though these numbers are all estimates, it is a certainty that illegal aliens' use of each of these programs imposes some cost upon the State. Appx. 184.

Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. 42 C.F.R. § 440.255(c). Because claims data do not conclusively track the legal residency of patients, Texas's Health and Human Services Commission estimates, as it is required to do by State law, the portion of emergency Medicaid spending attributable to illegal aliens. Appx. 182–83. For Fiscal Year 2019, the most recent year for which data is available, that amount was $80 million. *Id.*

The Family Violence Program contracts with non-profit agencies across the State to furnish essential services to victims of family violence, including illegal aliens. Appx. 183. The Program does not ask individuals about their residency status, so, as with the Emergency Medicaid Program, HHSC estimates the amount of spending attributable to illegal aliens. *Id.* In Fiscal Year 2019, that amount was $1 million. *Id.*

Finally, CHIP furnishes pre-natal care to certain low-income women who do not qualify for Medicaid. Appx. 183. CHIP, like the other two programs, does not require legal residency information, so HHSC estimates the amount of spending attributable to illegal aliens. *Id.* For Fiscal Year 2019, that amount was $6 million—the first time since the estimates began in Fiscal Year 2009 that the amount has been less than $30 million. Appx. 183–84.

Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. The last time that HHSC estimated this amount was Fiscal Year 2008, when it calculated them at almost $720 million. Appx. 184.

### D.  Law Enforcement and Correctional Costs

The Texas Department of Criminal Justice administers the State Criminal Alien Assistance Program in conjunction with ICE and DHS. Appx. 192–93. That program pays states and localities

some of the costs of incarcerating certain criminal illegal aliens. *Id.* The program does not begin paying reimbursements until the agency has incarcerated the alien for at least four consecutive days. Appx. 193. For the most recent application period, 2019–20, TDCJ reported a systemwide cost of incarcerating illegal aliens of more than $156 million. *Id.* For the 2018–19 period, TDCJ reported a systemwide cost of more than $165 million. Appx. 193–94. For Fiscal Year 2020, TDCJ estimates that it will cost roughly $11 million to furnish parole and mandatory supervision services to illegal aliens. Appx. 194.

**STANDARD OF REVIEW**

The Defendants have moved to dismiss Texas's complaint under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants argue that Texas has failed to establish subject matter jurisdiction by failing to prove standing and failing to waive the Defendants' immunity. They further claim that Texas has failed to state a claim for which relief can be granted under Rule 12(b)(6) with regard to the Appointments Clause.

"As the parties invoking federal jurisdiction, the States bear the burden of establishing standing. Texas mut therefore show (i) an injury in fact that is concrete, particularized, and actual or imminent, (ii) that the defendant likely caused the injury, and (iii) that the injury would be redressed by judicial relief." *General Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) (internal citations and quotation marks omitted).

When subject-matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of proof. *McLin v. Twenty-First Judicial District*, 79 F.4th 411, 415 (5th Cir. 2023). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001) (internal citations omitted).

12

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also McLin,* 79 F. 4th at 415.

ARGUMENT

**I.    Texas Has Article III Standing to Pursue This Lawsuit.**

Texas has established Article III standing. To demonstrate standing, a plaintiff must demonstrate that it has (1) an injury-in-fact; (2) fairly traceable to the defendants' conduct; and (3) that the injury is redressable by a favorable court ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992). Texas has alleged facts that establish all three elements.

Texas is spending more on border security than ever before.  According to the July 2022 Legislative Budget Board report on border security, Texas appropriated $800 million for border security in the 2018-19 legislative session and $800.6 million in the 2020-21 session.  In the most recent session, because of the ongoing crisis at the border, that number had increased *over 300%* to $2.926 billion.[3] The border crisis has forced Texas to massively increase spending on criminal justice, public safety, state health services, the Military Department, court administration, and the Department of Motor Vehicles. *Id.* As a result, Texas is injured by *any* rule that increases the presence of unlawful immigrants in the State of Texas because its costs to absorb the presence of these unlawful immigrants will continue to rise.

The fact that the IFR does not specifically name Texas does not stop it from injuring Texas. Immigrants move once they enter the United States, and many people from around the country move

---

[3] See Legislative Budget Board, Report on Border Security: Appropriations and Reporting Requirements, July 2022, at 2-4; Appx 217-29.

to Texas.[4] Texas is also known as a popular destination for aliens. The State Department has reported that Texas is a top destination for the initial resettlement of refugees—Texas was the second-most popular destination as a state of initial resettlement in FY 2021, second only to California.[5] The Migration Policy Institute ranked Texas as number one in 2023—10 percent of all refugees granted asylum chose Texas as their initial state of settlement.[6] And more refugees arrived in the United States in the first 8 months of Fiscal Year 2023 than at any time since FY 2018.[7] Thus, it is reasonable to infer that an agency Rule that makes it quicker and easier for aliens to receive asylum will both increase the number of aliens seeking asylum status in the United States and the number of those aliens who end up in Texas unlawfully.

### A. Texas has an injury-in-fact.

Defendants point to the fact that the IFR does not specifically name Texas as a location where the new asylum rule will be applied, and that Texas has not tied the IFR to increased migrants into Texas. Defs' MTD at 6, 8-9. But, whether the IFR names Texas or not does not end the inquiry. The Defendants do not dispute that the increase of unlawful immigration into Texas would constitute an injury that multiple courts have recognized. Defs' MTD at 9-10 (citing *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("DAPA" case); *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd and remanded*, 142 S. Ct. 2528 ("MPP" case); *Texas v. United States*, 50 F.4th at 498 (5th Cir. 2022) ("DACA" case)). The question here is whether Defendants may write

---

[4] *See, e.g.*, United States Census Bureau, *State-to-State Migration Flows: 2022*, at State-to-State Migration Flows (census.gov); Appx 224-69.

[5] United States Department of State, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2023*, Sept. 8, 2022, at 42, Table VIII, *available at* Report to Congress on Proposed Refugee Admissions for Fiscal Year 2023 - United States Department of State; Appx 311-12.

[6] Migration Policy Institute, *Refugees and Asylees in the United States*, June 15, 2023, at Article: Refugees and Asylees in the United States | migrationpolicy.org.; Appx 321.

[7] *Id*; Appx 316.

a rule that specifically excludes Texas and effectively claim that this careful drafting avoids Defendants' responsibility for any subsequent injury to Texas. They cannot.

