## United States District Court
## Northern District of Texas
## Amarillo Division

STATE OF TEXAS,
    *Plaintiff,*

v.

ALEJANDRO MAYORKAS, in his official
  capacity as Secretary of Homeland
  Security, et. al.,
    *Defendants.*

Case 2:22-cv-00094

### APPENDIX TO
### BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

| Exhibit | Description | Appendix No. |
|---------|-------------|--------------|
| 1 | Interim Final Rule | Appx. 001 - 149 |
| 2 | State Attorneys General Comment | Appx. 150 - 168 |
| 3 | Declaration of Sheri Gipson | Appx.169 - 172 |
| 4 | Declaration of Leonardo Lopez | Appx. 173 - 180 |
| 5 | Declaration of Susan Bricker | Appx. 181 - 191 |
| 6 | Declaration of Rebecca Waltz | Appx.192 - 194 |
| 7 | Homeland Security Memo: Significant Considerations in Developing Updated Guidelines for the Enforcement of Civil Immigration Law | Appx. 195 - 215 |
| 8 | Legislative Budge Board: Border Security; Appropriations and Reporting Requirements (Bates No. TX_0001998 – 2005) | Appx. 216 - 223 |

| 9 | State by State Migration Flows: 2022 − 2023 | Appx. 224 - 269 |
|---|---|---|
| 10 | Proposed Refugee Admissions for FY 2023 | Appx. 270 - 315 |
| 11 | Article: Refugees and Asylees in the United States | Appx. 316 - 325 |
| 12 | Southwest Land Border Encounters (By Component) | Appx. 326 − 373 |
| 13 | NBC News: *Biden Changes led to historic number of court-granted asylum cases* | Appx. 374 - 379 |
| 14 | Department of Homeland Security, *Asylum Application Processing: FY 2022 Report to Congress*, July 17, 2023, at 10, *available at* | Appx. 380 - 402 |

Dated: October 23, 2023

Respectfully submitted.

Ken Paxton
Attorney General

/s/ Susanna Dokupil
Susanna Dokupil
Attorney-in Charge
Special Counsel
Texas Bar No. 24034419

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ethan Quinn Szumanski
Special Counsel
Texas Bar No. 24123966

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General
Special Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Ryan D. Walters
Deputy Chief, Special Litigation Division
Texas Bar No. 254105085

Gene P. Hamilton
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

### CERTIFICATE OF SERVICE

On October 23, 2023, I filed this document through the Court's CM/ECF system, which automatically serves it upon all counsel of record as follows:

Brian C. Ward - brian.c.ward@usdoj.gov
Erez Reuveni - erez.r.reuveni@usdoj.gov
Erin T. Ryan – erin.t.ryan@usdoj.gov
Elizabeth Tulis – Elizabeth.tulis@usdoj.gov

/s/ Susanna Dokupil
Susanna Dokupil

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208, 212, and 235**

[CIS No. 2692–21; DHS Docket No. USCIS–2021–0012]

RIN 1615–AC67

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Parts 1003, 1208, 1235, and 1240**

[A.G. Order No. 5369–2022]

RIN 1125–AB20

### Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule with request for comments.

**SUMMARY:** On August 20, 2021, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") (collectively "the Departments") published a notice of proposed rulemaking ("NPRM" or "proposed rule") that proposed amending regulations governing the procedures for determining certain protection claims and available parole procedures for individuals subject to expedited removal and found to have a credible fear of persecution or torture. After a careful review of the comments received, the Departments are now issuing an interim final rule ("rule" or "IFR") that responds to comments received in response to the NPRM and adopts the proposed rule with changes. Most significantly, the IFR provides that DHS's United States Citizenship and Immigration Services ("USCIS") will refer noncitizens whose applications are not granted to DOJ's Executive Office for Immigration Review ("EOIR") for streamlined removal proceedings. The IFR also establishes timelines for the consideration of applications for asylum and related protection by USCIS and, as needed, EOIR. This IFR responds to comments received in response to the NPRM and adopts the NPRM with changes as described in this rule. The Departments solicit further public comment on the IFR's revisions, which will be considered and addressed in a future rule.

**DATES:** *Effective Date:* This interim final rule is effective May 31, 2022.

*Submission of public comments:* Comments must be submitted on or before May 31, 2022. The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on the entirety of this interim final rule package, identified by DHS Docket No. USCIS–2021–0012, through the Federal eRulemaking Portal: *https:// www.regulations.gov.* Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the interim final rule and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments also are not accepting mailed comments at this time. If you cannot submit your comment by using *https:// www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 (not a toll-free call) for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For USCIS:* Rená Cutlip-Mason, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20588–0009; telephone (240) 721–3000 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Public Participation
II. Executive Summary
  A. Background
  B. Legal Authority
  C. Changes in the IFR
  1. Revisions to the Proposed DHS Regulations
  2. Revisions to the Proposed DOJ Regulations
  D. Provisions of the IFR
  1. Credible Fear Screening Process
  2. Applications for Asylum
  3. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear
  4. Streamlined Section 240 Removal Proceedings Before the Immigration Judge
  5. Parole
  E. Summary of Costs and Benefits
  F. Effective Date
III. Discussion of the IFR
  A. Credible Fear Screening Process
  B. Applications for Asylum
  C. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear
  D. Streamlined Section 240 Removal Proceedings Before the Immigration Judge
  1. Schedule of Proceedings
  a. Pre-Hearing Procedures
  b. Merits Hearing(s)
  2. Evidentiary Standard
  3. Timeline for Proceedings
  4. Continuances and Filing Extensions
  5. Consideration of Statutory Withholding of Removal and CAT Protection
  6. Exceptions to Streamlined Procedures
  E. Other Amendments Related to Credible Fear
  F. Parole
  G. Putative Reliance Interests
IV. Response to Public Comments on the Proposed Rule
  A. Summary of Public Comments
  B. General Feedback on the Proposed Rule
  1. General Support for the Proposed Rule
  a. Immigration Policy Benefits
  b. Positive Impacts on Applicants, Their Support Systems, and the Economy
  2. General Opposition to the Proposed Rule
  a. Immigration Policy Concerns
  b. Negative Impacts on Applicants and Their Support Systems
  c. Negative Impacts on U.S. Citizens and the Economy
  d. Other General Opposition to the Proposed Rule
  C. Basis for the Proposed Rule
  1. DOJ and DHS Statutory/Legal Authority
  2. Need for the Proposed Rule/DOJ and DHS Rationale
  3. Prior Immigration Rulemakings
  D. Proposed Changes
  1. Applicability
  2. Parole
  a. General Comments on Parole
  b. Change in Circumstances Under Which Parole May Be Considered
  c. Availability of Employment Authorization for Those in Expedited Removal Who Have Been Paroled From Custody
  d. Other Comments on Proposed Approach to Parole
  3. Credible Fear Screening Process
  a. General Comments on Credible Fear Screening Process
  b. "Significant Possibility" Standard for Protection Claims
  c. Due Process in Credible Fear Screening
  d. Removal of Mandatory Bars From Consideration

Appx. 001

e. Other Comments on the Proposed Credible Fear Screening Process
4. Applications for Asylum
a. Written Record of the Credible Fear Determination Created by USCIS, Together With the Service of the Credible Fear Determination, Treated as an Application for Asylum
b. Date Positive Credible Fear Determination Served as Date of Filing and Receipt
c. Inclusion of Applicant's Spouse and Children
d. Due Process in Asylum Applications
e. Other Comments on Proposed Provisions on Applications for Asylum
5. Adjudication of Applications for Asylum for Noncitizens With Credible Fear
a. DHS Interpretation of Statute in Creating a New Adjudication Process
b. Review of Asylum Claim by an Asylum Officer, Rather Than by an Immigration Judge, in Section 240 Removal Proceedings
c. Requirements for USCIS Asylum Merits Adjudication
d. Failure To Appear
e. Process for USCIS To Deny an Application for Asylum or Other Protection and Issue a Removal Order
f. Other Comments on Proposed Adjudication of Applications for Asylum
6. Application Review Proceedings Before an Immigration Judge
a. Creation of New Limited Proceedings in Lieu of Section 240 Removal Proceedings and Limitation on Relief to Asylum, Statutory Withholding of Removal, and Convention Against Torture Review Only
b. De Novo Review of Full Asylum Hearing Record and Consideration of Additional Testimony and Evidence
c. Immigration Judge's Discretion To Vacate Asylum Officer's Removal Order
d. Immigration Judge's Authority To Review All Asylum Officer Decisions
e. Appeal of Immigration Judge's Decision to the Board of Immigration Appeals
f. Other Comments on Proposed Application Review Proceedings before Immigration Judges
E. Other Issues Related to the Proposed Rulemaking
1. Public and Stakeholder Input
2. Severability
3. Discretion and Phased Implementation
a. Discretion
b. Phased Implementation
4. Comments on Immigration Court Inefficiencies and Bottlenecks
F. Statutory and Regulatory Requirements
1. Impacts and Benefits (E.O. 12866 and E.O. 13563)
a. Methodology
b. Population
c. Costs or Transfers
i. Impacts on the Credible Fear Asylum Population and Support Networks
ii. Impacts on U.S. Workers, Companies, Economy
iii. Impacts on Federal Government
iv. Other Comments on Costs or Transfers
d. Other Comments on Impacts and Benefits of the Proposed Rulemaking
2. Paperwork Reduction Act

3. Other Comments on Statutory and Regulatory Requirements
G. Comments Outside of the Scope of This Rulemaking
V. Statutory and Regulatory Requirements
A. Administrative Procedure Act
B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)
1. Summary of the Rule and Its Potential Impacts
2. Background and Purpose of the Rule
3. Population
4. Impacts of the Rule
a. Impacts to the Credible Fear Asylum Population
b. Impacts to USCIS
i. Total Quantified Estimated Costs of Regulatory Changes
ii. Intra-Federal Government Sector Impacts
c. Familiarization Costs, Benefits, and Transfers of Possible Early Labor Market Entry
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act of 1995
E. Congressional Review Act
F. Executive Order 13132 (Federalism)
G. Executive Order 12988 (Civil Justice Reform)
H. Family Assessment
I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
J. National Environmental Policy Act
K. Paperwork Reduction Act

**I. Public Participation**

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this interim final rule by the deadline stated above. The Departments also invite comments that relate to the economic, environmental, or federalism effects that might result from this interim final rule. Comments must be submitted in English, or an English translation must be provided. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the interim final rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change. Comments submitted in a manner other than those listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the interim final rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the agency name and the DHS Docket No. USCIS–2021–0012 for this rulemaking. All submissions will be posted, without change, to the Federal eRulemaking

Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or that is offensive. For additional information, please read the Privacy and Security Notice available at *https:// www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https:// www.regulations.gov,* referencing DHS Docket No. USCIS–2021–0012. You may also sign up for email alerts on the online docket to be notified when comments are posted or a final rule is published.

**II. Executive Summary**

*A. Background*

On August 20, 2021, the Departments published an NPRM in the **Federal Register** proposing to amend the regulations governing the process for further consideration of asylum and related protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906 (Aug. 20, 2021).

The preamble discussion in the NPRM, including the detailed presentation of the need for reforming the system for processing asylum and related protection claims at the Southwest border, is generally adopted by reference in this IFR, except to the extent specifically noted in this IFR, or in the context of proposed regulatory text that is not contained in this IFR.

To reform and improve the process, the NPRM proposed revisions to 8 CFR parts 208, 235, 1003, 1208, and 1235. Those proposed revisions fell into five main categories. First, individuals subject to expedited removal and found to have a credible fear of persecution or torture would have their claims for asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act ("INA" or "the Act") ("statutory withholding of removal"), or

**Appx. 002**

Convention Against Torture ("CAT")[1] protection initially adjudicated by USCIS following a nonadversarial interview before an asylum officer. Second, individuals granted protection by USCIS would be entitled to asylum, statutory withholding of removal, or protection under the CAT, as appropriate, without further adjudication. Third, individuals not granted protection would be ordered removed by the asylum officer but would have the ability to seek prompt, de novo review with an immigration judge ("IJ") in EOIR through a newly established procedure, with appeal available to the Board of Immigration Appeals ("BIA") and the Federal courts. Fourth, individuals placed in expedited removal proceedings would be eligible for consideration for parole from custody in accordance with section 212(d)(5) of the Act, if DHS determined, in the exercise of its discretion and on a case-by-case basis, that parole is warranted because, inter alia, detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities). Finally, the NPRM proposed to restore the expedited removal framework and credible fear screening processes that were in place before various regulatory changes made from late 2018 through late 2020. Specifically, the longstanding "significant possibility" screening standard would apply once more to all such protection claims arising from expedited removal proceedings initiated pursuant to section 235(b)(1) of the Act, and the mandatory bars to asylum and withholding of removal (with limited exception) would not apply at this initial screening stage.

The comment period for the NPRM opened on August 20, 2021, and closed on October 19, 2021, with 5,235 public comments received. The Departments summarize and respond to the public comments below in Section IV of this preamble.

### B. Legal Authority

The Departments are publishing this IFR pursuant to their respective and joint authorities concerning asylum, statutory withholding of removal, and protection under the CAT. Section 235 of the INA provides that if an asylum officer determines that a noncitizen subject to expedited removal has a credible fear of persecution, the noncitizen shall receive "further consideration of the application for asylum." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). This IFR addresses how that further consideration, including of the noncitizen's related claims to statutory withholding of removal and CAT protection, will occur.

Section 208 of the INA authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen—including a noncitizen subject to expedited removal under section 235(b) of the INA—"who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section." INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); see INA 208(a)(1), 8 U.S.C. 1158(a)(1) (referencing asylum applications by noncitizens subject to expedited removal under section 235(b) of the INA, 8 U.S.C. 1225(b)); see also INA 208(d)(1), (d)(5)(B), 8 U.S.C. 1158(d)(1), (d)(5)(B) (further authorizing rulemaking concerning asylum applications).

These provisions of the INA reflect that the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the execution of Federal immigration law. See, e.g., HSA 101, 441, 451(b), 471, 1511(d)(2), 6 U.S.C. 111, 251, 271(b), 551(d)(2). By operation of the HSA, certain references to the "Attorney General" in the INA are understood to refer to the Secretary. HSA 1517, 6 U.S.C. 557. As amended by the HSA, the INA thus "charge[s]" the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1), 8 U.S.C. 1103(a)(1), and grants the Secretary the power to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3). The Secretary's authority thus includes the authority to publish regulations governing the apprehension, inspection and admission, detention and removal, withholding of removal, and release of noncitizens[2] encountered in the interior of the United States or at or between the U.S. ports of entry. See INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231. Certain

of the Secretary's authorities have been delegated within DHS to the Director of USCIS.[3] USCIS asylum officers conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's affirmative asylum application should be granted. See 8 CFR 208.2(a), 208.9(a), 208.30.

In addition, under the HSA, the Attorney General retains authority to "establish such regulations . . ., issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" his authorities under the INA. HSA 1102, INA 103(g)(2), 8 U.S.C. 1103(g)(2). The Attorney General also retains authority over certain individual immigration adjudications, including removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings," "section 240 proceedings," or "240 proceedings"), and certain adjudications related to asylum applications, conducted by IJs within DOJ's EOIR. See HSA 1101(a), 6 U.S.C. 521(a); INA 103(g), 8 U.S.C. 1103(g). With limited exceptions, IJs within EOIR adjudicate asylum and withholding of removal applications filed by noncitizens during the pendency of section 240 removal proceedings, and IJs also adjudicate asylum applications referred by USCIS to the immigration court. 8 CFR 1208.2(b), 1240.1(a); see INA 101(b)(4), 240(a)(1), 8 U.S.C. 1101(b)(4), 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3).

The United States is a party to the 1967 United Nations Protocol Relating to the Status of Refugees, January 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33 of the Refugee Convention contains a qualified non-refoulement obligation to refrain from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 19 U.S.T. at 6276. The United States implements its obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

[2] This rule uses the term "noncitizen" as equivalent to the statutory term "alien." See INA 101(a)(3), 8 U.S.C. 1101(a)(3); Barton v. Barr, 140 S. Ct. 1442, 1446 n.2 (2020).

[3] See DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003); see also 8 CFR 2.1, 208.2(a), 208.30.

**Appx. 003**

provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), which provides that a noncitizen may not be removed to a country where his or her life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.

The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681. In addition, FARRA includes the following policy statement: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." *Id.*, sec. 2242(a). DHS and DOJ have promulgated various regulations implementing U.S. obligations under Article 3 of the CAT, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c) through (f), 208.17, and 208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), as corrected by 64 FR 13881 (Mar. 23, 1999).

Section 212 of the INA vests in the Secretary the discretionary authority to grant parole to applicants for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit. INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Section 103 of the INA authorizes the Secretary to establish rules and regulations governing parole. INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3).

### C. Changes in the IFR

After carefully reviewing the public comments received in response to the NPRM, this IFR makes 23 changes to the regulatory provisions proposed in the NPRM, many of which were recommended or prompted by commenters. The regulatory changes pertain to both the DHS and DOJ regulations. As also described below, procedurally, the Departments could issue a final rule. However, the Departments are publishing this IFR rather than proceeding to a final rule in order to provide the public with an additional opportunity to comment. Although not legally required, the additional opportunity to comment on the IFR's changes to the NPRM is

desirable given the new procedures and scheduling deadlines applicable to the IFR's streamlined EOIR process, the limited time between issuance of this IFR and when the first cases will be calendared for hearings, and the changes made to facilitate a shift from the proceedings proposed in the NPRM to the IFR's streamlined 240 proceedings. The Departments therefore solicit further public comment on the IFR's revisions, which will be considered and addressed in a final rule.

#### 1. Revisions to the Proposed DHS Regulations

First, in new 8 CFR 208.30(g)(1)(i), this rule provides that USCIS may, in its discretion, reconsider a negative credible fear finding with which an IJ has concurred, provided such reconsideration is requested by the applicant or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first. USCIS, however, will not accept more than one such request for reconsideration of a negative credible fear finding.

Second, this rule adds a new 8 CFR 208.4(b)(2) to clarify that noncitizens whose asylum applications are retained by USCIS for further consideration following a positive credible fear determination may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, provided the information is submitted directly to the asylum office no later than 7 days prior to the scheduled asylum interview, or for documents submitted by mail, postmarked no later than 10 days prior to the interview. This rule further provides that, upon the asylum officer finding good cause in an exercise of USCIS discretion, the asylum officer may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in new 8 CFR 208.9(e)(2) and provided in new 8 CFR 208.4(b)(2). In new 8 CFR 208.9(e)(2), this rule further provides that, in the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent a decision from being issued to the applicant within 60 days of service

of the positive credible fear determination.

Third, this rule provides in new 8 CFR 208.2(a)(1)(ii), 208.30(f), 1208.2, and 1208.30(g) that USCIS may further consider the asylum application of a noncitizen found to have a credible fear of persecution or torture through a nonadversarial merits interview conducted by an asylum officer when such application is retained by USCIS or referred to USCIS by an IJ after an IJ has vacated a negative credible fear determination. Such nonadversarial merits interviews are known as "Asylum Merits interviews" and are governed by the procedures in 8 CFR 208.9.

Fourth, this rule provides in new 8 CFR 208.9(b) that, in the case of a noncitizen whose case is retained by USCIS for an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal and CAT protection. This rule provides that if the asylum application is not granted, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal in accordance with 8 CFR 208.16(b) or CAT protection pursuant to 8 CFR 208.16(c). *See* 8 CFR 208.16(a), (c). Even if the asylum officer determines that the applicant has established eligibility for statutory withholding of removal or protection under the CAT, the asylum officer shall proceed with referring the asylum application to the IJ for a hearing pursuant to 8 CFR 208.14(c)(1). *See* 8 CFR 208.16(a). If the asylum application includes a dependent (that is, a spouse or child who is in the United States and is included on the principal applicant's application as a dependent, *cf.* 8 CFR 208.30(a), 208.14(f)) who has not filed a separate application and the principal applicant is determined to not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b). If the asylum officer determines that there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for asylum, statutory withholding of removal, or protection under the CAT, the asylum officer shall inform the dependent of that determination. *See id.* USCIS also intends to inform dependents that they may request their own credible fear determination and

**Appx. 004**

may separately file an asylum application if they choose to do so. If a spouse or child who was included in the principal's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 208.3(a)(2), 1208.3(a)(2).

Fifth, this rule provides in 8 CFR 208.9(a)(1) that USCIS shall not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the noncitizen, subject to the need to reschedule an interview due to exigent circumstances. *See* 8 CFR 208.9(a)(1).

Sixth, this rule includes language from existing regulations, currently in effect, in 8 CFR 208.9(d), that was inadvertently not included in the NPRM's proposed regulatory text related to USCIS's discretion to limit the length of a statement or comment and require its submission in writing. *See* 8 CFR 208.9(d)(1).

Seventh, this rule removes language proposed in the NPRM in 8 CFR 208.9(f)(2) related to having the Asylum Merits record include verbatim audio or video recordings, and provides that the interview will be recorded and a verbatim transcript of the interview shall be included in the record. *See* 8 CFR 208.9(f)(2).

Eighth, this rule clarifies in 8 CFR 208.9(g)(2) that if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for the purposes of employment authorization pursuant to 8 CFR 208.7. The rule continues to provide that, for asylum applications retained by USCIS for further consideration, if the applicant is unable to proceed effectively in English, the asylum officer shall arrange for the assistance of an interpreter in conducting the Asylum Merits interview. *See* 8 CFR 208.9(g)(2).

Ninth, although the NPRM proposed to amend 8 CFR 208.10(a) to provide that, for noncitizens whose cases are retained by USCIS for further consideration of their asylum application after a positive credible fear determination, failure of a noncitizen to appear for an Asylum Merits interview might result in the issuance of an order of removal, no changes to 8 CFR

208.10(a) are being made in this IFR. Failure to appear may result in referral of the noncitizen to section 240 removal proceedings before an IJ as well as dismissal of the asylum application. *See* 8 CFR 208.10(a).

Tenth, in 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii), this rule establishes the regulatory authority for consideration for parole of noncitizens in expedited removal or in expedited removal with pending credible fear determinations consistent with the current regulation at 8 CFR 212.5(b).

Eleventh, the rule includes a technical amendment to 8 CFR 212.5(b) to incorporate a reference to 8 CFR 235.3(b).

Twelfth, in 8 CFR 235.3(c)(2), this rule includes a technical amendment to establish the regulatory authority for consideration for parole of noncitizens whose asylum applications are retained by USCIS for further consideration following a positive credible fear determination consistent with the current regulation at 8 CFR 212.5(b).

Thirteenth, the IFR includes edits to 8 CFR 208.14 and 8 CFR 1208.14 to emphasize that asylum officers' decisions on approval, denial, referral, or dismissal of an asylum application remain subject to review within USCIS, and an edit to 8 CFR 208.14(c)(1) to make clear that an asylum applicant described in 8 CFR 208.14(c)(4)(ii)(A), if not granted asylum, may first be placed into expedited removal and receive a positive credible fear screening before being referred to an IJ.

## 2. Revisions to the Proposed DOJ Regulations

In the fourteenth change from the NPRM, this rule neither adopts the NPRM's proposal to create a new IJ review process when USCIS does not grant asylum nor requires the applicant to affirmatively request such review. Instead, this rule requires DHS to refer noncitizens whose applications for asylum are not granted to section 240 removal proceedings by issuing a Notice to Appear ("NTA"). However, this rule adds 8 CFR 1240.17 to DOJ's regulations, which will impose streamlining measures to enable such proceedings to be completed more expeditiously than ordinary section 240 proceedings involving cases that originate from the credible fear process. The rules and procedures that apply during all section 240 proceedings will generally apply to cases governed by the new 8 CFR 1240.17, but the rule's additional procedural requirements will further ensure efficient adjudication while preserving fairness.

Fifteenth, this rule does not adopt the NPRM's proposed evidentiary limitations, which would have required the noncitizen to demonstrate that any additional evidence or testimony to be considered by the IJ was not duplicative of that considered by the asylum officer and was necessary to fully develop the record. Instead, with the exception of time limits, the long-standing evidentiary standards for section 240 removal proceedings will apply as provided in new 8 CFR 1240.17(g)(1). To ensure expeditious adjudication, this rule imposes deadlines for the submission of evidence as specified in new 8 CFR 1240.17(f). In general, new 8 CFR 1240.17(f) requires the respondent to submit any additional documentary evidence by the time of the status conference which, under new 8 CFR 1240.17(f)(1), is held 30 days, or the next available date no later than 35 days, after the master calendar hearing unless a continuance or a filing extension is granted. Under new 8 CFR 1240.17(f)(3)(i), DHS must file any documents 15 days prior to the merits hearing or, if the IJ determines a merits hearing is not warranted, 15 days following the status conference. New 8 CFR 1240.17(f)(3)(ii) allows the respondent to submit a supplemental filing replying to DHS and identifying any additional witnesses or documentation 5 days prior to the merits hearing or, if the IJ determines a merits hearing is not warranted, 25 days following the status conference. These deadlines may be extended in accordance with the continuances and extension provisions in new 8 CFR 1240.17(h), and an IJ may otherwise accept late-filed evidence pursuant to new 8 CFR 1240.17(g)(2) under certain circumstances, including if required to do so under statute or the Constitution.

Sixteenth, the rule provides that streamlined section 240 removal proceedings for cases covered by the new 8 CFR 1240.17, where the USCIS Asylum Merits interview record is transmitted to EOIR for review, will generally be adjudicated under an expedited timeline. The master calendar hearing will occur 30 to 35 days after DHS commences proceedings as provided in new 8 CFR 1240.17(b) and (f)(1). Any merits hearing will be held 60 days after the master calendar hearing, or on the next available date no later than 65 days after the master calendar hearing, *see* 8 CFR 1240.17(f)(2), subject to continuance and filing extension requests as outlined in new 8 CFR 1240.17(h). This rule also imposes time limits for an IJ to issue a decision as provided in new 8 CFR

**Appx. 005**

1240.17(f)(5). To ensure expeditious adjudication, this rule adopts the NPRM's requirement that USCIS must file the complete record of proceedings for the Asylum Merits interview, including the transcript and decision, with the immigration court and serve it on the respondent pursuant to new 8 CFR 1240.17(c). Additionally, as in the NPRM, this rule does not require the respondent to complete and file a new asylum application, but instead provides that the record of the positive credible determination shall be treated as satisfying the application filing requirements subject to any supplementation or amendment, and shall further be deemed to satisfy EOIR's application filing requirements for any spouse or child included in the cases referred by USCIS and who has not separately filed an asylum application that was adjudicated by USCIS, as provided in new 8 CFR 1208.3(a)(2). *See* 8 CFR 1240.17(e).

