# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-00094-Z |
| | ) | |
| ALEJANDRO MAYORKAS, | ) | |
| in his official capacity as | ) | |
| Secretary of Homeland Security, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

## DEFENDANTS' REPLY IN SUPPORT
## OF THEIR MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................1

I.     Texas Lacks Article III Standing ................................................................1

      A.    Texas's Speculation About Generic "Illegal Immigration" Fails to Establish an Injury in Fact from the IFR ..........................................................2

      B.    Facts at the Time of Filing the Complaint Defeat Texas's Standing ................................................................................................3

      C.    The IFR Did Not Increase Noncitizens Migrating into Texas ...........6

      D.    Texas Fails to Show Traceability and Redressability .......................10

II.    Texas Has Not Established a Legally Cognizable Injury ...........................14

III.   Texas Is Not Entitled to Special Solicitude ..............................................20

IV.   Texas Is Not in the Zone of Interests .......................................................21

V.    Texas Fails to State a Claim that the IFR Violates the Appointments Clause ..........21

CONCLUSION ..................................................................................................25

CERTIFICATE OF SERVICE .........................................................................27

# TABLE OF AUTHORITIES

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ................................................................................ 14

*Arpaio v. Obama,*
   27 F. Supp. 3d 185 (D.D.C. 2014) ......................................................................... 2

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ................................................................................. 2

*Attala Cnty., Mississippi Branch of NAACP v. Evans,*
   37 F.4th 1038 (5th Cir. 2022) ................................................................................ 4

*Bennett v. Spear,*
   520 U.S. 154 (1997) .............................................................................................. 20

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023) .......................................................................................... 17

*Biden v. Texas,*
   142 S. Ct. 2528 (2022) ............................................................................................ 7

*Buckley v. Valeo,*
   424 U.S. 1 (1976) .................................................................................................. 22

*Burgess v. FDIC,*
   871 F.3d 297 (5th Cir. 2017) ................................................................................ 22

*City of Los Angeles v. Patel,*
   576 U.S. 409 (2015) .............................................................................................. 24

*Center for Individual Freedom v. Carmouche,*
   449 F.3d 655 (5th Cir. 2006) ............................................................................ 3, 24

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................................................ 4, 6

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ..................................................................................... 15, 16

*DHS v. Regents of Univ. of California,*
   140 S. Ct. 1891 (2020) .......................................................................................... 16

*Does #1-7 v. Abbott,*
   345 F. Supp. 3d 763 (N.D. Tex. 2018) ................................................................ 23

*Does #1-7 v. Abbott,*
   945 F.3d 307 (5th Cir. 2019) ......................................................................... 23

*Edmond v. United States,*
   520 U.S. 651 (1997).......................................................................................... 23

*Florida v. Mayorkas,*
   No. 3:23-cv-9962, 2023 WL 3398099 (N.D. Fla. 2023) ............................... 12

*GLO v. Biden,*
   71 F.4th 264 (5th Cir. 2023) ............................................................. 10, 11, 15

*Henderson v. Stalder,*
   287 F.3d 374 (5th Cir. 2002) ......................................................................... 18

*In re Carney,*
   258 F.3d 415 (5th Cir. 2001) ......................................................................... 10

*Lucia v. SEC,*
   138 S. Ct. 2044 (2018)............................................................................... 21, 22

*Lujan v. Defs. Of Wildlife,*
   504 U.S. 555 (1992)................................................................................. *passim*

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990)...................................................................................... 7, 9

*Massachusetts v. EPA,*
   549 U.S. 497 (2007)......................................................................................... 20

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004)................................................................................... 7, 9, 13

*Okpalobi v. Foster,*
   190 F.3d 337 (5th Cir. 1999) ......................................................................... 24

*Okpalobi v. Foster,*
   244 F.3d 405 (5th Cir. 2001) ......................................................................... 24

*Paterson v. Weinberger,*
   644 F.2d 521 (5th Cir. 1981) ................................................................. *passim*

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014)............................................................................................ 4

*Texas v. Biden* ("MPP"),
  20 F.4th 928 (5th Cir. 2021) .................................................................. *passim*

*Texas v. United States* ("DACA"),
  50 F.4th 498 (5th Cir. 2022) .................................................. 7, 16, 17, 20

*Texas v. United States*,
  106 F.3d 661 (5th Cir. 1997) ................................................................ 19

*Texas v. United States* ("DAPA"),
  809 F.3d 134 (5th Cir. 2015) .......................................................... 7, 18

*U.S. Parole Comm'n v. Geraghty*,
  445 U.S. 388 (1980) .............................................................................. 3

*United States v. Arthrex*,
  141 S. Ct. 1970 (2021) ........................................................................ 21

*United States v. Robinson*,
  367 F.3d 278 (5th Cir. 2004) .............................................................. 23

*United States v. Stevens*,
  559 U.S. 460 (2010) ............................................................................ 24

*United States v. Texas* ("Priorities"),
  143 S. Ct. 1964 (2023) ................................................................ *passim*

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ...................................................................... 23, 25

## FEDERAL STATUTES

5 U.S.C. § 7521 ........................................................................................ 21

8 U.S.C. § 1101(a)(18) ............................................................................ 18

8 U.S.C. § 1182 ........................................................................................ 19

8 U.S.C. § 1182(d)(5) .............................................................................. 13

8 U.S.C. § 1182(d)(5)(A) ............................................................ 13, 18, 19

8 U.S.C. § 1225(a) .................................................................................. 18

8 U.S.C. § 1225(b) .................................................................................. 18

8 U.S.C. § 1229a ................................................................................................................ 18


**FEDERAL REGULATIONS**

8 C.F.R. § 212.5(b)(5) ........................................................................................................ 19


**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 25

Fed. R. Civ. P. 36(b) .......................................................................................................... 10


**FEDERAL REGISTER**

*Procedures for Credible Fear Screening and Consideration of Asylum,*
 *Withholding of Removal and CAT Protection Claims by Asylum Officers* ("IFR"),
 87 Fed. Reg. 18078-01 (Mar. 29, 2022). ......................................................... *passim*


**MISCELLANEOUS**

Texas Dep't of Public Safety, *Driver License Fees*, https://www.dps.texas.gov/section/driver-
 license/driver-license-fees (last visited Oct. 16, 2023). .......................................... 18

U.S. CBP, *U.S. Border Patrol and Office of Field Operations Encounters FY2022*,
 https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified Oct.
 21, 2023) ........................................................................................................................ 5