**B. Standing is determined by facts in existence when the suit is commenced, and evidence of injury pre-dating the challenged agency action is relevant.**

"The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (emphasis in original; citation omitted); *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").

"While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted); *see also Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ("'In identifying an injury that confers standing, courts look exclusively to the time of filing.'") (citing *Loa-Herrera v. Trominksi*, 231 F.3d 984, 987 (5th Cir. 2000); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000) ("'[A fact concerning injury in existence] at the time of trial, however, implicates mootness; it has no bearing on the particular litigant's standing at the time the suit was filed.").

This suit was filed on April 28, 2022. ECF No. 1. No facts after that date can serve to defeat standing retroactively. *See GLO v. Biden*, 71 F.4th 264, 272 n.12 (5th Cir. 2023) ("As this action was filed in October 2021, developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing). Thus, post-filing numbers of migrants entering (or not entering) the United States are irrelevant to standing (although they could be relevant to mootness). *Pederson*, 213 F.3d at 870.

Defendants submitted an expert report projecting future migrant flows as a result of the IFR. Defs' MTD at Exh. C. This expert report *admits* that "[t]he evidence is not inconsistent with the

possibility that changes to asylum procedure or processing can be a necessary element of a larger bundle of policies that, together, are sufficient to cause substantial changes in migration behavior." Defs' MTD at Exh. C, ¶10. Thus, even Defendants' expert believes it is reasonable to expect that changes to asylum procedure could have an impact on broader migration behavior.  At the time of the filing of the complaint, then, Texas had standing to assert an injury from the IFR based on the expectation that a streamlined asylum procedure with a lower procedural bar to entry would create additional migrant flows into Texas.

Defendants' expert report shows that from the time the IFR was announced on March 29, 2022 until its effective date of May 31, 2022, the number of border encounters at the Southwest border did, in fact, marginally increase. Defs' MTD Exh. C at 4 (chart).[8] Thus, even according to Defendants' own expert, Texas had facts to support an injury due to increases in border encounters from the time the rule was promulgated, at the time of the complaint, and immediately after. This increase is confirmed by the underlying data provided on the U.S. Customs and Border Protection website. In March of 2022, the total number of border encounters in the Southwest was 211,181; in April of 2022, the total was 203,504; and in May of 2022, it was 224,370.[9]

Defendants' expert does claim that after the IFR went into effect, there was a decrease in border encounters that prevents the conclusion that the IFR increased the presence of unlawful migrants in Texas. Defs' MTD at 12; Defs' MTD Exh. C at 7-10. But even if Defendant's expert is correct, this subsequent data does not impact Texas's standing because "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the

---

[8] The expert report's data comes in part from U.S. Customs and Border Protection, "Fiscal Year Stats," *Southwest Land Border Patrol Encounters (by Component)*, at Southwest Land Border Encounters (By Component) | U.S. Customs and Border Protection (cbp.gov).  This data is partially included at Appx 326ff.

[9] *Id*; Appx 326, 362-66.

suit was filed." *Davis*, 554 U.S. at 734. Texas had standing to assert an injury based on increased migration at the time of filing.

**C.   The injury need not be actualized—a prospective injury will suffice.**

Texas did not need to show an actual injury from the IFR at the time of the complaint to establish standing. The U.S. Supreme Court has recognized that "the injury required for standing need not be actualized." *Davis v. FEC*, 554 U.S. 724, 734 (2008). "A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Id.* Here, Texas's imminent injury from the threat of an increase in unlawful immigrants entering the State as a result of the IFR was established by both the prospective threat and the actual entry of unlawful immigrants.

Texas faced a "substantial risk" of future injury from the flow of migrants due to the operation of the IFR. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Texas was not required to show that it was "literally certain" that it would be injured in the future. *Clapper*, 568 U.S. at 414 n.5. It needed only to show a "substantial risk" that injury would occur. *Susan B. Anthony List*, 573 U.S. at 158.

Because this is an APA case, Texas could sue the moment the IFR was issued without waiting for an injury from the rule's implementation to occur. In APA cases, there will often be no evidence of present or past injury because "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement." *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (citation omitted). Facial challenges to regulation, such as the challenge here, are generally ripe the moment the challenged regulation is passed. *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736 n.10 (1997).

And, indeed, the publicly available data on which Defendants' expert relied, *see* Defs' MTD Exh. C at ¶12, demonstrates that there was an uptick in overall U.S. Customs and Border Protection encounters in Texas in the months following the rule, once the Texas numbers are separated out from

the other states.[10] Below is a chart using the same CBP data, but calculating only the numbers based on Border Patrol Sectors in Texas in FY 2022:[11]

| Texas CBP encounters total by month for FY 2022 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 |
| | | | | | | | | | |
| El Paso | | 18039 | 20618 | 25618 | 29865 | 34643 | 26242 | 25024 | 29756 |
| Big Bend | | 2379 | 3007 | 3665 | 3383 | 1422 | 2024 | 1619 | 1400 |
| Del Rio | | 31154 | 30815 | 41631 | 40931 | 29977 | 45610 | 49618 | 52735 |
| Laredo | | 7375 | 9501 | 13800 | 12577 | 3464 | 9886 | 6603 | 6299 |
| Rio Grande Valley | | 30232 | 33847 | 44072 | 41922 | 38032 | 44663 | 35189 | 27286 |
| **TOTAL** | | **89179** | **97788** | **128786** | **128678** | **107538** | **128425** | **118053** | **117476** |

The CBP website also calculates a year-over-year comparison of the number of migrants entering various ports along the border, some of which are in California, New Mexico, and Arizona.[12] With regard to the points of entry in Texas measured by CBP, some have seen fewer migrants in FY2023 than in FY2022, but El Paso's border encounter total is up *50.4 percent year-over-year*.[13] The numbers do not tell as obvious a story as Defendants suggest. And, if any additional unlawful migration causes the State government to allocate more resources to caring for that population, it is an injury. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14

---

[10] U.S. Customs and Border Protection, *Southwest Land Border Patrol Encounters (by Component)*, at Southwest Land Border Encounters (By Component) | U.S. Customs and Border Protection (cbp.gov); Appx 326ff,
[11] *Id.*, complied into spreadsheet for an independent calculation.
[12] Id., Fiscal Year 2023 Stats.; Appx 326ff.
[13] *Id.*; Appx 350.

(1973) ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)).