Seventeenth, to prepare cases for expeditious adjudication, this rule requires IJs to hold status conferences to take place 30 days after the master calendar hearing, or if a hearing cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing, as outlined in new 8 CFR 1240.17(f)(2). This rule requires both parties to participate at the status conference, although the level of participation required by the respondent depends on whether the respondent has legal representation. At a minimum, as required by new 8 CFR 1240.17(f)(2)(i)(A), if the respondent will contest removal or seek any protection(s) for which the asylum officer did not determine the respondent eligible, the respondent shall indicate whether the respondent intends to testify, present any witnesses, or offer additional documentation. If a respondent thereafter obtains legal representation, nothing in the IFR prohibits respondent's counsel from supplementing statements or submissions made by the respondent during the status conference so long as there is no delay to the merits hearing or a filing deadline or, if the case will be delayed, the respondent satisfies the IFR's provisions governing continuances and filing extensions. Under new 8 CFR 1240.17(f)(2)(ii) and (f)(3), if DHS will participate in the case, DHS shall, at the status conference or in a written statement filed no later than 15 days prior to the scheduled merits hearing (or if the IJ determines that no such hearing is warranted, no later than 15 days following the status conference), set forth its position on the respondent's

application and identify contested issues of law or fact, among other things. Where DHS has elected to participate in the case but does not timely provide its position as required under paragraph (f)(2)(ii), the IJ has authority pursuant to new 8 CFR 1240.17(f)(3)(i) to deem claims or arguments previously advanced by the respondent unopposed, subject to certain exceptions. The purpose of the status conference and these procedural requirements is to identify and narrow the issues and ready the case for a merits hearing.

Eighteenth, under new 8 CFR 1240.17(f)(2)(i)(B), a respondent may choose to concede removability and not seek asylum, in which case the IJ will issue an order of removal and deny asylum, but the IJ shall, with a limited exception, give effect to a determination by an asylum officer that the respondent is eligible for statutory withholding of removal or protection under the CAT. DHS may not appeal a grant of statutory withholding of removal or protection under the CAT in this context to the BIA except to argue that the IJ should have denied the application(s) based on certain evidence, as provided in new 8 CFR 1240.17(i)(2).

Nineteenth, new 8 CFR 1240.17(h) establishes standards for continuances during these streamlined section 240 removal proceedings. The rule adopts a "good cause" standard for respondent-requested continuances or filing extensions that would delay any merits hearing up to certain limits as detailed in new 8 CFR 1240.17(h)(2)(i). Any such continuance or extension generally shall not exceed 10 days. When the respondent has received continuances or filing extensions that cause a merits hearing to occur more than 90 days after the master calendar hearing, the rule requires the respondent to meet a heightened standard for further continuances or extensions as provided in new 8 CFR 1240.17(h)(2)(ii). Pursuant to new 8 CFR 1240.17(h)(2)(iii), any further continuances or extensions requested by the respondent that would cause a merits hearing to occur more than 135 days after the master calendar hearing may be granted only if the respondent demonstrates that failure to grant the continuance or extension would be contrary to statute or the Constitution. DHS may receive continuances or extensions based on significant Government need, as outlined in new 8 CFR 1240.17(h)(3), which will not count against the limits on respondent-requested continuances. Further, as provided in new 8 CFR 1240.17(h)(2)(iv) and (h)(4), any delay due to exigent circumstances shall not

count toward the limits on continuances or extensions.

Twentieth, new 8 CFR 1240.17(f)(4)(i) and (ii) provide that in certain circumstances the IJ may decide the respondent's application without holding a merits hearing, including where neither party has elected to provide testimony and DHS has declined to cross-examine the respondent or where the IJ intends to grant the application and DHS has not elected to examine the respondent or present evidence or witnesses. Under these provisions, the IJ shall still hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record.

Twenty-first, new 8 CFR 1240.17(i)(2) provides that, where the asylum officer does not grant asylum but determines the respondent is eligible for statutory withholding of removal or CAT relief, and where the IJ subsequently denies asylum and issues a removal order, the IJ shall generally give effect to the asylum officer's determination(s). In such circumstances, the IJ shall issue a removal order, but the IJ shall give effect to the asylum officer's determination by granting statutory withholding of removal or protection under the CAT unless DHS presents evidence or testimony that specifically pertains to the respondent, that was not in the record of proceedings for the USCIS Asylum Merits interview, and that demonstrates that the respondent is not eligible for the protection in question.

Twenty-second, this rule sets forth certain exceptions from the procedures and timelines summarized above. Under new 8 CFR 1240.17(k), such exceptions include the following circumstances: The respondent was under the age of 18 on the date that the NTA was issued and is not in consolidated removal proceedings with an adult family member; the respondent has produced evidence demonstrating prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, voluntary departure, or CAT relief and the respondent is seeking to apply for, or has applied for, such relief or protection; the respondent has produced evidence supporting a prima facie showing that the respondent is not subject to removal, and the question of removability cannot be resolved simultaneously with the adjudication of the applications for asylum and related protection; the IJ finds the respondent subject to removal to a country other than the country or countries in which the respondent claimed a fear of persecution, torture, or both before the asylum officer and the respondent claims a fear of persecution, torture, or

**Appx. 006**

both in that alternative country or countries; the case is on remand or has been reopened following the IJ's order; or the respondent exhibits indicia of mental incompetency.

Finally, DOJ is making technical edits in 8 CFR 1003.42 to conform with changes to DHS regulations proposed in the NPRM and adopted in this rule related to the credible fear screening process in new 8 CFR 208.30(e).

### D. Provisions of the IFR

The Departments carefully considered the 5,235 public comments received, and this IFR generally adopts the framework proposed in the NPRM with certain modifications as explained in this rule. This rule also relies on the justifications articulated in the NPRM, except as reflected in this preamble.

### 1. Credible Fear Screening Process

The Departments are generally returning to the regulatory framework governing the credible fear screening process in place before various regulatory changes were made from the end of 2018 through the end of 2020, which currently are not in effect.[4] As

---

[4] On November 9, 2018, the Departments issued an IFR that barred noncitizens who entered the United States in contravention of a covered presidential proclamation or order from eligibility for asylum, required that they receive a negative credible fear finding on their asylum claims, and required that their statutory withholding and CAT claims be considered under the higher reasonable fear screening standard. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934, 55939, 55943 (Nov. 9, 2018) ("Presidential Proclamation Bar IFR"). A month later, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the IFR, *E. Bay Sanctuary Covenant v. Trump,* 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018), and the Ninth Circuit affirmed, *E. Bay Sanctuary Covenant v. Biden,* 993 F.3d 640, 680 (9th Cir. 2021).

On July 16, 2019, the Departments published another IFR, entitled "Asylum Eligibility and Procedural Modifications," 84 FR 33829 (July 16, 2019) ("Third Country Transit (TCT) Bar IFR"), which generally barred noncitizens from asylum eligibility if they entered or attempted to enter the United States across the Southwest border after failing to apply for protection from persecution or torture while in any one of the third countries through which they transited, required a negative credible fear finding for such noncitizens' asylum claims, and required their withholding and CAT claims be considered under the higher reasonable fear screening standard. *Id.* at 33837–38. The U.S. District Court for the District of Columbia vacated the TCT Bar IFR. *Capital Area Immigrants' Rights Coal. v. Trump,* 471 F. Supp. 3d 25, 45–57 (D.D.C. 2020). The Departments issued a final rule on December 17, 2020, entitled "Asylum Eligibility and Procedural Modifications," 85 FR 82260 (Dec. 17, 2020) ("TCT Bar rule"), which again attempted to bar from asylum eligibility those noncitizens who transited through a third country before arriving at the border. The U.S. District Court for the Northern District of California subsequently issued a preliminary injunction against implementation of the TCT Bar rule, which remains in place as of this

writing. *E. Bay Sanctuary Covenant v. Barr,* 519 F. Supp. 3d 663, 668 (N.D. Cal. Feb. 2021).

Around the same time that the Departments issued the final TCT Bar rule, they also issued the final rule entitled "Procedures for Asylum and Withholding of Removal: Credible Fear and Reasonable Fear Review," 85 FR 80274 (Dec. 11, 2020) ("Global Asylum rule"). That rule revised the credible fear screening process to require that all the mandatory bars to asylum and withholding be considered during the credible fear screening process and established a new screening standard for withholding of removal and CAT protection. On January 8, 2021, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the Global Asylum rule. *Pangea Legal Servs. v. DHS,* 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) ("*Pangea II*"). That preliminary injunction remains in place as of this writing.

Finally, the Departments also published a final rule entitled "Security Bars and Processing," 85 FR 84160 (Dec. 23, 2020) ("Security Bars rule"), which added an additional bar to asylum and withholding that would be applied to the credible fear screening process. The Departments have delayed the Security Bars rule's effective date to December 31, 2022, as the Departments consider possible action to rescind or revise the rule. *See* Security Bars and Processing; Delay of Effective Date, 86 FR 73615 (Dec. 28, 2021).

---

provided in this IFR, DHS is amending 8 CFR 208.30(b) to return to providing that noncitizens subject to expedited removal who indicate an intention to apply for asylum, or who express a fear of persecution or torture, or a fear of return to the noncitizen's country, shall be screened by a USCIS asylum officer for a credible fear of persecution or torture (rather than a credible fear of persecution, reasonable possibility of persecution, or reasonable possibility of torture). All references in 8 CFR 208.30 and 8 CFR 235.6 to a "credible fear of persecution, reasonable possibility of persecution, or a reasonable possibility of torture" are replaced with "credible fear of persecution or torture" or "credible fear."

DHS is further amending 8 CFR 208.30(b) to provide that the asylum officer to whom such a noncitizen is referred for a credible fear screening may, in USCIS's discretion and with supervisory concurrence, refer the noncitizen for proceedings under section 240 of the Act without making a credible fear determination.

DHS is amending 8 CFR 208.30(c) to provide for the inclusion of a noncitizen's concurrently arriving spouse or child in the noncitizen's positive credible fear evaluation and determination, unless the noncitizen declines such inclusion. Additionally, DHS is amending 8 CFR 208.30(c) to provide asylum officers with the discretion to include a noncitizen's other concurrently arriving family members in the noncitizen's positive credible fear evaluation and determination for purposes of family unity.

DHS is amending 8 CFR 208.30(e) to return to defining "credible fear of persecution" as "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the [asylum] officer, that the [noncitizen] can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act." DHS is further amending 8 CFR 208.30(e) to return to defining "credible fear of torture" as "a significant possibility that the [noncitizen] is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to [8 CFR] 208.16 or [ ] 208.17."

Additionally, as provided in the NPRM, DHS is amending 8 CFR 208.30(e)(5) to return to the existing and two-decade-long practice of not applying at the credible fear screening the mandatory bars to applying for, or being granted, asylum that are contained in sections 208(a)(2)(B)–(D) and (b)(2) of the Act, including any bars established by regulation under section 208(b)(2)(C) of the Act, or bars to eligibility for statutory withholding of removal, with limited exceptions. DHS is maintaining the regulations related to the threshold screening under the safe third country agreement with Canada in 8 CFR 208.30(e)(6), but making technical edits to change "credible fear of persecution, reasonable possibility of persecution, or reasonable possibility of torture" to "credible fear of persecution or torture" to align the terminology with the rest of this IFR. DHS will continue to require supervisory review of all credible fear determinations before they can become final. *See* 8 CFR 208.30(e)(8).

Consistent with the NPRM, this IFR amends 8 CFR 208.30(g) to return to providing that once an asylum officer has made a negative credible fear determination, if a noncitizen refuses or fails to either request or decline IJ review, such refusal or failure to make an indication will be considered a request for IJ review. In those instances, the noncitizen will be served with a Form I–863, Notice of Referral to Immigration Judge. If, upon review of an asylum officer's negative credible fear determination, the IJ finds the noncitizen possesses a credible fear of persecution or torture, the IJ shall vacate the Form I–860, Notice and Order of Expedited Removal, and remand the case to DHS for further consideration of the application for asylum. Alternatively, DHS may commence section 240 removal proceedings, during which the noncitizen may file an

application for asylum and withholding of removal. If the IJ concurs with the negative credible fear determination, DHS can execute the individual's expedited removal order, promptly removing the individual from the United States.

In comparison to the NPRM, in this IFR, DHS is amending 8 CFR 208.30(g) to provide that USCIS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred, provided such reconsideration is requested by the noncitizen or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first, and further provided that no previous request for consideration has already been made.[5] There is no change for noncitizens who do not elect to have their determination reviewed by an IJ. Any reconsideration request made prior to review by an IJ will be treated as an election for review by an IJ. *See* 8 CFR 208.30(g)(1).

## 2. Applications for Asylum

Under section 235(b)(1)(B)(ii) of the Act, noncitizens who receive a positive credible fear determination from a USCIS asylum officer are referred for "further consideration of the application for asylum." As provided in the NPRM, this rule establishes a new process by which such "further consideration" may occur, wherein a noncitizen will have their asylum claim adjudicated following an Asylum Merits interview before a USCIS asylum officer in the first instance, rather than by an IJ in section 240 removal proceedings. *See* 8 CFR 208.30(f).

In issuing both the NPRM and this IFR, the Departments concluded that the expedited removal process presented an opportunity for establishing a more efficient process for making protection determinations for those coming to our borders. The credible fear interview process creates a unique opportunity for the protection claim to be presented to a trained asylum officer and documented; that documentation can then initiate and facilitate a merits adjudication. Unlike those noncitizens who are placed directly into section 240 removal proceedings after apprehension at the border, noncitizens placed instead into expedited removal and who subsequently make a fear claim are referred to USCIS for an interview under oath. Rather than move noncitizens who

receive positive credible fear determinations directly into section 240 proceedings—which is what happens to noncitizens apprehended at the border who are not placed into expedited removal—the Departments have determined that it is appropriate to establish a more efficient process that includes the involvement of USCIS and the creation of a documented record of the noncitizen's protection claim during the credible fear screening process. By treating the record of the credible fear determination as an asylum application and by issuing a follow-up interview notice when the credible fear determination is served, USCIS will be able to promptly schedule and conduct an interview on the merits of the noncitizen's protection claims and issue a final decision. For those noncitizens not granted asylum by USCIS, the IFR's process will also create a more complete record of the principal applicant's protection claims, as well as those of their spouse or child included on the application and interviewed during the Asylum Merits interview. EOIR can then use the rationale of the USCIS determination in a streamlined section 240 removal proceeding. Consistent with the NPRM, DHS is amending 8 CFR 208.3 to address application and filing requirements for noncitizens over whom USCIS retains jurisdiction for further consideration of asylum applications pursuant to the Asylum Merits process established by this rule. DHS is amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that the written record of a positive credible fear finding satisfies the asylum application filing requirements in 8 CFR 208.3(a)(1). DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(1) and (2), that noncitizens placed in the Asylum Merits process are subject neither to the general requirement in 8 CFR 208.3(a)(1) that asylum applicants file a Form I–589, Application for Asylum and for Withholding of Removal, nor to the benefit request submission requirements of 8 CFR 103.2.

Consistent with the NPRM, DHS is also amending 8 CFR 208.3(a) to provide that the written record of the positive credible fear determination shall be considered a complete asylum application for purposes of the one-year filing deadline at 8 CFR 208.4(a), requests for employment authorization based on a pending application for asylum under 8 CFR 208.7, and the completeness requirement at 8 CFR 208.9(a); shall not be subject to the requirements of 8 CFR 103.2; and shall be subject to the conditions and

consequences in 8 CFR 208.3(c) upon signature at the Asylum Merits interview, as described in new 8 CFR 208.3(a)(2). DHS is amending 8 CFR 208.3(c)(3) to provide that receipt of a properly filed asylum application under 8 CFR 208.3(a) commences the period after which a noncitizen may file an application for employment authorization based on a pending asylum application. DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that the date that the positive credible fear determination is served on the noncitizen shall be considered the date of filing and receipt. DHS is further amending 8 CFR 208.3(a) to provide, in new 8 CFR 208.3(a)(2), that biometrics captured during expedited removal for the principal applicant and any dependents may be used to verify identity and for criminal and other background checks for purposes of an asylum application under the jurisdiction of USCIS and any subsequent immigration benefit.

DHS is amending current 8 CFR 208.4(c), rather than 8 CFR 208.3(a)(2) as provided in the NPRM, and redesignating it as 8 CFR 208.4(b), with certain modifications as compared to the NPRM, to provide the noncitizen the opportunity to subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, within a specified time frame (7 or 10 days, depending on the method of submission) prior to the scheduled Asylum Merits interview. DHS is further amending current 8 CFR 208.4(c) to provide, in new 8 CFR 208.4(b)(2), that, finding good cause in an exercise of USCIS's discretion, the asylum officer may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in 8 CFR 208.9(e)(2). In the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent an Asylum Merits decision from being issued to the applicant within 60 days of service of the positive credible fear determination, as described in new 8 CFR 208.9(e)(2).

---

[5] Reconsideration requests made by noncitizens of negative credible fear determinations already affirmed by an IJ are colloquially known as requests for reconsideration ("RFRs").

**Appx. 008**

3. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear

Under the framework in place prior to this rulemaking, if an asylum officer determined that a noncitizen subject to expedited removal had a credible fear of persecution or torture, DHS placed the noncitizen before an immigration court for adjudication of the noncitizen's claims by initiating section 240 removal proceedings. Section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), however, authorizes a procedure for "further consideration of [an] application for asylum" that may commence outside of section 240 removal proceedings.

Consistent with the NPRM, DHS is amending 8 CFR 208.2(a) to provide that USCIS may take initial jurisdiction to further consider the application for asylum, in an Asylum Merits interview, of a noncitizen, other than a stowaway and a noncitizen physically present in or arriving in the Commonwealth of the Northern Mariana Islands ("CNMI"), found to have a credible fear of persecution or torture. DHS is amending 8 CFR 208.9(b) to provide that the purpose of the Asylum Merits interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. In comparison to the NPRM, DHS is further amending 8 CFR 208.9(b) to provide that, in the case of a noncitizen whose case is retained by USCIS for an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal and CAT protection. This rule further provides in 8 CFR 208.16(a) that, in the case of a noncitizen whose case is retained by or referred to USCIS for an Asylum Merits interview and whose asylum application is not approved, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal under 8 CFR 208.16(b) or withholding or deferral of removal pursuant to the CAT under 8 CFR 208.16(c).

In comparison to the NPRM, DHS is amending 8 CFR 208.9(a) to provide that USCIS shall not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the

noncitizen subject to the need to reschedule an interview due to exigent circumstances, as provided in new 8 CFR 208.9(a)(1). Consistent with the NPRM, DHS is amending 8 CFR 208.9 to specify the procedures for such interviews before an asylum officer. With limited exception, these amendments generally provide that the same procedures applicable to affirmative asylum interviews will also apply to interviews under this rule, such as the right to have counsel present, 8 CFR 208.9(b), at no expense to the Government.

In this IFR, DHS also includes language from existing regulations in 8 CFR 208.9(d) that was inadvertently not included in the NPRM's proposed regulatory text related to the USCIS's discretion to limit the length of a statement or comment and require its submission in writing. As was stated in the NPRM, DHS is amending 8 CFR 208.9(f) to provide, in new 8 CFR 208.9(f)(2), that for Asylum Merits interviews, a verbatim transcript of the interview will be included in the referral package to the immigration judge. However, DHS is removing the language proposed in the NPRM regarding the record also including a verbatim audio or video recording in new 8 CFR 208.9(f)(2). DHS believes that recording the interview in order to produce a verbatim transcript that will be included in the record is sufficient to meet the aims of the rule.[6]

DHS is amending 8 CFR 208.9(g) to provide, in new 8 CFR 208.9(g)(2), that if a noncitizen is unable to proceed effectively in English at an Asylum Merits interview, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. In comparison to the NPRM, this rule provides in new 8 CFR 208.9(g)(2) that if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for purposes eligibility for employment authorization.

In comparison to the revisions proposed in the NPRM, this IFR leaves existing 8 CFR 208.10 unchanged—thus providing that a noncitizen's failure to appear for an Asylum Merits interview may result in the referral of the application for consideration in section 240 removal proceedings before an IJ (as opposed to the issuance of an order of removal). *See* 8 CFR 208.10(a)(1).

In 8 CFR 208.14(b), USCIS continues to implement its authority to grant asylum in any case within its

jurisdiction. In comparison to the NPRM, DHS is amending 8 CFR 208.14(c) and 208.16(a) and (c) to provide that if an asylum officer conducting an Asylum Merits interview for further consideration of an asylum application after a positive credible fear determination does not grant asylum to an applicant, the asylum officer will determine whether the applicant is eligible for statutory withholding of removal or CAT protection. The asylum officer will not issue an order of removal as proposed in the NPRM, nor issue a final decision on an applicant's request for statutory withholding of removal or CAT protection. Instead, the asylum officer will refer the application—together with the appropriate charging document and written findings of, and the determination on, eligibility for statutory withholding of removal or CAT protection—to an IJ for adjudication in streamlined section 240 removal proceedings. *See* 8 CFR 208.14(c); 8 CFR 208.16(a), (b), (c)(4); 8 CFR 1208.14(c). The referral of the asylum application of a principal applicant to the IJ will also include any dependent of that principal applicant, as appropriate. *See* 8 CFR 208.3(a)(2), 208.14(c)(1). If the asylum application includes a dependent who has not filed a separate application and the principal applicant is determined to not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 1208.3(a)(2).

4. Streamlined Section 240 Removal Proceedings Before the Immigration Judge

DOJ is adding 8 CFR 1240.17, which shall govern section 240 removal proceedings for respondents whose cases originate from the credible fear process and who have not been granted asylum after an initial adjudication by an asylum officer, pursuant to 8 CFR 208.14(c)(1). The general rules and procedures that govern all other removal proceedings under section 240 apply to removal proceedings covered by this

---

[6] The Departments may consider making available a process by which parties to EOIR proceedings under 8 CFR 1240.17 will be able to timely review, upon request, the recording of the USCIS Asylum Merits interview.

rule with certain exceptions designed to streamline the proceedings and account for the unique procedural posture of these cases.

Under new 8 CFR 1240.17(b), USCIS will issue an NTA to any noncitizen not granted asylum by USCIS after an Asylum Merits interview held pursuant to 8 CFR 208.2(a), with the master calendar hearing in these streamlined section 240 proceedings scheduled for 30 to 35 days after service of the NTA. Under new 8 CFR 1240.17(e), the record of the proceedings for the interview before the asylum officer and the asylum officer's decision shall be admitted as evidence and considered by the IJ. Moreover, this rule provides that a respondent is not required to separately prepare and file a Form I–589, Application for Asylum and for Withholding of Removal, and that the record of the positive credible fear determination satisfies the application filing requirements for the principal applicant as well as for any dependent included in the referral who did not separately file an asylum application that was adjudicated by USCIS. *See* 8 CFR 208.3(a), 1208.3(a), 1240.17(e). That is, any spouse or child included in the referral will be deemed to have satisfied EOIR's application filing requirements as a principal applicant.

The Departments have determined that it is appropriate for cases under this rule to proceed on a streamlined time frame before the IJ as claims will have been significantly developed and analyzed by USCIS before the IJ proceedings start, the record will be available for review by the IJ, and respondents will not be required to prepare and file an asylum application. Accordingly, the rule establishes timelines for certain hearings to occur as provided in new 8 CFR 1240.17(f)(1)–(4). As set forth in new 8 CFR 1240.17(h), the rule imposes limitations on the length of continuances and filing extensions that can be granted before a respondent must satisfy a heightened standard to receive additional continuances or filing extensions that have the effect of further delaying a hearing required under the rule. The rule also imposes certain procedural requirements and gives IJs additional tools designed to narrow the issues and ready the case for a merits hearing, if necessary. Under new 8 CFR 1240.17(f)(1) and (2), the rule requires the IJ to hold a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing, and imposes obligations on both parties to participate

at the conference, although the level of participation required by the respondent depends on whether the respondent has legal representation. If DHS indicates that it will participate in the case, DHS has an obligation under new 8 CFR 1240.17(f)(2)(ii) and (f)(3) to set forth its position on the respondent's application and identify contested issues of law or fact (including which elements, if any, of the respondent's claim(s) it is challenging), among other things. In certain circumstances, where DHS does not respond in a timely manner to the respondent's claims, the IJ has authority to deem those claims unopposed, as provided in new 8 CFR 1240.17(f)(3)(i). However, DHS may respond at the merits hearing to any arguments or claimed bases for asylum first advanced by the respondent after the status conference. *See* 8 CFR 1240.17(f)(3)(i). Where DHS has indicated that it will not participate in a merits hearing, the rule allows DHS, in certain, limited instances, to retract this position prior to the merits hearing, as provided in new 8 CFR 1240.17(f)(2)(ii). The rule allows IJs to hold additional status conferences if the case is not ready for a merits hearing, as provided in new 8 CFR 1240.17(f)(2).

Under new 8 CFR 1240.17(f)(4), the IJ may forgo a merits hearing and decide the respondent's application on the documentary record (1) if neither party has requested to present testimony and DHS has indicated that it waives cross-examination, or (2) if the noncitizen has timely requested to present testimony, DHS has indicated that it waives cross-examination and does not intend to present testimony or produce evidence, and the IJ concludes that the application can be granted without further testimony. The rule preserves the IJ's ability to hold a merits hearing if the IJ decides that it is necessary to fulfill the IJ's duty to fully develop the record.

If the case cannot be decided on the documentary record, the new 8 CFR 1240.17(f)(2) requires the IJ to hold a merits hearing 60 days after the master calendar hearing or, if a hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing. At the merits hearing, the respondent may testify fully and offer any additional evidence that has been submitted in compliance with the time limits on evidentiary filings under the normal evidentiary standards that apply to 240 removal proceedings as provided in new 8 CFR 1240.17(f)(4)(iii)(A) and (g)(1). If the proceedings cannot be completed at the scheduled merits hearing, the IJ shall schedule any continued merits hearing as soon as possible but no later

than 30 days after the initial merits hearing except in case of a continuance or extension as provided in 8 CFR 1240.17(f)(4)(iii)(B). Under new 8 CFR 1240.17(f)(5), the IJ is required, wherever practicable, to issue an oral decision on the date of the final merits hearing or, if the IJ concludes that no hearing is necessary, no later than 30 days after the status conference. Where issuance of an oral decision on such date is not practicable, the IJ must issue an oral or written decision as soon as practicable, and in no case more than 45 days after the applicable date described in the preceding sentence. *See* 8 CFR 1240.17(f)(5).