**INTRODUCTION**

As Defendants explained, ECF 102, the Court should dismiss this case for lack of standing, lack of reviewability under the Administrative Procedure Act, and failure to state a claim upon which relief can be granted. Critically, Plaintiff State of Texas has not identified an injury sufficient to support standing. Undisputed evidence shows that, at the time of filing this brief, not a single noncitizen identifying a destination in Texas has received an asylum merits interview from USCIS or been granted asylum under *Procedures for Credible Fear Screening and Consideration of Asylum*, *Withholding of Removal and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18078 (Mar. 29, 2022) ("IFR"). Further, the number of noncitizen border encounters of noncitizens was *lower* in the months after the IFR took effect, undermining Texas' claim that the IFR incentivizes immigration, *and* the percentage of credible fear findings and the overall asylum grant rate have also not increased under the IFR, undermining Texas' allegations that the IFR will make it easier to obtain asylum. In response, Texas offers no factual support of its claim that the IFR has or will harm the state other than overall concerns with "illegal immigration." Texas does not show that the IFR has or is likely to increase the number of noncitizens both living in Texas *and* utilizing public services in Texas. Nor does it offer any evidence that any possible increase in noncitizens living in Texas would be due to the IFR; that the Court can redress Texas's alleged harm by enjoining or vacating the IFR; or that Texas falls into the zone of interests of the INA provisions under which the IFR was promulgated. Finally, Texas's Appointments Clause argument fails to state a claim because Texas has not plausibly alleged that there are no circumstances under which the IFR could be constitutionally applied. The Court should dismiss Texas's complaint.

## ARGUMENT

## I.    TEXAS LACKS ARTICLE III STANDING.

As Defendants explained, ECF 102 at 8-33, Texas has not produced evidence sufficient to establish standing. Defendants presented evidence challenging Texas's standing, placing the burden on Texas to show by a preponderance of the evidence that it has suffered or will imminently suffer an "injury in fact" "caused" by the IFR that a favorable decision would "redress." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992); *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Texas has not met its burden. Defendants address each of Texas's arguments in turn.

### A.  Texas's Speculation About Generic "Illegal Immigration" Fails to Establish an Injury in Fact from the IFR.

To satisfy the "injury-in-fact" requirement of Article III, Texas must identify an injury that is "concrete … particularized" and "actual or imminent"—not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560. Texas's alleged injury is not concrete, particularized, actual or imminent. Texas's theory of standing is based on an argument that the IFR was likely to increase the number of noncitizens obtaining asylum, or being paroled pending consideration of their credible fear claims, which would increase the number of noncitizens in the State and thus increase the State's costs. *See* ECF 1 at ¶¶ 52-60. But Texas has failed to establish both essential pieces of this theory: that the IFR has caused a greater number of asylum seekers to move to Texas *and* that those noncitizens are using the identified state services at a cost to Texas.[1]

---

[1] Contrary to Texas's claim, ECF 105 at 14, Defendants have and continue to dispute that the mere presence of more noncitizens in a state on its own could constitute a sufficient Article III injury. ECF 102 at 10 n.4 (citing *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014) (A state "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources."), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).

Indeed, Texas admits that it "has not tied the IFR to increased migrants into Texas." ECF 105 at 14. This recognition should decide the matter. Texas further acknowledges "that the IFR does not specifically name Texas as a location where the new asylum rule will be applied." *Id.* On this point, however, Texas argues that Defendants cannot "write a rule that specifically excludes Texas and effectively claim that this careful drafting avoids Defendants' responsibility for any subsequent injury to Texas." *Id.* at 14-15. This contention is wrong. First, the IFR does not "specifically exclude[] Texas." The IFR does not single Texas out but rather has been applied for the asylum merits interviews for *only* those noncitizens whose intended destination is "Arlington [Virginia], Boston, Chicago, Los Angeles, Miami, New Orleans, New York, Newark, and San Francisco." ECF 102 at 6; 102-1. Second, Texas undeniably has not *shown* "any subsequent injury" from the IFR. ECF 105 at 14 ("Texas has not tied the IFR to increased migrants into Texas.").

**B. Facts At the Time of Filing the Complaint Defeat Texas's Standing.**

Texas does nothing to counter Defendants' evidence that, contrary to Texas's initial speculation, border encounters decreased after the IFR went into effect, not to mention there have been no asylum merits interviews for individuals headed to Texas and asylum grant rates have not increased as a result. *See id.* at 15-17. Texas merely argues that evidence that the IFR has not harmed the State is impermissibly *post hoc* to the filing of the complaint for standing purposes, and the evidence available at that time demonstrates its standing. *Id.* However, even focusing only on facts available as of April 28, 2022, ECF 1, Texas still fails to to demonstrate injury in fact.[2]

---

[2] Texas concedes that the post-filing evidence showing the IFR has in fact defied its conjecture and not led to increased migration, asylum grant rates, or noncitizens entering its State "could be relevant to mootness." ECF 105 at 15. Mootness is relevant only if a plaintiff establishes standing initially, which Texas has not. Regardless, mootness has been described as "'the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Center for Individual Freedom v. Carmouche,* 449 F.3d 655, 661 (5th Cir. 2006) (quoting *U.S. Parole Comm'n v.*

Texas concedes that its suit was not based on any realized injury, but "on the expectation that a streamlined asylum procedure with a lower procedural bar to entry would create additional migrant flows into Texas." ECF 105 at 16. To satisfy Article III, such a prospective "threatened injury must be *certainly impending* to constitute injury in fact," and "[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis added). At the very least, there "must be at least a 'substantial risk' that the injury will occur." *Attala Cnty., Mississippi Branch of NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). There is no such substantial risk, and injury is not certainly impending, where injury is merely "conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Texas proffers no evidence contemporaneous to its filing suit that the likelihood of the IFR increasing asylum-seeking noncitizens in Texas accruing costs from using state services was "certainly impending" or "substantial." Indeed, the information available at that time demonstrated the opposite, that the IFR was not

> [E]xpect[ed] to encourage or cause an increase in the number of individuals seeking asylum in the United States . . . . To the contrary, by reducing the amount of time a noncitizen can expect to remain in the United States with a pending asylum claim that originated in credible fear screening, the rule dramatically reduces a critical incentive for noncitizens not in need of protection to exploit the system.

87 Fed. Reg. at 18192; *see also id.* at 18111 ("By limiting the amount of time a noncitizen may remain in the United States while a claim for relief or protection is pending, the rule stands to dramatically reduce potential incentives for noncitizens to make false claims for relief and

---

*Geraghty*, 445 U.S. 388, 397 (1980)). Thus, "any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Id.* Because the evidence shows that IFR has not contributed to more noncitizens entering the United States and living in Texas while seeking asylum and using state-subsidized services, Texas lacks an ongoing personal interest in this suit and the case may be dismissed as moot as well.