Defendants' expert report purports to demonstrate that the IFR did not meaningfully change migration into Texas—and if anything, the numbers slightly decreased. Defs' MTD Exh. C. However, Defendants' expert admits that the story behind the numbers is complicated.  Defendants' expert notes that migrations fluctuate seasonally. Defs' MTD, Exh. C at ¶¶23, 25. He also points out that his study factors in the unemployment rate for Hispanic/Latino workers, which impacts the volume of border encounters. *Id.* at ¶25. The expert report further uses the overall Southwest border crossing numbers without isolating Texas. *Id.* at ¶12. As explained above, isolating Texas could generate a different result. Naturally, many factors impact migration rates. And Defendants' expert makes clear that the IFR was analyzed on its own, but were it analyzed in conjunction with a bundle of other policies, the result might be different. *Id.* at ¶¶8-10. Thus, the expert report does not conclusively demonstrate that the IFR did not increase unlawful immigration in Texas—it merely puts the fact into controversy.

Even assuming the expert is correct that migrant flows decreased, a mere "temporal correlation" with migrant flows does not demonstrate that the IFR was the cause of a net decrease. *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 798 (D. Ariz. 2022). "Correlation is not causation." *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009), and there are "myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States.'" *Arizona*, 584 F. Supp. 3d at 795 (quoting *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021)). As "any number of variables might influence an alien's independent decision to enter the country illegally," *Arizona*, 584 F. Supp. 3d at 797 (internal quotations omitted), the standing inquiry cannot be dismissed simply because certain migration numbers decreased.

Texas has put forth facts sufficient to allege that it had a substantial risk of an injury from the IFR at the time it filed the complaint.  This is all Texas had to do to meet its burden.

Defendants also note that "Texas has admitted that asylum grant rates fluctuate over time based on numerous factors including judicial decisions and socio-economic conditions in other countries, all separate and apart from the IFR." Defs' MTD at 14. Defendants believe that this so-called admission precludes Texas's ability to claim that its injury results from an increased number of aliens entering Texas. Even accepting the Defendants' mischaracterization of this statement as an "admission," it does not defeat standing for two reasons.

*First*, grant rates are only part of the issue. Texas is also alleging that the IFR will make it easier for aliens with nonmeritorious claims to receive a grant of asylum. *See* Defs' Exh. B at 14-16. The heart of the matter, however, is squarely presented by Texas's Interrogatory No. 11-12: Regardless of the grant rate, Texas believes that the IFR will incentivize immigrants to enter the United States at any port of entry and increase the number of unlawful immigrants in the United States and Texas. Defs' Exh. B at 16. Moreover, the grant rates are irrelevant because many immigrants who are not granted asylum will simply continue to remain in the United States—paroled—either because their removal has been withheld or because, as the Government admits, it lacks the resources to remove more than a small fraction of the removable population. *See* Appx. 200-09; 28-31. Any administrative rule that makes it easier to enter the United States increases the substantial risk to Texas that its social services and criminal justice system will have to take care of the people that the U.S. Government allows in.

*Second*, Texas is not required to trace specific asylum grants under the IFR to specific migrants paroled in Texas. *See supra*, Part I.A.1. Texas can, however, trace increased asylum applications to Presidential policy. The current Administration has an explicit policy of encouraging massive levels of immigration into the United States. This can be clearly seen in the analogous context of refugee resettlement. The President sets the annual resettlement cap for refugees seeking asylum, and this cap

is known to fluctuate—for example, President Trump set the cap at 15,000 in FY 2021, and President Biden raised that cap to 125,000 for FY 2023.[14]

In the asylum context, Syracuse University released a study that found that there were more grants of asylum in 2022 than in any other year—and the study attributed this increase to policies of the Biden Administration.[15] To deny that asylum grant rates depend on multiple factors would strain credulity, but so would denying that the Biden Administration's administrative rule had a significant impact. Again, the operative question for standing is whether Texas had a substantial risk of injury at the time it filed the complaint, not after grant numbers came in, and Texas has alleged facts to meet that burden. *See Pederson*, 213 F.3d at 870; *Susan B. Anthony List*, 573 U.S. at 158.

To counter the inference that the IFR had an impact, Defendants argue that the numbers demonstrate no massive increase in the number of asylum cases finding a credible fear determination since the IFR was implemented, based on a comparison of the total asylum grant rate across the board in 2021 and the asylum grant rate attributable to the IFR cohort since June 2022. Defs' MTD at 13-14. Again, these numbers only tell one piece of the story. In the USCIS Director's FY 2022 report to Congress in July 2023, a chart showing the year-over-year numbers of asylum cases received based on affirmative grants, credible fear, or reasonable fear indicated that the overall number of cases in 2022 *increased 166 percent* from 124,939 in 2021 to 331,761 in 2022.[16] All types of cases increased from 2021 to 2022.[17] While the chart showed only 759 cases attributable to the IFR cohort, the IFR cohort numbers only include a few months of data. Texas's argument has never been limited to the IFR

---

[14] Migration Policy Institute, *Refugees and Asylees in the United States*, June 15, 2023, Article: Refugees and Asylees in the United States | migrationpolicy.org; Appx 316.

[15] Suzanne Gamboa, *Biden Admin Changes Have Led to Historic Number of Court-Granted Asylum Cases*, NBC News, Dec. 14, 2022, at Biden changes led to historic number of court-granted asylum cases (nbcnews.com); Appx 375.

[16] Department of Homeland Security, *Asylum Application Processing: FY 2022 Report to Congress*, July 17, 2023, at 6, *available at* https://www.dhs.gov/sites/default/files/2023-08/23_0717_uscis_asylum_application_processing.pdf (last visited Oct. 13, 2023); Appx 389.

[17] *Id.*

itself—Texas's complaint is that the IFR will increase the number of overall asylum seekers, which will, in turn, lead to more unlawful immigrants in Texas, many of whom will never be processed, detained, or removed.

The DHS's own numbers show that there is at least a correlation between the passage of the rule and a massive increase in asylum cases. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (courts may take "judicial notice of publicly-available documents and transcripts produced by the [a federal agency], which were matters of public record directly relevant to the issue at hand"). This massive increase proves Texas's point that the IFR will lead to more asylum cases, which are substantially likely to result in more asylum seekers being paroled into Texas at the state taxpayer's expense.