Under new 8 CFR 1240.17(i)(2), if the IJ denies asylum but an asylum officer has determined that the respondent is eligible for statutory withholding of removal or protection under the CAT with respect to the proposed country of removal, then the IJ shall enter an order of removal but give effect to the asylum officer's eligibility determination by granting the applicable form of protection, unless DHS demonstrates that evidence or testimony that specifically pertains to the respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview establishes that the respondent is not eligible for such protection. Under new 8 CFR 1240.17(f)(2)(i)(B), the rule similarly provides that where an asylum officer has declined to grant asylum but has determined that the respondent is eligible for statutory withholding of removal or protection under the CAT with respect to the proposed country of removal, the respondent may elect not to contest removal and not pursue a claim for asylum before the IJ but still receive statutory withholding of removal or CAT protection. In such a case, the rule provides that the IJ shall enter an order of removal but give effect to the asylum officer's eligibility determination by granting the applicable form of protection, unless DHS makes a prima facie showing through evidence that specifically pertains to the respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview that the respondent is not eligible for such protection. Similarly, new 8 CFR 1240.17(d) further provides that an IJ must give effect to an asylum officer's determination that a noncitizen is eligible for statutory withholding of removal or protection under the CAT, even if the noncitizen is ordered removed in absentia, unless DHS makes a prima facie showing through evidence that specifically pertains to the

respondent and that was not in the record of proceedings for the USCIS Asylum Merits interview that the respondent is not eligible for such protection. In addition, new 8 CFR 1240.17(l) makes clear that DHS may, in keeping with existing regulations, seek to terminate such protection.[7]

Finally, the rule specifically exempts certain cases that cannot be expedited under the circumstances from the timelines and other expedited aspects of the streamlined 240 proceedings. *See* 8 CFR 1240.17(k). Such exceptions include the following circumstances: The respondent was under the age of 18 on the date that the NTA was issued and is not in consolidated removal proceedings with an adult family member, 8 CFR 1240.17(k)(1); the respondent has produced evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, protection under the CAT, and voluntary departure, and the respondent is seeking to apply for, or has applied for, such relief or protection, 8 CFR 1240.17(k)(2);[8] the respondent has produced evidence that supports a prima facie showing that the respondent is not removable and the IJ determines that the issue of whether the respondent is removable cannot be resolved simultaneously with the adjudication of the applications for asylum and related protection, 8 CFR 1240.17(k)(3); the IJ finds the respondent subject to removal to a country other than the country or countries in which the respondent claimed a fear of persecution, torture, or both before the asylum officer and the respondent claims a fear of persecution, torture, or both in that alternative country or countries, 8 CFR 1240.17(k)(4); the case is on remand or has been reopened following the IJ's order, 8 CFR 1240.17(k)(5); or the respondent exhibits indicia of mental incompetency, 8 CFR 1240.17(k)(6). The provisions at 8 CFR 1240.17(f), (g), and (h), which pertain to the schedule of proceedings, to the consideration of evidence and testimony, and to continuances, adjournments, and filing

extensions, will not apply in such cases. The other provisions in 8 CFR 1240.17, however, will apply.

**5. Parole**

DHS is amending 8 CFR 235.3(b)(2)(iii) to permit parole of detained individuals whose inadmissibility is being considered in the expedited removal process, or who have been ordered removed under the expedited removal process, only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, which includes, as interpreted in longstanding regulations, *see* 8 CFR 212.5(b), circumstances in which continued detention is not in the public interest, provided that the noncitizen presents neither a security risk nor a risk of absconding. Similarly, DHS is amending 8 CFR 235.3(b)(4)(ii) to permit parole of detained individuals pending a credible fear interview and any review of an asylum officer's credible fear determination by an IJ only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, including if continued detention is not in the public interest, provided that the noncitizen presents neither a security risk nor a risk of absconding. This rule further finalizes, as proposed, that such a grant of parole would be for the limited purpose of parole out of custody and cannot serve as an independent basis for employment authorization under 8 CFR 274a.12(c)(11). *See* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). The IFR also includes a technical amendment to 8 CFR 212.5(b) to incorporate a reference to 8 CFR 235.3(b). Parole is not guaranteed but instead considered on a case-by-case basis to determine whether it is warranted as a matter of discretion; DHS also may impose reasonable conditions on parole such as periodic reporting to U.S. Immigration and Customs Enforcement ("ICE"). *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(b).[9]

Additionally, DHS is including in this rule a technical amendment to 8 CFR 235.3(c)(2) to provide that parole of noncitizens with positive credible fear determinations whose asylum applications are retained by USCIS for further consideration through the Asylum Merits process is permissible only on a case-by-case basis for urgent humanitarian reasons or significant public benefit, including if continued detention is not in the public interest,

provided that the noncitizen presents neither a security risk nor a risk of absconding. This technical amendment is necessary to clarify that the parole authority pertaining to noncitizens awaiting an Asylum Merits interview with USCIS under this rule will be consistent with 8 CFR 212.5, just as the parole authority pertaining to detained noncitizens subject to expedited removal who are placed in section 240 removal proceedings is consistent with 8 CFR 212.5. As noted above, parole is not guaranteed but instead considered on a case-by-case basis to determine whether it is warranted as a matter of discretion.

*E. Summary of Costs and Benefits*

The primary individuals and entities that this rule is expected to affect are: (1) Noncitizens who are placed into expedited removal and who receive a credible fear screening; (2) the support networks of asylum applicants who receive a positive credible fear determination; (3) USCIS; and (4) EOIR. The expected impacts to these individuals and entities and to others are detailed in Section V.B of this preamble. In brief, by reducing undue delays in the asylum adjudication system, and by providing a variety of procedural safeguards, the rule protects equity, human dignity, and fairness given that individuals who are eligible for asylum or other protection may receive that protection more promptly, while individuals who are ineligible may more promptly be ordered removed. In the Departments' judgment, these benefits—which are difficult or impossible to quantify—along with the benefits of the rule that are more amenable to quantification, amply justify the aggregate costs of the rule.

The rule's impact on affected noncitizens (and, in turn, on their support networks) may vary substantially from person to person depending on, among other things, whether the individual receives a positive credible fear determination and whether the individual's asylum claim is granted or not granted by USCIS. For example, some individuals may benefit more from an earlier grant of asylum because they may be able to enter the labor force sooner. And individuals who establish credible fear may benefit from cost savings associated with no longer having to file a Form I–589, Application for Asylum and for Withholding of Removal.

The Departments have estimated the human resource- and information-related expenditures required for USCIS to implement this rule. These estimates are developed along three population

---

[7] Nothing in this rule alters the existing regulatory provisions governing termination of withholding or deferral; these provisions apply to any noncitizen whose removal has been withheld or deferred, whether through the procedure established in this rule or otherwise. *See* 8 CFR 208.17(d), 208.24(f), 1208.17(d), 1208.24(f).

[8] The rule does not specify the particular type of evidence that must be produced in order to demonstrate prima facie eligibility for relief. Such evidence could include testimonial evidence as well as documentary evidence. The rule further does not require that a completed application for the relief at issue be filed with the immigration court.

[9] Noncitizens who are paroled are not considered to be "admitted" to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

bounds to account for possible variations in the number of credible fear screenings in future years. Implementation of the rule also is expected to reduce EOIR's workload, allowing EOIR to focus efforts on other priority work and to reduce the growth of its substantial current backlog. That expected reduction in workload would result from (1) cases in which USCIS grants asylum never reaching EOIR, resulting in a potential 15 percent reduction in EOIR's caseload originating from credible fear screening (assuming historic grant rates), and (2) many of the cases reaching EOIR being resolved with less investment of immigration court time and resources than they would have required if referred directly to EOIR in the first instance.

An important caveat to the Departments' estimates of the potential costs and benefits associated with this rule is that it will take time to fully implement the rule, as the Departments intend to take a phased approach to implementing the rule.

*F. Effective Date*

This IFR will be effective 60 days from the date of publication in the **Federal Register**.

This rule applies prospectively and only to adults and families who are placed in expedited removal proceedings and indicate an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their home country, after the rule's effective date. The rule does not apply to unaccompanied children, as they are statutorily exempt from expedited removal proceedings. *See* 8 U.S.C. 1232(a)(5)(D)(i) (providing that "any unaccompanied alien child" whom DHS seeks to remove "shall be . . . placed in removal proceedings under section 240" of the INA); *see also* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").[10] The rule also does not apply to individuals in the United States who are not apprehended at or near the border and subject to expedited removal.[11] Such individuals will

continue to have their asylum claims heard in section 240 removal proceedings in the first instance, or through an affirmative asylum application under section 208 of the INA, 8 U.S.C. 1158, if they have not yet been placed in immigration proceedings. The rule also does not apply to (1) stowaways or (2) noncitizens who are physically present in or arriving in the CNMI who are determined to have a credible fear. Such individuals will continue to be referred to asylum-and-withholding-only proceedings before an IJ under 8 CFR 208.2(c).

**III. Discussion of the IFR**

The principal purpose of this IFR is to simultaneously increase the promptness, efficiency, and fairness of the process by which noncitizens who cross the border without appropriate documentation are either removed or, if eligible, granted protection. The IFR accomplishes this purpose both by instituting a new process for resolving the cases of noncitizens who have been found to have a credible fear of persecution or torture and by facilitating the use of expedited removal for more of those who are eligible, and especially for populations whose detention presents particular challenges. When individuals placed into the expedited removal process make a fear claim, they are referred to a USCIS asylum officer, who interviews them to determine whether they have a credible fear of persecution or torture. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 208.30. Under

procedures in place immediately prior to the effective date of this IFR, individuals who receive a positive credible fear determination are referred to an immigration court for section 240 removal proceedings, during which they have the opportunity to apply for asylum and other forms of relief or protection from removal. *See* 8 CFR 208.30(f) (2018) (providing that if a noncitizen, other than a stowaway, "is found to have a credible fear of persecution or torture, the asylum officer will so inform the [noncitizen] and issue an NTA, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act"). As explained in the NPRM, it may take years before the individual's protection claim is first adjudicated by an IJ. This delay creates additional stress and uncertainty for those ultimately determined to merit asylum and other forms of humanitarian protection, as they are left in limbo as to whether they might still be removed, are unable to lawfully work until their asylum application has been granted or has remained pending for several months, and are unable to petition for qualified family members, some of whom may still be at risk of harm. Moreover, the ability to stay in the United States for years waiting for an initial decision may motivate unauthorized border crossings by individuals who otherwise would not have sought to enter the United States and who lack a meritorious protection claim. Such additional entrants only further increase the backlog and lengthen the delays.

To respond to this problem, this rule at 8 CFR 208.2(a)(1)(ii) and 208.9 provides USCIS the authority to adjudicate in the first instance the asylum claims of individuals who receive a positive credible fear determination, and further provides that USCIS does so following a nonadversarial interview by an asylum officer. The rule also provides at 8 CFR 208.3(a)(2) that the record of a credible fear interview will serve as an asylum application for noncitizens whose cases are retained by or referred back to USCIS for adjudication after a positive credible fear determination, thereby allowing cases originating with a credible fear screening to be adjudicated substantially sooner. Both the Departments and the noncitizen can avoid the burden caused by delays associated with otherwise requiring the noncitizen to file a Form I–589, Application for Asylum and for Withholding of Removal. *See* Section IV.D.4.a of this preamble. By

---

[10] In lieu of being placed in section 240 removal proceedings, unaccompanied children from contiguous countries who meet special criteria may be permitted to withdraw their applications for admission and be voluntarily returned to their country of nationality or country of last habitual residence. *See* 8 U.S.C. 1232(a)(2).

[11] The former Immigration and Naturalization Service ("INS") initially implemented expedited removal processes only for certain noncitizens arriving at ports of entry. In 2002, DHS, by designation, expanded the application of expedited removal to certain noncitizens who (1) entered the United States by sea, either by boat or other means, (2) were not admitted or paroled into the United States, and (3) had not been continuously present in the United States for at least 2 years. Notice

Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 FR 68924 (Nov. 13, 2002). In 2004, DHS published an immediately effective notice in the **Federal Register** to expand the application of expedited removal to certain noncitizens encountered within 100 miles of the border and to noncitizens who entered the United States without inspection fewer than 14 days before they were encountered. Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004). In 2019, DHS expanded the process to the full extent authorized by statute to reach certain noncitizens, not covered by prior designations, who entered the country without inspection less than two years before they were apprehended and who were encountered anywhere in the United States. Designating Aliens for Expedited Removal, 84 FR 35409 (July 23, 2019). President Biden has directed DHS to consider whether to modify, revoke, or rescind that 2019 expansion. Executive Order 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 FR 8267, 8270–71 (Feb. 2, 2021). On March 21, 2022, DHS published a **Federal Register** Notice rescinding the 2019 designation. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 FR 16022 (Mar. 21, 2022).

authorizing USCIS to adjudicate in the first instance the asylum claims of individuals who receive a positive credible fear determination and by making it possible for this adjudication to be made promptly and independently of EOIR, the Departments predict that the rule will also help to stem the rapid growth of the EOIR caseload, described in greater detail in the NPRM. *See* 86 FR 46937. As for the noncitizen, this change reduces potential barriers to protection for eligible applicants by enabling asylum seekers to meet the statutory requirement to apply for asylum within one year of arrival, avoiding the risk of filing delays, and immediately beginning the waiting period of work authorization eligibility. *See id.* at 46916. Any spouse or child who arrived with the principal asylum applicant and is included as a dependent on the principal applicant's positive credible fear determination may make a separate claim for protection and submit their own principal asylum application to USCIS for consideration.

As noted in the NPRM, the current system for processing protection claims made by individuals encountered at or near the border and who establish credible fear was originally adopted in 1997. From 2018 through 2020, however, several attempts were made to change the credible fear screening process. Many of these attempts have been initially vacated or enjoined, and the implementation of others has been delayed pending consideration of whether they should be revised or rescinded.[12] The Global Asylum rule, which is enjoined, revised regulations to provide that noncitizens with positive credible fear determinations would be placed in asylum-and-withholding-only proceedings before an IJ. *See* 85 FR 80276. In the Global Asylum rule, the Departments explained their view that placing such noncitizens in asylum-and-withholding-only proceedings before an IJ would "bring the proceedings in line with the statutory objective that the expedited removal process be streamlined and efficient," *id.*, and later noted that it would "lessen the strain on the immigration courts by limiting the focus of such proceedings and thereby streamlining the process," *id.* at 80286. The Departments provided that these asylum-and-withholding-only proceedings would follow the same rules of procedure that apply in section 240 proceedings and that a noncitizen could appeal their case to the BIA and Federal circuit courts, as necessary. *See id.* at 80289. The Departments

acknowledged that IJs often adjudicate multiple forms of relief in a single removal proceeding, in addition to asylum, statutory withholding of removal, or CAT protection claims, and stated that those additional issues "generally only serve to increase the length of the proceedings" and that "there may be rare scenarios in which [noncitizens] subject to expedited removal are eligible for a form of relief other than asylum." *Id.* In the Global Asylum rule, the Departments concluded that placing noncitizens with positive credible fear determinations into more limited asylum-and-withholding-only proceedings properly balanced the need to prevent noncitizens from being removed to countries where they may face persecution or torture with ensuring efficiency in the overall adjudication process. *See id.*

This rule offers another approach. It establishes a streamlined and simplified adjudication process for individuals encountered at or near the border, placed into expedited removal, and determined to have a credible fear of persecution or torture, with the aim of deciding protection claims in a more timely fashion while ensuring appropriate safeguards against error.[13] The rule authorizes USCIS to adjudicate in the first instance the asylum claims of individuals who receive positive credible fear determinations under the expedited removal framework in section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). The procedures that USCIS asylum officers will use to adjudicate these claims will be nonadversarial, and the decisions will be made within time frames consistent with those established by Congress in section 208(d)(5)(A) of the INA, 8 U.S.C. 1158(d)(5)(A).[14]

The Departments believe that the approach in this rule, in contrast to the approach outlined in the Global Asylum rule, will allow for noncitizens' claims

to be heard more efficiently and fairly. As further explained in this rule, allowing noncitizens with positive credible fear determinations to have their asylum, statutory withholding, and CAT protection claims heard in a nonadversarial setting before an asylum officer capitalizes on the investment of time and expertise that USCIS has already made and, for the subset of cases in which asylum is granted by USCIS, saves investment of time and resources by EOIR and ICE. *See* Sections II.C. and IV.D.5 of this preamble. The extensive and well-rounded training that asylum officers receive is designed to enable them to conduct nonadversarial interviews in a fair and sensitive manner. This rule will also enable meritorious cases to be resolved more quickly, reducing the overall asylum system backlogs and using limited asylum officer and IJ resources more efficiently. If the asylum officer does not grant asylum following an Asylum Merits interview, the noncitizen will be referred to an IJ for streamlined section 240 removal proceedings, with a structure that provides for the prompt resolution of their claims and that allows the noncitizen to seek other forms of relief. If the asylum application includes a dependent who has not filed a separate application and the principal applicant is determined not to be eligible for asylum, the asylum officer will elicit sufficient information to determine whether there is a significant possibility that the applicant's dependent has experienced or fears harm that would be an independent basis for protection prior to referring the family to the IJ for a hearing. This will allow EOIR to consider all family members to have separately filed an asylum application once the family is placed into the streamlined section 240 removal proceedings.

This IFR will help more effectively achieve many of the goals outlined in the Global Asylum rule—including improving efficiency, streamlining the adjudication of asylum, statutory withholding of removal, and CAT protection claims, and lessening the strain on the immigration courts—albeit with a different approach. This rule helps meet the goal of lessening the strain on the immigration courts by having USCIS asylum officers adjudicate asylum claims in the first instance, rather than IJs. As explained further in this rule, the Departments anticipate that the number of cases USCIS refers to EOIR for adjudication will decrease. *See* Sections IV.F.1.a and V.B.4.b.ii of this preamble. In contrast to the Global Asylum rule, in this rule, the

---

[12] *See supra* note 4 (discussing recent regulations and their current status).

[13] Section 4(b)(i) of Executive Order 14010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, instructed the Secretary to review the procedures for individuals placed into expedited removal at or near the border and issue a report with recommendations "for creating a more efficient and orderly process that facilitates timely adjudications [of asylum and protection claims] and adherence to standards of fairness and due process." 86 FR 8267, 8270 (Feb. 2, 2021).

[14] *See* INA 208(d)(5)(A)(ii)–(iii), 8 U.S.C. 1158(d)(5)(A)(ii)–(iii) (specifying that an initial interview or hearing on an asylum application should generally commence within 45 days after the filing of the application and that final administrative adjudication should generally be completed within 180 days after the filing of the application).

**Appx. 013**

Departments are amending regulations to include several time frames for the adjudication process and particular procedural requirements designed to streamline the overall process and take advantage of the record created by the asylum officer, while still providing noncitizens with a full and fair opportunity to present testimony and evidence in support of their claims before an IJ. *See* Sections II.A.4 and III.D of this preamble. Accordingly, these changes better meet the Departments' goals of improving efficiency and streamlining the process. In addition, upon reconsideration, the Departments recognize that giving noncitizens the opportunity to seek other forms of relief within the context of streamlined section 240 removal proceedings helps reduce barriers to accessing other immigration benefits that may be available, and that the potential benefits to noncitizens of having such an opportunity outweigh efficiency concerns.

The Departments clarify that nothing in this rule is intended to displace DHS's (and, in particular, USCIS's) prosecutorial discretion to place a covered noncitizen in, or to withdraw a covered noncitizen from, expedited removal proceedings and issue an NTA to place the noncitizen in ordinary section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See* 8 CFR 208.30(b), (f); *Matter of J–A–B– & I–J–V– A–*, 27 I&N Dec. 168, 171 (BIA 2017); *Matter of E–R–M– & L–R–M–*, 25 I&N Dec. 520, 523 (BIA 2011). Moreover, should any provision of the rule governing the USCIS process for cases covered by 8 CFR 208.2(a)(1)(ii) be enjoined or vacated, EOIR has the discretion to place into ordinary section 240 proceedings any case referred to EOIR under this section.

*A. Credible Fear Screening Process*

The credible fear screening regulations under this rulemaking generally recodify the current screening process, returning the regulatory language, in large part, to what was in place prior to the various regulatory changes made from the end of 2018 through the end of 2020. Noncitizens encountered at or near the border or ports of entry and determined to be inadmissible pursuant to INA 212(a)(6)(C) or (a)(7), 8 U.S.C. 1182(a)(6)(C) or (a)(7), can be placed in expedited removal and provided a credible fear screening if they indicate an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their home countries. *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C.

1225(b)(1)(A)(ii), (B); 8 CFR 235.3(b)(4), 1235.3(b)(4). Individuals claiming a fear or an intention to apply for protection are referred to USCIS asylum officers for an interview and consideration of their fear claims under the "significant possibility" standard, which presently applies to all relevant protection claims because the regulatory changes referenced above have been vacated or enjoined.[15]

The Departments are returning to codifying the historical practice of applying the "significant possibility" standard across all forms of protection screened in the credible fear process. This rule adopts the "significant possibility" standard for credible fear screening for purposes of asylum, statutory withholding of removal, and CAT protection. While the statutory text at INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), only defines "credible fear" for purposes of screening asylum claims, the Departments believe that the efficiency gained in screening the same or a closely related set of facts using the same legal standard at the same time is substantial and should not be overlooked. Moreover, the credible fear screening process is preliminary in nature; its objective is to sort out, without undue decision costs, which cases merit further consideration. *See generally* INA 235(b)(1)(B); 8 U.S.C. 1225(b)(1)(B). Efficiently using one standard of law at the preliminary step is consistent with that objective, even though the ultimate adjudication of a noncitizen's claim for each form of protection may require a distinct analysis.

The standard for establishing a credible fear of persecution under the INA requires "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under section 208" of the INA. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). While the "significant possibility" standard for the purpose of screening for asylum is established by statute, the statute does not specify a standard to be used in screening for statutory withholding of removal or CAT protection. In June 2020, the Departments proposed alternative standards for statutory withholding of removal and CAT protection. *See* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264,

36268 (June 15, 2020) ("Global Asylum NPRM"). Under that proposed rule, "asylum officers would consider whether [noncitizens] could establish a credible fear of persecution, a reasonable possibility of persecution, or a reasonable possibility of torture." *Id.* at 36269. In finalizing that rule, the Departments noted that in changing the standard of law for withholding of removal and deferral of removal, an individual's "screening burdens would become adequately analogous to the merits burdens, where the [individual's] burdens for statutory withholding of removal and protections under the CAT regulations are higher than the burden for asylum." Global Asylum rule, 85 FR 80277. However, pursuant to an Executive order and with the additional context of the court's injunction against the implementation of the Global Asylum rule in *Pangea II*,[16] the Departments have reviewed and reconsidered that rule. *See* Executive Order 14012, Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, 86 FR 8277 (Feb. 2, 2021) ("E.O. on Legal Immigration") (ordering review of existing regulations for consistency with the E.O. on Legal Immigration). In line with this review, the Departments have revisited the approach of having divergent standards applied during the credible fear screening and determined that keeping one standard in screening for asylum, statutory withholding, and CAT protection better promotes an efficient credible fear screening process.

In multiple rulemaking efforts, the Departments promulgated divergent standards for asylum and withholding of removal, along with variable standards for individuals barred from certain types of protection.[17] However, in working to create efficiencies within this process, as well as recognizing that the Departments have signaled their intention to either modify or rescind these rules,[18] adhering to the legal standard that was set by Congress in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v), is the logical

---

[15] *See supra* note 4 (discussing recent regulations and their current status).

[16] *See supra* note 4 (discussing recent regulations and their current status).

[17] *See supra* note 4 (describing the TCT Bar IFR, Presidential Proclamation Bar IFR, and Security Bars rule).

[18] *See* Executive Office of the President, Office of Management and Budget ("OMB"), Office of Information and Regulatory Affairs ("OIRA"), Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgendaHistory* (last visited Mar. 5, 2022) (select DHS or DOJ); Executive Office of the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgendaMain* (last visited Mar. 5, 2022) (select DHS or DOJ).

choice. *See* 86 FR 46914. Upon reconsideration, the Departments believe that the varied legal standards created by different rulemakings, and enjoined or vacated by legal challenges, defeat their intended purpose, and complicate and extend the initial screening process provided for in INA section 235. Having asylum officers apply varied legal standards would generally lead to the need to elicit additional testimony from noncitizens at the time of the credible fear screening interview, which lengthens credible fear interviews and increases adjudication times. In the Departments' view, the delays associated with complicating and extending every credible fear interview likely outweigh any efficiencies gained by potential earlier detection of individuals who may be barred from or ineligible for certain types of protection. For example, when the TCT Bar IFR was in effect,[19] asylum officers were required to spend additional time during any interview where the bar potentially applied developing the record related to whether the bar applied, whether an exception to the bar might have applied, and, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, developing the record sufficiently such that a determination could be made according to the higher reasonable fear standard. This additional time spent developing the record when the higher reasonable fear standard applied decreased the efficiency of the screening interviews themselves and complicated the analysis asylum officers were required to perform, thus contributing to the overall lengthening of the entire process.

In the Global Asylum NPRM, the Departments stated that "[r]aising the standards of proof to a 'reasonable possibility' for the screening of

[noncitizens] seeking statutory withholding of removal and CAT protection would allow the Departments to better screen out non-meritorious claims and focus limited resources on claims much more likely to be determined to be meritorious by an immigration judge." 85 FR 36271. However, based on the Departments' experience implementing divergent screening standards for asylum, statutory withholding of removal, and CAT protection while the TCT Bar IFR was in effect, no evidence has been identified that this approach resulted in more successful screening out of non-meritorious claims while ensuring the United States complied with its non-refoulement obligations.