4

protection."). Indeed, to meet its evidentiary burden of showing injury by a preponderance of the evidence in response to Defendants' factual attack on its standing, *see Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981), Texas relies on alleged implications from the testimony of Defendants' expert, Dr. Michael A. Clemens, and Dr. Clemens' reference to border-encounter statistics that (contrary to Texas's own position that post-hoc data is irrelevant) post-dated the filing of its complaint. ECF 105 at 15-16. Setting aside that both the expert's report and the data he relies on post-date the complaint and are therefore irrelevant, his testimony and underlying data actually undermine Texas's position.

Texas claims Dr. Clemens' report supports the proposition that "it is reasonable to expect that changes to asylum procedure could have an impact on broader migration behavior." ECF 105 at 16. But Texas quotes him out of context. While Dr. Clemens held out the theoretical "possibility that changes to asylum procedure or processing can be a necessary element of a larger bundle of policies that, together, are sufficient to cause substantial changes in migration behavior," he found, in the concrete circumstances present here, that is "no evidence that the Asylum Processing IFR, by itself, was sufficient to substantially affect overall CBP encounters at the Southwest Border." ECF 102-3 at 3. And the underlying CBP data on border encounters that Texas cites shows that encounters decreased after the IFR went into effect. *Id.* at 4-5; U.S. CBP, "U.S. Border Patrol and Office of Field Operations Encounters FY2022," https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified Oct. 21, 2023) (showing lower figures for border encounters after the IFR took effect in June 2022).

While later than the Complaint, Dr. Clemens' findings and the CBP data showing that the IFR did not increase migration confirm the IFR's *pre-filing* explanation of how the rule would disincentivize migration by noncitizens without meritorious claims. This evidence, when

considered along with the lack of pre-filing evidence showing any, let alone a "substantial," likelihood that the IFR would increase migration, underscores that there *was no evidentiary basis* at all for Texas's prediction of harm when it sued. Texas relied on pure conjecture and fails to meet its burden of proffering evidence establishing that harm from the IFR was "certainly impending."

**C. The IFR Did Not Increase Noncitizens Migrating into Texas.**

Texas next argues that prospective injury can suffice and the IFR could increase the number of noncitizens in Texas. ECF 105 at 17-23. But a prospective injury can support standing only where evidence shows that, when the plaintiff filed its complaint, such injury was "certainly impending" and "substantial[ly]" likely. *Clapper*, 568 U.S. at 409. As explained, Texas lacks any such evidence. Instead, Texas's allegations of prospective injury rest on pure speculation.

To compensate for its lack of evidence showing impending injury *ab initio*, Texas points to *post hoc* CBP border-encounter data, which it claims, when isolated to just Border Patrol Sectors in the Texas portion of the Southwest, "demonstrates that there was an uptick in overall U.S. Customs and Border Protection encounters in Texas in the months following the rule." ECF 105 at 15. However, the data for Texas sectors shows a decrease in encounters across the board when one compares the data for May 2022 (the month leading up to the IFR taking effect on May 31, 2022) with encounter data a year later in May 2023. Pls' App'x 366. Texas offers no contrary evidence that any alleged increase in encounters (which Dr. Clemens did not find to have increased, ECF No. 102-3 at 3) in border sectors along the Texas border translated into an increase in the number of noncitizens living in *and* using public services in its State, or any evidence that State costs for those services increased during that period. Regardless of whether the IFR increased migration to the border—and as the data shows and Defendants' expert found, the IFR did not, ECF 102-3 at 3—statistics concerning migration to the Texas border are insufficient to establish

standing, especially absent evidence that any noncitizens apprehended at the border settled in Texas and caused an increase in public costs. Texas points to no cases finding an injury in fact based solely on increased migration to the United States. The cases finding standing in comparable suits in the Fifth Circuit (which Defendants maintain did so erroneously) required at least a demonstration that the challenged action had led to more noncitizens living in the State itself *and* increasing costs to the State. ECF 102 at 9-10 (explaining standing findings in *Texas v. United States*, 809 F.3d 134, 152-155 (5th Cir. 2015) ("DAPA"); *Texas v. Biden*, 20 F.4th 928, 970-72 (5th Cir. 2021), *rev'd and remanded*, 142 S. Ct. 2528 (2022) ("MPP"); *Texas v. United States*, 50 F.4th 498, 520 (5th Cir. 2022) ("DACA")). Indeed, Texas acknowledges that an increase in migration to a State must also "cause[] the State government to allocate more resources to caring for that population" in order to even possibly constitute an injury. ECF 105 at 18.

Texas further contends that Dr. Clemens' finding that the IFR did not increase migration has reduced probative value because, Texas claims: migration can be affected by seasonal fluctuations, Dr. Clemens' analysis was skewed by the Hispanic/Latino unemployment rate, he did not look solely at migration to Texas border sectors, and he "analyzed [the IFR] on its own, but were it analyzed in conjunction with a bundle of other policies, the result might be different." ECF 105 at 19. But Dr. Clemens' analysis controlled for seasonal migration patterns and the influence of unemployment. ECF 102-3 at 9. And the data does not show an increase in migration to the Southwest border in Texas, much less more noncitizens moving into Texas, as explained. Finally, the impact of other policies on the IFR's effect on migration is irrelevant to Texas's standing. Texas is challenging *only* the IFR here, not the IFR combined with a "bundle of other policies," and it is that discrete agency action that Texas must trace to some evidence of concrete injury to establish standing. *See Lujan*, 497 U.S. at 891 ("[R]espondent cannot seek wholesale improvement

of this program by court decree … [but] must direct its attack against some particular 'agency action' that causes it harm."); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("The limitation to discrete agency action precludes … [a] broad programmatic attack[.]").