Defendants further argue that Texas admitted in a Request for Admission that increasing the time to process claims would likely increase the incentive to file a nonmeritorious claim (to take advantage of being paroled into the country), while decreasing the time to processing would do the reverse. Defs' MTD at 15-16. Texas does not believe this hypothetical question changes its substantive argument that the IFR will generally lead to more asylum cases, more nonmeritorious cases, and more unlawful immigrants in Texas. As Texas explained above, the Government's own numbers showed that asylum cases increased, and attempted entry into Texas through one main entry point also increased. A hypothetical speculation in a Request for Admission cannot supersede this Court's ability to take judicial notice of the Government's own numbers. And, as Defendants repeatedly have informed this Court, many factors influence migration rates—the time to process an application is merely one of them.

Admittedly, it is difficult to isolate the impact of the IFR in the face of many factors affecting the number of migrants entering Texas. But this fact is exactly why it makes sense to apply the precedent cited above—that whether a plaintiff has asserted an injury sufficient to establish standing

22

is determined by the facts at the time of the complaint, and that these facts may establish a right to prospective relief before the injury occurs. Nearly every APA rule challenge is going to be subject to the same criticism that it is difficult to isolate the impact of one rule in a market environment where many factors influence the relevant actors. Thus, the applicable precedent correctly establishes a system in which a plaintiff can plead a prospective injury, and then have its standing determined by the "substantial risk" rather than the "econometric analysis." Texas has alleged facts and put forth evidence sufficient to meet the applicable standards. Texas was entitled to rely on its prospective injury from increased asylum seekers due to the IFR at the time the complaint was filed, and the Defendants' proffered evidence to the contrary has been effectively countered by its own data.

**D. Texas can show that its injury is likely caused by the IFR and redressable by a favorable court decision.**

Defendants argue that even if Texas has an injury-in-fact, it cannot demonstrate that its injury is fairly traceable to the IFR or redressable because the IFR allegedly decreases border encounters and because Texas's injury is due to various factors and acts of independent third parties that cannot be attributable to the government. Defs' MTD at 17-21. To the contrary, Texas has alleged facts demonstrating that the IFR will lead to an increase in unlawful and paroled immigrants in Texas, which, in turn, will cost Texas money on government programs. *See DAPA*, 809 F.3d at 161. "[A]n increase in parolees causes the States financial harm by way of driver's license applications … [and] healthcare" and it is "obvious that if the total number of in-State aliens [via parole] increases, the States will spend more on healthcare." *MPP*, 20 F.4th at 969.

Although Texas does not—indeed, cannot—track data on unlawful immigrants in a manner that would show individual aliens who, say, attended public schools as a result of the IFR, Texas does not have to eliminate all possibility of other factors or variables in order to establish standing. To demonstrate causation, "Texas needs only to have alleged facts showing the Federal Defendants' conduct is a cause-in-fact of the injury that the State asserts." *GLO v. Biden*, 71 F.4th at 272; *see also*

23

*DACA*, 50 F.4th at 419. Texas has alleged facts that, if true, demonstrate that DHS's policy will result in fiscal injuries to the State. *See id.*

Texas's allegations "are taken as true at the pleading stage, and they are not yet obliged to produce specific evidence to counter the Defendants' merits arguments." *GLO*, 71 F.4th at 273 (citing *Lujan*, 504 U.S. at 561). Thus, Texas does not have to prove to a certainty that the IFR causes an increase in illegal immigrants in Texas—it only must show that it is likely. Nor do Defendants' arguments that border encounters or asylum grant rates have decreased defeat Texas's standing. Once an "injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Id.*, citing *DAPA*, 809 F. 3d at 155-56.

Texas is a top destination for immigrants, both lawful and unlawful. Texas has alleged that DHS's new asylum policy will increase the rate at which illegal aliens are entering Texas, and that this will result in fiscal injuries to the State. Texas has alleged that eliminating that new policy will reduce the number of illegal aliens entering Texas and reduce the cost to Texas. This argument "does not rest on mere speculation about the decision of third parties" but "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York,* 139 S. Ct. 2251, 2566 (2019). Thus, the fact that aliens make individual choices to move to Texas and use its services does not negate the causation between the IFR and Texas's injury.

Defendants argue—based on law from other circuits—that Texas's connection between the IFR and its injury is "pure speculation," insufficient to establish causation. Defs' MTD at 18-19. The Fifth Circuit, however, made clear in a similar immigration case that the standard is not as strict as Defendants suggest, and Texas does not have to connect the IFR to individual illegal immigrants in Texas using its services:

> The Government says that's not enough because Texas has not shown it has already
> issued any licenses to immigrants who became eligible because of MPP's termination.
> Tellingly, however, it offers no hint as to how Texas could make that showing—nor
> why we should require it to do so. Imagine Texas had produced copies of driver's

24

license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional 'driver's license as a result' of 'MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*MPP*, 20 F.4th at 971; *see also  Florida v. Mayorkas*, --- F.Supp.3d ----, 2023 WL 3398099, at *5 (N.D.

Fla. May 11, 2023) ("[T]he evidence presented ... established that Florida suffers substantial harm—

both to its sovereignty and its public fisc—when the federal government releases aliens into the

country on 'parole' (or otherwise) rather than detaining them as required by the INA.").

Nevertheless, Texas has put forth numbers demonstrating that border encounters and asylum

applications are up. An increase in aliens' (1) applications for driver's licenses, (2) incarceration, (3)

usage of public education, and (4) usage of social services, and the costs that these impose on Texas,

are such predictable effects. Aliens who enter Texas, either from being paroled under the IFR or from

simply entering unlawfully due to an overall impression of lax enforcement, are unlikely to behave

differently than other typical aliens. Therefore, because Texas is one of the top states new immigrants

choose for resettlement, the IFR will "likely cause" more unlawful immigrants to use Texas's services.

Texas has rebutted the Government's evidence, showing a likelihood that the choices of third

parties "will be made in such a manner that produce causation and permit redressability of the harm."

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504

U.S. at 562). Further, the harm Texas alleges is sufficiently direct even after the *Enforcement Priorities*

decision, as will be discussed in greater detail in the next section.

In addition, Texas's injury would be redressed by a favorable ruling. Defendants argue at some

length that Texas cannot show that enjoining the IFR would provide complete relief. Defs' MTD at

21. Defendants, however, are applying the wrong standard. When establishing redressability, a plaintiff

need only show that a favorable ruling could potentially lessen its injury; it need not definitively

demonstrate that a victory would completely remedy the harm." *Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) (quoting *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)).  Indeed, just as the Fifth Circuit did not require Texas to eliminate all other variables that might contribute to the causation of its injury in *MPP*, 20 F.4th at 917, Texas need not prove here that its requested relief will redress every aspect of its injury.