The Departments also reasoned in the Global Asylum NPRM: "Adopting a higher standard for statutory withholding and CAT screenings would not hinder the streamlined process envisioned for expedited removal. Asylum officers already receive extensive training and guidance on applying the 'reasonable possibility' standard in other contexts because they are determining whether a reasonable possibility of persecution or torture exists in reasonable fear determinations pursuant to 8 CFR 208.31. In some cases, asylum officers would need to spend additional time eliciting more detailed testimony from [noncitizens] to account for the higher standard of proof; however, the overall impact on the time asylum officers spend making screening determinations would be minimal." 85 FR 36271. However, the Departments have reconsidered these predictions, again based on the experience implementing divergent screening standards while the TCT Bar IFR was in effect. Beyond the additional time asylum officers themselves spent conducting these screening interviews, making determinations, and recording their assessments, supervisory asylum officers reviewing these cases spent additional time assessing whether the varying standards of proof were properly applied to the forms of relief for which asylum officers screened. This effort also required the additional investment of time and resources from Asylum Division headquarters, including training and quality assurance staff who had to develop and deliver guidance and trainings on the new process, monitor the work being conducted in the field to ensure compliance with regulations and administrative processes, and provide guidance to asylum officers and supervisory asylum officers on individual cases. Attorneys from the

USCIS Office of Chief Counsel had to spend time and resources reviewing and advising on training materials and guidance issued by the Asylum Division, as well as on individual cases on which legal advice was sought to ensure proper application of the divergent screening standards on various forms of relief. IJs reviewing negative determinations by asylum officers were also compelled to spend additional time ensuring the proper application of these screening standards, compared to the time spent reviewing determinations under a single standard in the status quo ante. The Departments failed to account in the relevant rulemakings for the necessity of expending these additional resources beyond time spent by asylum officers themselves making screening determinations.

The Departments also stated in the Global Asylum NPRM: "The procedural aspects of making screening determinations regarding fear of persecution and of torture would remain largely the same. Moreover, using a higher standard of proof in the screening context for those seeking statutory withholding of removal or protection under the CAT regulations in the immigration courts allows the Departments to more efficiently and promptly distinguish between aliens whose claims are more likely or less likely to ultimately be meritorious." 85 FR 36271. However, for the reasons detailed above, the Departments' experience implementing divergent screening standards while the TCT Bar IFR was in effect demonstrated that these predictions of increased efficiency and promptness did not materialize, undermining congressional intent that the screening process in the expedited removal context operate nimbly and in a truly expedited manner.

In clarifying that the "significant possibility" standard applies not only to credible fear screening for asylum, but also to credible fear screening for statutory withholding and CAT protection, the Departments will help ensure that the expedited removal process remains truly expedited, and will allow for asylum officers to adhere to a single legal standard in screening claims for protection from persecution and torture in the expedited removal process.

Similarly, through this rulemaking, the Departments are generally returning the regulatory text to codify the pre-2018, and current, practice of screening for eligibility for asylum and statutory withholding of removal while not applying most bars to asylum or withholding of removal in the credible

---

[19] The TCT Bar IFR went into effect on July 16, 2019, *see* 84 FR 33829, and was vacated on June 30, 2020, *see Capital Area Immigrants' Rights Coal. v. Trump,* 471 F. Supp. 3d at 45–57. The TCT Bar rule went into effect on January 19, 2021. *See* 85 FR 82260. However, it did not have an impact on credible fear processing. The TCT Bar rule did not directly make any amendments to the credible fear regulations at 8 CFR 208.30 and instead relied on changes to the credible fear regulations made by the Global Asylum rule in order to apply the TCT bar in credible fear. On January 8, 2021, the Global Asylum rule was preliminarily enjoined. *See Pangea II,* 512 F. Supp. 3d 966. As a result of the preliminary injunction in *Pangea II,* the amendments to 8 CFR 208.30 made by the Global Asylum rule were enjoined. Thus, the bar to asylum eligibility at 8 CFR 208.13(c)(4) established in the TCT Bar rule did not apply in credible fear while the Global Asylum rule remained enjoined. The TCT Bar rule itself was enjoined on February 16, 2021. *See E. Bay Sanctuary Covenant,* 519 F. Supp. 3d at 668. Therefore, only the TCT Bar IFR ever went into effect.

**Appx. 015**

**Federal Register** / Vol. 87, No. 60 / Tuesday, March 29, 2022 / Rules and Regulations

fear screening process. The Global Asylum rule, which has been enjoined, attempted to require the application of a significantly expanded list of mandatory bars during credible fear screenings and mandated a negative credible fear finding should any of the bars apply to the noncitizen at that initial stage. *See* 85 FR 80278; *supra* note 4. In the Global Asylum NPRM, the Departments justified this change by stating: ''From an administrative standpoint, it is pointless and inefficient to adjudicate claims for relief in section 240 proceedings when it is determined that an alien is subject to one or more of the mandatory bars to asylum or statutory withholding at the screening stage. Accordingly, applying those mandatory bars to aliens at the 'credible fear' screening stage would eliminate removal delays inherent in section 240 proceedings that serve no purpose and eliminate the waste of adjudicatory resources currently expended in vain.'' 85 FR 36272. However, upon reconsideration, the Departments have determined that, in most cases, the stated goal of promoting administrative efficiency can be better accomplished through the mechanisms established in this rulemaking rather than through applying mandatory bars at the credible fear screening stage. The Departments now believe that it is speculative whether, had the Global Asylum rule been implemented, a meaningful portion of the EOIR caseload might have been eliminated because some individuals who were found at the credible fear screening stage to be subject to a mandatory bar would not have been placed into section 240 proceedings. This is particularly true in light of the Global Asylum rule's preservation of a noncitizen's ability to request review of a negative credible fear determination (including the application of mandatory bars at the credible fear stage) by an IJ, as well as that rule's allowance for individuals found subject to a mandatory bar to seek asylum at the credible fear screen stage to nonetheless have their asylum claims considered by an IJ in asylum-and-withholding-only proceedings if they demonstrate a reasonable possibility of persecution or torture and are not subject to a bar to withholding of removal. Requiring asylum officers to broadly apply mandatory bars during credible fear screenings would have made these screenings less efficient, undermining congressional intent that the expedited removal process be truly expeditious, and would further limit DHS's ability to use expedited removal

to an extent that is operationally advantageous.

Requiring asylum officers to broadly apply the mandatory bars at credible fear screening would increase credible fear interview and decision times because asylum officers would be expected to devote time to eliciting testimony, conducting analysis, and making decisions about all applicable bars. For example, when the TCT Bar IFR was in effect,[20] asylum officers were required to spend additional time during any interview where the bar potentially applied developing the record related to whether the bar applied, whether an exception to the bar might have applied, and, if the noncitizen appeared to be barred and did not qualify for an exception to the bar, developing the record sufficiently such that a determination could be made according to the higher reasonable fear standard. As another example, a ''particularly serious crime'' is not statutorily defined in detail, beyond an aggravated felony,[21] and offenses typically are designated as particularly serious crimes through case-by-case adjudication—the kind of fact-intensive inquiry requiring complex legal analysis that would be more appropriate in a full adjudication before an asylum officer or in section 240 proceedings with the availability of judicial review than in credible fear screenings.[22] Presently, asylum officers ask questions related to all mandatory bars to develop the record sufficiently and identify potential bars but, since mandatory bars are not currently being applied in the credible fear determination, the record does not need to be developed to the level of detail that would be necessary if the issue of a mandatory bar was outcome-determinative for the credible fear determination. If a mandatory bar were to become outcome determinative, it would be necessary to develop the

record sufficiently to make a decision about the mandatory bar such that, depending on the facts, the interview would go beyond its congressionally intended purpose as a screening for potential eligibility for asylum or related protection—and a fail-safe to minimize the risk of refoulement—and would instead become a decision on the relief or protection itself. The level of detailed testimony necessary in some cases to make such a decision would require asylum officers to spend significantly more time developing the record during the interview and conducting additional research following the interview.

IJs reviewing negative credible fear determinations where a mandatory bar was applied would, depending on the facts, similarly face a more complicated task, undermining the efficiency of that process as well. Applying a mandatory bar often involves a complex legal and factual inquiry. While asylum officers are trained to gather and analyze such information to determine the applicability of mandatory bars in affirmative asylum adjudications, they are currently instructed to assess whether certain bars may apply in the credible fear screening context. *See* USCIS, Credible Fear of Persecution and Torture Determinations Lesson Plan 42–43 (Feb. 13, 2017). The latter assessment is designed to identify any mandatory bar issues requiring further exploration for IJs and the ICE attorneys representing DHS in section 240 removal proceedings, *see* 6 U.S.C. 252(c), rather than to serve as a comprehensive analysis upon which a determination on the applicability of a bar may be based.[23] Because of the complexity of the inquiry required to develop a sufficient record upon which to base a decision to apply certain mandatory bars, such a decision is, in general and depending on the facts, most appropriately made in the context of a full merits interview or hearing, whether before an asylum officer or an IJ, and not in a screening context.

Furthermore, the Departments recognize that considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process. In

---

[20] *See supra* note 19.

[21] *See* INA 208(b)(2)(A)(ii), (B)(i), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(i).

[22] *See Matter of Frentescu,* 18 I&N Dec. 244, 247 (BIA 1982) (setting out multi-factor test to determine whether a noncitizen has committed a particularly serious crime, including ''the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community''); *see also Matter of L–S–,* 22 I&N Dec. 645, 649 (BIA 1999) (en banc); *Matter of G–G–S–,* 26 I&N Dec. 339, 343–43 (BIA 2014) (''We have held that for an alien who has not been convicted of an aggravated felony or whose aggravated felony conviction did not result in an aggregate term of imprisonment of 5 years or more, it is necessary to examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction to determine whether the crime was particularly serious.'').

[23] *See* USCIS, Credible Fear of Persecution and Torture Determinations Lesson Plan 44 (Feb. 13, 2017) (''The officer must keep in mind that the applicability of these bars requires further evaluation that will take place in the full hearing before an immigration judge if the applicant otherwise has a credible fear of persecution or torture. In such cases, the officer should consult a supervisory officer follow procedures on 'flagging' such information for the hearing, and prepare the appropriate paperwork for a positive credible fear finding.'').

response to the Global Asylum NPRM, a commenter emphasized that each of the mandatory bars involves intensive legal analysis and asserted that requiring asylum officers to conduct this analysis during a screening interview would result in "the return of many asylum seekers to harm's way." Global Asylum rule, 85 FR 80294. Another commenter expressed the concern that "countless asylum-seekers could be erroneously knocked out of the process based on hasty decisions, misunderstandings, and limited information." *Id.* at 80295. Upon review and reconsideration, due to the intricacies of the fact-finding and legal analysis often required to apply mandatory bars, the Departments now believe that individuals found to have a credible fear of persecution generally should be afforded the additional time, procedural protections, and opportunity to further consult with counsel that the Asylum Merits process or section 240 removal proceedings provide.

In light of these concerns, the Departments have reconsidered their position stated in the preamble to the Global Asylum NPRM that any removal delays resulting from the need to fully consider the mandatory bars in section 240 proceedings "serve no purpose" and amount to "adjudicatory resources currently expended in vain." 85 FR 36272. As stated above, the Departments now believe that, in many cases, especially when intensive fact-finding is required, the notion that consideration of mandatory bars at the credible fear screening stage would result in elimination of removal delays for individuals subject to the bars is speculative. Moreover, to the extent consideration of mandatory bars in section 240 proceedings does result in delays to removal, the Departments believe in light of the public comments cited above that such delays do serve important purposes—particularly in cases with complicated facts—namely, ensuring that the procedures and forum for determining the applicability of mandatory bars appropriately account for the complexity of the inquiry and afford noncitizens potentially subject to the mandatory bars a reasonable and fair opportunity to contest their applicability. Adjudicatory resources designed to ensure that noncitizens are not refouled to persecution due to the erroneous application of a mandatory bar are not expended in vain. Rather, the expenditure of such resources helps keep the Departments in compliance with Federal law and international treaty obligations.

Given the need to preserve the efficiencies Congress intended in making credible fear screening part of the expedited removal process and to ensure procedural fairness for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory withholding of removal but for the potential applicability of a mandatory bar, the Departments have decided that the Global Asylum rule's broad-based application of mandatory bars at the credible fear screening stage should be rescinded.[24]

If an asylum officer determines that an individual does not have a credible fear of persecution or torture, the individual can request that an IJ review the asylum officer's negative credible fear determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g). The Departments also are re-codifying the treatment of a failure or refusal on the part of a noncitizen to request IJ review of a negative credible fear determination as a request for IJ review. *See* 8 CFR 208.30(g)(1), 1208.30(g)(2)(i). In the Global Asylum rule, the Departments amended regulations to treat a noncitizen's refusal to indicate whether they would like IJ review as declining IJ review. *See* 85 FR 80296. The Departments explained that treating refusals as requests for review serves to create unnecessary and undue burdens and that it is reasonable to require an individual to answer affirmatively when asked by an asylum officer if they would like IJ review. *See id.* In this rule, the Departments are reverting to the pre-existing regulations. Upon reconsideration, the Departments recognize that there may be numerous explanations for a noncitizen's refusal or failure to indicate whether they would like to seek IJ review—and indeed there will be cases in which a noncitizen wants review but fails to explicitly indicate it. The Departments now conclude that treating any refusal or failure to elect review as a request for IJ review, rather than as a declination of such review, is fairer and better accounts for the range of explanations for a noncitizen's failure to seek review. Treating such refusals or failures to elect review as requests for IJ review appropriately ensures that any noncitizen who may wish to pursue IJ

review (that is, any noncitizen who has not, in fact, declined IJ review) has the opportunity to do so. A noncitizen who genuinely wishes to decline review may of course withdraw the request for review before the IJ; in such a case, the IJ will return the noncitizen's case to DHS for execution of the expedited removal order. *See* 8 CFR 1208.30(g)(2).

In comparison to the NPRM, in this rule, the Departments are amending 8 CFR 208.30(g) to provide, in new 8 CFR 208.30(g)(1)(i), that USCIS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred, provided the request for reconsideration is received from the noncitizen or their attorney or initiated by USCIS no more than 7 days after the concurrence by the IJ, or prior to the noncitizen's removal, whichever date comes first. USCIS's reconsideration of any such request is discretionary. After an IJ has concurred with a negative credible fear determination, DHS can execute the individual's expedited removal order, promptly removing the individual from the United States. Under no circumstances, however, will USCIS accept more than one request for reconsideration.

The Departments carefully considered the public comments received in response to the NPRM related to the proposal to foreclose any DHS reconsideration of negative credible fear determinations. Based on those comments, the Departments decided to retain the existing regulatory language related to DHS reconsideration, *see* 8 CFR 208.30(g), but to place reasonable procedural limits on the practice. Accordingly, the Departments are amending the regulation to include numerical and time limitations and clarify that DHS may, in its discretion, reconsider a negative credible fear determination with which an IJ has concurred. These procedural limitations and clarifications are necessary to ensure that reconsideration requests to USCIS do not obstruct the streamlined process that Congress intended in creating expedited removal. These changes also are consistent with the statutory scheme of INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B), under which it is the IJ review of the negative credible fear determination that serves as the check to ensure that noncitizens who have a credible fear of persecution or torture are not returned based on an erroneous screening determination by USCIS. The expedited removal statute and its implementing regulations generally prohibit any further administrative review or appeal of an IJ's decision made after review of a

---

[24] In addition to the proposed changes to the DOJ portions of the regulations in the NPRM related to the application of mandatory bars in the credible fear process, the IFR also includes a similar edit to 8 CFR 1003.42(d)(1). Both 8 CFR 1003.42 and 8 CFR 1208.30 relate to IJs' review of asylum officers' credible fear determinations, and the Departments intend for the regulations to be consistent with regard to the treatment of mandatory bars in the credible fear review process.

**Appx. 017**

negative credible fear determination. *See* INA 235(b)(1)(B)(iii)(III), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (C); 8 CFR 1003.42(f)(2), 1208.30(g)(2)(iv)(A). Congress similarly has made clear its intent that expedited removal should remain a streamlined, efficient process by limiting judicial review of many determinations in expedited removal. *See* INA 242(a)(2)(A), (e), 8 U.S.C. 1252(a)(2)(A), (e). These statutory provisions limiting administrative and judicial review and directing expeditious determinations reflect clear congressional intent that expedited removal be a truly expedited process.

The numerical and time limitations promulgated in this rule are consistent with congressional intent and with the purpose of the current regulation allowing for such requests. The Departments believe that, over time, the general allowance for reconsideration by USCIS asylum offices came to be used beyond its original intended scope. Such requests have not used a formalized process, since there is currently no formal mechanism for noncitizens to request reconsideration of a negative credible fear determination before USCIS; instead, they are entertained on an informal, ad hoc basis whereby individuals contact USCIS asylum offices with their reconsideration requests after an IJ has affirmed the negative credible fear determination. This informal, ad hoc allowance for such requests, including multiple requests, has proven difficult to manage. To deal with these many requests, USCIS has had to devote time and resources that could more efficiently be used on initial credible fear and reasonable fear determinations, affirmative asylum cases, and now, Asylum Merits interviews with the present rule.

## B. Applications for Asylum

If the noncitizen is found to have a credible fear, this IFR changes the procedure as described above. Under this rule, rather than referring the individual to an IJ for an adversarial section 240 removal proceeding in the first instance, or, as provided for in a presently enjoined regulation, asylum-and-withholding-only proceedings before an IJ,[25] the individual's asylum application instead may be retained for further consideration by USCIS through a nonadversarial interview before an asylum officer. *See* 8 CFR 208.30(f). Similarly, if, upon review of an asylum officer's negative credible fear

determination, an IJ finds that an individual does have a credible fear of persecution or torture, the individual also can be referred back to USCIS for further consideration of the individual's asylum claim. *See* 8 CFR 1003.42, 1208.30(g). To eliminate delays between a positive credible fear determination and the filing of an application for asylum, the Departments are amending regulations to provide, in new 8 CFR 208.3(a)(2), that the written record of the credible fear determination created by USCIS during the credible fear process, and subsequently served on the individual together with the service of the credible fear decision itself, will be treated as an "application for asylum," with the date of service on the individual considered the date of filing. Every individual who receives a positive credible fear determination and whose case is retained by USCIS will be considered to have filed an application for asylum at the time the determination is served on them. The application will be considered filed or received as of the service date for purposes of the one-year filing deadline for asylum, *see* INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B), and for starting the waiting period for eligibility to file for employment authorization based upon a pending asylum application, *see* 8 CFR 208.3(c)(3). The Departments are amending regulations to provide that this application for asylum will be considered a complete application for purposes of 8 CFR 208.4(a), 208.7, and 208.9(a) in order to qualify for an interview and adjudication, and will be subject to the other conditions and consequences provided for in 8 CFR 208.3(c) once the noncitizen signs the documentation under penalty of perjury and with notice of the consequences of filing a frivolous asylum application at the time of the Asylum Merits interview, as provided in new 8 CFR 208.3(a)(2).[26]

The Departments will implement these changes to the credible fear process by having the USCIS asylum officer conducting the credible fear interview advise the noncitizen of the consequences of filing a frivolous asylum application and capture the noncitizen's relevant information through testimony provided under oath. During the credible fear interview, as 8 CFR 208.30(d) already provides and will continue to provide under the IFR, the asylum officer will "elicit all relevant and useful information" for the credible fear determination, create a summary of the material facts presented by the noncitizen during the interview, review the summary with the noncitizen, and allow the noncitizen to correct any errors. The record created will contain the necessary biographical information and sufficient information related to the noncitizen's fear claim to be considered an application. As a matter of longstanding practice in processing families through credible fear screenings, the information captured by the asylum officer during the credible fear interview will contain information about the noncitizen's spouse and children, if any, including those who were not part of the credible fear determination—but under this rule only a spouse or child who was included in the credible fear determination issued pursuant to 8 CFR 208.30(c) or who has a pending asylum application with USCIS pursuant to 8 CFR 208.2(a)(1)(ii) can be included as a dependent on the request for asylum.[27] *See* 8 CFR 208.3(a)(2). Any spouse or child included as a dependent on the credible fear determination may request to file a separate asylum application as a

---

[25] *See Global Asylum* rule, 85 FR 80276; *supra* note 4 (discussing recent regulations and their current status).

[26] In addition, the Departments are amending 8 CFR 1208.3 and 1208.4 to account for changes made by this rule, including the provisions that will treat the record of the credible fear determination as an application for asylum in the circumstances addressed by the rule. The amendment at 8 CFR 1208.3(c)(3) affects language that was enacted in the rule entitled "Procedures for Asylum and Withholding of Removal," 85 FR 81698 (Dec. 16, 2020). The December 16, 2020, rulemaking made various changes to DOJ regulations, including 8 CFR 1208.3(c)(3). *Id.* at 81756–51. The December 16, 2020, rulemaking is preliminarily enjoined. *See* Order at 1, *Nat'l Immigrant Justice Ctr.* v. *Exec. Office for Immigration Review*, No. 21–cv–56 (D.D.C. Jan. 14, 2021). This rule makes changes to the regulations only as necessary to effectuate its goals. The Departments anticipate that additional changes to the relevant regulations, including rescission of or revision to the language added by the preliminarily enjoined regulation, will be made through later rulemakings. *See* Executive Office of

the President, OMB, OIRA, Fall 2021 Unified Agenda of Regulatory and Deregulatory Actions, *https://www.reginfo.gov/public/do/eAgenda ViewRule?pubId=202110&RIN=1125-AB15* (last visited Feb. 28, 2022).

[27] While only a spouse or child included on the credible fear determination or who presently has an asylum application pending with USCIS after a positive credible fear determination can be included as a dependent on the subsequent asylum application under this process, the noncitizen granted asylum remains eligible to apply for accompanying or follow-to-join benefits for any qualified spouse or child not included on the asylum application, as provided for in 8 CFR 208.21. The Departments believe that it is procedurally impractical to attempt to include a spouse or child on the application when the spouse or child has not previously been placed into expedited removal and subsequently referred to USCIS after a positive credible fear determination. This is similar to the inability to include a spouse or child not in section 240 removal proceedings on the asylum application of a principal asylum applicant who is in such section 240 removal proceedings. Under such circumstances, there is no clear basis for issuing a final order of removal against such an individual spouse or child should the asylum application not be approved.

principal applicant with USCIS at any time while the principal's asylum application is pending with USCIS. *See* 8 CFR 208.3(a)(2). A copy of the principal applicant's application for asylum—the record of the credible fear determination, including the asylum officer's notes from the interview, the summary of material facts, and other materials upon which the determination was based—will be provided to the noncitizen at the time that the positive credible fear determination is served. *See* 8 CFR 208.30(f). As provided in new 8 CFR 208.4(b)(2), the noncitizen may subsequently amend or correct the biographic or credible fear information in the Form I–870, Record of Determination/Credible Fear Worksheet, or supplement the information collected during the process that concluded with a positive credible fear determination, up until 7 days prior to the scheduled Asylum Merits interview before a USCIS asylum officer, or for documents submitted by mail, postmarked no later than 10 days before the scheduled Asylum Merits interview. The asylum officer, finding good cause in an exercise of USCIS discretion, may consider amendments or supplements submitted after the 7- or 10-day submission deadline or may grant the applicant an extension of time during which the applicant may submit additional evidence, subject to the limitation on extensions described in 8 CFR 208.9(e)(2). In new 8 CFR 208.9(e)(2), this rule further provides that, in the absence of exigent circumstances, an asylum officer shall not grant any extensions for submission of additional evidence that would prevent the Asylum Merits decision from being issued to the applicant within 60 days of service of the positive credible fear determination. The Departments believe that such limitations are necessary to ensure that the process remains expeditious while maintaining fairness.

The information required to be gathered during the credible fear screening process is based on the noncitizen's own testimony under oath in response to questions from a trained USCIS asylum officer. Thus, the Departments believe that the screening would provide sufficient information upon which to ascertain the basis of the noncitizen's request for protection. Under this rule, noncitizens who receive a positive credible fear determination would have an asylum application on file with the Government within days of their credible fear screenings, thereby meeting the one-year asylum filing deadline, avoiding

the risk of filing delays, and expeditiously beginning the waiting period for employment authorization eligibility.

*C. Proceedings for Further Consideration of the Application for Asylum by USCIS Through Asylum Merits Interview for Noncitizens With Credible Fear*

In this IFR, consistent with the NPRM, the Departments are amending regulations to authorize USCIS asylum officers to conduct Asylum Merits interviews for individuals whose cases are retained for further consideration by USCIS following a positive credible fear determination or returned to USCIS if an IJ vacates an asylum officer's negative credible fear finding.[28] The Departments carefully considered the comments received in response to the NPRM focused on timelines related to Asylum Merits interviews, and, in this IFR, are including regulatory language clarifying timelines for scheduling hearings and providing asylum decisions.

As provided in 8 CFR 208.9(a)(1), USCIS will not schedule an Asylum Merits interview for further consideration of an asylum application following a positive credible fear determination fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination, unless the applicant requests in writing that an interview be scheduled sooner. The asylum officer shall conduct the interview within 45 days of the date that the positive credible fear determination is served on the noncitizen—*i.e.*, the date the asylum application is considered filed, *see* 8 CFR 208.3(a)(2)—subject to the need to reschedule an interview due to exigent circumstances. *See* 8 CFR 208.9(a)(1). These timelines are consistent with the INA, which provides that, "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed." INA 208(d)(5)(A)(ii), 8 U.S.C. 1158(d)(5)(A)(ii).

The nonadversarial Asylum Merits interview process will provide several procedural safeguards, such as the following: (1) The applicant may have

counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence, 8 CFR 208.9(b); (2) the applicant or applicant's representative will have an opportunity to make a statement or comment on the evidence presented and the representative will also have the opportunity to ask follow-up questions of the applicant and any witness, 8 CFR 208.9(d)(1); (3) a verbatim transcript of the interview will be included in the referral package to the IJ, with a copy also provided to the noncitizen, 8 CFR 208.9(f)(2), 1240.17(c); (4) an asylum officer will arrange for the assistance of an interpreter if the applicant is unable to proceed effectively in English, and if a USCIS interpreter is unavailable, USCIS will attribute any resulting delay to USCIS for purposes of eligibility for employment authorization, 8 CFR 208.9(g); and (5) the failure of a noncitizen to appear for an interview may result in the referral of the noncitizen to section 240 removal proceedings before an IJ, 8 CFR 208.10(a)(1)(iii), unless USCIS, in its own discretion, excuses the failure to appear, 8 CFR 208.10(b)(1). The Departments believe that these procedural safeguards will enhance efficiency and further the expeditious adjudication of noncitizens' asylum claims, while at the same time balancing due process and fairness concerns. The protection claims considered in Asylum Merits interviews will be adjudicated in a separate queue, apart from adjudications of affirmative asylum applications filed directly with USCIS.