Further, Texas offers nothing to rebut the evidence Defendants presented that credible fear and asylum grant rates have not increased under the IFR, precluding an argument that the IFR is increasing the number of noncitizens who will be living in Texas while they seek or after they obtain asylum. *See* ECF 102 at 13-14. Rather, in response, Texas first argues that regardless of the asylum grant rate, "the IFR will incentivize immigrants to enter the United States at any port of entry and increase the number of unlawful immigrants in the United States and Texas." ECF 105 at 20. However, as demonstrated by Dr. Clemens' report and the underlying border data he relies on, that did not happen, and Texas offers no evidence showing it was likely to happen as of the filing of its complaint. Second, Texas argues that "grant rates are irrelevant" because even noncitizens denied asylum "will simply continue to remain in the United States—paroled—either because their removal has been withheld or because, as the Government admits, it lacks the resources to remove more than a small fraction of the removable population." ECF No. 105 at 20. Texas cites a DHS Memorandum, Pls. App'x 195-215, for its assertion that noncitizens denied asylum under the IFR will not be removed, but that Memorandum indicates the opposite: it notes that the Government has pursued as a removal priority the very noncitizens who would be subject to the IFR. *Id.* 203 (noting Memo identified as a removal priority "Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November l, 2020, or who were not physically present … before November 1, 2020.").

Texas contends it "is not required to trace specific asylum grants under the IFR to specific migrants paroled in Texas." ECF 105 at 20. But the lack of need to identify specific asylees living

8

in Texas does not relieve it of is burden to establish by a preponderance of the evidence that the IFR has or will increase the number of individuals in the State using its services. *See Lujan*, 504 U.S. at 561 (stating "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"); *Paterson*, 644 F.2d at 523 (standard is preponderance for factual attack on jurisdiction). Texas has not proffered *any* actual evidence of harm. It instead argues, relying on refugee and general asylum grant statistics, that current Presidential policy is encouraging migration and more asylum applications. ECF 105 at 20-21. This assertion is a red herring: even if true, it would not establish increased costs to Texas from the IFR and is irrelevant to its standing bid. The IFR does not address refugees and they are not at issue in this case. Regardless of asylum statistics in other contexts, Texas here is challenging the IFR, and the undisputed evidence shows that asylum grant rates have not increased under the IFR.[3]

Texas argues, however, that the statistics showing no increase in positive credible fear findings or asylum grant rate under the IFR "tell only one piece of the story" because overall national statistics indicate that the number of asylum cases increased from 2021 to 2022 and "Texas's argument has never been limited to the IFR itself" but challenges an alleged, projected increase in overall migration. ECF 105 at 21-22. As explained, however, Texas cannot challenge the Government's strategy for dealing with migration wholesale and must show an injury specifically from the IFR to establish traceability, which it has not done. *See Lujan*, 497 U.S. at 891; *Norton*, 542 U.S. at 64. Further, the data Texas relies on shows neither an overall increase in asylum cases nor does it attribute any change to the IFR—it only shows that USCIS asylum officers

---

[3] Texas repeatedly asserts that it has "alleged" sufficient facts to show it faced a substantial risk of injury when it filed suit. ECF 105 at 21. However, mere allegations are insufficient to meet its burden in this factual attack on jurisdiction, which accounts for jurisdictional discovery. *See Paterson*, 644 F.2d at 523. Texas must proffer evidence showing it faces injury from the IFR and establish that fact by a preponderance of the evidence, which it has not done. *See id.*

(as opposed to IJs) started handling more asylum cases, and primarily because "USCIS now is experiencing a significant surge in asylum applications filed by nationals of Cuba and Venezuela, both of which are currently experiencing documented humanitarian crises catalyzing increased emigration from those countries." Pls. App'x 388-89. And none of this data shows *the IFR* has increased asylum requests or counters the evidence Defendants presented showing that asylum grant rates have not increased under the IFR and that the IFR has reduced the time to obtain removal orders for noncitizens processed under it who lack meritorious asylum claims, creating a disincentive to illegal immigration. ECF 102 at 13-14; 87 Fed. Reg. at 18192.

Indeed, Texas admitted the latter–that decreasing processing times under the IFR reduces any incentive to file nonmeritorious asylum claims in order to gain parole into the United States. ECF 102 at 15; ECF 105 at 22. Texas argues that the Court can nonetheless take notice of government statistics. However, Texas's admission is binding and establishes that reduced processing times under the IFR disincentivize nonmeritorious asylum seekers. *See In re Carney*, 258 F.3d 415, 419 (5th Cir. 2001) (noting "[a]ny matter admitted ... is conclusively established unless the court on motion permits withdrawal or amendment of the admission" (quoting Fed. R. Civ. Proc. 36(b)). And in any event, the government statistics Texas cites do not establish that the IFR, rather than other international factors, caused an increase in the number of asylum applications overall, or that asylum grant rates have increased under the IFR.

Ultimately, Texas's asserted injury-in-fact represents mere speculation, which is insufficient to meet Texas' burden to establish standing.

### D. Texas Fails to Show Traceability and Redressability.

Even if Texas had shown an injury from increased noncitizens accruing costs for the State, Texas still could not show it is traceable to the IFR, because (1) Texas concedes it cannot trace

expenditures on noncitizens to those processed under the IFR, (2) any use of state-subsidized services is a result of independent third-party decisions, *i.e.*, that of the individual noncitizens, and (3) Texas's alleged costs are indirect and too attenuated from the IFR. ECF 102 at 17-20.

Texas responds that it need only offer allegations supporting inferences of traceability because this case is at the pleading stage. ECF 105 at 24 (citing *GLO v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023)). However, as explained, the Court may not assume the truth of speculative allegations on a motion to dismiss that levies a *factual* attack on standing, such as here. *See Paterson*, 644 F.2d at 523.[4] Texas must proffer evidence to overcome the contrary evidence Defendants have provided and establish the truth of its allegations regarding traceability (and everything else) by a preponderance of the evidence, which it has failed to do. *Id.*

Texas contends the IFR has resulted in more grants of asylum, more grants of parole, and more illegal immigration, each of which has caused or will cause Texas to spend money. ECF 105 at 23-25. But Texas's contentions are unsupported by the evidence. As explained by Dr. Clemens and the relevant statistics, neither border encounters, positive credible fear findings, nor grants of asylum have increased under the IFR, nor was there any evidentiary basis to conclude they likely would in the future based on the IFR. *Supra* pp. 5-6. Further, Texas concedes that it has no evidence noncitizens processed under the IFR have caused it to incur expenses *and* that it lacks any tracking mechanism for ascertaining whether such noncitizens will do so in the future. ECF 105 at 23.