Texas is injured by Defendants' policies that make it easier for unlawful immigrants to enter Texas than Congressional statutes allow, and its injury will be redressed by a court decision that makes Defendants return to adhering to those statutes. If the Defendants had to follow Congress's statutory requirements in the INA for processing asylum applications, any parolee who would be using Texas's public services would no longer be doing so. *DAPA*, 809 F.3d at 161.  At a minimum, enjoining the change in policy would force asylum officers to apply the commands of 8 U.S.C. § 1182(d)(5) and to grant parole "only on a case-by-case basis," which would still reduce Texas's harm. Texas has, therefore, established causation and redressability.

## II. Texas has a legally cognizable injury-in-fact.

Texas has a legally cognizable injury under Article III. Any increase in the presence of aliens in Texas who are not citizens creates an injury in the form of higher costs to provide state social services. "For standing purposes, even 'a dollar or two' of injury suffices." *Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008)); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Texas is suffering injury in fact—concrete and particularized injuries attributable to the Defendants' actions. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). An increase in unlawful immigrants increases the burden on a variety of State educational,

social services, driver's license, and criminal justice functions due to the need to serve aliens who are in the United States as a result of Defendants' policy. "Federal law affirmatively requires the States to make some of these expenditures" on aliens present in the State. *Texas v. Biden (MPP)*, 20 F.4th 928, 969 (5th Cir. 2021) (citing 42 C.F.R. § 440.255(c) (Emergency Medicaid)). This cost increase is an imminent and occurring injury because Texas currently operates these programs and intends to continue. *Texas v. United States*, 524 F. Supp. 3d 598, 619 (S.D. Tex. 2021) (Tipton, J.) ("alleged injuries to its detention and education costs are sufficiently concrete and actual or imminent" in challenge to 100-day pause in removals).

Defendants argue that Texas has not presented a legally cognizable injury for standing in light of, *inter alia*, the United States Supreme Court's recent decision in *United States v. Texas*, 599 U.S. 670, 143 S. Ct. 1964 (2023) (hereinafter *"Enforcement Priorities"*). Defs' MTD at 22-30. Specifically, Defendants believe this decision both prevents States from challenging asylum grants and precludes a State from establishing standing based on a federal policy's indirect effects that may cause the State to incur additional costs. Defs' MTD at 23-27.

The Supreme Court's decision, however, explicitly does not apply to cases like this one. *Enforcement Priorities* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he

himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

Defendants mischaracterize *Enforcement Priorities* as precluding Texas's standing based on an injury from the Government's decision to parole aliens. *See* Defs' MTD at 29-30. *Enforcement Priorities'* holding is narrower than this. The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

This extremely "narrow" and "highly unusual" case does not apply here. That is because Texas's injury is not based on a mere failure to arrest particular aliens. Texas's injury is based on Defendants' release of aliens into the United States pending their asylum determination and the resulting incentive for more immigrants to enter the United States illegally. This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine

standing here. Enjoining the IFR does not require Defendants to take any immigration, deportation, or criminal action against any particular aliens.

Defendants argue that the *Enforcement Priorities* decision makes clear that a State does not have standing to sue for indirect harms caused by a change in federal policy. Defs' MTD at 22-23. The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," 143 S. Ct. at 1972 n.3 (cleaned up; citations omitted). This mild language—"can become attenuated"—does not preclude standing based on indirect costs to States in all cases.

The State plaintiffs in *Enforcement Priorities* asserted an injury similar to the one Texas asserts here—that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969-70. But *those* injuries were not "judicially cognizable" because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id.* at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id.* at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not control this case because Texas has not claimed that any particular aliens should be arrested to redress its injury.

Instead, Texas' complaint is with the incentive structure the IFR creates. Texas asserts that the statutorily mandated system requiring a longer application process, detention pending adjudication, and an appearance before an immigration judge creates a better incentive structure for eliminating

unlawful entry into the United States than the IFR. Texas's argument is more similar to that in *GLO v. Biden*, in which the Fifth Circuit found that Texas had standing to assert that failing to build a border wall would create an incentive for unlawful immigration and, thus, cause it injury based on increased costs to criminal justice, education, and social services. 71 F.4th at 273. In *GLO*, Texas alleged that border barriers reduce illegal entry and increase the detection and apprehension of illegal immigrants. *Id.* Here, Texas argues that the statutory border barrier (*i.e.,* the asylum process) does the same thing. Here, as in *GLO*, Texas has standing to challenge DHS's policies.

Defendants assert that *Enforcement Priorities* calls *GLO* into question. Defs' MTD at 26-27. But *GLO* is about government policy that creates a predictable incentive structure for illegal immigrants to enter Texas while *Enforcement Priorities* is about indirect harm resulting from a failure to arrest. The injury in *GLO*, as here, is far more direct and traceable to the challenged policy.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which upheld indirect injury as a basis for States' standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms." (citing *Dep't of Commerce*, 139 S. Ct. at 2565–66)).

Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016).

Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom.*

*Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023). This Court should continue to apply *Dep't of Commerce* and existing Fifth Circuit precedent in this area.

The Supreme Court took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973. Although the *Enforcement Priorities* rule does not apply to this case, exceptions articulated by the Supreme Court would apply even if it did.

### A.   The IFR confers affirmative benefits and is not merely non-enforcement.

The *Enforcement Priorities* majority noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. . . . because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." 143 S. Ct. at 1974. The Court cited two examples: *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *DAPA*, 809 F.3d at 154 (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).

DACA counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R.

31

§ 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

Here, the same is true of asylum seekers being paroled into the United States, which under the new IFR may occur even when the applicant does not qualify for asylum. Under federal law, aliens paroled into the United States become eligible for various benefits after five years. These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments). *See* 8 U.S.C. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States"). Beneficiaries of the IFR also get an early start on the "waiting period for eligibility to file for employment authorization based upon a pending asylum application" because the credible fear determination is treated as an asylum application. Appx. 18 (citing 8 C.F.R. § 208.3(c)(3)).

This case is more similar to the DACA case, in which the Supreme Court recognized an injury when a policy went beyond mere non-enforcement and constituted "affirmative immigration relief":

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. App. to Pet. for Cert. 100a. . . . And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (citations truncated).