Allowing the cases of individuals who receive a positive credible fear determination to remain with USCIS for the Asylum Merits interview, rather than initially referring the case to an IJ for an adversarial section 240 removal proceeding or, as provided for in a presently enjoined regulation, for an asylum-and-withholding-only proceeding,[29] will capitalize on the investment of time and expertise that USCIS has already made and, for the subset of cases in which asylum is granted by USCIS, save investment of time and resources by EOIR and ICE. It will also enable meritorious cases to be resolved more quickly, reducing the overall asylum system backlogs and using limited asylum officer and IJ resources more efficiently. The Asylum Merits interview process affords noncitizens a fair opportunity to present their claims. In addition, noncitizens

---

[28] In addition to the proposed changes to the DHS portion of the regulations in the NPRM, the IFR also includes a similar edit to 8 CFR 1003.42(d)(1). This edit is intended to ensure consistency with 8 CFR 1003.42 and the proposed edits to 8 CFR 1208.30(g)(2) so that both provisions properly direct that a case where an IJ vacates a negative credible fear finding will be referred back to USCIS as intended by both the NPRM and the IFR.

[29] *See* Global Asylum rule, 85 FR 80276; *supra* note 4 (discussing recent regulations and their current status).

who are not granted asylum will be referred to an immigration court for a streamlined section 240 removal proceeding, which means that an IJ will consider their asylum and, as necessary, statutory withholding and CAT protection claims. Overall, these ample procedural safeguards will ensure due process, respect human dignity, and promote equity.

Section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), authorizes a procedure for "further consideration" of asylum applications that is separate from section 240 removal proceedings. As the Department of Justice recognized over two decades ago, "the statute is silent as to the procedures for those who . . . demonstrate a credible fear of persecution." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 10312, 10320 (Mar. 6, 1997) (interim rule). It "does not specify how or by whom this further consideration should be conducted." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 444, 447 (Jan. 3, 1997) (proposed rule).

By not specifying what "further consideration" entails, the statute leaves it to the Departments to determine. Under the familiar *Chevron* framework, it is well-settled that such "ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159 (2000) (citing *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984)); *see also Epic Sys. Corp.* v. *Lewis,* 138 S. Ct. 1612, 1629 (2018) (noting that *Chevron* rests on "the premise that a statutory ambiguity represents an implicit delegation to an agency to interpret a statute which it administers" (quotation marks and citation omitted)). An agency may exercise its delegated authority to plug the gap with any "reasonable interpretation" of the statute. *Chevron,* 467 U.S. at 844.

By its terms, the phrase "further consideration" is open-ended. The fact that Congress did not specify the nature of the proceedings for those found to have a credible fear, *see* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), contrasts starkly with two other provisions in the same section that expressly require or deny section 240 removal proceedings for certain other classes of noncitizens. In one provision, INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A), Congress provided that an applicant for admission who "is not

clearly and beyond a doubt entitled to be admitted" must be "detained for a proceeding under [INA 240]." And in another, INA 235(a)(2), 8 U.S.C. 1225(a)(2), Congress provided that "[i]n no case may a stowaway be considered . . . eligible for a hearing under [INA 240]." This shows that Congress knew how to specifically require or prohibit referral to a section 240 removal proceeding when it wanted to do so. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Salinas* v. *United States R.R. Ret. Bd.,* 141 S. Ct. 691, 698 (2021) (quotation marks and citation omitted).

The D.C. Circuit has "consistently recognized that a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion." *Catawba Cnty., N.C.* v. *EPA,* 571 F.3d 20, 36 (D.C. Cir. 2009) (quotation marks and citation omitted). That Congress's silence in section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), permits the Departments discretion to establish procedures for "further consideration" is reinforced by the fact that the noncitizens whom DHS has elected to process using the expedited removal procedure are expressly excluded from the class of noncitizens who are statutorily guaranteed section 240 removal proceedings under section 235(b)(2)(A) of the INA, 8 U.S.C. 1225(b)(2)(A).

If, following an Asylum Merits interview described in this IFR, USCIS grants asylum, the individual may be allowed to remain in the United States indefinitely with the status of asylee and eventually may apply for lawful permanent residence. *See* INA 208(c)(1), 209(b), 8 U.S.C. 1158(c)(1), 1159(b). If asylum is not granted, the asylum officer will refer the application, together with the appropriate charging document and the record of the Asylum Merits interview, for adjudication in streamlined section 240 removal proceedings before an IJ. *See* 8 CFR 208.14(c)(1), 1240.17(a).

The Departments carefully considered the public comments received in response to the NPRM and reconsidered the proposals outlined in the NPRM related to having USCIS asylum officers make final decisions regarding statutory withholding of removal and CAT protection claims and issue removal orders. *See* 86 FR 46917–19. In this IFR, DHS is amending 8 CFR 208.9(b) to

provide that, in the case of a noncitizen whose case is retained by or referred to USCIS for further consideration through an Asylum Merits interview, an asylum officer will also elicit all relevant and useful information bearing on the applicant's eligibility for statutory withholding of removal or CAT protection. This IFR further provides in 8 CFR 208.16(a) and (c) that if the asylum application is not granted, the asylum officer will determine whether the noncitizen is eligible for statutory withholding of removal under 8 CFR 208.16(b) or CAT protection under 8 CFR 208.16(c). Asylum officers will not issue orders of removal to applicants who are not granted asylum as proposed in the NPRM, but rather will refer applicants who are not granted asylum to the immigration court for consideration of their protection claims in streamlined section 240 removal proceedings before an IJ. *See* 8 CFR 208.14(c)(1), 208.16(a). USCIS will not issue a final decision on an applicant's request for statutory withholding of removal or CAT protection. Rather, pursuant to new 8 CFR 1240.17(d), (f)(2)(i)(B), and (i)(2), if an asylum officer does not grant asylum but determines the noncitizen is eligible for statutory withholding of removal or CAT protection and the IJ does not grant asylum, the IJ will issue a removal order and, subject to certain exceptions, give effect to USCIS's determination.

If the asylum application includes a dependent who has not filed a separate application, the asylum officer will, as appropriate and prior to referring the family to streamlined section 240 proceedings before an IJ, elicit information sufficient to determine whether there is a significant possibility that the applicant's dependent has experienced or fears harm that would be an independent basis for protection in the event that the principal applicant is not granted asylum. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal applicant's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 208.3(a)(2), 1208.3(a)(2). This provision will allow any spouse or child in the streamlined procedure to exercise their right to seek protection on an independent basis without the need for delaying the proceedings to allow for the preparation and filing of an I–589, Application for Asylum and for Withholding of Removal. The

**Appx. 020**

Departments have determined that these changes meet the goals of this rule, such as improving efficiency while allowing noncitizens to receive a full and fair opportunity to be heard, and are also responsive to commenters' concerns raised in response to the NPRM, as detailed in Sections IV.D.5 and 6 of this preamble. While USCIS will not make final decisions regarding statutory withholding of removal and CAT protection claims and issue removal orders, it is appropriate for USCIS to make eligibility determinations regarding statutory withholding of removal and protection under the CAT. As a threshold issue, applications for asylum, statutory withholding of removal, and protection under the CAT are all factually linked. While the legal standards and requirements differ among the forms of relief and protection, the relevant applications will substantially share the same set of operative facts that an asylum officer would have already elicited, including through evidence and testimony, in the nonadversarial Asylum Merits interview. Moreover, asylum officers receive extensive training, and develop extensive expertise, in assessing claims and country conditions, and are qualified to determine whether an applicant will face harm in the proposed country. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b). Asylum officers also receive training on the standards and eligibility issues related to determinations for statutory withholding of removal and CAT protection in order to conduct credible fear screening interviews and make appropriate credible fear determinations under 8 CFR 208.30(e). *See* 8 CFR 208.1(b).

While asylum officers will also not make final decisions regarding a dependent's eligibility for asylum, statutory withholding of removal, and CAT protection claims if the dependent has not received a prior separate positive credible fear determination or filed a separate principal asylum application with USCIS, it is appropriate for asylum officers to elicit sufficient information regarding each dependent's eligibility for protection in order to allow for those claims to be on the record and appropriately considered should the family be placed into streamlined section 240 removal proceedings. In many cases, the family members will likely substantially share the same set of operative facts that an asylum officer would have already elicited from the principal applicant, including through evidence and testimony, during the same

nonadversarial Asylum Merits interview. Accordingly, the additional questioning that will ordinarily be needed to develop the record enough to facilitate an IJ's adjudication of any claims through streamlined section 240 proceedings is expected to be modest. Moreover, any dependent who wishes to be adjudicated as a principal applicant by USCIS may file a separate application with USCIS prior to referral to removal proceedings.

Where a noncitizen's asylum application is not granted by USCIS, automatic referral to streamlined section 240 proceedings—as further discussed in Section III.D of this preamble—ensures that the application of the principal applicant and any family members may be reviewed by the IJ. In the streamlined section 240 proceedings, the IJ will adjudicate de novo the noncitizen's and any family members' applications for asylum and, if USCIS determined them ineligible for statutory withholding of removal or protection under the CAT, such claims as well. Statutory withholding of removal and CAT protection are nondiscretionary forms of protection, the granting of which is mandatory upon a showing of eligibility. *See, e.g., Myrie* v. *Att'y Gen. United States*, 855 F.3d 509, 515–16 (3d Cir. 2017); *Benitez Ramos* v. *Holder*, 589 F.3d 426, 431 (7th Cir. 2009). Because an asylum officer does not issue an order of removal under the IFR, it is appropriate to wait until the IJ enters the order of removal before generally giving effect to USCIS's statutory withholding of removal and CAT protection eligibility determinations. *See Matter of I–S– & C–S–*, 24 I&N Dec. 432, 433 (BIA 2008).

### D. Streamlined Section 240 Removal Proceedings Before the Immigration Judge

Upon careful consideration of the comments received in response to the NPRM, as discussed in Section IV of this preamble, this IFR does not adopt the IJ review proceedings proposed in the NPRM. *See* 86 FR 46946–47 (8 CFR 1003.48, 1208.2(c) (proposed)). Instead, the Departments will place noncitizens whose applications for asylum are not granted by USCIS, as well as any spouse or children included on the noncitizen's application, in section 240 proceedings that will be streamlined as provided in new 8 CFR 1240.17. *See* 8 CFR 1240.17(a), (b). As provided in new 8 CFR 1240.17(a), IJs must conduct these proceedings in accordance with the procedures and requirements set forth in section 208 of the Act, 8 U.S.C. 1158.

Currently, further consideration of an asylum application by an individual in

expedited removal is done through section 240 proceedings. *See, e.g.,* 8 CFR 208.30(f) (2020); [30] 8 CFR part 1240, subpart A (2020). Such proceedings follow issuance of an NTA, which informs the noncitizen of DHS's charges of inadmissibility or removability, INA 239(a)(1), 8 U.S.C. 1229(a)(1), and these proceedings provide an opportunity for the noncitizen to make his or her case to an IJ, INA 240(a)(1), 8 U.S.C. 1229a(a)(1). Parties in section 240 removal proceedings have a wide range of well-established rights, including the following: The right to representation at no expense to the Government, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A); a reasonable opportunity to examine evidence, present evidence, and cross-examine witnesses, INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)–(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the BIA, 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review in the appropriate U.S. Court of Appeals, INA 242, 8 U.S.C. 1252.

Under the IFR, USCIS will have authority to adjudicate asylum claims brought by noncitizens subject to expedited removal and found to have a credible fear of persecution or torture rather than immediately referring such cases for adjudication by IJs in section 240 removal proceedings. The Departments have determined that noncitizens who subsequently are not granted asylum by USCIS should be referred to section 240 removal proceedings that will be streamlined as described in new 8 CFR 1240.17. The well-established rights that apply in section 240 proceedings will continue to apply during the 240 proceedings described in new 8 CFR 1240.17, but the latter will include new procedures designed to streamline the process while continuing to ensure fairness.

The Departments believe that these cases can be adjudicated more expeditiously than other cases in section 240 removal proceedings. Unlike other cases, noncitizens subject to this IFR will have had a full opportunity to present their protection claims to an asylum officer. Moreover, as established in new 8 CFR 1240.17(c) and (e), IJs and parties in any subsequent streamlined section 240 removal proceedings will have the benefit of a fully developed record and

---

[30] The Global Asylum rule would have revised the process, placing such noncitizens into asylum-and-withholding-only proceedings instead of section 240 proceedings, *see* 85 FR 80276, but it was enjoined, *see supra* note 4.

decision prepared by USCIS.[31] Because the USCIS Asylum Merits interview will create a record that includes testimony and documentary evidence, the Departments believe that less time will be needed in immigration court proceedings to build the evidentiary record. Thus, cases will be resolved more expeditiously before the IJ. The Departments recognize that, in some instances, IJs may need to take additional testimony and evidence—beyond what is contained in the USCIS record—to fully develop the record. *See, e.g.,* 8 CFR 1240.17(f)(4)(iii). By providing IJs with the ability to rely upon the previously developed record in most cases, while preserving the flexibility for IJs to take new evidence and testimony when warranted, without the additional motions practice contemplated by the NPRM's provisions, the IFR creates more streamlined, efficient adjudications overall. Accordingly, the Departments believe that it is possible to achieve the purposes of the NPRM—to increase efficiency and maintain procedural fairness—by making procedural changes to streamline existing 240 proceedings instead of establishing the IJ review proceedings proposed under the NPRM.

In keeping with this goal, the IFR provides that these section 240 proceedings will be subject to particular procedural requirements designed to streamline the overall process and take advantage of the record created by the asylum officer while still providing noncitizens with a full and fair opportunity to present testimony and evidence in support of their claims. Where the IJ record is not able to take advantage of that record, the streamlining measures do not apply. Thus, new 8 CFR 1240.17(k) exempts certain cases from the streamlined process, including, for example, where the respondent has produced evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, CAT protection, or voluntary departure, 8 CFR 1240.17(k)(2); where the respondent has raised a substantial defense to the removal charge,[32] 8 CFR

1240.17(k)(3); or where the designated country of removal is different from the one that the asylum officer considered in adjudicating the noncitizen's application for asylum or protection, 8 CFR 1240.17(k)(4).[33] New 8 CFR 1240.17(k) makes other exceptions for certain vulnerable noncitizens and it exempts cases that have been reopened or remanded. *See* 8 CFR 1240.17(k)(1), (5), (6). Accordingly, with these exceptions, the Departments believe that these proceedings can be expedited given the limited forms of relief and protection that will need to be adjudicated by the IJ and given that the IJ and the parties will benefit from the record developed before USCIS.

The IFR provides additional procedures that will contribute to efficient adjudication. As provided in revised 8 CFR 208.3(a)(2) and 8 CFR 1208.3(a)(2) and new 8 CFR 1240.17(e), the IFR treats the record underlying the positive credible fear determination as the noncitizen's asylum application, as well as an asylum application for any spouse or child included as a dependent on the application for purposes of EOIR's filing requirements if USCIS does not grant the principal applicant's application and if the spouse or child does not separately file an asylum application that is adjudicated by USCIS. This procedure obviates the need for the noncitizen and any dependent to prepare and file a new application before the IJ. IJs are also required to hold status conferences to identify and narrow issues under new 8 CFR 1240.17(f)(1), (2). The USCIS Asylum Merits interview record and decision will permit the parties and the

IJ to identify any errors or omissions in the record, narrow issues, and provide any additional bases for asylum or related protection. Specifically, the rule, as provided in new 8 CFR 1240.17(f)(2) and (3), imposes obligations on the parties to identify and narrow the issues prior to the merits hearing, although the obligations on the noncitizen depend on whether the noncitizen has representation. As provided by new 8 CFR 1240.17(f)(2)(ii)(A), DHS must state whether it intends to rest on the existing record, waive cross-examination of the respondent, otherwise participate in the proceedings before the IJ, or waive appeal in the event the IJ grants protection. This position may be retracted by DHS, orally or in writing, prior to the issuance of the IJ's decision, if DHS seeks consideration of evidence pursuant to the standard laid out in 8 CFR 1240.17(g)(2). *See* 8 CFR 1240.17(f)(2)(ii)(C). Moreover, if DHS indicates that it will participate in the case, at the status conference or via a subsequent written statement it shall state its position on the respondent's claim(s); state which elements of the respondent's claim(s) it is contesting and which facts it is disputing, if any, and provide an explanation of its position; identify any witnesses it intends to call; provide any additional non-rebuttal or non-impeachment evidence; and state the status of the identity, law enforcement, or security investigations or examinations required by section 208(d)(5)(A)(i) of the Act, 8 U.S.C. 1158(d)(5)(A)(i), and 8 CFR 1003.47. *See* 8 CFR 1240.17(f)(2)(ii), (f)(3). If DHS does not timely respond, either at the status conference or in its written statement, to one or more of the respondent's arguments or claimed bases for asylum, including which arguments raised by the respondent DHS is disputing and which facts it is contesting, the IJ has authority to deem those arguments or claims unopposed, provided, however, that DHS may respond at the merits hearing to any arguments or claimed bases for asylum first advanced by the respondent after the status conference. *See* 8 CFR 1240.17(f)(3)(i). The IFR creates additional efficiencies by permitting IJs to decide applications on the documentary record in certain circumstances, including where neither party has elected to present testimony and DHS has not elected to cross-examine the noncitizen or where the IJ determines that the application can be granted without further testimony and DHS declines to cross-examine the noncitizen. *See* 8 CFR 1240.17(f)(4)(i), (ii). Notwithstanding these provisions,

---

[31] New 8 CFR 1240.17(c) provides that DHS will serve the record of proceedings for the Asylum Merits interview and the asylum officer's written decision on the respondent and on the immigration court no later than the date of the master calendar hearing; it further provides that, in the exceptional case in which service is not effectuated by that date, the schedule of proceedings pursuant to new 8 CFR 1240.17(f) will be delayed until service is effectuated.

[32] As stated in note 8, *supra*, the rule does not specify that a particular type of evidence is required in order to show prima facie eligibility for relief,

and such evidence could include testimonial evidence as well as documentary evidence.

[33] Under this IFR, a noncitizen's accompanying spouse and children may be included in the request for asylum if they were included in the credible fear determination. *See* 8 CFR 208.3(a)(2), 208.30(c). Where a noncitizen is accompanied by a spouse or children, and the noncitizen is found to have a credible fear of persecution or torture, the family has the choice to have the spouse and children be included as dependents on the asylum application or to separately seek asylum as principal applicants. *See* 8 CFR 208.3(a)(2), 208.30(c). Should the family choose to have the spouse and children proceed solely as dependents, the asylum officer will, as appropriate, elicit sufficient information to determine whether there is a significant possibility that the applicant's spouse or child has experienced or fears harm that would be an independent basis for protection in the event that the principal applicant is not granted asylum prior to referring the family to the IJ for a hearing. *See* 8 CFR 208.9(b), (i). If a spouse or child who was included in the principal applicant's request for asylum does not separately file an asylum application that is adjudicated by USCIS, the principal's asylum application will be deemed by EOIR to satisfy EOIR's application filing requirements for the spouse or child as principal applicants. *See* 8 CFR 1208.3(a)(2).

**Appx. 022**

however, the IJ shall hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record. *See id.*

The IFR also gives appropriate effect to the asylum officer's determination of a noncitizen's eligibility for statutory withholding of removal or protection under the CAT. This serves to increase efficiency and provides a safeguard where an asylum officer has already found that the noncitizen could be subject to persecution or torture if removed. In general, in cases where the IJ denies asylum and issues a removal order, the IJ will give effect to the asylum officer's determination of eligibility for statutory withholding of removal or protection under the CAT; the IJ may not sua sponte review the asylum officer's determination. *See 8 CFR 1240.17(d), (f)(2)(i)(B), (i)(2).* However, these provisions account for the possibility that DHS may submit evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceedings for the USCIS Asylum Merits interview in order to demonstrate that the respondent is not eligible for the protection(s) the asylum officer determined. *See id.* In such a case, the IJ will, based on the review of this new evidence or testimony, make a separate determination regarding the noncitizen's eligibility for statutory withholding of removal or protection under the CAT, as relevant.

### 1. Schedule of Proceedings

The Departments are imposing procedural adjudication time frames and limitations on continuances and filing extensions during streamlined section 240 removal proceedings under this IFR. The Departments believe that these time frames and limitations are justified given both the streamlining procedures discussed above and the fact that such cases will come to the IJ with a complete asylum application and following a nonadversarial interview before an asylum officer at which a comprehensive record, including a verbatim transcript and decision, has been assembled.

Under new 8 CFR 1240.17, the Departments will impose procedural time frames on IJs with respect to their hearing schedules. Specifically, an IJ will hold a master calendar hearing 30 days after service of the NTA or, if a hearing cannot be held on that date, on the next available date no later than 35 days after service. As provided by new 8 CFR 1240.17(f)(1) and (2), the IJ will hold a status conference 30 days after the master calendar hearing or, if a status conference cannot be held on that

date, on the next available date no later than 35 days after the master calendar hearing, followed by a merits hearing, if necessary, 60 days after the master calendar hearing or, if a hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing.[34] If needed, under new 8 CFR 1240.17(f)(4)(iii), the IJ may hold a subsequent merits hearing to resolve any lingering issues or complete testimony no later than 30 days after the initial merits hearing. As further discussed below, the IJ may grant continuances and filing extensions under specified standards. *See 8 CFR 1240.17(h).* Finally, under 8 CFR 1240.17(f)(5), whenever practical, the IJ shall issue an oral decision on the date of the final merits hearing or, if the IJ determines that no such hearing is warranted, no more than 30 days after the status conference; and where issuance of an oral decision on such date is not practicable, the IJ shall issue an oral or written decision as soon as practicable, no later than 45 days after the final merits hearing or, if the IJ concludes that no hearing is necessary, no later than 75 days after the status conference.[35]

The combined effect of these provisions should fully achieve the NPRM's efficiency goals while allowing noncitizens to receive a full and fair hearing in streamlined section 240 removal proceedings rather than through the IJ review process contemplated by the NPRM. The well-established rights that apply in ordinary section 240 proceedings will continue to apply during the streamlined section 240 proceedings described in new 8 CFR 1240.17, but certain new procedures will streamline the process by taking advantage of the record created by the asylum officer and ensure a prompt, efficient, and fair hearing on the respondent's claim.

---

[34] Because the timing of the merits hearing is tied to the date that the status conference occurs, the Departments note that any delay of the status conference will necessarily result in a corresponding delay of the merits hearing. In other words, if the status conference occurs 45 days after the master calendar hearing rather than 30–35 days after it because, for example, the respondent requested a continuance to seek counsel on the immigration court had to close on the original date of the status conference, *see* 8 CFR 1240.17(h), the merits hearing would still occur 30–35 days after the status conference—on days 75–80.

[35] In other words, where it is not practicable to issue an oral decision on the date of the final merits hearing, the immigration judge has up to 45 days to issue a decision. Where an IJ has determined that a merits hearing is not necessary, and it is not practicable to issue a decision within 30 days after the status conference, the IJ has up to an additional 45 days within which to issue a decision.