Texas responds by arguing that it "does not have to connect the IFR to individual illegal immigrants in Texas using its services." ECF 105 at 24. But this is a strawman. Defendants have not suggested that Texas must connect its alleged costs to *individually named* noncitizens affected

---

[4] *GLO* is inapposite. There, the government did not raise a factual attack on standing but rather moved to dismiss based only on the State's allegations. *See GLO*, 71 F.4th at 272.

by the IFR. Rather, Texas must show an increase in its expenses attributable to the IFR in general, *see Lujan*, 504 U.S. at 560, which it also has not done. Texas's reliance on the MPP case on this point is unavailing. In the cited passage, the Fifth Circuit was not saying Texas required no evidence connecting its injury to the termination of MPP, only that it need not establish with a certainty that a parolee applying for a driver's license in Texas would not have been paroled but-for the termination of MPP. ECF 105 at 24-25 (citing *MPP*, 20 F.4th at 971). There, the Court indicated that Texas had provided sufficient "big-picture evidence" to establish causation even without "highly specific individualized documents." *Id.* That is, the district court found after trial that Texas had proffered sufficient evidence to establish "MPP's termination has increased the number of immigrants paroled into Texas." 20 F.4th at 970. Here, Texas proffers no such "big-picture evidence" showing by a preponderance of the evidence that the IFR has increased, or is likely to increase, the number of asylees or parolees in Texas.[5]

On this point, Texas argues that individuals generally released on parole pending credible fear screening or asylum adjudications under the IFR will likely live for some period in Texas. Its only support for this is its *ipse dixit* that "Texas is a top destination for immigrants." ECF 105 at 24, 25. This bald assertion is insufficient to carry Texas's evidentiary burden, especially when measured against the *evidence* Defendants have supplied that the asylum merits interviews the IFR sets up are being conducted only for certain noncitizens with intended destinations outside Texas, and that the IFR is decreasing asylum processing times and facilitating quicker removal of noncitizens without valid claims (thus eliminating or reducing the time they would spend living in *any* State).

---

[5] Texas cites the *Florida v. Mayorkas* case, but that case is similarly inapposite because there was evidence demonstrating Parole ATD parolees were present in Florida. No. 3:23-cv-9962, 2023 WL 3398099, at *5 (N.D. Fla. May 11, 2023).

Finally, even if Texas had shown more asylum grants, more parole grants, or more undocumented migration—none of which is supported by the data—Texas still has not shown that such noncitizens are using State resources in a manner to generate increased net costs to the State. Indeed, Texas does not present any such data. *See generally* ECF 105. Texas must provide such evidence, even if in "big picture" as opposed to individualized form, to causally connect any alleged injury to the presence of additional noncitizens in Texas, and provide evidence the injury is caused by the IFR rather than some other factor. *See Lujan*, 504 U.S. at 560; *Norton*, 542 U.S. at 64; *MPP*, 20 F.4th at 971.

Texas also fails to provide evidence to establish redressability. Enjoining or vacating the IFR would not redress any injury to Texas because doing so would merely shift asylum cases back to immigration judges (IJs). And the evidence shows IJs were granting asylum *at a higher rate* than USCIS asylum officers post-IFR, and were taking longer to deny non-meritorious claims, allowing noncitizens with such claims to remain in the United States for longer. ECF 102 at 20-22. Enjoining or vacating the IFR would only *exacerbate* Texas's alleged injury because the IFR permits DHS to process and remove noncitizens lacking valid asylum claims more quickly. *Id.*

In response, Texas first argues that redress need only reduce its harm and need not provide complete relief. ECF 105 at 25-26. But Texas has not shown that it is harmed by the IFR at all. Texas claims it "is injured by Defendants' policies that make it easier for unlawful immigrants to enter Texas than Congressional statutes allow, and its injury will be redressed by a court decision that makes Defendants return to adhering to those statutes." *Id.* at 26. However, the evidence precludes Texas's theory of redress because the IFR: does not "make it easier" to enter Texas, but deters and disincentivizes irregular migration and has not increased the asylum grant rate. Texas further argues that enjoining the IFR "would force asylum officers to apply the commands of 8

13

U.S.C. § 1182(d)(5) and to grant parole 'only on a case-by-case basis.'" ECF 105 at 26. However, the IFR does not alter the section 1182(d)(5)(A) standard for granting parole on a case-by-case basis, which DHS officers would apply to determine parole even absent the IFR.

## II.  Texas Has Not Established a Legally Cognizable Injury.

Even if Texas could establish that it incurred monetary costs from the IFR, its claims of injury are not cognizable. ECF 102 at 22-30. Contingent injuries, especially those arising from the impact of regulations on third parties, have rarely been recognized as satisfying the case and controversies requirement for federal court jurisdiction. *Id*. at 22; *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022). Federal policies routinely create downstream, indirect costs, and the Supreme Court has recently cautioned against recognition of such injuries for purposes of standing. *United States v. Texas* ("*Priorities*"), 143 S. Ct. 1964, 1972 n.3 (2023). This caution is particularly acute where a state challenges either grants of asylum to third parties or the parole of third parties under the INA, disputes which courts traditionally have not adjudicated. ECF 102 at 23, 29.

Texas argues, however, that its alleged injuries remain legally cognizable following the Supreme Court's decision in *Priorities*, which held that Texas's allegations of indirect financial harm were insufficient to challenge the guidance at issue in that case. ECF 105 at 26-35. Texas contends the holding of *Priorities* was narrow and has no application outside challenges to Executive arrest and prosecution policies. *Id*. at 17-18. But *Priorities* was not so limited.

This case implicates the same concerns as those reflected in the Supreme Court's decision in *Priorities*. For example, the Supreme Court stated that, in assessing standing, courts must examine "history and tradition" to guide the determination of whether a case is one that Article III has traditionally empowered federal courts to consider. *Priorities*, 143 S. Ct. at 1970. Texas has not identified any history or tradition of courts finding attenuated theories of harm based on

14

indirect financial costs allegedly caused by changes in asylum processing and expedited-removal procedures to satisfy Article III. ECF 102 at 22-26. This case thus falls within a long line of precedent holding that a plaintiff bears a high burden to establish concrete harm when it is not directly regulated by a policy but rather asserts only indirect harm. *Id*. at 25-27. Texas argues that *Priorities* stands only for the proposition that indirect costs are insufficient to establish Article III standing if they result from the government's failure to arrest certain noncitizens. ECF 105 at 28-29. But *Priorities* followed a long line of Supreme Court decisions holding States generally face a substantially harder burden to show standing when they are not directly regulated by the challenged policy and any allegations of costs are thus indirect. *See* ECF 284 at 14-17. And even if *Priorities* itself was limited to arrest and prosecution policies, it reaffirmed this general principle from cases that did not involve arrest and prosecution policies and called into question the viability of standing arguments based on attenuated indirect costs, such as Texas advances. *Id*.