Even where the connection between "affirmative immigration relief" and a State's injury is more indirect, the exception to *Enforcement Priorities* still applies. In the *MPP* case, increasing grants of parole even indirectly through termination of MPP satisfied this test:

> [T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (emphases in original).  When a policy "has increased the number of aliens released on parole into the United States, including Texas," *MPP*, 20 F.4th at 966, that meant that more aliens were being released to use healthcare services and public education—and parole made them eligible for subsidized driver's licenses. *Id.* at 968. This was sufficient for Article III standing and remains the case here—Texas's increased costs are a *direct* result of the IFR's "affirmative immigration relief." *See DACA*, 50 F.4th at 517 ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id.* at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.").

Even though the IFR does not directly provide aliens with benefits, "an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up).

Contrary to Defendants' argument, Defs' MTD at 25, the Supreme Court's recent decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) *reinforces* that the costs to Texas in this case are direct rather than indirect. That case upheld the State of Missouri's standing to challenge the Biden

Administration's student loan forgiveness program. Missouri had "created MOHELA as a nonprofit government corporation to participate in the student loan market," *id.* at 2365, and it interacted with the federal government to service student loans and received administrative fees for these services. *Id.* The loss of those fees was "an injury in fact *directly traceable* to the" loan forgiveness program, *id.* (emphasis added), as it "will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a *direct injury* to Missouri itself." *Id.* at 2366 (emphasis added).

Similarly, Texas has a direct financial injury through subsidized driver's licenses. Texas interacts with the federal government through the REAL ID Act, *see DAPA*, 809 F.3d at 155 n.58, and ties eligibility for subsidized licenses to lawful presence—as aliens with parole status are eligible to receive subsidized licenses from Texas, and "[b]ecause driving is a practical necessity in most of the state, there's little doubt many newly paroled aliens have applied—and without the district court's injunction, will apply in the future—for Texas driver's licenses." *MPP*, 20 F.4th at 970–71 (citing *DAPA*, 809 F.3d at 156). Just as the financial harm to MOHELA was "directly traceable" to the challenged agency action in *Nebraska*, 143 S. Ct. at 2366, Texas has a direct financial injury due to the IFR.

## B. Texas has standing because Defendants have abdicated their statutory responsibilities.

The *Enforcement Priorities* majority noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* at 1973–74 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 1974. There, "the States ha[d] not advanced a *Heckler*-style 'abdication' argument in this case or argued that the

34

Executive has entirely ceased enforcing the relevant statutes," so the Court did not analyze this potential basis for standing. *Id.*

Here, the IFR is just such an extreme example that constitutes abdication of the Federal Defendants' statutory responsibilities. The applicable statutes, as explained above, provide that an alien who has applied for asylum may have an asylum officer make a credible fear determination, and that determination is reviewable by an immigration judge. *See* 8 U.S.C. §§ 1225(a); 1225(b); 1229a. Instead, the IFR removes the immigration judge from the process—the asylum officer's determination is the initial determination, the application, and the final disposition. The asylum officer can even decide to "withhold removal" from an alien who does not qualify for asylum. Appx. 28-29. And, contrary to the statutes that provide that aliens should be detained except for "urgent humanitarian reasons" or "significant public benefit," 8 U.S.C. §1182(d)(5), the IFR provides that aliens who do not present a threat or flight risk should be paroled. Appx. at 30-32. "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *MPP*, 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse.*" *Id.* at 997. This court may find standing on this additional ground.

## III.    Texas is entitled to special solicitude.

Because "States are not normal litigants for the purposes of invoking federal jurisdiction," they may be entitled to "special solicitude"—a doctrine that allows a state to establish standing "without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514 (citing *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 520 (2007)). Under this standard, a state will establish standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* (quoting *Massachusetts*, 549 U.S. at 518).

35

Texas has satisfied the test for special solicitude standing because it has shown that (1) there is "a procedural right to challenge the action in question" and (2) the challenged action "affect[ed] one of the State's quasi-sovereign interests." *DACA*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 151-52).

### A.   Texas has a procedural right to challenge the agency action in question.

Texas satisfies the first prong because it is "asserting a procedural right under the APA to challenge an agency action." *MPP*, 20 F.4th at 970 (citation omitted) & n.10 (noting that such a procedural right is not limited to notice-and-comment claims but also includes substantive claims). *See* 5 U.S.C. § 706. "Enjoining [the IFR] based on the procedural APA claim could prompt DHS to reconsider the program, which is all a plaintiff must show when asserting a procedural right. And enjoining [the IFR] based on the substantive APA claim would prevent Texas's injury altogether." *DAPA*, 809 F.3d at 161.

Defendants argue that Texas must show a specific procedural right in the INA that authorizes its suit, similar to that created by the Clean Air Act.  *See* Defs' MTD at 32-33.   Whether the INA itself provides a specific procedure for States to challenge its provisions is irrelevant because the Administrative Procedure Act itself creates a sufficient procedural right. As in the *DACA* case, Texas is challenging "DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *DACA*, 50 F.4th at 514. Like in *DACA*, Texas has procedural right under the APA: "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). In addition, when states "challenge DHS's decision to act, rather than its decision to remain inactive, a procedural right similar to that created by the Clean Air Act is not necessary to support standing." *DAPA*, 809 F.3d at 152.  Texas thus satisfies the first element of special solicitude.

**B.  The challenged action affects Texas's quasi-sovereign interests.**

Texas satisfies the second element of special solicitude because the IFR affects Texas's quasi-sovereign interests. Those "quasi-sovereign interests" are "a judicial construct that does not lend [themselves] to a simple or exact definition." *DACA*, 50 F.4th at 514 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)).

"'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *DACA*, 50 F.4th at 515 (quoting *Massachusetts*, 549 U.S. at 519). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain "sovereign prerogatives [that] are now lodged in the Federal Government." *Id.* (quoting *Massachusetts*, 549 U.S. at 519).

Classifying aliens is a quasi-sovereign interest.  In *DACA*, the Fifth Circuit reasoned that the State's "interest in classifying aliens was analogous to the interest in regulating emissions that the Supreme Court deemed a quasi-sovereign interest in *Massachusetts v. EPA*" and concluded that "DACA implicate[d] Texas's quasi-sovereign interest in classifying aliens." *DACA*, 50 F.4th at 515. It also recognized that "a State's inability to legislate around DACA can create a quasi-sovereign interest," meaning that "a quasi-sovereign interest could arise based on 'federal preemption of state law.'" *Id.* The recognition that preemption concerns are relevant to quasi-sovereign interests is consistent with the previous *DAPA* case, which indicated that pressure to change state law could also be sufficient in certain immigration contexts to establish special solicitude. *See DAPA*, 809 F.3d at 153. An inability to adapt state law to avoid injury due to preemption is simply the converse situation.