### a. Pre-Hearing Procedures

In order to best prepare the case for adjudication, new 8 CFR 1240.17(f) establishes initial procedures to ensure that the IJ has a complete picture of the case and the relevant issues prior to conducting any merits hearing that may be needed. As provided in new 8 CFR 1240.17(f)(1), at the master calendar hearing, the IJ will perform the functions required by 8 CFR 1240.10(a), including advising the respondent of the right to be represented, at no expense to the Government, by counsel of the respondent's own choosing. *See 8 CFR 1240.17(f)(1).* Additionally, the IJ will advise as to the nature of the streamlined section 240 removal proceedings, including that the respondent has pending applications for asylum, statutory withholding of removal, and withholding or deferral of removal under the CAT, as appropriate; that the respondent has the right to testify, call witnesses, and present evidence in support of these applications; and of the deadlines that govern the submission of evidence. *See id.* Finally, except where the noncitizen is ordered removed in absentia, at the conclusion of the master calendar hearing the IJ will schedule a status conference to take place 30 days after the master calendar hearing or, if necessary, on the next available hearing date no later than 35 days after the master calendar hearing. *See id.* The IJ will also advise as to the requirements for the status conference. *See id.* The adjournment of the case until the status conference will not be considered a noncitizen-requested continuance under new 8 CFR 1240.17(h)(2). *See id.*

The purpose of the status conference is to take pleadings, identify and narrow any issues, and determine whether the case can be decided on the documentary record alone or, if a merits hearing before the IJ is needed, to ready the case for such a hearing. *See 8 CFR 1240.17(f)(2).* In general, the Departments expect that the parties will use the record of the Asylum Merits interview as a tool to prepare the proceeding for the IJ's adjudication. *See id.*

At the status conference, the noncitizen must indicate, orally or in writing, whether the noncitizen intends to contest removal or seek any protection(s) for which the asylum officer did not determine the noncitizen eligible. *See 8 CFR 1240.17(f)(2)(i).* The IJ will also advise the noncitizen that the respondent has the right to testify, call witnesses, and present evidence in support of the noncitizen's application; and of the deadlines that govern the

**Appx. 023**

submission of evidence. If a noncitizen expresses an intent to contest removal or seek protection for which the asylum officer did not determine the noncitizen eligible, the noncitizen must, orally or in writing: (1) Indicate whether the noncitizen plans to testify before the IJ; (2) identify any witnesses the noncitizen plans to call at the merits hearing; and (3) provide any additional documentation in support of the applications. *See* 8 CFR 1240.17(f)(2)(i)(A). A represented noncitizen is further required to: (4) Describe any alleged errors or omissions in the asylum officer's decision or the record of proceedings before the asylum officer; (5) articulate or confirm any additional bases for asylum and related protection, whether or not they were presented or developed before the asylum officer; and (6) state any additional requested forms of relief or protection. If a noncitizen is unrepresented, the IJ will ask questions and guide the proceedings in order to elicit relevant information from the noncitizen and otherwise fully develop the record. *See Quintero* v. *Garland,* 998 F.3d 612, 623–30 (4th Cir. 2021) (describing the general duty of the IJ to develop the record, which is "especially crucial in cases involving unrepresented noncitizens"); *see also Matter of S–M–J–,* 21 I&N Dec. 722, 723–24, 729 (BIA 1997) (en banc) (also describing the general duty of the IJ to develop the record). If a noncitizen does not express an intent to contest removal or seek protection for which the asylum officer did not determine the noncitizen eligible, the IJ will order the noncitizen removed and will not conduct further proceedings. *See* 8 CFR 1240.17(f)(2)(i)(B). In such cases, where the asylum officer determined the noncitizen eligible for statutory withholding of removal or protection under the CAT, the IJ will issue a removal order and will give effect to that protection, unless DHS makes a prima facie showing—through evidence that specifically pertains to the noncitizen and that was not included in the record of proceedings for the USCIS Asylum Merits interview—that the noncitizen is not eligible for such protection. *See id.*

For its part, DHS must indicate at the status conference, orally or in writing, whether it intends to: (1) Rest on the record; (2) waive cross-examination of the noncitizen; (3) otherwise participate in the case; or (4) waive appeal if the IJ decides to grant the noncitizen's application. *See* 8 CFR 1240.17(f)(2)(ii). If DHS indicates that it will participate in the case, it then must, orally or in

writing: (1) State its position on each of the noncitizen's claimed grounds for asylum or related protection; (2) state which elements of the noncitizen's claim for asylum or related protection it is contesting and which facts it is disputing, if any, and provide an explanation of its position; (3) identify any witnesses it intends to call at any merits hearing; (4) provide any additional non-rebuttal or non-impeachment evidence; and (5) state whether the appropriate identity, law enforcement, or security investigations or examinations have been completed. *See id.* DHS can provide this information at the status conference or by submitting a written statement under 8 CFR 1240.17(f)(3)(i) as outlined below. *See id.*

At the status conference, as further detailed below, the IJ will determine whether further proceedings are warranted; if they are, the IJ will schedule the merits hearing to take place 60 days after the master calendar hearing or, if the merits hearing cannot be held on that date, on the next available date no later than 65 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(2). The IJ may also schedule additional status conferences prior to any merits hearing if the IJ determines such conferences will contribute to efficient resolution of the case. *See id.*

After the adjournment of the status conference, where DHS intends to participate in a case, DHS is required to file a written statement providing information required under 8 CFR 1240.17(f)(2)(ii) but that DHS did not provide at the status conference, as well as any other relevant information or argument in response to the noncitizen's submissions. *See* 8 CFR 1240.17(f)(3)(i). DHS's written statement is due no later than 15 days prior to the scheduled merits hearing or, if the IJ determines that no such hearing is warranted, no later than 15 days following the status conference. *See id.* The noncitizen may also submit a supplemental filing after the status conference to reply to any statement submitted by DHS, identify any additional witnesses, and provide any additional documentation in support of the respondent's application. *See* 8 CFR 1240.17(f)(3)(ii). Any such filing is due no later than 5 days prior to the scheduled merits hearing or, if the IJ determines that no such hearing is warranted, no later than 25 days following the status conference. *See id.* The IFR's efficiencies and timeline are predicated on the parties' participation in the status conference and other procedural steps needed to narrow the issues and prepare the case for adjudication in advance of any merits

hearing before an IJ. This rule helps "ensure efficient adjudication by focusing the immigration courts' limited resources on the issues that the parties actually contest." *Matter of A–C–A–A–,* 28 I&N Dec. 351, 352 (A.G. 2021). In this regard, as described above, DHS ICE Office of the Principal Legal Advisor attorneys representing DHS in immigration court ("DHS attorneys") play a critical role in narrowing the issues during section 240 removal proceedings. The Departments believe that the rule's requirements will increase the overall efficiency of case adjudications and help parties better prepare their respective positions before the IJ.

*b. Merits Hearing(s)*

Based on the parties' statements and submissions at the status conference, the IJ will determine whether the noncitizen's application may be decided on the documentary record without a merits hearing or whether a merits hearing is required. *See* 8 CFR 1240.17(f)(4)(i)–(iii). Specifically, an IJ may decline to hold a merits hearing and decide the application on the documentary record if: (1) DHS has indicated that it waives cross-examination and neither the noncitizen nor DHS has requested to present testimony under the pre-hearing procedures described above, *see* 8 CFR 1240.17(f)(4)(i); or (2) the noncitizen has timely requested to present testimony and DHS has indicated that it waives cross-examination and does not intend to present testimony or produce evidence, and the IJ concludes that the asylum application can be granted without further testimony, *see* 8 CFR 1240.17(f)(4)(ii). Notwithstanding these provisions, the IJ shall hold a hearing if the IJ decides that a hearing is necessary to fulfill the IJ's duty to fully develop the record. *See* 8 CFR 1240.17(f)(4)(i), (ii).[36]

---

[36] The Departments emphasize that permitting the IJ to issue decisions in some cases without holding a hearing does not undermine the fairness or integrity of asylum proceedings because the respondent will already have testified, under oath, before the asylum officer. The IFR's framework only allows for the IJ to render a decision without scheduling a hearing in a manner that would not prejudice the noncitizen or undermine the integrity of asylum proceedings.

In *Matter of Fefe,* 20 I&N Dec. 116 (BIA 1989), the BIA held that "[a]t a minimum . . . the regulations require that an applicant for asylum and withholding take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct." *Id.* at 118. The BIA determined that the regulations required these procedures for fairness reasons and to maintain "the integrity of the asylum process itself." *Id.* The provisions in this IFR that permit IJs to decide applications without a hearing in certain

Continued

If the IJ determines to hold a merits hearing, the IJ will conduct that hearing as in section 240 removal proceedings generally. The IJ will swear the noncitizen to the truth and accuracy of any information or statements, hear all live testimony requested by the parties, and consider the parties' submissions. *See* 8 CFR 1240.17(f)(4)(iii)(A).

The Departments' goal is for the IJ to issue an oral decision at the conclusion of a single merits hearing (when a merits hearing is required) whenever practicable, *see* 8 CFR 1240.17(f)(4)(iii)(A), (f)(5), but the Departments recognize that not every case may be resolved in that fashion. The rule therefore allows the IJ flexibility in such circumstances to hold another status conference and take any other steps the IJ considers necessary and efficient for the resolution of the case. *See* 8 CFR 1240.17(f)(4)(iii)(B). In all circumstances, the IJ will be required to schedule any subsequent merits hearing no later than 30 days after the initial merits hearing. *Id.*

### 2. Evidentiary Standard

This IFR provides that, in the streamlined section 240 proceedings, noncitizens and DHS will have the opportunity to address alleged errors in the USCIS Asylum Merits record, present testimony, and submit additional evidence. The longstanding evidentiary standard for section 240 proceedings applies—evidence must be relevant and probative, and its use must be fundamentally fair. 8 CFR 1240.17(g)(1); *see* 8 CFR 1240.7(a) ("The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case . . . ."); *Nyama* v. *Ashcroft,* 357 F.3d 812, 816 (8th Cir. 2004) ("The traditional rules of evidence do not apply to immigration proceedings . . . . 'The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair.' " (citations omitted) (citing *Henry* v. *INS,* 74 F.3d 1, 6 (1st Cir. 1996); quoting *Espinoza* v. *INS,* 45 F.3d 308, 310 (9th Cir. 1995))); *Matter of Ramirez-Sanchez,* 17 I&N Dec. 503, 505 (BIA 1980) (holding that evidence must be "relevant and probative and its use not fundamentally unfair"). In addition, any evidence submitted must be timely (after taking into account a timely request for a continuance or filing extension that is granted), *see* 8 CFR

1240.17(g)(1), subject to certain exceptions, *see* 8 CFR 1240.17(g)(2). Evidence submitted after the deadline set by the IJ but before the IJ issues a decision in the case may be considered only if it could not reasonably have been obtained and presented before the applicable deadline through the exercise of due diligence, or it its exclusion would violate a statute or the Constitution.[37] *See id.* As in all section 240 proceedings, the IJ will exclude evidence that does not meet the requirements described above. *See* 8 CFR 1240.17(g)(1).

The Departments are not adopting the NPRM's proposal that noncitizens seeking to submit additional evidence for IJ review would have to demonstrate that it was not duplicative and was necessary to develop the record. Instead, the Departments believe the IFR's provisions will promote efficiency and fairness by allowing the parties and adjudicators to apply longstanding, workable evidentiary standards. The Departments believe that the NPRM's efficiency goals can be achieved in the context of streamlined section 240 removal proceedings without the NPRM's evidentiary restrictions because, unlike individuals in ordinary section 240 removal proceedings, noncitizens whose cases are subject to this rule will already have received an initial adjudication by USCIS, and their case will come to the immigration court with a fully developed record.

### 3. Timeline for Proceedings

As noted in the NPRM, the Departments' purpose for conducting rulemaking on this topic is to develop a "better and more efficient" system for processing applications for asylum and related relief brought by individuals subject to expedited removal under section 235 of the Act, 8 U.S.C. 1225. 86 FR 46907. Under the current procedures, individuals who are first placed in the expedited removal process but who are subsequently found to have a credible fear of persecution or torture are placed in section 240 removal proceedings before the immigration court. 8 CFR 208.30(f) (2020). Under existing procedures, these proceedings often take several years to complete and can be highly protracted and inefficient. Further, as stated in the NPRM, the current system was created at a time when most noncitizens encountered at the border were single adults from

Mexico, relatively few of whom made asylum claims. *See* 86 FR 46908. In contrast, at present, a large share of noncitizens encountered at the border are families and unaccompanied children, a significant portion of whom express the intention to seek asylum. *See id.*

Given the above, the IFR establishes the timeline and procedures detailed below to apply in all cases subject to the streamlined section 240 removal proceedings. The Departments believe that these procedures serve important efficiency interests while still permitting noncitizens an appropriate amount of time to prepare for proceedings.

Immigration court proceedings commence when DHS files the NTA, and the master calendar hearing will take place 30 days after the date the NTA is served or, if a hearing cannot be held on that date, on the next available date no later than 35 days after service. *See* 8 CFR 1240.17(b). Except where the noncitizen is ordered removed in absentia, the IJ will then schedule a status conference 30 days after the initial master calendar hearing or, if a status conference cannot be held on that date, on the next available date no later than 35 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(1). From there, if warranted, the merits hearing will be scheduled 60 days after the master calendar hearing or, if a hearing cannot be scheduled on that date, on the next available date no later than 65 days after the master calendar hearing. *See* 8 CFR 1240.17(f)(2). If any subsequent merits hearing is necessary, the IJ will schedule it no later than 30 days after the initial merits hearing. *See* 8 CFR 1240.17(f)(4)(iii)(B). Finally, whenever practicable, the IJ shall issue an oral decision on the date of the final merits hearing or, if no such hearing is held, 30 days after the status conference. *See* 8 CFR 1240.17(f)(4)(iii)(A), (f)(5). If the IJ cannot issue a decision on that date, the IJ must issue an oral or written decision as soon as practicable and no later than 45 days after the applicable date described in the previous sentence. *See* 8 CFR 1240.17(f)(5).

Under the default timeline set forth in the IFR, at least 90 days is provided from the service of the NTA before the merits hearing for the noncitizen to secure counsel, collect evidence, and otherwise prepare—in addition to the time the noncitizen had to secure counsel and obtain evidence leading up to the Asylum Merits interview. *See Matter of C–B–,* 25 I&N Dec. 888, 889 (BIA 2012) (holding that "the [IJ] must grant a reasonable and realistic period of time to provide a fair opportunity for a

---

[37] In addition, as described below, under new 8 CFR 1240.17(h), a party may seek to have an extension of a filing deadline. For example, a party may seek to have a filing deadline extended if there is an unexpected delay in receipt of the evidence from a medical practitioner or other party.

---

circumstances do not raise the same concerns that animated the BIA's decision in *Matter of Fefe,* including because the cases covered by the IFR involve noncitizens who have already received a hearing on their asylum and protection claims before an asylum officer.

**Appx. 025**

noncitizen to seek, speak with, and retain counsel"). Moreover, as discussed below, 8 CFR 1240.17(h) contemplates continuances and filing extensions by request of the parties. The Departments believe these time frames, including the standards for continuances and extensions, ensure adequate time and protect procedural fairness while also meeting the Department's goal of creating efficient and streamlined proceedings. Unlike in ordinary section 240 removal proceedings, noncitizens in these streamlined section 240 proceedings will already have had an incentive and time to obtain representation prior to the commencement of immigration court proceedings. Similarly, noncitizens will not be appearing in immigration court on a totally blank slate; they will have had notice regarding what sort of evidence is needed and a prior opportunity to obtain any available evidence ahead of the Asylum Merits interview. In addition, where a noncitizen is placed in removal proceedings under the procedures in the IFR, the noncitizen will have already applied before USCIS for asylum, withholding of removal, and protection under the CAT, as relevant. The noncitizen will have had the opportunity to testify before, and submit evidence to, the asylum officer, and the asylum officer will have fully evaluated the noncitizen's eligibility for asylum, withholding of removal, and protection under the CAT. Moreover, any dependent would have also had the opportunity to testify before the asylum officer, and the asylum officer would have elicited testimony from the dependent for any independent basis for eligibility for asylum, withholding of removal, and protection under the CAT. The IJ will be provided with the record before USCIS, including the asylum officer's decision, the verbatim transcript of the Asylum Merits interview, and the evidence on which the asylum officer relied in reaching the decision. In the Departments' view, it is appropriate for cases under this IFR to proceed on an expedited time frame before the immigration courts as claims will have been significantly developed and analyzed before the proceedings start.

### 4. Continuances and Filing Extensions

The IFR establishes modified standards for continuances and filing extensions in streamlined 240 proceedings. Generally, in immigration proceedings, a noncitizen may file a motion for continuance for good cause shown. *See* 8 CFR 1003.29. The regulations have incorporated this

"good cause" standard since 1987, *see* 8 CFR 3.27 (1987),[38] and substantial case law and agency guidance have elaborated on its meaning, *see, e.g., Matter of L–A–B–R–,* 27 I&N Dec. 405, 413–19 (A.G. 2018) (clarifying the framework for applying the "good cause" standard when a noncitizen requests a continuance to pursue collateral relief); *Matter of Hashmi,* 24 I&N Dec. 785, 790 (BIA 2009) (setting forth factors for consideration when determining whether there is good cause for a continuance so that a noncitizen may pursue adjustment of status before USCIS); *Matter of Garcia,* 16 I&N Dec. 653, 657 (BIA 1978) (holding that, in general, IJs should favorably exercise discretion to continue proceedings when a prima facie approvable visa petition and adjustment application are submitted); *Usubakunov* v. *Garland,* 16 F.4th 1299, 1305 (9th Cir. 2021) (holding that the denial of a noncitizen's motion for a continuance to permit his attorney to be present at his merits hearing amounted to a violation of his statutory right to counsel). The Departments believe that good cause remains an appropriate standard for most continuances because it provides IJs with sufficient guidance and discretion to manage their cases both fairly and efficiently, and the IFR adopts this standard as the default for continuance requests by noncitizens in streamlined section 240 proceedings, subject to certain restrictions described below.

Specifically, the IFR imposes limits on the length of continuances that may be granted for good cause. First, no individual continuance for good cause may exceed 10 days unless the IJ determines that a longer continuance would be more efficient. *See* 8 CFR 1240.17(h)(2)(i). This will ensure that continuances do not delay proceedings unnecessarily, either by being too long or too short. The Departments recognize that, on occasion, it may be appropriate and more efficient to grant one lengthier continuance to achieve its intended

---

[38] *See also* Aliens and Nationality; Rules of Procedure for Proceedings Before Immigration Judges, 52 FR 2931, 2934, 2938 (Jan. 29, 1987) (final rule). The regulation at 8 CFR 3.27 has been redesignated twice—first to 8 CFR 3.29, second to its current location at 8 CFR 1003.29—without amending the regulatory text. *See* Executive Office for Immigration Review; Rules of Procedure, 57 FR 11568, 11569 (Apr. 6, 1992) (interim rule); Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 FR 9824, 9830 (Feb. 28, 2003) (final rule). The regulatory text was recently amended by "Procedures for Asylum and Withholding of Removal," 85 FR 81698, 81699, 81750 (Dec. 16, 2020) (final rule), but that rule has been preliminarily enjoined, *see* Order at 1, *Nat'l Immigrant Justice Ctr.* v. *EOIR,* No. 21–cv–56 (D.D.C. Jan. 14, 2021).

purpose—for example, to gather evidence that will take time to obtain or to secure the availability of a witness— such that it would not be necessary to grant further continuances at the time that the proceedings are scheduled to reconvene. *Cf. Meza Morales* v. *Barr,* 973 F.3d 656, 665 (7th Cir. 2020) (Barrett, J.) ("'[T]imeliness' is not a hard and fast deadline; some cases are more complex and simply take longer to resolve. Thus, not all mechanisms that lengthen the proceedings of a case prevent 'timely' resolution. That is presumably why nobody appears to think that continuances conflict with the regulation's timeliness requirement."). Thus, this IFR provides IJs with sufficient flexibility to grant continuances for good cause to ensure fairness of proceedings while appropriately balancing efficiency considerations.

Second, the IFR also establishes two modified continuance procedures that govern in specific factual circumstances unique to streamlined section 240 removal proceedings. The Departments believe that the IFR's streamlined section 240 proceedings warrant modified standards for continuances under certain conditions because the IFR's streamlined section 240 proceedings occur after noncitizens have had a nonadversarial hearing before an asylum officer and have had a chance to present their claims for asylum and protection from removal. Additionally, the Departments have a considerable interest in developing an efficient process to fully and fairly adjudicate the claims of those noncitizens who were initially screened for expedited removal but have demonstrated a credible fear of persecution or torture. As noted in the NPRM, section 235 of the Act, 8 U.S.C. 1225, developed a system that "was initially designed for protection claims to be the exception, not the rule, among those encountered at or near the border." 86 FR 46909. Accordingly, the IFR's imposition of modified requirements for continuances in streamlined section 240 removal proceedings is in keeping with the NPRM's purpose to develop more fair and efficient processes to adjudicate the claims of individuals encountered at or near the border and found to have a credible fear of persecution or torture.

Specifically, the IFR provides that IJs should apply the "good cause" standard only where the aggregate length of all continuances and extensions requested by the noncitizen does not cause a merits hearing to take place more than 90 days after the master calendar hearing. 8 CFR 1240.17(h)(2)(i). The IFR then implements different criteria based

on the length of the resulting delay for deciding requests for continuances and extensions by the noncitizen that would cause a merits hearing to occur more than 90 days after the master calendar hearing. *See* 8 CFR 1240.17(h)(2)(ii)–(iii).

Where a noncitizen-requested continuance or filing extension would cause a merits hearing to take place between 91 and 135 days after the master calendar hearing, an IJ should grant a continuance or filing extension if the noncitizen demonstrates that it is necessary to ensure a fair proceeding and the need for it exists despite the noncitizen's exercise of due diligence. *See* 8 CFR 1240.17(h)(2)(ii). The length of continuances and extensions under this provision are, as a matter of procedure, limited to the time necessary to ensure a fair proceeding. *See id.*

Next, should the noncitizen request any continuances or filing extensions that would cause a merits hearing to take place more than 135 days after the master calendar hearing, the noncitizen must demonstrate that failure to grant the continuance or extension would be contrary to statute or the Constitution. 8 CFR 1240.17(h)(2)(iii).

Noncitizens in removal proceedings have the "right to a full and fair hearing," *Arrey* v. *Barr,* 916 F.3d 1149, 1157 (9th Cir. 2019) (collecting cases), which "derives from the Due Process Clause of the Fifth Amendment," *Cinapian* v. *Holder,* 567 F.3d 1067, 1074 (9th Cir. 2009); *see also Matter of Sibrun,* 18 I&N Dec. 354, 356 (BIA 1983) ("It should be emphasized that the full panoply of procedural protections . . . are not mandated for [noncitizens] in these civil, administrative proceedings . . . . All that is required here is that the hearing be fundamentally fair." (citations omitted)). A full and fair hearing, "at a minimum, includes a reasonable opportunity to present and rebut evidence and to cross-examine witnesses." *Grigoryan* v. *Barr,* 959 F.3d 1233, 1240 (9th Cir. 2020) (citing *Cinapian,* 567 F.3d at 1074 (citing, in turn, section 240(b)(4)(B) of the Act, 8 U.S.C. 1229a(b)(4)(B))). When adjudicating continuance and extension requests pursuant to the IFR's heightened standards, IJs should consider whether the request is related to the noncitizen's ability to reasonably present his or her case or implicates any of the rights found at section 240(b)(4)(B) of the Act, 8 U.S.C. 1229a(b)(4)(B). Thus, continuance requests to present testimony and evidence, to rebut evidence, or to cross-examine witnesses may meet the

standards set forth in new 8 CFR 1240.17(h)(2)(ii) and (iii).[39]

In addition to the foregoing, the Departments emphasize that the Act provides noncitizens in section 240 removal proceedings with the right to representation at no Government expense, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A), and that the noncitizen must be provided a reasonable opportunity to obtain counsel. *See Matter of C–B–,* 25 I&N Dec. 888, 889 (BIA 2012) ("In order to meaningfully effectuate the statutory and regulatory privilege of legal representation where it has not been expressly waived by a noncitizen, the Immigration Judge must grant a reasonable and realistic period of time to provide a fair opportunity for the noncitizen to seek, speak with, and retain counsel."). Federal courts have strictly reviewed IJ decisions to deny continuances for seeking counsel or take other actions that may impinge that right in proceedings. *See, e.g., Usubakunov,* 16 F.4th at 1305 (holding that the denial of a noncitizen's motion for a continuance to permit his attorney to be present at his merits hearing amounted to violation of his statutory right to counsel); *see also Leslie* v. *Att'y Gen. of U.S.,* 611 F.3d 171, 180–81 (3d Cir. 2010) (The "statutory and regulatory right to counsel is also derivative of the due process right to a fundamentally fair hearing."); *Hernandez Lara* v. *Barr,* 962 F. 3d 45, 54 (1st Cir. 2021) ("The statutory right to counsel is a fundamental procedural protection worthy of particular vigilance."). Accordingly, a continuance to seek representation would be sufficient to qualify for the heightened continuance standards in these streamlined 240 proceedings if denial would violate a noncitizen's right to

representation or another statutory or constitutional right.[40]

The Departments emphasize that the time periods that determine the relevant continuance standard do not begin to run until the day after the master calendar hearing, at which the IJ will advise noncitizens of their rights in the streamlined section 240 proceedings, including their right to representation, at no expense to the Government, and of the availability of pro bono legal services, and will ascertain that noncitizens have received a list of such pro bono legal service providers. 8 CFR 1240.17(f)(1) (citing 8 CFR 1240.10(a)); *see* INA 240(b)(4), 8 U.S.C. 1229a(b)(4). Furthermore, these calculations only pertain to delay of hearings and deadlines specifically included in this regulation, namely, the status conference hearing or a merits hearing and any filing deadline that, if extended, would have the effect of delaying a hearing. Any continuances with respect to interim hearings or deadlines that may be set by the IJ do not impact determination of the continuance standard that applies in this section.[41] Continuances or filing extensions granted due to exigent circumstances, such as court closures or

---

[39] The Departments note, however, that the decision to grant or deny a continuance or extension will depend on the individual facts and circumstances present in each case. *See, e.g., De Ren Zhang* v. *Barr,* 767 F. App'x 101, 104–05 (2d Cir. 2019) (collecting cases in which the Second Circuit upheld an IJ's denial of a continuance where a noncitizen "had already received multiple continuances, and had a significant amount of time in which to gather and submit evidence" but, under the particular circumstances of that case, concluding that the IJ's denial of a continuance was an abuse of the IJ's discretion); *Bondarenko* v. *Holder,* 733 F.3d 899, 906–08 (9th Cir. 2013) (holding that the denial of the noncitizen's request for a continuance to investigate the Government's forensic report was a violation of the noncitizen's right to due process); *Cruz Rendon* v. *Holder,* 603 F.3d 1104, 1111 (9th Cir. 2010) (determining that "the denial of the requested continuance" to obtain evidence that bore directly on the noncitizen's eligibility for relief, "in conjunction with the limitations placed upon her testimony, prevented [the noncitizen] from fully and fairly presenting her case").

[40] This does not mean that a request for a continuance to seek counsel can never be denied. *See Usubakunov,* 16 F.4th at 1304 ("We recognize that immigration courts bear a crushing caseload and an applicant cannot unreasonably delay the administrative process, which has various component parts and must be managed efficiently by the IJ."); *see also Arrey,* 916 F.3d at 1158 (explaining that a noncitizen "is not denied the right to counsel where continuing the hearing would have been futile or where the IJ had done everything he reasonably could to permit [the noncitizen] to obtain counsel" (quotation marks and citation omitted)). Such determinations are made on a case-by-case basis. *See Biwot* v. *Gonzales,* 403 F.3d 1094, 1099 (9th Cir. 2005) ("The inquiry is fact-specific and thus varies from case to case. We pay particular attention to the realistic time necessary to obtain counsel; the time frame of the requests for counsel; the number of continuances; any barriers that frustrated a [noncitizen's] efforts to obtain counsel, such as being incarcerated or an inability to speak English; and whether the [noncitizen] appears to be delaying in bad faith."); *see also Gonzalez-Veliz* v. *Garland,* 996 F.3d 942, 949 (9th Cir. 2021) (comparing cases granting and denying requests for continuances to seek counsel).

[41] In other words, the IJ would determine the appropriate standard to consider when reviewing a noncitizen's request for a continuance by considering how much the continuance would shift the merits hearing. For example, the IJ would apply the "good cause" standard under 8 CFR 1240.17(h)(2)(i) if a noncitizen requests an initial continuance of the status conference for 10 days, which would in turn cause the merits hearing to be delayed by 10 days (because the merits hearing will occur 30–35 days after the status conference). However, if the noncitizen later requests further continuances that would cause the status conference to occur later than day 60, and in turn would cause the merits hearing to occur later than day 90, the IJ would apply the heightened continuance standard under 8 CFR 1240.17(h)(2)(ii).

**Appx. 027**

illness of a party, will not count against the aggregate limits on continuances, as further explained below and as set forth at new 8 CFR 1240.17(h)(4).