Texas argues that this case is more like *GLO v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) than *Priorities*. ECF 105 at 29-30. Texas claims "in *GLO*, Texas alleged that border barriers reduce illegal entry" and here "Texas argues that the statutory border barrier (*i.e.,* the asylum process) does the same thing." *Id.* at 30. But this argument fails in several respects. First, Texas's "statutory border barrier" phrase is a semantic conceit; there is a substantial difference in form and effect between an actual wall built on Texas's border physically preventing entry and an immigration processing rule that allegedly incentivizes more asylum claims. (Moreover, as explained, the IFR actually disincentivizes meritless asylum applications.) Second, *GLO* is inapposite because the government did not raise a factual attack on standing at the pleadings stage, as Defendants have here. *See supra* note 4. Third, as explained, *GLO* predates *Priorities*, which calls into serious question *GLO*'s standing analysis. ECF 102 at 26-27.

Texas also relies on *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which Texas claims found injury based on indirect costs. ECF 105 at 30. The injury in *Dep't of Commerce* was much more direct than Plaintiff's alleged costs here: it was based on evidence that a change in the census would undercount a state's population and lead *directly* to a loss of federal funds which are based on population. 139 S. Ct. at 2565. In contrast, the IFR does not affect Texas in any way that would cause a direct loss of revenue. Rather, Texas claims an indirect injury that would happen only if several independent, contingent (and counterfactual) acts were to coincide: the IFR would have to encourage more immigration by noncitizens, who would gain relief under the IFR they otherwise would not receive, and who then would decide to settle in Texas and to utilize state subsidized services. This theory of injury is far more attenuated and indirect than the basis for standing in *Dep't of Commerce* and involves exactly the same types of alleged injuries the Supreme Court found to be "attenuated" and "indirect" in *Priorities*. 143 S. Ct. 1972 n.3.

Texas next argues that certain "exceptions articulated by the Supreme Court would apply even if" *Priorities* applied here. ECF 105 at 31. *Priorities*, however, did not hold that there were exceptions to its holding, but rather that certain factors might affect the standing analysis in "cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions," and reserved resolution of those questions for another day. 143 S. Ct. at 1973. Because Texas argues that this case does not involve arrest policies, it has no basis to invoke the factors the Supreme Court said might "arguably" be relevant in challenges to such policies. *Id*. In any event, even if such factors are relevant here, they do not change the standing analysis.

Texas first argues that the IFR's processes provide legal benefits, a distinction the Supreme Court suggested "could lead to a different standing analysis." ECF 105 at 31 (quoting 143 S. Ct. at 1974). Plaintiff cites the DACA case as an example of a policy that included "provision of

16

benefits even though that agency action did not itself supply those benefits." *Id.* (citing *DHS v. Regents of Univ. of California*, 140 S. Ct. 1891, 1902 (2020)). In *Regents*, however, the Supreme Court noted that "[t]he Government acknowledges that '[d]eferred action coupled with the associated benefits are the two legs upon which the DACA policy stands.'" 140 S. Ct. at 1913. Texas argues that the same is true here, because parole also provides eligibility for certain benefits. ECF 105 at 32. However, as Texas concedes, any benefits for parolees are conferred by and traceable to statutes enacted by Congress, not the IFR. ECF 105 at 32.[6] The IFR itself does not provide benefits to noncitizens.

Texas also asserts that injuries from agency actions that allegedly make noncitizens eligible for benefits are "direct" injuries. ECF 105 at 33-34. But to make this argument, Texas relies on decisions from the DACA case, which are distinguishable for the reasons noted above. Plaintiff also cites the Supreme Court's discussion of direct injuries in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). ECF 105 at 33-34. But that case dealt with a policy that would cause a direct financial loss to a state entity created to administer federal student loans (and thereby gain revenue), unlike the contingent, attenuated theory of loss that Texas claims as its injury here. *See* ECF 102 at 25. Although Texas argues that the harm in *Nebraska* is similar to its allegations of harm related to driver's licenses, ECF 105 at 34, its theory of harm really is the same indirect theory addressed in *Priorities*—that immigration policy will affect the number of individuals in Texas, who in turn may impose costs on the State. As explained, Plaintiff faces a high burden to prove harm based on

---

[6] Notably, Texas does not state that it incurs any economic loss from the provision of these federal-law benefits. ECF 105 at 32.

such an indirect theory, and its allegations of harm also fail because Texas *makes money* from issuing driver's licenses to noncitizens.[7]

Next, Texas argues that *Priorities* is distinguishable based on the Supreme Court's statement that the standing analysis might be different if an agency "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." ECF 105 at 34-35 (citing 143 S. Ct. at 1973-74). Texas argues the Court should find standing here based on its argument that the IFR violates 8 U.S.C. §§ 1225(a), 1225(b), and 1229a because it allows an asylum officer, rather than an immigration judge, to make determinations on asylum and withholding of removal for those noncitizens who establish a credible fear. ECF 105 at 35. But the IFR does not permit asylum officers to grant withholding of removal, 87 Fed. Reg. 18086 ("The asylum officer will not issue an order of removal … nor issue a final decision on an applicant's request for statutory withholding of removal or CAT protection."), and DHS has no "statutory responsibilit[y]" under the cited provisions to assign the

---

[7] Texas speculates that if the demand for driver's licenses increases by tens of thousands of individuals, it will have to build new facilities and hire more staff. Pls' App'x 170-72. But Texas has not provided any evidence showing that any current or anticipated increased expenditures on drivers' licenses have actually required the State to build, or even plan to build, any new facilities or hire any additional staff. *See id.* And there have been a much smaller number of asylum merits interviews under the IFR, and all in states other than Texas. *See* ECF 105 at 21 (conceding the statistics showed only 759 asylum cases under the IFR). Further, Texas's costs for verification of lawful-presence status, social security and eligibility are a total of $0.35 for one limited-term driver's license for most applicants, and an absolute maximum of less than $0.88 for a small percentage of applicants. *Id.* at 170-71. The costs for card production for one limited term driver's license is $2.70. *See id.* at 171 ¶ 9 ($540,000.00 annually for card production divided by 200,000 applicants). Combining the costs for verification and production of limited term driver's licenses, each license costs Texas between $3.05 and $3.58, *see id.* at 170-71, approximately one tenth of the $33 Texas charges for each limited term driver's license. *See* Texas Dep't of Public Safety, *Driver License Fees*, https://www.dps.texas.gov/section/driver-license/driver-license-fees (last visited Oct. 16, 2023). These types of offsets must be considered in determining whether Texas has suffered an Article III injury. *See Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015) (citing *Henderson v. Stalder*, 287 F.3d 374, 379-81 (5th Cir. 2002)).