Here, the IFR also implicates Texas's quasi-sovereign interests. Texas has no power to reclassify unlawful immigrants within its borders because it "surrendered some of their sovereign prerogatives over immigration" upon entering the union, including its power to "establish their own classifications of aliens." *Id.* Any attempt to reclassify immigrants would "implicate preemption

37

concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *DACA*, 50 F.4th at 515. "An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *Id.* (citing *Arizona*, 567 U.S. at 409). Thus, because Texas must yield to a federal classification scheme that implicates its quasi-sovereign interest, it is entitled to special solicitude here.

  *Enforcement Priorities* is not to the contrary. Defendants again argue that *Enforcement Priorities* negates Texas's standing, and the special solicitude doctrine cannot save it. Defs' MTD at 30-31. This case falls into both the exception for which "the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions" and the exception when prosecution priorities are combined with "provision of legal benefits or legal status." 143 S. Ct. 1973. *Enforcement Priorities* itself mysteriously says nothing about special solicitude. *See* 143 S. Ct. at 1977 (Gorsuch, J., concurring). Thus, once Texas demonstrates that it falls into an exception to the *Enforcement Priorities* decision, it is still entitled to special solicitude because its injury satisfies "bedrock Article III constraints." *See infra*, Part II.

## IV. Texas's claims fall within the zone of interests that the Immigration and Naturalization Act is designed to protect.

  Texas has a cause of action under the APA because its claims are within the zone of interests protected by the INA. The zone-of-interest test is satisfied if the claims are "*arguably* within the zone of interests to be protected or regulated by the statute." *DACA*, 50 F.4th at 521 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225).

Texas easily satisfies this "lenient" standard for an APA claim. *DACA*, 50 F.4th at 521.  The Fifth Circuit has already recognized that states can bring APA actions under the INA consistent with Congress's intent: "In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *DAPA*, 809 F.3d at 152. "'The interests the states seek to protect fall within the zone of interests of the INA,' .... The States will have no trouble clearing this low bar...." *Texas v. United States*, 40 F.4th 205, 223 (5th Cir. 2022), *overruled on other grounds*, *United States v. Texas*, 143 S. Ct. 1964 (2023) (quoting *DAPA*, 809 F.3d at 163).  And in *DACA*, the Fifth Circuit reiterated the point: "In *DAPA*, we held that the states' challenge fell within the INA's zone of interests. The Government argues that this case is different because of the different harms alleged.... This argument misunderstands the States' claims.... The INA encompasses [the States'] concerns about the financial burdens of illegal immigration...." *DACA*, 50 F.4th at 521. Here, just as in that case, Texas's "objectives are consistent with the INA's, so they pass the lenient zone-of-interests test." *Id.*

The proper reference point for the APA's zone-of-interest inquiry is the INA as a whole rather than any particular section. *MPP*, 20 F.4th at 975–76. Despite Defendants' argument that the relevant zone of interest should be limited to particular subparts of the INA, Defs' MTD at 33-34, *MPP* solidly rejected Defendants' nearly identical reasoning to the arguments advanced here.

In *MPP*, the federal government argued that "the States lack a cause of action because their claims fall outside the zone of interest of § 1225(b)(2)(A) and (C)." 20 F.4th 928, 975 (5th Cir. 2021) *reversed on other grounds*, 142 S. Ct. 2528, (2022). The Fifth Circuit was not impressed: "Note the shift— the Government focuses on the zone of interests of two subparagraphs in § 1225(b)(2) rather than that of the INA (or even § 1225(b)(2)) as a whole. That particular form of jiu-jitsu is at odds with both Fifth Circuit and Supreme Court precedent." *Id.* at 976.

Texas's claim is also within the zone of interests the INA is trying to protect. The INA's purposes are to set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). Another reason the INA was enacted was the "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'"—benefits such as the ones Texas must furnish under the Emergency Medicaid program and its obligation to furnish a public education. *DAPA*, 809 F.3d at 163 (quoting 8 U.S.C. § 1601).

*MPP* also rejected the very argument now advanced by Defendants that the States fell outside the zone of interests because the section of the INA at issue in the case "said nothing ... about benefiting States or saving them from attenuated financial burdens," noting that "[t]hat argument likewise focuses too narrowly on" the particular section and was "nothing more than a rehash of the Government's failed standing arguments." *Id.* Indeed, the INA was enacted due to the "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'"—benefits such as the ones Texas must provide under the Emergency Medicaid program and its obligation to furnish a public education. *DAPA*, 809 F.3d at 163 (quoting 8 U.S.C. § 1601).

Thus, Texas has an interest in seeing the INA and other statutes enforced and upheld. *See DACA,* 50 F.4th at 521 (citing *Arizona*, 567 U.S. at 397, and *DAPA*, 809 F.3d at 163). Texas's interests in not "spending millions of dollars to subsidize" illegal aliens are within the zone of interests protected by the INA. *Id.*

**V.      The IFR violates the Appointments Clause by giving the power of Officers to employees.**

The Appointments Clause sets forth the "exclusive means of appointing 'Officers.' Only the President, a court of law, or a head of department can do so." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (citing U.S. Const. art. II, § 2, cl. 2.). Officers have duties that are "continuing and permanent," have positions that are "continuing," and exercise "significant authority pursuant to the laws of the United States." *Lucia v. S.E.C*, 138 S. Ct. 2044, 2051 (2018); *see Edmond v. United States*, 520 U.S. 651, 662–63 (1997). Conversely, employees are lesser functionaries subordinate to officers of the United States that have duties that are only "occasional or temporary." *Buckley v. Valeo,* 424 U.S. 1, 125–26 & n.162 (1976).  Because asylum officers are not properly appointed, they have no power to exercise the federal government's sovereign authority, as proposed in the IFR, to adjudicate claims after a positive credible fear finding.