The Departments have also contemplated DHS's need for continuances and provided for them in appropriate situations. The IJ may grant DHS a continuance and extend filing deadlines based on significant Government need, as set forth at new 8 CFR 1240.17(h)(3). The Departments anticipate that significant Government need will only arise in exceptional cases. The IFR provides a nonexclusive list of examples of significant Government needs, including "confirming domestic or foreign law enforcement interest in the respondent" and "conducting forensic analysis of documents submitted in support of a relief application or other fraud-related investigations." 8 CFR 1240.17(h)(3). The Departments believe that requiring DHS to demonstrate a significant Government need for a continuance serves efficiency interests without undermining DHS's opportunity to present its case. First, DHS inherently possesses the subject-matter expertise to navigate section 240 proceedings in general and does not face the same obstacles as do noncitizens in exploring and securing competent representation. Second, noncitizens, not DHS, bear the burden of proof throughout the majority of streamlined section 240 proceedings. Of particular relevance, noncitizens generally bear the burden of demonstrating eligibility for protection-based relief. *See, e.g.,* INA 208(b)(1)(B), 8 U.S.C. 1158(b)(1)(B). Third, DHS does not face the same issues with respect to access to counsel, especially when taking into consideration the likelihood that some noncitizens will be detained during the course of proceedings. IJs must be able to take such factors under consideration when considering continuance requests made by noncitizens, but they are not relevant to such requests made by DHS.

In addition, these timelines and standards do not apply to an IJ's ability to continue a case, extend a filing deadline, or adjourn a hearing due to exigent circumstances, such as the unavailability of the IJ, the parties, or counsel due to illness, or the closure of the immigration court. *See* 8 CFR 1240.17(h)(4). Such continuances must be limited to the shortest time necessary and each must be justified. *See id.* The Departments recognize the magnitude and weight of asylum claims, and the importance of ensuring that asylum procedures do not undermine the fairness of proceedings. *See Quintero,* 998 F.3d at 632 ("[N]eedless to say,

these cases *per se* implicate extremely weighty interests in life and liberty, as they involve individuals seeking protection from persecution, torture, or even death."); *Xue* v. *BIA,* 439 F.3d 111, 113–14 (2d Cir. 2006) ("We should not forget, after all, what is at stake. For each time we wrongly deny a meritorious asylum [or withholding] application, . . . we risk condemning an individual to persecution. Whether the danger is of religious discrimination, extrajudicial punishment, forced abortion or involuntary sterilization, physical torture or banishment, we must always remember the toll that is paid if and when we err."); *Matter of O–M–O–,* 28 I&N Dec. 191, 197 (BIA 2021) ("The immigration court system has no more solemn duty than to provide refuge to those facing persecution or torture in their home countries, consistent with the immigration laws."). The Departments believe that this rule strikes the appropriate balance by providing noncitizens with a full and fair opportunity to present their claims—first before USCIS and then, if necessary, in streamlined section 240 removal proceedings—while ensuring that such claims are adjudicated in a timely and efficient manner.

### 5. Consideration of Statutory Withholding of Removal and CAT Protection

The NPRM proposed that, where USCIS denied asylum, IJs would reconsider the entire USCIS Asylum Merits record de novo, including grants of statutory withholding of removal and protection under the CAT. *See, e.g.,* 86 FR 46946 (8 CFR 1003.48(a) (proposed)). Upon further review, including the review of comments as discussed further below, the Departments have determined that IJs should generally give effect to an asylum officer's determination that a noncitizen is eligible for statutory withholding of removal or protection under the CAT subject to certain exceptions.

Specifically, under new 8 CFR 1240.17(i)(1), if an asylum officer finds that the noncitizen is not eligible for asylum or other protection sought, IJs will adjudicate de novo all aspects of a noncitizen's application, including the noncitizen's eligibility for asylum and, if necessary, statutory withholding of removal or protection under the CAT. However, if an asylum officer does not grant asylum but finds that a noncitizen is eligible for statutory withholding of removal or protection under the CAT, the noncitizen has two options.

First, the noncitizen may indicate that the noncitizen does not intend to contest removal or seek protection(s) for

which the asylum officer did not find the noncitizen eligible, as described at new 8 CFR 1240.17(f)(2)(i)(B). In that case, unless DHS makes a prima facie showing, through evidence that specifically pertains to the noncitizen and was not in the record of proceedings for the USCIS Asylum Merits interview, that the noncitizen is not eligible for such protection(s), the IJ will issue the removal order and give effect to any protection for which the asylum officer found the noncitizen eligible, and no further proceedings will be held.[42]

Second, and alternatively, the noncitizen may contest the asylum officer's decision to not grant asylum, in which case the IJ will adjudicate de novo the noncitizen's application for asylum. *See* 8 CFR 1240.17(i)(2). If the IJ subsequently denies asylum, then the IJ will enter an order of removal and give effect to the protections for which the asylum officer deemed the noncitizen eligible, unless DHS demonstrates through evidence or testimony that specifically pertains to the respondent and that was not included in the record of proceedings for the USCIS Asylum Merits interview that the noncitizen is not eligible for such protection. *See id.*[43]

[42] In addition, at 8 CFR 1240.17(d), the IFR provides that a noncitizen who fails to appear and who is ordered removed in absentia under section 240(b)(5)(A) of the INA, 8 U.S.C. 1229a(b)(5)(A), will still receive the benefit of any protections from removal for which the asylum officer found that the noncitizen was eligible unless DHS makes a prima facie showing through evidence that specifically pertains to the noncitizen and that was not included in the record of proceedings for the USCIS Asylum Merits interview that the noncitizen is not eligible for such protection. Where USCIS has determined that an applicant is eligible for statutory withholding of removal or protection under the CAT, the United States would risk violating its nonrefoulement obligations by nonetheless removing the noncitizen to the country in which they more likely than not would be subject to persecution or torture due to the failure to appear. That would particularly be so if the noncitizen's failure to attend the hearing were due to misunderstanding, confusion, or a belief that no further steps were necessary to preserve the noncitizen's eligibility for statutory withholding of removal or protection under the CAT.

[43] The Departments emphasize that the evidence or testimony relied upon by DHS to demonstrate that the noncitizen is not eligible for withholding of removal or protection under the CAT must be evidence or testimony not considered by the asylum officer that pertains specifically to the noncitizen and establishes that the noncitizen is not eligible. For example, DHS could submit information that arose from background checks conducted after the asylum officer interview, but DHS cannot point to a statement by the noncitizen in the Form I–213, Record of Deportable/Inadmissible Alien. The evidence or testimony must demonstrate the noncitizen's ineligibility for the protection that the asylum officer determined the noncitizen was eligible for. The IJ's decision must be based on such new evidence or testimony; the IJ may not

Continued

The Departments have determined that these changes are advisable for several reasons. First, after reviewing comments, the Departments have declined to adopt certain provisions proposed in the NPRM and instead have set forth that after an asylum officer does not grant asylum, an individual will be automatically referred to streamlined section 240 removal proceedings. Automatic referral to streamlined section 240 proceedings means that every noncitizen whose application is not approved by the asylum officer will have the opportunity to have their case reviewed by the IJ, without first affirmatively requesting review. During streamlined 240 proceedings, the noncitizen may elect to have the IJ adjudicate de novo the noncitizen's asylum application, and any protection claim for which the asylum officer found the noncitizen ineligible. At the same time, the rule recognizes that an asylum officer's determination that a noncitizen is eligible for protection should generally be given effect in the interest of efficiency and to ensure that the noncitizen is not returned to a country where an immigration official has already determined that the noncitizen may be persecuted or tortured.

It is appropriate for USCIS to make eligibility determinations for statutory withholding of removal and protection under the CAT. As a threshold issue, applications for asylum, statutory withholding of removal, and protection under the CAT are all factually linked. While the legal standards and requirements differ among the forms of relief and protection, the relevant applications will substantially share the same set of operative facts that an asylum officer would have already elicited, including through evidence and testimony, in the nonadversarial proceeding. Moreover, asylum officers receive extensive training, and develop extensive expertise, in assessing claims and country conditions and are qualified to determine whether an applicant will face harm in the proposed country. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b). Asylum officers also receive training on standards and eligibility issues related to determinations for statutory withholding of removal and CAT protection in order to conduct credible fear screening interviews and make appropriate credible fear determinations under 8 CFR 208.30(e). *See* 8 CFR

reconsider the asylum officer's determination or deny eligibility based merely on disagreement with the asylum officer's conclusions or evaluation of the record before the asylum officer.

208.1(b). Finally, statutory withholding of removal and protection under the CAT are nondiscretionary forms of protection, the granting of which is mandatory upon a showing of eligibility. *See, e.g., Myrie,* 855 F.3d at 515–16; *Benitez Ramos,* 589 F.3d at 431. Because the asylum officer does not issue an order of removal under the IFR, it is appropriate to wait until the IJ enters the order of removal before giving effect to USCIS's statutory withholding of removal and CAT protection eligibility determinations. *See Matter of I–S– & C–S–,* 24 I&N Dec. at 433.

Thus, this IFR recognizes that applications for discretionary and mandatory forms of protection will be reviewed by IJs. However, determinations that a noncitizen is eligible for a mandatory form of protection will be given effect by the IJs, unless DHS demonstrates, through new evidence specifically pertaining to the noncitizen, that the noncitizen is not eligible for such protection.

Considering the comments received on the NPRM, the Departments recognize that this procedure is an intermediate approach between the NPRM and the commenters' suggestions described below in Section IV.D.6 of this preamble. Whereas the NPRM would have allowed the IJ to sua sponte review the asylum officer's statutory withholding and CAT determinations, the IFR instead places the burden on DHS to demonstrate, with new evidence specific to the noncitizen, that the noncitizen is not eligible for such protections. The Departments have determined that this process is most efficient, given that there may be particular instances, such as evidence of fraud or criminal activity, where overturning the asylum officer's eligibility determination is justified. If the Departments provided no mechanism in these streamlined section 240 removal proceedings through which the asylum officer's eligibility determinations could be overturned, DHS would have to follow the procedures set forth in 8 CFR 208.17(d) and 208.24(f) in instances where overturning the asylum officer's eligibility determinations is justified. Providing an exception where DHS demonstrates that evidence or testimony specifically pertaining to the noncitizen and not in the record of proceedings for the USCIS Asylum Merits interview establishes that the noncitizen is not eligible is substantially more efficient, consistent with the overall aims of this IFR.

### 6. Exceptions to Streamlined Procedures

The IFR provides specific exceptions that will allow certain noncitizens or situations to be exempted from these streamlined procedures and timelines despite originating in the expedited removal process and being referred to immigration court following an asylum officer's initial adjudication. *See* 8 CFR 1240.17(k). These exceptions ensure procedural fairness because not all cases that might otherwise be placed in streamlined section 240 removal proceedings would in fact be suitable for the expedited timeline.

At new 8 CFR 1240.17(k)(3), the IFR provides an exception to the expedited timeline if the noncitizen has raised a substantial challenge to the charge that the noncitizen is subject to removal— *e.g.,* if the noncitizen has a claim to U.S. citizenship or the charge that the noncitizen is subject to removal is not supported by the record—and that challenge cannot be resolved simultaneously with the noncitizen's applications for asylum, statutory withholding of removal, or withholding or deferral of removal under the CAT.

Because the IFR places noncitizens into section 240 proceedings, the noncitizen can affirmatively elect to apply for a wide range of relief in addition to asylum, statutory withholding of removal, and protection under the CAT. *See, e.g.,* 8 CFR 1240.1(a)(1)(ii) (providing IJs with the authority to adjudicate a wide range of applications for relief); 8 CFR 1240.11(a)(2) ("The immigration judge shall inform the [noncitizen] of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the [noncitizen] an opportunity to make application during the hearing . . . ."). The IFR therefore provides an exception to the timeline if the noncitizen produces evidence of prima facie eligibility for relief or protection other than asylum, statutory withholding of removal, withholding or deferral of removal under the CAT, and is seeking to apply for, or has applied for, such relief or protection. *See* 8 CFR 1240.17(k)(2). For example, a noncitizen who also is eligible to seek adjustment of status under section 245 of the Act, 8 U.S.C. 1255, could provide the IJ with proof of prima facie eligibility and a copy of the submitted Form I–130, Petition for Alien Relative, and upon receipt of such evidence, the timeline in 8 CFR 1240.17(f)–(h) would not apply.[44] Testimonial evidence, and

[44] Although a submitted visa petition demonstrating prima facie eligibility for relief would be an optimal way to demonstrate

out-of-court written statements, could also be considered by immigration judges as evidence of prima facie eligibility for relief. The Departments believe this exception from the timeline is appropriate to allow effective adjudication of the new relief being sought because the IJ will not have the benefit of an already developed record regarding those forms of relief, which the IJ will have for the noncitizen's application for asylum or other protection.[45]

Similarly, the IFR provides an exception where the IJ finds the noncitizen subject to removal to a different country from the country or countries in which the noncitizen claimed a fear of persecution and torture before the asylum officer, and the noncitizen claims a fear of persecution or torture with respect to that alternative country. *See* 8 CFR 1240.17(k)(4). The Departments similarly believe the IFR's timeline should not apply in these circumstances because the record would need to be developed without the benefit of previous adjudication.

The Departments have also considered the effect of the streamlined 240 proceedings on vulnerable populations. To ensure procedural fairness, the Departments will exempt the following categories of noncitizens from these procedures: Noncitizens under the age of 18 on the date the NTA was issued, except noncitizens in section 240 proceedings with an adult family member, 8 CFR 1240.17(k)(1); and noncitizens who have exhibited indicia of mental incompetency, 8 CFR 1240.17(k)(6).

Finally, the expedited timeline does not apply to cases that have been reopened or remanded following the IJ's order. 8 CFR 1240.17(k)(5). Reopened and remanded cases may present unique

---

[45] The Departments also note that this shift from the NPRM to streamlined section 240 removal proceedings addresses comments that the NPRM would have improperly burdened noncitizens by requiring them to file motions to vacate their removal orders and by limiting noncitizens to only one such motion. Further, by placing noncitizens into streamlined 240 proceedings—thereby allowing them to seek various forms of relief or protection for which they may be eligible—the IFR also addresses comments that the NPRM would have authorized the IJs to exercise discretion over whether to allow the respondent to apply for additional forms of relief or protection.

qualification for this exception, there may exist circumstances in which a filed petition would not be possible to present on an expedited timeline due to factors outside of a noncitizen's control. For example, a complaint for custody and motion for Special Immigrant Juvenile classification ("SIJ") findings, as filed with a State court, along with a statement and evidence as to other eligibility factors listed on the Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant, could be sufficient to permit the IJ to assess a respondent's prima facie eligibility for SIJ classification.

issues that are outside of the scope of these streamlined 240 proceedings.

### E. Other Amendments Related to Credible Fear

In addition to the new procedures at 8 CFR 1240.17, this IFR amends 8 CFR 1003.42, 1208.2, 1208.3, 1208.4, 1208.5, 1208.14, 1208.16, 1208.18, 1208.19, 1208.22, 1208.30, and 1235.6. Except for the amendments at 8 CFR 1003.42, the Departments proposed amendments to all of these sections in the NPRM in order to: (1) Effectuate the reestablishment of the "significant possibility" standard in credible fear review proceedings before EOIR; (2) ensure that IJs, like asylum officers, do not apply the mandatory bars at the credible fear screening process; and (3) ensure that the provisions providing for the USCIS Asylum Merits process are accurately reflected in EOIR's regulations where relevant, including confirmation that the written record of the positive credible fear determination will count as an asylum application. The IFR adopts these same changes where limited technical amendments where necessary to accord with the streamlined section 240 proceedings under new 8 CFR 1240.17.

The Departments also include amendments to 8 CFR 1003.42(d)(1) in this IFR. Although these amendments were not included in the NPRM, they are direct corollaries of the NPRM's proposed amendments and are necessary to ensure consistency, both internally within DOJ's regulatory provisions and more broadly between DHS's and DOJ's regulations. Specifically, the IFR amends 8 CFR 1003.42(d)(1) to ensure consistency with the revisions to 8 CFR 208.30(e) related to credible fear screening standards and treatment of mandatory bars in the credible fear screening process and with the revisions to 8 CFR 1208.30(g)(2) so that both provisions properly direct that when an IJ vacates a negative credible fear finding, the IJ will refer the case back to USCIS as intended by the NPRM and the IFR.

### F. Parole

This rule amends the DHS regulations governing the circumstances in which parole may be considered for individuals who are being processed under the expedited removal provisions of INA 235(b)(1), 8 U.S.C. 1225(b)(1). Expedited removal is a procedure that applies when an immigration officer "determines" that a noncitizen "arriving in the United States," or a noncitizen covered by a designation who has not been admitted or paroled into the United States, is inadmissible under

either INA 212(a)(6)(C), 8 U.S.C. 1182(a)(6)(C) (fraud or misrepresentation), or INA 212(a)(7), 8 U.S.C. 1182(a)(7) (lack of proper documents), and further determines that the noncitizen should be placed in expedited removal. INA 235(b)(1)(A)(i), (iii), 8 U.S.C. 1225(b)(1)(A)(i), (iii). Other noncitizens who are applicants for admission—and whom an immigration officer determines are not clearly and beyond a doubt entitled to be admitted—generally are referred for ordinary removal proceedings under INA 240, 8 U.S.C. 1229a. *See* INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A).

The statute generally provides for the detention of noncitizens subject to expedited removal pending a final credible fear determination and, if no such fear is found, until removed. *See* INA 235(b)(1)(B)(iii)(IV), 8 U.S.C. 1225(b)(1)(B)(iii)(IV) (noncitizens in the expedited removal process "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"). The statute, likewise, provides that noncitizens determined to have a credible fear "shall be detained for further consideration of the application for asylum." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). Congress has, however, expressly granted DHS the authority to release any applicant for admission from detention via parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). This includes DHS's authority to parole noncitizens detained under section 235 of the Act, 8 U.S.C. 1225. *See Jennings* v. *Rodriguez*, 138 S. Ct. 830, 837, 844 (2018).

The NPRM proposed to replace the current narrow parole standard with a standard that would permit parole "only when DHS determines, in the exercise of discretion, that parole is required to meet a medical emergency, for a legitimate law enforcement objective, or because detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities)." 86 FR 46946 (8 CFR 235.3(b)(2)(iii) (proposed); *see id.* at 46913–14. Having considered all comments received on this issue, DHS has determined that the current narrow standard should be replaced not with the standard proposed in the NPRM but with the longstanding parole standard applicable in other circumstances and described in 8 CFR 212.5(b), with which DHS officers and agents have substantial experience. That provision describes

**Appx. 030**

five categories of certain noncitizens detained under 8 U.S.C. 1225(b) who may meet the parole standard of INA 212(d)(5), 8 U.S.C. 1182(d)(5), provided they present neither a security risk nor a risk of absconding: (1) Noncitizens who have serious medical conditions such that continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) noncitizens who will be witnesses in proceedings conducted by judicial, administrative, or legislative bodies in the United States; and (5) noncitizens whose continued detention is not in the public interest. *See* 8 CFR 212.5(b)(1)–(5). Consistent with the statute and the regulation, DHS will consider noncitizens covered by this rule for parole under this standard pending their credible fear interview "only on a case-by-case basis," 8 CFR 212.5(b), and may impose reasonable conditions on parole (including, for example, periodic reporting to ICE) to ensure that the noncitizen will appear at all hearings and for removal from the United States if required to do so, 8 CFR 212.5(c)–(d); *see* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

For purposes of making these case-by-case determinations concerning parole of noncitizens pending a credible fear interview, the Secretary recognizes that, in circumstances where DHS has determined that the continued detention of a noncitizen who has been found not to be a flight risk or a danger to the community is not in the public interest, the release of that noncitizen on parole may serve "urgent humanitarian reasons" or achieve "significant public benefit." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 212.5(b)(5).

The INA does not define these ambiguous terms, leaving them to the agency's reasonable construction.[46] In implementing the statutory parole authority, DHS and the former INS have long interpreted the statute to permit parole of noncitizens whose continued detention is not in the public interest as determined by specific agency officials. Specifically, prior to the 1996 amendment to the INA that provided for parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104–208, div. C, tit. VI, subtit. A, sec. 602, 110 Stat. 3009, 3009–689, the former INS had paroled individuals "whose continued detention" was "not in the public interest," 8 CFR 212.5(b)(5) (1995); *see* Detention and Parole of Inadmissible Aliens; Interim Rule With Request for Comments, 47 FR 30044, 30045 (July 9, 1982) (interim rule). After the 1996 amendment, the agency incorporated the new "case-by-case" requirement into its regulation, while also providing, similar to prior regulatory authority, that parole of certain noncitizens, including those who pose neither a security risk nor a risk of absconding and whose "continued detention is not in the public interest" would generally be justified for "significant public benefit" or "urgent humanitarian reasons," consistent with the 1996 statutory amendment. 62 FR 10348; *see id.* at 10313.

Nothing in INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), prohibits DHS from considering its resources and detention capacity when it determines, on a case-by-case basis, whether the parole of a noncitizen otherwise subject to detention under INA 235(b), 8 U.S.C. 1225(b), would have a significant public benefit or would advance urgent humanitarian reasons.[47] Rather, consistent with the statute, 8 CFR 212.5, and longstanding practice, DHS may take into account the important prerogative for it to use its detention resources for other individuals whose detention is in the public interest, including because of public safety or national security reasons. As has been the case for decades, DHS views detention as not being in the public interest where, in light of available detention resources, and considered on a case-by-case basis, detention of any particular noncitizen would limit the agency's ability to detain other noncitizens whose release may pose a greater risk of flight or danger to the community.[48] With regard to noncitizens detained pending a credible fear interview, whose inadmissibility was still being considered, or who had been ordered removed in expedited removal proceedings, the former INS, in a 1997 rule, restricted the regulatory authority for release on parole to where parole is required for a "medical emergency" or "a legitimate law enforcement objective." 8 CFR 235.3(b)(2)(iii), (b)(4)(ii) (current); *see* 62 FR 10356. As the NPRM explained, this current narrow standard effectively prevents DHS from placing into expedited removal many noncitizens who would otherwise be eligible for this process, especially families, given the practical constraints and the legal limits of the *Flores* Settlement Agreement ("FSA").[49] *See* 86 FR 46910. These restrictions on DHS's ability to detain families in significant numbers and for an appreciable length of time, coupled with capacity constraints imposed by the COVID–19 pandemic, have effectively prevented the Government from processing more than a very limited number of families under expedited removal. Amending the regulation by which the former INS previously constrained itself (and now DHS) to considering parole for noncitizens in the expedited removal process far more narrowly than what the statute authorizes will advance the significant public benefit of allowing DHS to place more eligible noncitizens, particularly noncitizen families, in

---

[46] *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3); *see also Nat'l Cable & Telecomms. Ass'n* v. *Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if agency's reading differs from what the court believes is the best statutory interpretation." (citing *Chevron*, 467 U.S. at 843–44)); *Garfias-Rodriguez* v. *Holder*, 702 F.3d 504, 515 (9th Cir. 2012) (en banc) ("We defer to an agency not because it is better situated to interpret statutes, but because we have determined that Congress created gaps in the statutory scheme that cannot be filled through interpretation alone, but require the exercise of policymaking judgment." (citing *Chevron*, 467 U.S. at 865)); *cf., e.g., Ibragimov* v. *Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of 8 CFR 212.5).

[47] *See, e.g., New Mexico* v. *McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D. N.M. 2020) ("This vague ['significant public benefit'] standard [in INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A)] conceivably encompasses a wide range of public benefits, such as conserving resources otherwise spent on housing asylum seekers . . . .").

[48] *See, e.g.,* ICE, *Interim Guidance for Implementation of* Matter of M–S–, *27 I&N Dec. 509 (A.G. 2019) During the Stay of the Modified Nationwide Preliminary Injunction in Padilla* v. *ICE, No. 18–298, 2019 WL 2766720 (W.D. Wash. July 2, 2019); Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture (July 15, 2019); Memorandum from DHS Secretary John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvement Policies 3 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf; Memorandum from Gene McNary, INS Commissioner, Parole Project for Asylum Seekers at Ports of Entry and INS Detention 1 (Apr. 29, 1992).*

[49] Stipulated Settlement Agreement, *Flores* v. *Reno,* No. 85–cv–4544 (C.D. Cal. Jan. 17, 1997); *see also* 86 FR 46910 & n.27 (describing the FSA). The FSA provides for a general policy favoring release of minors and requires the expeditious transfer of minors who are not released from custody, including minors accompanied by their parents or legal guardians, to a non-secure, state-licensed program. *See* FSA ¶¶ 6, 12, 14, 19. When the former ICE family residential centers were operational, the court determined that such facilities were secure, unlicensed facilities; therefore, DHS generally released noncitizen children detained during their immigration proceedings within 20 days. *See Flores* v. *Sessions,* 394 F. Supp. 3d 1041, 1070–71 (C.D. Cal. 2017).

expedited removal proceedings, rather than processing them through lengthy and backlogged ordinary section 240 removal proceedings.

This approach will allow DHS to more efficiently obtain orders of removal for families who do not raise a fear claim or who are found not to possess a credible fear, thereby facilitating their expeditious removal without the need for lengthy immigration court proceedings, and will allow other families to have their fear claims adjudicated in a more timely manner. Accordingly, the flexibility of the 8 CFR 212.5(b) standard—subject, of course, to the limitations on the parole authority contained in INA 212(d)(5), 8 U.S.C. 1182(d)(5)—will allow DHS to achieve the significant public benefits of more effectively utilizing the expedited removal authority in response to changing circumstances and promoting border security. DHS expects that expedited removal of families who do not make a fear claim, or who are determined not to have a credible fear of persecution or torture, will reduce the incentives for abuse by those who will not qualify for protection and smugglers who exploit the processing delays that result from ordinary removal backlogs.

Finally, the contours of the category of noncitizens "whose continued detention is not in the public interest," 8 CFR 212.5(b)(5), have been developed through directives and guidance. For example, in 2009 ICE issued guidance stating that "when an arriving alien found to have a credible fear establishes to the satisfaction of [ICE Detention and Removal Operations (DRO)] his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors (as described [later in the directive]), parole the alien on the basis that his or her continued detention is not in the public interest." ICE Policy No. 11002.1 ¶ 6.2, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009), *https://www.ice.gov/doclib/dro/pdf/ 11002.1-hd-parole_of_arriving_aliens_ found_credible_fear.pdf*. DHS intends to use further directives and guidance to apply the parole standard to noncitizens in expedited removal pending a credible fear interview. DHS emphasizes that any such directives or guidance will account for the fact that there are important and relevant differences between the population of noncitizens who have received a positive credible fear determination and the population of noncitizens in expedited removal who have not received a credible fear determination, including the expected length of time before such an individual

may be ordered removed and considerations relevant to assessing flight risk.