referenced asylum determinations to immigration judges. Indeed, sections 1225(a) and (b) authorize these functions for "immigration officers," a broader category than "immigration judges" that covers asylum officers, *see* 8 U.S.C. § 1101(a)(18) (defining the term "immigration officer"), and section 1229a is irrelevant because the IFR does not permit asylum officers to conduct removal proceedings, *see* 87 Fed. Reg. 18086. Texas also argues that DHS has abdicated its responsibilities because it is not complying with the parole statute, 8 U.S.C. § 1182(d)(5)(A). ECF 105 at 35. But Texas makes no attempt to explain its basis for asserting that parole decisions are not being made on a case-by-case basis, let alone to demonstrate that DHS has adopted a "general policy" that conflicts with the parole statute. Nor does Texas trace this argument to any harm established through jurisdictional discovery or even explain how it can show standing on this basis. The evidence produced during jurisdictional discovery shows that the IFR facilitates the faster removal of noncitizens lacking valid claims for relief, reducing the time such noncitizens are released in the United States, and that it has not resulted in a higher grant rate of asylum applications: this is not the abdication of duty at all, much less a source of harm to Texas.

Plaintiff's sole argument that the IFR violates the section 1182(d)(5)(A) standard is that "the IFR provides that aliens who do not present a threat or flight risk should be paroled." ECF 105 at 35. This is not what the IFR provides. Rather, it provides that, on a case-by-case basis, a DHS officer's determination "that the continued detention of a noncitizen who has been found not to be a flight risk or a danger to the community is not in the public interest" may, based on the circumstances, meet the urgent humanitarian reasons or significant public benefit standard of section 1182(d)(5)(A). 87 Fed. Reg. at 18108 (citing 8 C.F.R. § 212.5(b)(5). As noted, this passage merely reflects the language in 8 C.F.R. § 212.5(b)(5) providing circumstances where parole under section 1182(d)(5)(A) would be appropriate, a longstanding regulation Texas does not challenge

19

here. Moreover, the IFR repeatedly states that decisions regarding parole must be made on a case-by-case basis in compliance with the parole statute. 87 Fed. Reg. at 18108. In short, Texas merely speculates that the IFR might have some indirect effect on State costs; it has provided no evidence of any such harm. And "[p]erceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997).

### III. Texas Is Not Entitled to Special Solicitude.

As Texas acknowledges, even where special solicitude has been applied, it is relevant only to a plaintiff's burden to establish redressability. ECF 105 at 35. Texas does not argue that special solicitude relieves a plaintiff of the burden to prove a concrete injury traceable to the challenged action. Because Texas has not done that, *supra* pp. 7-20, special solicitude has no bearing on the standing analysis in this case. *See* ECF 102 at 30-33.

Even if special solicitude could make a difference in this case, Texas lacks the prerequisites to invoke it. First, Texas cannot show a particular procedural right like the one in the Clean Air Act that the Supreme Court identified as a critical aspect of its holding in *Massachusetts v. EPA,* 549 U.S. 497, 522 (2007). *See* ECF 102 at 32-33. Texas argues that raising an APA claim is sufficient, *see* ECF 105 at 36, but the Supreme Court has never held that an APA claim alone is sufficient to satisfy this requirement, *see* ECF 102 at 31 & n.10. Nor has Texas shown that the IFR affects Texas's quasi-sovereign interests. *See* ECF 102 at 33. Texas argues that because the DACA decision provided that "a quasi-sovereign interest could arise based on 'federal preemption of state law,'" the IFR implicates Texas's quasi-sovereign interests because it "has no power to reclassify unlawful immigrants within its borders." ECF 105 at 37. But Texas's argument is missing several critical steps. Texas does not state what law it wishes to pass, how it proposes to reclassify

immigrants within its borders, and how the IFR itself preempts the passage of such proposed laws. Special solicitude therefore has no bearing on the outcome of the standing analysis in this case.

### III. Texas Is Not in the Zone of Interests.

Texas cannot obtain APA review because it is not in the zone of interests of the statutes under which the IFR was enacted. ECF 102 at 33-34. In opposition, Texas cites the *MPP* decision, ECF 105 at 29 (citing *Texas*, 20 F.4th at 975-76), but prior precedent shows that the Court in *MPP* was wrong—just as Texas is here. The zone of interests "is to be determined not by reference to the overall purpose of the Act in question … but by reference to the *particular provision of law* upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (emphasis added). In *Priorities*, the Supreme Court reaffirmed that non-regulated parties have no cognizable interest in how the INA is enforced against others. *Priorities*, 143 S. Ct. at 1970-72. Although *Priorities* focused on Article III standing, the principles the Supreme Court articulated are also relevant to the zone-of-interests inquiry, especially where Congress has given no indication that the type of harms Texas alleges here are "legally cognizable injuries redressable by a federal court." *Priorities*, 143 S. Ct. at 1973.

Finally, Texas's argument that it is in the zone of interests fails on its own terms. Texas argues "Texas's interests in not 'spending millions of dollars to subsidize' illegal aliens are within the zone of interests protected by the INA." ECF 105 at 40. But Texas has proffered evidence that it has or is likely to incur any net costs as a result of the IFR, let alone "millions of dollars."

### V.      Texas Fails To State a Claim that the IFR Violates the Appointments Clause.

Texas fails to state a claim that the IFR facially violates the Appointments Clause. Texas does not dispute that nothing in the IFR precludes the Secretary of Homeland Security from appointing asylum officers. ECF 102 at 39. Nor does it dispute that the Secretary is plainly

authorized to make such appointments under DHS's organic statute. *See id.* Its failure to do so resolves this claim in Defendant's favor. Texas tries to salvage its facial challenge by arguing that the asylum officers making relevant decisions under the IFR cannot be validly appointed as officers of the United States because they hold career positions. ECF 105 at 41-42. Texas cites no authority for this assertion. As the government has explained, career status is not incompatible with inferior officer status. ECF 102 at 40 (citing *United States v. Arthrex*, 141 S. Ct. 1970, 1987 (2021)). In *Lucia*, the Supreme Court held that SEC administrative law judges (ALJs) holding career positions are officers, and that the constitutional infirmity of the adjudication at issue in that case could be cured by a new hearing before a "properly appointed" ALJ—still a career civil servant. *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018); *cf.* 5 U.S.C. § 7521 (setting forth career civil service protections for administrative law judges).