Defendants do not dispute that the IFR gives career civil servants the power of officers.  *See* Defs' MTD at 39-40. Under existing statutes and regulations—outside of the credible-fear and expedited-removal context—asylum officers already have some limited discretion to grant "asylum to an applicant who qualifies as a refugee." *See, e.g.*, 8 C.F.R. § 208.14(b). But the IFR gives asylum officers even more authority. 87 Fed. Reg. 18,078, 18,086 (May 31, 2022). When deciding whether to grant asylum, asylum officers, among other things, administer oaths, verify the identity of asylum applicants, present and receive evidence, question applicants and any witnesses, make credibility determinations, issue written decisions, and determine whether applicants have met their burden of proof. *See, e.g.*, 8 C.F.R. § 208.9(b)–(c). The Supreme Court has held that these quasi-judicial functions require appointment as an officer. *See Lucia*, 138 S. Ct. at 2053-54; *Freytag v. Commr.*, 501 U.S. 868, 881 (1991).

Moreover, asylum officers "hold a continuing office established by law." *Lucia*, 138 S. Ct. at 2053. They do not have "episodic" or temporary appointments. Their positions are career positions created and defined by statute. 8 U.S.C. § 1225(b)(1)(E); *see also* 8 C.F.R. § 208.1(b). Additionally, their

41

actions are not subject to oversight by a properly appointed officer; rather, they are supervised by other asylum officers with "substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E). *Cf. United States v. Arthrex*, 141 S. Ct. 1970, 1976 (2021).

But officers they are not. They are not principal officers, that is, persons appointed by the President following the Senate's advice and consent. Nor are they inferior officers, that is, officers appointed by principal officers whose work is directed and supervised by a principal officer. *See Lucia*, 138 S. Ct. at 2051; *Edmond*, 520 U.S. at 663. As the IFR concedes, they are "career Government employees," 87 Fed. Reg. 18,110. They are "only empowered to grant asylum[] as an exercise of the Secretary's authority," *id.* at 18,113, and their decisions are "subject to supervisory review," *id.* at 18,112, by other employees, only reviewed by an actual officer of the United States upon certification by the USCIS Director herself. *Id.*

Indeed, Congress has made clear that Asylum Officers are merely employees, not officers. Congress has defined by statute that "'asylum officer' means an immigration officer who" has received specified training and who "is supervised by an officer who" has also received such training and who "has had substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E). Thus, an asylum officer is a certain type of "immigration officer," and Congress has specified that "[t]he term "immigration officer" means any *employee or class of employees* of the Service or of the United States designated by the [DHS Secretary], individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title." 8 U.S.C. § 1101(a)(18) (emphasis added).

Defendants do not even dispute that asylum officers would exercise the function of officers under the IFR. Defs' MTD at 39. Nor could they. Instead, they contend that Texas cannot show the IFR is facially invalid. *Id.* at 38-39. Defendants suggest that a constitutionally valid scenario could exist in which the Secretary of DHS appoints the asylum officers. *See id.* The IFR, however, does not require

any action from the Secretary before asylum officers assume their enhanced powers. Were the Secretary to make appointments, as per Defendants' scenario, they would be superfluous.

More importantly, were the Secretary to appoint asylum officers, it would prove Texas's argument. An invalid appointment may be reinstated by a Secretary in whom Congress has vested the power of appointment. But an appointment in this case would be a *cure* for the IFR's constitutional defect, not a constitutionally licit application of the IFR. *See, e.g.*, *Edmond v. United States*, 520 U.S. 651, 117 S. Ct. 1573, 137 L. Ed. 2d 917 (1997) (assignments invalid under the Appointments Clause were "cured" by secretarial appointment). The IFR, as written, illegally vests review power in federal employees, and asylum officers will lack the authority to perform their new functions. *See Buckley*, 424 U.S. at 142.

While it is true that the prescribed test for facial challenges asks if "no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), the 'no' in 'no circumstances' has not been viewed as an absolute requirement. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010).[18] Facial challenges would never succeed if *Salerno*'s 'no circumstances' test were meant literally; then, every unconstitutional rule could be kept safe by an ad hoc but lawful hypothetical, no matter how far removed from likely or intended applications. *See Patel*, 576 U.S. at 418 (dismissing City's argument that lawful but peripheral applications saved its ordinance).

---

[18] Courts alter the rigor of their inquiry according to the specifics of the statute or rule before them. *See e.g. City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 419 (2015) (ruling only some circumstances relevant to fourth amendment related facial challenge); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 n.6 (1992) (Court did not consider 'no circumstances' in approving facial challenge against land-use ordinance); *United States v. Rahimi*, 61 F.4th 443, 454-55 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) (stating *Salerno*'s means-end scrutiny was irrelevant to facial challenge against gun law); *see also Patel*, 576 U.S. at 415 (noting that Court has affirmed facial challenges brought under "diverse array of constitutional provisions"). *Salerno* may have reeled in courts' inclination to approve facial attacks but subsequent decisions have let out the slack.

Indeed, courts relax the 'no circumstances' standard and allow a facial attack when it identifies unconstitutional applications so "substantial" as to overshadow the law's "plainly legitimate sweep" *Stevens*, 559 U.S. at 473; *see also Okpalobi v. Foster*, 190 F.3d 337, 358 (5th Cir. 1999), *on reh'g en banc*, 244 F.3d 405 (5th Cir. 2001) ("law that chills the exercise of a constitutional right will succumb to a facial challenge '*even when* [*the law*] *could have had some legitimate application*.'") (emphasis added).

Courts do not need to abandon their sense of reality when they review facial challenges but should assess the constitutionality of new rules based on the likely set of circumstances. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659-60 (5th Cir. 2006); *Patel*, 576 U.S. at 419.

Asylum officers are not properly appointed under the Appointments Clause, and yet the IFR purports to vest them with "significant authority pursuant to the laws of the United States." *Lucia*, 138 S. Ct. at 2055. It therefore follows that the IFR is unconstitutional." *Id.*; *Buckley*, 424 U.S. at 126.

## CONCLUSION

For the foregoing reasons, the Defendants Motion to Dismiss should be denied.

Dated October 23, 2023.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085
ryan.walters@oag.texas.gov

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

*/s/ Susanna Dokupil*
SUSANNA DOKUPIL
*Lead Counsel*
Special Counsel, Special Litigation Division
Texas Bar No. 24034419
susanna.dokupil@oag.texas.gov

RALPH MOLINA
Deputy for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

GENE P. HAMILTON
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

## CERTIFICATE OF SERVICE

I certify that on October 23, 2023, this brief was filed through the Court's CM/ECF system, which served it upon all counsel of record.

*/s/ Ryan D. Walters*

45