*G. Putative Reliance Interests*

In responses to comments below, the Departments have addressed the reliance interests in the status quo asserted by commenters. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (requiring agencies to consider "serious reliance interests" when changing policies); *see also Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 222 (2016) (referring to "significant" and "serious" reliance interests (quotation marks omitted)). The governmental commenters do not appear to have identified any reliance interests. Although some commenters identified what they believed would be burdens on or injuries to State, county, and local governments as a result of the proposed rule—claims that are addressed in the Departments' responses to comments—none clearly identified any significant reliance interests in the current state of affairs.

The Departments perceive no serious reliance interests on the part of any State, county, or local governmental entity in the currently existing provisions the NPRM implicated or that are affected by this IFR. Even if such reliance interests exist, the Departments would nevertheless promulgate this regulation for the reasons stated in this rule.

## IV. Response to Public Comments on the Proposed Rule

*A. Summary of Public Comments*

In response to the proposed rule, the Departments received 5,235 comments during the 60-day public comment period. Approximately 1,347 of the comments were letters submitted through mass mailing campaigns, and 3,790 comments were unique submissions. Primarily, individuals and anonymous entities submitted comments, as did multiple State Attorneys General, legal service providers, advocacy groups, attorneys, religious and community organizations, elected officials, and research and educational institutions, among others.

Comments received during the 60-day comment period are organized by topic below. The Departments reviewed the public comments received in response to the proposed rule and address relevant comments in this IFR, grouped by subject area. The Departments do not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the changes to made by this rule. This IFR

does not resolve issues outside the scope of this rulemaking. A brief summary of comments the Departments deemed to be out of scope or unrelated to this rulemaking, making a substantive response unnecessary, is provided at the end of the section. Comments may be reviewed at *https:// www.regulations.gov,* docket number USCIS–2021–0012.

Following careful consideration of public comments received, the Departments in this IFR have made modifications to the regulatory text proposed in the NPRM. The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid with respect to those regulatory amendments, except where a new or supplemental rationale is reflected in this IFR. As a general matter, the Departments believe that the IFR addresses concerns expressed by a majority of those who commented on the NPRM's proposed IJ review procedure by establishing that where the asylum officer denies a noncitizen's application for asylum, that noncitizen will be placed into streamlined section 240 proceedings, rather than the alternative procedure proposed in the NPRM. While the Departments found a number of the concerns raised by commenters to be persuasive in making this change, general statements that the IFR addresses commenters' concerns should not be read to mean that the Departments have adopted or agree with commenters' reasoning in whole or in part.

The Departments welcome comments on the IFR's revisions that are submitted in accordance with the instructions for public participation in Section I of this preamble. Among other topics, the Departments invite comment on the procedures for streamlined section 240 proceedings and whether any further changes to those procedures would be appropriate.

*B. General Feedback on the Proposed Rule*

1. General Support for the Proposed Rule

a. Immigration Policy Benefits

*Comments:* Several commenters supported the proposed rule on the basis of immigration policy benefits, including: Reducing duplication of effort between USCIS asylum officers and IJs by allowing asylum officers to adjudicate claims that originated through the USCIS-administered credible fear screening process with less or no expenditure of immigration court time or resources; improving the process to better serve traumatized populations;

expediting the asylum application process and allowing covered asylum seekers to receive protection sooner; making the asylum application process more efficient and fair; helping to better manage migrant flows and increase security at the Southwest border; and providing due process, dignity, and equity within the system.

*Response:* The Departments acknowledge the commenters' support for the rule.

b. Positive Impacts on Applicants, Their Support Systems, and the Economy

*Comments:* A few commenters supported the proposed rule, without substantive rationale, on the basis of positive impacts on applicants, their support systems, and the U.S. economy. Some commenters supported the proposed rule and expressed gratitude for helping people who are in fear for their lives and encouraged facilitating a smoother pathway for noncitizens once they get through the initial process successfully. Another commenter stated that the rule represents a fundamental shift that will help eligible asylum applicants receive humanitarian protection and not keep asylum seekers in limbo for years while awaiting a final status determination. An individual commenter supporting the rule wrote that asylum seekers who have received a positive credible fear determination may be able to enter the labor force sooner. According to this commenter, enabling earlier access to employment for asylum-eligible individuals could reduce the public burden, reduce the burden on the asylum support network, and benefit those asylum seekers in terms of equity, human dignity, and fairness.

*Response:* The Departments acknowledge these commenters' support for the rule and agree the rule will benefit asylum seekers and their support systems, including public entities.

2. General Opposition to the Proposed Rule

a. Immigration Policy Concerns

*Comments:* Many commenters expressed general opposition to the rule out of a belief that this Administration is not committed to enforcing U.S. immigration law or deterring unauthorized migration into the United States, or out of a belief that the Administration intends to drive more irregular migration for political reasons. Several of these commenters pointed to the high numbers of Southwest border encounters that have occurred in 2021 as support for their beliefs.

*Response:* The Departments acknowledge the commenters'

frustration with the high rates of unauthorized entry into the United States between ports of entry on the Southwest border in 2021, a continuation of an increase that has been observed since April 2020.[50] However, the Departments disagree with the commenters' suggestion that the high numbers of border encounters imply either that the Administration supports or is indifferent to such unauthorized entries. To the contrary, maintaining an orderly, secure, and well-managed border and reducing irregular migration are priorities for the Departments and for the Administration. The Fiscal Year ("FY") 2022 President's Budget directs resources toward robust investments in border security and safety measures, including border technology and modernization of land ports of entry. *See* DHS, *FY 2022 Budget in Brief* 1–2, *https://www.dhs.gov/sites/default/files/publications/dhs_bib_-_web_version_-_final_508.pdf.* Under this Administration, the United States has also bolstered public messaging discouraging irregular migration and strengthened anti-smuggling and anti-trafficking operations, while at the same time investing in Central America to address the lack of economic opportunity, weak governance and corruption, and violence and insecurity that lead people to leave their homes in the first place and attempt the dangerous journey to our Southwest border. *See* Press Release, The White House, FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System (July 27, 2021) *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/* (last visited Mar. 14, 2022). The Departments emphasize that the COVID–19 pandemic and associated economic downturn, along with two severe hurricanes that together impacted Nicaragua, Honduras, Guatemala, and El Salvador in November 2020, have added to those longstanding problems. *See* DHS, Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border (Mar. 16, 2021), *https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandro-n-mayorkas-regarding-situation;* USAID, Latin American

---

[50] *See* U.S. Customs and Border Protection ("CBP"), Southwest Land Border Encounters, *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.*

Storms—Fact Sheet #1, (FY) 2021 (Nov. 19, 2020), *https://www.usaid.gov/crisis/hurricanes-iota-eta/fy21/fs1* (last visited Mar. 14, 2022). Finally, misinformation—including the false message that our borders are "open"—has also driven irregular migration. *See* DHS, Secretary Mayorkas Delivers Remarks in Del Rio, TX (Sep. 20, 2021), *https://www.dhs.gov/news/2021/09/20/secretary-mayorkas-delivers-remarks-del-rio-tx.* The Departments reiterate that the borders of the United States are not open and that individuals should not put their own lives or the lives of their family members in the hands of smugglers or other criminals who represent otherwise.

*Comments:* Many commenters generally opposed the rule due to concerns that USCIS asylum officers would be more likely than IJs to grant asylum or other protection to individuals who should not be eligible for it or to otherwise "loosen" the requirements for asylum eligibility. Some commenters expressed, without providing details, that IJs are better trained, better qualified, or better equipped to "vet" applicants or detect fraudulent claims. Other commenters explained that they were concerned USCIS asylum officers would not apply the law or would not serve as impartial adjudicators. Commenters based this concern on at least two different rationales. Some commenters reasoned that asylum officers were subject to greater political control than IJs; other commenters reasoned that asylum officers are too "unaccountable" to the public. Finally, a few commenters expressed concern about USCIS being "fee-driven" and that having a "fee-driven" agency control the credible fear process removes it from congressional oversight.

While most comments that disapproved of authorizing asylum officers to adjudicate defensive asylum applications urged the Departments to continue to require that IJs within EOIR adjudicate all such applications, some comments urged that "Federal judges" or immigration judges "appointed by the judicial branch" should be hired to quickly and impartially adjudicate asylum claims.

*Response:* The Departments disagree with the assertion that USCIS asylum officers cannot appropriately vet or determine eligibility for protection. Asylum officers are career Government employees selected based on merit, they receive extensive training, and they possess expertise in determining eligibility for protection. *See* INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E); 8 CFR 208.1(b); *see, e.g.,* USAJOBS,

Asylum Officer, *https://www.usajobs.gov/job/632962200* (last visited Mar. 14, 2022) (specifying that asylum officers are members of the competitive service); *see also* 22 U.S.C. 6473(b) (requisite training on religious persecution claims). USCIS asylum officers must undergo "special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles." 8 CFR 208.1(b); *see also* INA 235(b)(1)(E)(i), 8 U.S.C. 1225(b)(1)(E)(i) (requiring that asylum officers have "professional training in country conditions, asylum law, and interview techniques"). While IJs handle a broad swath of immigration-related matters, USCIS asylum officers are uniquely trained to adjudicate protection claims. Additionally, USCIS asylum officers have dedicated resources available to them to address fraud concerns, including Fraud Detection and National Security ("FDNS") officers embedded within the USCIS Asylum Division.[51] FDNS employs numerous measures to detect and deter immigration benefit fraud and aggressively pursues benefit fraud cases in collaboration with USCIS adjudication officers and Federal law enforcement agencies. Since 2004, FDNS and ICE have collaborated in a strategic partnership to combat immigration fraud. FDNS officers work closely with law enforcement and intelligence community partners to resolve potential fraud, national security, and public safety concerns and to ensure the mutual exchange of current and comprehensive information. They conduct administrative investigations into suspected benefit fraud and aid in the resolution of national security or criminal concerns. Administrative investigations may include compliance reviews, interviews, site visits, and requests for evidence, and they may also result in a referral to ICE for consideration of a criminal investigation. Determining asylum eligibility and vetting is already a necessary part of the day-to-day work of a USCIS asylum officer and will continue to be so after this rule takes effect. Regardless of whether it is an IJ or an asylum officer who adjudicates an application, no individual may be granted asylum or withholding of removal until certain vetting and identity checks have been made. INA 208(d)(5)(A)(i), 8 U.S.C. 1158(d)(5)(A)(i);

8 CFR 208.14(b), 1003.47. The Departments believe that commenters' concerns about USCIS having a financial incentive to "rubber-stamp" grant applications for asylum or lacking congressional oversight because it is primarily fee-funded are likewise misplaced. USCIS adjudicates asylum applications without charge, *see* 86 FR 46922, and is subject to congressional oversight.

Moreover, EOIR is currently burdened with a heavy case backlog, as described in the NPRM. Notably, EOIR's caseload includes a wide range of immigration and removal cases. *See EOIR Policy Manual,* Part II.1.4(a) (updated Dec. 30, 2020), *https://www.justice.gov/eoir/eoir-policy-manual* ("EOIR Policy Manual"). Allowing USCIS to take on cases originating in the credible fear process therefore is expected to reduce delays across all of EOIR's dockets, as well as reducing the time it takes to adjudicate these protection claims. The Departments believe that alleviating immigration court caseloads through the fair, efficient process articulated in this rule is a positive step forward. Suggestions asking for additional Federal judges within the judicial branch to handle the influx of asylum and protection-related cases should be directed to Congress.

*Comments:* Many commenters generally opposed the rule on the ground that a higher-priority or better way to address the overwhelmed U.S. asylum system would be to "regain control" over who enters the country by "tak[ing] steps to significantly reduce the number of people flowing across the border" and by not releasing individuals who have entered the United States without inspection or parole.

*Response:* The Departments acknowledge concerns raised by the commenters and note that this rulemaking is one part of a multifaceted whole-of-government approach to addressing irregular migration and ensuring that the U.S. asylum system is fair, orderly, and humane. This whole-of-government approach seeks to make better use of existing enforcement resources by investing in border security measures that will facilitate greater effectiveness in combatting human smuggling and trafficking and addressing the entry of undocumented migrants. The United States also is working with governments of nearby countries to facilitate secure management of borders in the region and to investigate and prosecute organizations involved in criminal

smuggling.[52] These and other efforts to address irregular migration are beyond the scope of this rule, which specifically concerns the procedures by which individuals who are encountered near the border and placed into expedited removal will receive consideration of their claims for asylum or other protection, as is required by law. INA 235(b)(1), 8 U.S.C. 1225(b)(1). However, to the extent that the significant delays in the adjudication of asylum claims today contribute to rates of irregular migration, the Departments believe that the efficiencies introduced by the rule will help to reduce any incentive to exploit the system and enhance the Government's efforts to address irregular migration. By limiting the amount of time a noncitizen may remain in the United States while a claim for relief or protection is pending, the rule stands to dramatically reduce potential incentives for noncitizens to make false claims for relief and protection.

Finally, the Departments emphasize that individuals who have entered the United States without inspection or parole and who are subsequently encountered and placed into expedited removal are presumptively detained, as the statute provides that such individuals are subject to mandatory detention. *See* INA 235(b)(1)(B)(ii), (iii)(IV), 8 U.S.C. 1225(b)(1)(B)(ii), (iii)(IV). Such individuals may be released on parole only in accordance with the statutory and regulatory standards. *See* INA 212(d)(5), 8 U.S.C. 1182(d)(5); 8 CFR 212.5, 235.3(b)(2)(iii), (b)(4)(ii).

*Comments:* Many commenters generally opposed the rule on the ground that allowing USCIS to adjudicate the merits of asylum claims through a nonadversarial process would "take away the rights of the American people to be represented in court when migrants seek benefits that would place them on the path to citizenship" or "remov[e] . . . safeguards that are meant to protect the American population." Commenters asserted that allowing asylum claims to be adjudicated without a DHS attorney cross-examining the applicant and having the opportunity to offer impeachment evidence would give fewer rights to the American people, while the noncitizen applicant would

---

[51] *See* USCIS, Fraud Detection and National Security Directorate, *https://www.uscis.gov/about-us/directorates-and-program-offices/fraud-detection-and-national-security-directorate.*

[52] *See* Press Release, The White House, FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System (July 27, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/* (last visited Mar. 14, 2022).

**Appx. 034**

still have the opportunity to be represented by counsel.

*Response:* The Departments do not agree with the premise of commenters' assertions. A nonadversarial process does not take away the rights of the American people, but rather it allows for the presentation and consideration of asylum and other protection claims in a manner that is fair and efficient. Asylum officers are Government officials who are well-trained in making credibility determinations and assessing evidence. The asylum officer position is a specialized position focusing on asylum and related relief and protection from removal; as explained in Section III.B of this preamble, asylum officers already adjudicate affirmative asylum claims through a nonadversarial process. An asylum officer can consider evidence relevant to an applicant's claim, including evidence that might be introduced as impeachment evidence in immigration court, and an asylum officer, where appropriate, can ask the applicant questions similar to those that a DHS attorney might ask in immigration court during a cross-examination. The Departments believe that the American public is better served if claims for asylum or related protection that originate through the credible fear screening process may be adjudicated—fairly and efficiently—not only within section 240 proceedings before IJs but also by asylum officers who specialize in such claims.

*Comment:* Several commenters generally opposed the rule out of a belief that it is being promulgated solely for the purpose of providing asylum or other immigration benefits faster or through an easier procedure and is thereby putting the interests of migrants ahead of the interests of U.S. persons or of the public interest.

*Response:* The Departments disagree with the view that the rule is not in the public interest. Rather, providing a process through which vulnerable populations may seek protection is the means by which the United States meets its obligations under both U.S. and international law. *See* Refugee Protocol, 19 U.S.T. 6223; INA 208, 241(b)(3), 8 U.S.C. 1158, 1231(b)(3); FARRA sec. 2242. Amending the existing process to allow adjudications—both those that end in grants and those that end in denials—to be made more promptly, while maintaining fundamental fairness, is a change that is in the public interest. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. *See, e.g., INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 424 (1987) (observing that the Refugee Act of

1980 established "a broad class of refugees who are eligible for a discretionary grant of asylum, and a narrower class of aliens who are given a statutory right not to be deported to the country where they are in danger"); FARRA sec. 2242 (legislation implementing U.S. obligations under Article 3 of the CAT not to remove noncitizens to any country where there are substantial grounds for believing the person would be in danger of being subjected to torture). Ensuring that the Departments uphold these American values as enshrined in U.S. law is in the national interest. It is also in the public interest that the procedures by which the Departments administer the law and uphold these values not regularly result in years-long delays, which may be detrimental to both the U.S. public and those seeking protection. Efficient processing of cases is in the public interest, as cases that span years can consume substantially greater Government resources, including by contributing to delays in immigration court proceedings that hinder DHS's ability to swiftly secure the removal of noncitizens who are high priorities for removal. The process created by this rule therefore advances the public interest by authorizing the Departments to employ a fair and efficient procedure for individuals to seek protection as an appropriate alternative to the exclusive use of section 240 proceedings and by reducing immigration court backlogs that are detrimental to the public interest.

*Comments:* Some commenters generally opposed the rule on the ground that it allows noncitizens to seek review of any denial of asylum or other protection but does not allow an opportunity for correcting or reviewing erroneous grants of asylum or other protection.

*Response:* The Departments acknowledge the concern regarding error correction when asylum or other protection is granted, but the Departments believe this concern is addressed by existing statutory and regulatory provisions, as well as by DHS's longstanding practices regarding the supervision of asylum officers. To reiterate those longstanding supervision practices, the Departments have revised 8 CFR 208.14(b) and (c) and, correspondingly, 8 CFR 1208.14(b) and (c), to emphasize that asylum officers' decisions on approval, denial, dismissal, or referral of an asylum application remain subject to review within USCIS.

As noted above, the Secretary of Homeland Security is charged with the administration and enforcement of the

immigration laws and has the control, direction, and supervision of all employees and of all the files and records of USCIS. *See* INA 103(a)(1), (2), 8 U.S.C. 1103(a)(1), (2). Further, the asylum statute vests the Secretary of Homeland Security with the authority to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). The Secretary's broad authority includes the authority to review and modify immigration benefit decisions, including grants of asylum. Such authority has been delegated to the Director of USCIS. *See* DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003); *see also* 8 CFR 2.1. Further, USCIS retains authority under this delegation to reopen or reconsider decisions (including asylum decisions) at any time on the agency's own motion, based upon any new facts or legal determinations. *See* 8 CFR 103.5(a)(5). Nothing in this IFR in any way detracts from or diminishes the authority and responsibility of the Secretary of Homeland Security and the Director of USCIS over any grant of asylum that is issued by USCIS.

Beyond these statutory and regulatory provisions, 100 percent of USCIS asylum officers' approvals, denials, referrals, or dismissals of an asylum application are currently subject to supervisory review before a final decision is made and served on the applicant. *See* Memorandum from Andrew Davidson, Chief, Asylum Div., USCIS, *Modifications to Supervisory Review of Affirmative Asylum Cases* (Mar. 31, 2021). The decision of the asylum officer on whether or not to grant asylum undergoes review by a supervisor, and may be further reviewed as USCIS deems appropriate, before finalization and service on the applicant. *Id.* The Departments have revised 8 CFR 208.14(b) and (c), and made corresponding revisions to 8 CFR 1208.14(b) and (c), to emphasize these longstanding review practices. The Asylum Division also as a matter of policy determines which cases should receive further review at the headquarters level before being finalized. *See, e.g.,* USCIS Asylum Division, *Affirmative Asylum Procedures Manual,* III.Q. Quality Assurance Review (May 2016), *https:// www.uscis.gov/sites/default/files/ document/guides/AAPM-2016.pdf*. Further, the Director of USCIS, or the Director's delegate, "may direct that any case or class of cases be certified" to another USCIS official, including the USCIS Director herself, for decision. *See* 8 CFR 103.4(a)(1). Accordingly, USCIS

adjudicates each asylum claim, and the individual asylum officer is only empowered to grant asylum, as an exercise of the Secretary's authority. *See* 8 CFR 208.9(a).

If a grant of asylum or withholding of removal is not warranted, the grant may be terminated by USCIS or an immigration judge, as appropriate. *See* INA 208(c)(2), 8 U.S.C. 1158(c)(2); 8 CFR 208.24, 1208.24. A grant of CAT deferral of removal may also be terminated. *See* 8 CFR 208.17(d)–(f), 1208.17(d)–(f). The procedures for termination of a grant of asylum, withholding of removal, or deferral of removal is not changed by this rule. Any further judicial review may occur after the termination of asylum or other protection commences.

Moreover, with regard to individuals who are found eligible for withholding of removal but not granted asylum, the rule generally provides an opportunity for correcting an erroneous finding of eligibility through the streamlined section 240 proceeding. For example, if the DHS attorney becomes aware of new derogatory information indicating that the noncitizen is ineligible for that other protection, such information can be submitted and accounted for in the IJ's removal order. Finally, to the extent this IFR sets up a process under which, where an asylum officer declines to grant a noncitizen's asylum claim, that noncitizen can continue to pursue that claim before an IJ, the IFR does not break new ground. Rather, in these respects, the IFR mirrors the longstanding affirmative asylum process.

*Comments:* Several commenters generally opposed the rule on the ground that it would delay or otherwise make it harder for DHS to remove noncitizens by giving them more opportunities to appeal. Commenters expressed concern that delays in removal, coupled with more expeditious grants of asylum, would encourage irregular migration and incentivize individuals to make fraudulent claims for asylum to obtain parole from detention.

*Response:* The Departments acknowledge the commenters' concern but disagree with their conclusions. The rule intends to streamline adjudication of protection claims, whether granted or not. As noted in the NPRM, for claims involving non-detained individuals in section 240 removal proceedings, including asylum seekers encountered at the border and initially screened into expedited removal who establish a credible fear of persecution, the current average case completion time for EOIR is 3.75 years, and individuals who

arrive at the border and seek protection therefore often must wait several years for an initial adjudication by an IJ. *See* 86 FR 46909, 46928 tbl. 6. Any appeal after that adjudication adds even more time than an individual may expect to remain in the United States. Given the length of the process under the status quo and the streamlining procedures incorporated into the new process to promote prompt resolution of removal proceedings, it is unlikely that the new process allowed by the rule will result in further "delays in removal" that commenters fear may encourage further irregular migration or incentivize the filing of non-meritorious claims by individuals who do not need protection. The new process replaces a single section 240 removal proceeding in immigration court with a merits interview before an asylum officer, followed by a streamlined section 240 removal proceeding if USCIS does not grant asylum. Comments that assume this new two-step process will result in greater delays overlook that the new process is tailored specifically to adjudicate asylum and related protection claims, and individuals in the process will have been determined by an immigration officer to be inadmissible under section 235(b)(1)(A)(i) of the INA, 8 U.S.C. 1225(b)(1)(A)(i).[53] Additionally, as detailed in Section III.D of this preamble, the streamlined 240 removal proceeding will be governed by special procedural rules, including time frames and limits on continuances, that assure prompt completion. This streamlined process, as provided by the rule, thus addresses the commenters' underlying concern regarding delays. As explained in the NPRM, the Departments believe that this rule will substantially reduce the average time to adjudicate asylum claims—whether the final decision is a grant or a denial—thereby reducing any incentive for exploitation of the asylum system.

*Comments:* Several commenters generally opposed the rule based on the view that nearly all the migrants encountered at or near the Southwest border are economic migrants, not legitimate asylum seekers, and that all such individuals should therefore be removed without wasting resources on adjudications and appeals.

*Response:* The Departments acknowledge commenters' concern that legitimate asylum seekers be identified and distinguished from individuals seeking to enter the United States for other purposes, and the rule is indeed designed to more expeditiously and fairly distinguish the one group from the other. The Departments disagree with commenters' characterization that nearly all migrants encountered at the Southwest border are only seeking economic opportunity. Recent surveys of individuals seeking to migrate to the United States have found that individuals cite a variety of factors, often in combination, for leaving their country of origin. While economic concerns and a belief in American prosperity and opportunity are common reasons stated, violence and insecurity have been cited as reasons for migrating by majorities or near majorities of those surveyed.[54] And, regardless, Congress has instructed that individuals in expedited removal who claim a fear of persecution or indicate an intent to apply for asylum be given an individualized credible fear screening. INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); *see also* 8 CFR 208.30. The purpose of these individualized screenings is to prevent the removal of individuals in need of protection to a country where they face persecution or torture. Under this IFR, as under current regulations, individuals who receive a positive credible fear determination are given a fair opportunity to pursue their claim for asylum or other protection. Individuals who receive a negative credible fear determination and individuals who are determined to not warrant a discretionary grant of asylum or to be otherwise ineligible for protection will be subject to removal. Moreover, by making changes to facilitate the more frequent use of expedited removal for broader classes of individuals and families, the IFR will enable the Departments to more quickly secure removal orders in cases in which no fear claim is asserted or no credible fear is established than if such individuals and families were instead placed directly in removal proceedings, as frequently occurs.

---

[53] To be sure, the IFR includes exceptions to these streamlined section 240 proceedings. One of those exceptions is for noncitizens who raise a substantial challenge to the charges of inadmissibility or removability. *See* 8 CFR 1240.17(k)(3). Certain streamlining provisions under 8 CFR 1240.17, including the deadlines, and the limits on continuances and extensions of deadlines, will not apply in cases involving such noncitizens.

[54] *See, e.g.,* Randy Capps et al., Migration Policy Institute, *From Control to Crisis: Changing Trends and Policies Reshaping U.S.-Mexico Border Enforcement* 18–19 (Aug. 2019), *https://www.migrationpolicy.org/sites/default/files/publications/BorderSecurity-ControltoCrisis-Report-Final.pdf* (last visited Mar. 15, 2022); Medicins Sans Frontieres, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* 10–11 (May 2017), *https://www.nsf.org/sites/msf.org/files/msf_forced-to-flee-central-americas-northern-triangle_e.pdf* (last visited Mar. 15, 2022).

**Appx. 036**