In suggesting that career asylum officers by definition are "not properly appointed," ECF 105 at 41, Texas relies on a semantic argument: Because "asylum officers" are referred to in the U.S. Code as "employees," and because Appointments Clause cases draw a contrast between "Officers" and "employees," asylum officers cannot be appointed as officers of the United States. *Id.* at 42. But Texas cites no case that would support that proposition; indeed, its own citations contradict it. For example, in *Buckley v. Valeo*, the Supreme Court observed that the term "'Officers of the United States' does not include all employees of the United States." 424 U.S. 1, 126 n.162 (1976). Similarly, *Lucia* described "Officers of the United States" as "a class of government officials distinct from *mere* employees." *Lucia*, 138 S. Ct. at 2049 (emphasis added). The Fifth Circuit, too, has recognized that "employees" and "Officers of the United States" are not mutually exclusive categories, distinguishing principal and inferior Officers from "non-Officer employees." *Burgess v. FDIC*, 871 F.3d 297, 300 (5th Cir. 2017). In sum, no statute or regulation—

let alone the IFR itself—precludes career asylum officers from being appointed by the Secretary consistent with any Appointments Clause requirements.[8]

Texas also suggests that the IFR violates the Appointments Clause because it "does not require any action from the Secretary" before asylum officers make grants of asylum under the IFR. ECF 105 at 42-43.  But this is merely to say that the IFR does not specify one way or the other whether asylum officers are or may be appointed by the Secretary.  A statute or regulation is not facially unconstitutional merely because its constitutional application requires some additional action by the government. *Cf. United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004) (rejecting argument that that the Federal Death Penalty Act was facially unconstitutional because nothing in the Act "requires prosecutors to charge aggravating factors in an indictment," as there was "nothing in that law inhibiting such a charge"). Texas's assertion that the Secretary's appointment of asylum officers "would be a cure for the IFR's constitutional defect, not a constitutionally licit application of the IFR" is similarly unavailing. ECF 105 at 43. Texas points to no facial "constitutional defect" in the IFR, which would require it to show that the IFR "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

Rather, turning the rule on its head, Texas suggests that the IFR must be deemed constitutionally defective—and any constitutional application of the IFR a mere "cure" for that defect—if its text does not preclude an unconstitutional application. ECF 105 at 42-43. But by this reasoning, any regulation that could be applied either constitutionally or unconstitutionally would

---

[8] Contrary to Texas's suggestion, the government has not conceded that "asylum officers would exercise the function of officers under the IFR," ECF 105 at 42, or that the IFR gives asylum officers the "power of officers," *id.* at 41.  Rather, *even if* asylum officers making the relevant decisions under the IFR were deemed to be acting as inferior officers, the IFR's challenged provisions can be constitutionally applied. ECF 102 at 40.

be facially *un*constitutional, a proposition directly contrary to controlling authority. The sole case Texas cites for this argument, *Edmond v. United States*, 520 U.S. 651 (1997), certainly offers no support: it did not involve a facial challenge to a statute or regulation, but rather a claim that certain convictions by courts-martial should be vacated because the presiding military judges lacked valid appointments. 520 U.S. at 655. Here, Texas is challenging neither any particular adjudication under the IFR nor any particular appointment by the Secretary.

Instead, because Texas challenges the IFR "as written," *Does #1-7 v. Abbott*, 345 F. Supp. 3d 763, 774 (N.D. Tex. 2018), *aff'd,* 945 F.3d 307 (5th Cir. 2019), its claim fails because it fails to plausibly allege that the IFR would violate the Appointments Clause in all its applications. *Wash. State Grange*, 552 U.S. at 449. Tacitly acknowledging this failing, Texas argues alternatively that the Court should decline to apply the applicable legal standard, asserting that it is not an "absolute requirement." ECF 105 at 43. But no authority supports Texas's suggestion that it should be relieved of its burden of showing that the IFR would violate the Appointments Clause in all its applications—not even the cases on which it relies. *United States v. Stevens* involved an alleged unconstitutional restriction on speech, and explained that the standard the Court invoked— "whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep'"—applied specifically to "a second type of facial challenge," brought "[i]n the First Amendment context." 559 U.S. 460, 473 (2010). Similarly, *Okpalobi v. Foster* involved a claim that a law "chill[ed] the exercise of a constitutional right," and the language cited by Texas specifically addressed statutes challenged for vagueness. 190 F.3d 337, 358 (5th Cir. 1999), *rev'd*, 244 F.3d 405 (5th Cir. 2001) (*en banc*).

24

Further, contrary to Texas's characterization, neither the Supreme Court nor the Fifth Circuit has suggested that a law's facial constitutionality depends on its "likely" applications. Opp. at 43, 44.  In *City of Los Angeles v. Patel*, the Supreme Court rejected the city's defense of an ordinance not because a constitutional application of the law was unlikely, but because the city's argument rested on scenarios involving conduct the law did not actually authorize or prohibit. 576 U.S. 409, 418-19 (2015).  And in *Center for Individual Freedom v. Carmouche*, the Fifth Circuit addressed not the substance of a facial constitutional challenge, but whether the plaintiff had standing to raise its First Amendment claim. 449 F.3d 655, 659-60 (5th Cir. 2006). Nowhere did the Circuit instruct that courts "should assess the constitutionality of new rules based on the likely set of circumstances." ECF 105 at 44. Regardless, Texas cites no authority, nor any well-pleaded allegations, supporting a conclusion that constitutional application of the IFR is not "likely." *Id.* at 43, 44.

Texas's footnoted suggestion that courts may alter their approach to facial challenges "according to the specifics of the statute or rule before them" is neither here nor there, Opp. at 43 n.18, as it identifies no reason why the default standard for facial constitutional challenges should not apply to the IFR in this case. That standard requires Texas to plausibly allege that no circumstances exist under which the IFR would be constitutionally valid. *Wash. State Grange*, 552 U.S. at 449. Because Texas has not done so, its Appointments Clause claim should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

## CONCLUSION

For these reasons, the Court should dismiss Plaintiff's case in its entirety.

25

Dated: November 6, 2023        Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

BRIAN C. WARD
*Senior Litigation Counsel*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ELISSA P. FUDIM
ERIN T. RYAN
*Trial Attorney*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

CHRISTOPHER HALL
*Assistant Branch Director*

/s/ *Elizabeth Tulis*
ELIZABETH TULIS
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 514-9237
elizabeth.tulis@usdoj.gov

26

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, I electronically filed this motion to dismiss with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice

27