UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS,

      *Plaintiff,*

v.

ALEJANDRO MAYORKAS, *et al.,*
      *Defendants.*

Case 2:22-cv-00094-Z

---

# TEXAS'S MEMORANDUM IN SUPPORT
# OF ITS MOTION FOR SUMMARY JUDGMENT

---

TABLE OF CONTENTS

Table of Contents .................................................................................................................ii

Table of Authorities .............................................................................................................iv

Introduction .......................................................................................................................... 1

Statement of Issues ............................................................................................................... 1

Background ........................................................................................................................... 1

Applicable Standard ............................................................................................................. 2

Argument ............................................................................................................................... 2

I.   The Asylum Officer Rule constitutes final agency action. ............................................ 2

II.  Texas has standing. ........................................................................................................ 4

     A.  Texas's harms are judicially cognizable injuries in fact.......................................... 4

         1.  Texas's injury in fact remains legally cognizable. .................................... 8

         2.  Even were the general rule in *Enforcement Priorities* to apply to this case, its
             exceptions would allow Texas's standing. ............................................11

     B.  Texas's injuries are traceable to the Asylum Officer Rule. ....................................... 13

     C.  Texas's injuries are redressable by this Court. ......................................................... 14

     D.  Texas is entitled to special solicitude in the standing inquiry. ................................ 14

III. Texas has a cause of action under the APA because its claims are within the zone of
     interests protected by the INA. .................................................................................... 16

IV. The Asylum Officer Rule is unlawful. .......................................................................... 17

     A.  The IFR is unlawful because it violates the Homeland Security Act and
         Immigration and Nationality Act. ........................................................................... 18

     B.  The IFR is unlawful because it violates the parole authority in
         8 U.S.C. § 1182(d)(5). .............................................................................................. 21

     C.  The IFR is unlawful because it violates the Appointments Clause of the U.S.
         Constitution. ............................................................................................................ 30

     D.  The IFR is unlawful because it is arbitrary and capricious, in violation of the
         Administrative Procedure Act ................................................................................. 36

         1.  Asylum Procedures.......................................................................... 37

         2.  The Parole Provision ....................................................................... 43

     E.  The IFR is unlawful because it was promulgated without adequate notice and
         opportunity to comment in violation of the APA...................................................... 45

         1.  The IFR is Not a Logical Outgrowth of the Proposed Rule. ................................ 45

        2.   The IFR Doesn't Adequately Address Comments on the Proposed Rule. .......... 46

V.  This Court should enjoin the implementation of the Asylum Officer Rule............................ 47

        A.  Texas succeeds on the merits. ..................................................................................... 47

        B.  Texas is suffering irreparable harm.............................................................................. 47

        C.  The balance of the equities and public interest favor Texas....................................... 48

        D.  Injunctive relief should apply throughout the nation. ................................................ 48

VI. This Court should vacate the challenged agency action. ...................................................... 49

Conclusion ........................................................................................................................................ 50

Certificate of Service....................................................................................................................... 52

TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton*,
  521 U.S. 203 (1997) ....................................................................................... 13

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ....................................................................... 52

*Amador v. Meeker*,
  No. 8:11-CV-1977, 2011 WL 4502092 (M.D. Fla. Sept. 28, 2011) ....................... 32

*Arizona v. Biden*,
  593 F. Supp. 3d 676 (S.D. Ohio 2022) ................................................................ 56

*Arizona v. United States*,
  567 U.S. 387 (2012) .................................................................................. 22, 48

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................... 3, 21

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ................................................................................... 15

*Braidwood Mgmt., Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) ......................................................................... 62

*BST Holdings, L.L.C. v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ........................................................................... 62

*Buckly v. Valeo*,
  424 U.S. 1 (1976) ........................................................................................... 39

*Buckly v. Valeo*,
  424 U.S. 1(1976) ............................................................................................ 39

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ......................................................................................... 2

*Central and South West Servs., Inc. v. EPA*,
  220 F.3d 683, 692 (5th Cir. 2000) .................................................................... 58

*Chamber of Commerce v. Whiting*,
  563 U.S. 582 (2011) ........................................................................................ 22

*Chocolate Mfrs. Ass'n v. Block*,
  755 F.2d 1098 (4th Cir. 1985) ......................................................................... 59

*Christensen v. Harris Cnty.*,
  529 U.S. 576 (2000) ........................................................................................ 26

*City of Los Angeles v. Patel*,
  576 U.S. 409 ................................................................................................... 44

*City of Los Angeles v. Patel,*
   576 U.S. 409 (2015) .................................................................................. 44, 45

*Clarke v. Commodity Futures Trading Comm'n,*
   74 F.4th 627 (5th Cir. 2023) ............................................................................ 3

*Cochran v. SEC,*
   20 F.4th 194 (5th Cir. 2021) .................................................................... 14, 20

*Cruz-Miguel v. Holder,*
   650 F.3d 189 (2d Cir. 2011) .................................................................... 28, 37

*Ctr. for Individual Freedom v. Carmouche,*
   449 F.3d 655 (5th Cir. 2006) ......................................................................... 44

*Data Mktg. P'ship, LP v. United States Dep't of Lab.,*
   45 F.4th 846 (5th Cir. 2022) ............................................................................ 3

*Dennis Melancon, Inc. v. City of New Orleans,*
   703 F.3d 262 (5th Cir. 2012) ......................................................................... 61

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ...................................................................... 13, 21, 53

*DHS v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891 (2020) ...........................................................14, 15, 16, 49

*DHS v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891(2020) .................................................................................... 51

*Dillmon v. Nat'l Transp. Safety Bd.,*
   588 F.3d 1085 (D.C. Cir. 2009) .................................................................... 52

*Duke Power Co. v. Carolina Env't Study Grp., Inc.,*
   438 U.S. 59 (1978) ........................................................................................ 20

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ...................................................................................... 60

*Edmond v. United States,*
   520 U.S. 651 (1997) .......................................................................... 39, 40, 42

*EME Homer City Generation, L.P. v. E.P.A.,*
   795 F.3d 118 (D.C. Cir. 2015) ...................................................................... 63

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) .................................................................................. 47

*First Nat. Bank of Ariz. v. Cities Serv. Co.,*
   391 U.S. 253 (1968) ........................................................................................ 2

*Florida v. Mayorkas,*
   672 F.Supp.3d 1206 (N.D. Fla. 2023) ........................................................... 9

*Freytag v. Commr.*,
  501 U.S. 868 (1991) ........................................................................... 42

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................. 5

*Garcia v. Peery*,
  No. CV 15-6273, 2016 WL 6304647 (C.D. Cal. Aug. 26, 2016) ............ 32

*HBO v. FCC*,
  567 F.2d 9 (D.C. Cir. 1977) ............................................................... 57

*Hornof v. United States*,
  No. 2:19-CV-00198, 2023 WL 5627631 (D. Me. Aug. 31, 2023)........... 31

*In re Core Comm'n, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) (Griffith, J., concurring) ..................... 63

*In re Crocker*,
  941 F.3d 206 (5th Cir. 2019)............................................................... 36

*Interox Am. v. PPG Indus., Inc.*,
  736 F.2d 194 (5th Cir.1984)............................................................... 61

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018)................................................................... 26, 31

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................................... 28

*Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*,
  50 F.3d 1318 (5th Cir. 1995) ............................................................... 3

*Jonaitiene v. Holder*,
  660 F.3d 267 (7th Cir. 2011)............................................................... 33

*Larson v. Valente*,
  456 U.S. 228 (1982) ........................................................................... 20

*Lucas v. S.C. Coastal Council*,
  505 U.S. 1003 (1992) ......................................................................... 43

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018)............................................................. 39, 40, 42

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)......................................................................... 5, 18

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ..................................................................... 21, 22

*Milardo v. Kerilikowske*,
  No. 3:16-MC-00099, 2016 WL 1305120 (D. Conn. Apr. 1, 2016)......... 34

*Miss. Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989) ................................................................................................ 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................ 47

*Nat. Res. Def. Council v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) ........................................................................... 63

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ....................................................................... 4, 5, 64

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
    595 U.S. 109 (2022) .............................................................................................. 25

*NiGen Biotech, L.L.C. v. Paxton*,
    804 F.3d 389 (5th Cir. 2015) ............................................................................... 21

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................................. 61

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008) ............................................................................. 65

*Okpalobi v. Foster*,
    190 F.3d 337 (5th Cir. 1999) ............................................................................... 44

*Ortega-Cervantes v. Gonzales*,
    501 F.3d 1111 (9th Cir. 2007) ............................................................................. 37

*POET Biorefining, LLC v. EPA*,
    970 F.3d 392 (D.C. Cir. 2020) ............................................................................... 4

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) .............................................................................................. 24

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
    490 U.S. 477 (1989) .............................................................................................. 13

*Sackett v. EPA*,
    566 U.S. 120 (2012) ................................................................................................ 3

*Sanchez v. R.G.L.*,
    761 F.3d 495 (5th Cir. 2014) ............................................................................... 20

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016) ............................................................................... 17

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ........................................................................... 64

*State of N.C. v. Hudson*,
    665 F. Supp. 428 (E.D.N.C. 1987) ...................................................................... 29

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ................................................................................................ 13

*Succar v. Ashcroft*,
    394 F.3d 8 (1st Cir. 2005) ................................................................................. 32

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) .............................................................................. 3

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ........................................................................57, 58

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:23-CV-59-JDK, 2023 WL
    4977746  (E.D. Tex. Aug. 3, 2023) .................................................................... 64

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
    No. 6:23-CV-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) ..................... 63

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ........................................................................ 59, 64

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) .............................................................................. 48

*Texas v. Biden*,
    20 F.4th 928 (2021) ...................................................................................passim

*Texas v. Biden*,
    554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) ...................................................... 16

*Texas v. Cardona*,
    No. 4:23-CV-604, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024), appeal filed, No. 24-
    10910 (5th Cir. Oct. 7, 2024) ........................................................................... 19

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) .......................................................................... 3, 4

*Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ................................................... 2

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ........................................................... 61

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) .........................................................................passim

*Texas v. United States*,
    524 F.Supp.3d 598 (S. D. Tex. 2021) ............................................................... 49

*Texas v. United States*,
    549 F. Supp. 3d 572 (S.D. Tex. 2021) ...........................................................16, 19

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................................passim

*Torres-Balderas v. Lynch*,
    806 F.3d 1157 (8th Cir. 2015) .......................................................................... 33

*U.S. Army Corps of Eng'rs v. Hawkes,*
   578 U.S. 590 (2016) ............................................................................................... 4

*UMW v. Mine Safety & Health Admin.,*
   407 F.3d 1250 (D.C. Cir. 2005) ...................................................................... 58, 59

*United States v. Blanco,*
   392 F.3d 382 (9th Cir. 2004) ............................................................................... 33

*United States v. Calderon-Lopez,*
   268 F. App'x 279 (5th Cir. 2008) ....................................................................... 32

*United States v. Clements,*
   686 F. App'x 849 (11th Cir. 2017) ...................................................................... 33

*United States v. Jumaev,*
   20 F.4th 518 (10th Cir. 2021) .............................................................................. 32

*United States v. Kahre,*
   No. CR-S-05-0121, 2007 WL 9757487 (D. Nev. Apr. 20, 2007) ................................... 32, 34

*United States v. Mills,*
   334 F. App'x 946 (11th Cir. 2009) ...................................................................... 33

*United States v. Salerno,*
   481 U.S. 739 (1987) ............................................................................................. 43

*United States v. Stevens,*
   559 U.S. 460 (2010) ........................................................................................ 43, 44

*United States v. Texas,*
   143 S. Ct. 1964 (2023) ............................................................................... passim

*United States v. Texas,*143
   S. Ct. 1964 (2023) ............................................................................................. 14

*United States v. Williams,*
   571 F. App'x 887 (11th Cir. 2014) ...................................................................... 33

*United States v. Wilson,*
   503 U.S. 329 (1992) ............................................................................................. 36

*Valley v. Rapides Parish Sch. Bd.,*
   118 F.3d 1047 (5th Cir. 1997) .............................................................................. 61

*Wages & White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ................................................................... 47, 60, 61

*Wash. St. Grange v. Wash. St. Republican Party,*
   552 U.S. 442 (2008) ............................................................................................. 43

**Statutes**

5 U.S.C. § 553 ............................................................................................................. 59

5 U.S.C. § 553(b) ....................................................................................................... 57

5 U.S.C. § 553(c) ....................................................................................................... 57

5 U.S.C. § 704 .............................................................................................................. 2

5 U.S.C. § 706 ........................................................................................................... 23

5 U.S.C. § 706 ........................................................................................................... 23

5 U.S.C. § 706(2)(A) ................................................................................................. 46

6 U.S.C. § 271(b) ....................................................................................................... 25

8 U.S.C. § 1101 (a)(18) ............................................................................................. 43

8 U.S.C. § 1101(a)(18) ........................................................................................ 40, 46

8 U.S.C. § 1103(g)(1) ................................................................................................ 25

8 U.S.C. § 1182(d)(5) .......................................................................................... 23, 27

8 U.S.C. § 1182(d)(5)(A) .......................................................................................... 37

8 U.S.C. § 1225 .................................................................................................... 24, 37

8 U.S.C. § 1225(a) ............................................................................................... 37, 41

8 U.S.C. § 1225(b)(1) ................................................................................................ 39

8 U.S.C. § 1225(b)(1)(B)(ii) ..................................................................................... 36

8 U.S.C. § 1225(b)(1)(e) .................................................................................. 40, 42, 46

8 U.S.C. § 1225(b)(3)(C) ........................................................................................... 26

8 U.S.C. § 1226(a) ..................................................................................................... 37

8 U.S.C. § 1229a ........................................................................................................ 26

8 U.S.C. § 1229a(a)(1) ............................................................................................... 26

8 U.S.C. § 1229a(a)(3) ............................................................................................... 26

8 U.S.C. § 1601 .......................................................................................................... 23

8 U.S.C. § 1701 .......................................................................................................... 51

U.S. Const. art. II, § 2, cl. 2 ...................................................................................... 39

**Other Authorities**

42 C.F.R. § 417.422(h) ............................................................................................... 11

47 Fed. Reg. 30044, 30044-45 (July 9, 1982) .......................................................... 24

8  C.F.R. 1240.17 ....................................................................................................... 46

8 C.F.R. § 1.3(a)(4)(vi) ............................................................................................. 11

8 C.F.R. § 208.1(b) .................................................................................................... 30

8 C.F.R. § 208.14(b) ..................................................................................... 31

8 C.F.R. § 208.4(c) ...................................................................................... 32

8 C.F.R. § 208.9(b) ...................................................................................... 32

8 C.F.R. § 235.3(b)(2)(iii) ....................................................................... 29, 44

8 C.F.R. § 235.3(b)(4)(ii) ............................................................................. 44

8 C.F.R. § 235.3(b)(4)(ii) (2017) ................................................................ 29

8 C.F.R. § 274a.12(c)(14) (2022) ............................................................... 11

86 Fed. Reg. 46,908 ............................................................................... 18, 40

87 Fed. Reg. 18,078 (March 29, 2022) ................................................. passim

Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016) ............... 10

Fed. R. Civ. P. 56(a) ...................................................................................... 2

## INTRODUCTION

Texas challenges the Defendants' adoption and implementation of the "*Interim Final Rule: Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers,*" 87 Fed. Reg. 18,078 (March 29, 2022) (the "Asylum Officer Rule" or "IFR"). The Asylum Officer Rule took effect on May 31, 2022. That Rule violates the Homeland Security Act (HSA); the Immigration and Nationality Act (INA); and the Administrative Procedure Act (APA). Furthermore, it violates the Appointments Clause in Article II, Section 2, Clause 2 of the United States Constitution.

## STATEMENT OF ISSUES

Based on the material facts set forth in Texas's summary judgment evidence as to which there is no genuine dispute:

1. Does Texas have standing to assert its claims in this action?

2. Does the Asylum Officer Rule violate the HSA?

3. Does the Asylum Officer Rule violate the INA?

4. Does the Asylum Officer Rule violate the APA?

5. Does the Asylum Officer Rule violate the Appointments Clause of the United States Constitution?

6. Is Texas entitled to the injunctive and declaratory relief it seeks and should the Court order vacatur of the Asylum Officer Rule?

## BACKGROUND

Texas filed this action on April 28, 2022 (ECF No. 1). Defendants filed a Motion to Dismiss on October 2, 2023 (ECF No. 102). Texas filed its Response to Defendants' Motion to Dismiss on October 23, 2023 (ECF No. 105), including an Appendix with fourteen items, including four Declarations by Texas officials (ECF No. 106). This Court on February 6, 2024, issued its Memorandum Opinion and Order denying Defendants' Motion to Dismiss (ECF No. 121).

Defendants on March 5, 2024, filed Defendants' Opposed Motion to Reconsider Order on Defendants' Motion to Dismiss (ECF No. 123). Texas filed its Response on April 2, 2024 (ECF No. 127). This Court issued its Memorandum Opinion and Order denying Defendants' Motion to Reconsider on June 25, 2024 (ECF No. 134).

Defendants filed their Answer on July 9, 2024 (ECF No. 136). Defendants filed the administrative record as to the Asylum Officer Rule on August 9, 2024 (ECF Nos. 139–141).

APPLICABLE STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must then set forth specific facts showing that there is a genuine issue for trial. *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968).

ARGUMENT

## I.    The Asylum Officer Rule constitutes final agency action.

We start with finality because "that analysis contextualizes the standing inquiry." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). The APA allows judicial review of "final agency action." 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *EEOC*, 933 F.3d at 441 (cleaned up).

2

"[T]he key question [for the first finality prong] is whether [the agency action] is 'subject to further agency review.'" *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 638 (5th Cir. 2023); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022); *Sackett v. EPA*, 566 U.S. 120, 127 (2012). Indeed, where "the challenged action is a definitive statement of the agency's position," the "agency action is final." *Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995).

Agency actions satisfy the second prong is if they "bind" the agency and its employees "to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive rule—really any rule—and a general statement of policy . . . turns on whether an agency intends to bind itself to a particular legal position."); *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) ("We focus primarily on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up). Action binding an agency to a legal view "gives rise to direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (internal quotations omitted).

The Asylum Officer Rule did not merely "remind parties of existing statutory or regulatory duties" but rather imposed new duties and processes and effectively "chang[ed] the text" of the statute it "profess[ed] to interpret." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020); *Texas v. EEOC*, 827 F.3d 372, 385–86 (5th Cir. 2016), *opinion withdrawn on reh'g*, 838 F.3d 511 (5th Cir. 2016) ("[T]he [EEOC] Guidance does not simply repeat the relevant provisions of Title VII. Instead, the Guidance purports to interpret [Title VII] authoritatively . . . . This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA.").

The Asylum Officer Rule was issued not to "put[] the public on notice of pre-existing legal obligations," but to "speak with the force of law" and "creat[e] legal effects", and therefore was and is a "legislative [or substantive] rule." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020). The provisions of the Rule are not pre-existing legal processes or authorities, but new and significantly changed ones. These provisions are therefore legislative rules —and all legislative

rules are, "by definition, final agency action," *EEOC*, 933 F.3d at 441. Because no statutory authority "compels or logically justifies" the Asylum Officer Rule, it is a legislative rule and a final agency action. *Wheeler*, 955 F.3d at 84.

Defendants themselves designated the Asylum Officer Rule as an Interim "Final" Rule. Defendants did not contest that the IFR is final agency action in their Motion to Dismiss. (ECF No. 102). To the contrary, Defendants themselves stated that "[t]his IFR makes important changes" and "creates a process that will allow noncitizens to 'have their asylum claim adjudicated following an Asylum Merits interview before a USCIS asylum officer in the first instance, rather than by [an immigration judge] in section 240 removal proceedings' in immigration court." *Id.* at 1, quoting 87 Fed. Reg. 18078, 18085. The Asylum Officer Rule also expands parole into Texas and the United States for large numbers of aliens whom the law requires to be detained pending adjudication of their asylum claims by immigration courts.

Defendants acknowledged that they could have issued the Asylum Officer Rule as a "final rule" but chose to designate it as an "interim final rule" purportedly in order to allow additional public comment. 87 Fed. Reg. at 18081. The Asylum Officer Rule has been in effect for almost two and a half years now without change. It undeniably is "final agency action" under the APA.

## II.    Texas has standing.

Texas has demonstrated each of the three elements required to have standing to bring its claims: (a) an injury in fact, (b) fairly traceable to the challenged action, (c) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

### A.    Texas's harms are judicially cognizable injuries in fact.

Texas has already suffered and is suffering injury in fact—concrete and particularized injuries attributable to the Defendants' actions in adopting and implementing the Asylum Officer Rule. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The Asylum Officer Rule predictably and actually has injured Texas in multiple ways, each of which is sufficient to establish injury in fact for standing purposes.

4

First, the Asylum Officer Rule plainly incentivized noncitizen migrants to enter Texas[1] and claim asylum (whether in good faith or not, and whether the claims were or were not meritorious). Appx. 221 ¶ 56. Defendants publicly stated that the Asylum Officer Rule would provide great benefits to migrants by "reducing undue delays" in granting asylum; by permitting migrants to "enter the work force sooner;" and by "cost savings." 87 Fed. Reg. 18088 (summary), 18202–06, 18211-13. Defendants touted that the Rule would protect "equity, human dignity and fairness" for migrants. *Id.* at 18088. These attractive incentives to migrants to (a) enter Texas without lawful authorization and (b) claim asylum with or without basis were amplified by the press, groups promoting illegal or unauthorized migration into the United States, and by cartels that profit from such migration. Appx. 25–27, 44–51, 52–55.

Like everyone else, potential migrants respond to incentives, and the Asylum Officer Rule in fact contributed to a huge increase in unauthorized migration into Texas and the United States. Once in Texas, migrants claiming asylum impose costs on Texas. This is so regardless of whether asylum is or is not eventually granted if – as is overwhelmingly the case – the migrants are not detained by Defendants. Defendants routinely release asylum claimants into Texas and other States using the unlawful parole provisions of the IFR, or without express parole. Appx. 52. Such migrants may be given hearing dates many years in the future, but Texas and other States begin incurring costs immediately on their release. Backlogs in immigration courts have in fact skyrocketed since the IFR went into effect. The backlog in late 2022 was reported to be between 1 million and 1.6 million cases. Appx. 74. It shot up to over 3 million in 2023 with each immigration judge assigned an impossible 4,500 cases. Appx. 121–23. These numbers are not just numbers; they represent individuals to whom Texas must provide public education and emergency Medicaid, and who will in some instances predictably cause Texas to incur criminal justice expenses.

---

[1] The IFR incentivizes entry into the entire United States, but it was predictable and indeed inevitable as a practical matter that Texas, with over 1250 miles of southern border with Mexico would receive a disproportionately large share of entrants and their accompanying costs.

Yet the costs to Texas do not stop even when an asylum claimant receives a negative credible fear determination. Even though the claimant will be put in line for removal proceedings, those proceedings take substantial time. Texas incurs more expenses while the process slowly proceeds. Thus, the Asylum Officer Rule's incentive effects on unauthorized migration ensure that the Rule causes pocketbook injury to Texas regardless of whether an asylum claimant in Texas receives a credible fear determination or is ultimately successful in obtaining a grant of asylum.

In the real world, the Asylum Officer Rule and other actions of the current administration have effectively communicated around the world that migrants who want to enter the United States without authorization can use asylum claims to remain in Texas and other States (and move freely between States) without detention for many years. As a New York Times article put it earlier in 2024: "One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay; Seeking asylum has become the surest way for migrants to stay in the U. S." Appx. 128–36. Texas and other States incur costs as a result.

The financial injury to Texas is plain. Texas must spend money on government programs and services for aliens attracted to Texas by the Asylum Officer Rule who otherwise would not have migrated. Appx. 3 ¶¶ 12–14, 5–6 ¶¶ 5–7, 11–12 ¶¶ 10–11. Moreover, Texas is injured because many migrants are paroled into Texas, necessitating expenditures on parolees which Texas otherwise would not have incurred, due to the Defendants' unlawful policy of programmatically granting parole to more aliens while awaiting ultimate processing and eventual adjudication of asylum claims. Both constitute an injury to a legally protected interest. *DAPA*, 809 F.3d at 152–54. "Federal law affirmatively requires the States to make some of these expenditures" on aliens present in the State. *Texas v. Biden (MPP)*, 20 F.4th 928, 969 (2021) (citing 42 C.F.R. § 440.255(c) (Emergency Medicaid). Defendants admit in their Answer that such expenditures are federally required.

Further, many other federally mandated state expenditures are directly affected by the IFR. For example, the Supplemental Nutrition Assistance Program (SNAP) is federally funded, but States like Texas pay the administrative costs. Appx. 237–38 ¶ 121. Texas incurs costs for every

SNAP payment to every beneficiary, and the IFR creates new beneficiaries. The unlawful parole provisions of the IFR allow certain illegal aliens, such as those under 18, to immediately access SNAP benefits as "qualified immigrants." The costs to Texas are significant. Such immigrants may cost Texas millions per year in SNAP transaction ACH fees alone. Appx. 238 ¶ ¶ 122–23.

Texas need not show that any individual parole beneficiaries partake of any of these benefits to prove standing, and standing cannot be defeated by the fact that some of the beneficiaries could have been paroled under different circumstances. As the Fifth Circuit explained:

> The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional 'driver's license as a result' of" MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*MPP*, 20 F.4th at 971.

The Northern District of Florida held that similar injuries as those alleged by Texas here were sufficient to confer standing on the State of Florida to challenge a different unlawful federal parole program. "[T]he evidence presented ... established that Florida suffers substantial harm—both to its sovereignty and its public fisc—when the federal government releases aliens into the country on 'parole' (or otherwise) rather than detaining them as required by the INA." *Florida v. Mayorkas*, 672 F.Supp.3d 1206, 1214 (N.D. Fla. 2023). Furthermore, "[t]he harm to Florida [was] irreparable because it cannot be undone through monetary remedies, because the United States has sovereign immunity from damages claims, and there is no way to remedy the impact on state sovereignty that flows from the Florida's inability to exclude aliens who were improperly 'paroled' into the country from its territory." *Id*.

### 1. Texas's injury in fact remains legally cognizable.

The Supreme Court's decision in *United States v. Texas* (*Enforcement Priorities*), 143 S. Ct. 1964 (2023), does not affect this case. *Enforcement Priorities* addressed a challenge to DHS guidelines stating that DHS would not arrest certain criminal aliens who Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare . . . . This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974. The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue." *Id.* at 1974 n.5 (emphases added); *see also id.* at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court . . . holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies.'").

This extremely narrow and "highly unusual" case does not apply here. That is because Texas's injuries are not based on a mere failure to arrest particular aliens on the border—they are based on Defendants' release of already-detained aliens into Texas via parole, making them eligible for benefits. This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here; none of the relief sought here requires Defendants to take any immigration, deportation, or criminal action against any particular aliens. The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id.* (cleaned up; citations omitted). Note that this mild language—"can become attenuated"—does not preclude standing based on indirect costs.

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *see id.* at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. But *those* indirect injuries

were not "judicially cognizable" because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id.* at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id.* at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not hold in this case.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which upheld indirect injury as a basis for Texas's standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms.").

Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016). Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023). This Court should continue to apply *Dep't of Commerce* and existing Fifth Circuit precedent in this area.

**2. Even were the general rule in *Enforcement Priorities* to apply to this case, its exceptions would allow Texas's standing.**

The Court took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973. Although the *Enforcement Priorities* rule does not apply to this case, two closely related exceptions articulated by the Court would apply even if it did.

The *Enforcement Priorities* majority also noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis . . . because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." 143 S. Ct. at 1974. The Court cited two cases challenging DACA as exemplars of this exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *Texas v. United States* (*DAPA*), 809 F.3d 134, 154 (5th Cir. 2015) (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits"). DACA counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

This exception applies to this case due to Defendants' policy of paroling—rather than detaining— the vast majority of aliens arriving at the border. *See Enforcement Priorities*, 143 S. Ct. at 1974 (citing its previous decision reaching the merits of the termination of MPP, *Biden v. Texas*,

142 S. Ct. 2528 (2022), as raising different standing issues). Parole makes recipients eligible for various federal and state benefits. "When the Department of Homeland Security lacks sufficient capacity to detain noncitizens at the southern border pending their immigration proceedings (often asylum proceedings), the immigration laws afford DHS two primary options:" returning to Mexico (MPP) or parole. *Biden*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). "Due to the huge numbers of aliens who attempt to enter illegally from Mexico, DHS does not have the capacity to detain all inadmissible aliens encountered at the border," *Biden*, 142 S. Ct. at 2550 (Alito, J., dissenting). That means aliens arriving at the border are being granted parole, at an overall number that would be reduced absent the Asylum Officer Rule.

As this Court has explained:

> [T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (Kacsmaryk, J.) (emphases in original). Just as this Court found "that MPP's termination has increased the number of aliens released on parole into the United States, including Texas and Missouri," due to a lack of detention capacity, *Texas v. Biden (MPP)*, 20 F.4th 928, 966 (5th Cir. 2021), that meant that more aliens were being released into the States to use healthcare services and public education. *Id.* at 968. This was sufficient for Article III standing and remains the case.

Texas's injuries are not indirect—courts in the DACA litigation described these same injuries as *direct* costs to the States. *See Texas v. United States* (*DACA*), 50 F.4th 498, 517 (5th Cir. 2022) ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id.* at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United*

*States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.").

As with the operation of the Asylum Officer Rule, the DACA program did not directly provide these benefits, "but an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up). The Asylum Officer Rule increases the flow of aliens paroled into the United States, and the combination of the lack of capacity to detain all of them and the exercise of parole makes them eligible for benefits, imposing *direct* costs on Texas.

**B. Texas's injuries are traceable to the Asylum Officer Rule.**

The *Enforcement Priorities* majority addressed only whether there was a judicially cognizable injury in fact, not whether the traceability and redressability prongs were satisfied. *Enforcement Priorities*, 143 S. Ct. at 1970–71; *id.* at 1995 (Alito, J., dissenting). That decision therefore has no effect on those two prongs of the standing analysis.

Justice Gorsuch, for himself and two other Justices, questioned the majority's holding on legally cognizable injury in fact, but would have ruled against Texas on redressability grounds.[2] *Enforcement Priorities*, 143 S. Ct. at 1976 (Gorsuch, J., concurring in the judgment). But that opinion has no precedential effect—the majority had five different Justices supporting its holding and did not address traceability or redressability—and cannot somehow allow this Court to ignore binding Fifth Circuit precedent in this area, including the law-of-the-case determination by the Fifth Circuit. Texas's injuries are caused by the Asylum Officer Rule, not the INA. Because it is the challenged agency action rather than the statute that is the cause of Texas's injuries, the harms are traceable to that action.

---

[2] "[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 54 (D.C. Cir. 2016).

**C. Texas's injuries are redressable by this Court.**

This Court can remedy the harm Defendants' unlawful rule has caused to Texas by setting it aside and enjoining Defendants from implementing it. Redressability is satisfied as long as it is "likely" and not merely "speculative" that a favorable judicial decision will redress alleged injuries (though, with special solicitude, explained below, Texas's burden on this front is even lighter). *Lujan*, 504 U.S. at 561. The source of Texas's harms is the IFR; accordingly, this Court can redress Texas's injuries by voiding the agency action through vacatur and by negating its applicability via injunction.

**D. Texas is entitled to special solicitude in the standing inquiry.**

States are entitled to special solicitude when "(1) the State [has] a procedural right to challenge the action in question, and (2) the challenged action affect[s] one of the State's quasi-sovereign interests." *MPP*, 20 F.4th at 969 (citing *Massachusetts v. EPA*, 549 U.S. 497, 516–20 (2007)). Texas clearly satisfies the first prong because it "is asserting a procedural right under the APA to challenge an agency action," *id.* (citation omitted), with respect to all of its claims.

And Texas satisfies the second prong because the challenged agency action here "affect[s] quasi-sovereign interests by imposing substantial pressure" on Texas to divert its limited resources to illegal aliens at the expense of its own citizens and lawful residents and other state funding needs. *Biden*, 20 F.4th 970 (citation omitted). These interests include:

> [S]tates may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law.

*DAPA*, 809 F.3d at 153.

"Thus, Texas is entitled to special solicitude in the standing inquiry. If nothing else, that means imminence and redressability are easier to establish here than usual." *MPP*, 20 F.4th at 970 (citation omitted). The remaining prong of the standing analysis—causation (or traceability)—is also subject to the special solicitude doctrine. *See Texas v. United States*, 549 F. Supp. 3d 572, 585

(S.D. Tex. 2021) (Hanen, J.) ("The Fifth Circuit has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation and redressability analysis."). Texas is entitled to special solicitude, as this Court and the Fifth Circuit have repeatedly held. The *Enforcement Priorities* majority never used the phrase "special solicitude" or addressed it in its analysis. *See Texas v. Cardona*, ---F.Supp.3d---, No. 4:23-CV-604, 2024 WL 3658767, at *20 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.) (explaining continued viability of special solicitude doctrine post-*Enforcement Priorities*), *appeal filed*, No. 24-10910 (5th Cir. Oct. 7, 2024). Defendants may argue that *Enforcement Priorities* somehow calls into question the special solicitude doctrine (but it does not). But, again, lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it. *Cochran*, 20 F.4th at 206 n.11.

When special solicitude applies, "a state can establish standing without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 519–20 (cleaned up). "With special solicitude, however. . . [t]he standard is met if there is *some possibility* that the requested relief will reduce the harm." *Id.* at 520 (emphasis added; cleaned up). Vacating and/or enjoining the IFR would likely reduce the harms to Texas in at least two major ways. It will dis-incentivize future unauthorized migrants to make entry into Texas and assert fraudulent or dubious asylum claims with little or no prospect of detention and the likely prospect of years of unlawful parole. And it will deprive those with fraudulent or dubious asylum claims of the benefits of unlawful parolee status. It is also possible, and can be hoped, that a future administration may enforce the legal requirement of detention for asylum claimants and directly reduce the financial costs unlawfully suffered by Texas and other States.

In this case, a favorable decision would likely relieve Texas of at least some of the injuries caused by the IFR. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[Plaintiffs] need not show that a favorable decision will relieve [their] *every* injury."); *Duke Power Co. v. Carolina Env't Study*

*Grp., Inc.*, 438 U.S. 59, 74–75595 (1978) (a "substantial likelihood" of the requested relief redressing the alleged injury is enough); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (a plaintiff "need only show that a favorable ruling could potentially lessen its injury").

Redressability is satisfied even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g., Dep't of Com. v. New York*, 588 U.S. 752, 139 S. Ct. 2551, 767–68 (2019) ("[T]hird parties will likely react in predictable ways."); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (defendants' actions need not be "the very last step in the chain of causation"); *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015). Therefore, Texas's injuries caused by the IFR are fairly traceable to Defendants and redressable by a favorable decision.

## III. Texas has a cause of action under the APA because its claims are within the zone of interests protected by the INA.

The zone-of-interest test is satisfied if the claims are "arguably within the zone of interests to be protected or regulated by the statute." *DACA*, 50 F.4th at 521 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225).

In this case, the purposes of the INA and related immigration statutes are to set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). Thus, Texas has an interest in seeing the INA and other statutes enforced and upheld. *See id.* at 521 (citing *Arizona*, 567 U.S. at 397, and *DAPA*,

809 F. 3d at 163). Texas also has an interest in reducing the financial burdens of illegal immigration, as shown by the injuries that demonstrate its standing. *Id.*

Texas falls within the zone of interests of the INA as a whole, which is the proper reference for actions under the APA, rather than any particular section. *MPP*, 20 F.4th at 975–76. One reason the INA was enacted was the "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'"—benefits such as the ones Texas must furnish under the Emergency Medicaid program and its obligation to furnish a public education. *DAPA*, 809 F. 3d at 163 (quoting 8 U.S.C. § 1601).

Texas's interest in not "spending millions of dollars to subsidize" illegal aliens is within the zone of interests protected by the INA. *Id.* By strictly limiting the exercise of the parole power, Section 1182(d) ensures that aliens are not released into the United States to impose costs on American citizens and taxpayers. Texas's injuries flow from just that problem and it may use the APA to protect its interests under the INA.

## IV.   The Asylum Officer Rule is unlawful.

The APA, 5 U.S.C. § 706, empowers the Court to decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. It also requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law." 5 U.S.C. § 706 (cleaned up).

Accordingly, the Court should set aside the Rule. As explained above, the IFR causes substantial harm to Texas, both on its own and as a vital component of the administration's clearly broken overall immigration policy. It is also brazenly unlawful in several independent respects. The rule violates the HSA, the parole authority of 8 U.S.C. § 1182(d)(5), the Appointments Clause of

the U.S. Constitution, and the APA. Each of these violations is independently sufficient for this Court to "hold unlawful and set aside" the Interim Rule.

### A. The IFR is unlawful because it violates the Homeland Security Act and Immigration and Nationality Act.

The Asylum Officer Rule upends the careful statutory regime Congress established to adjudicate asylum claims. It is contrary to law and should be set aside because it violates the procedural requirements for evaluating asylum applications in the Homeland Security Act and the Immigration and Nationality Act. The IFR empowers asylum officers to issue *final* asylum decisions on the merits for aliens subject to expedited removal. 87 Fed. Reg. 18,096. Before the IFR, asylum officers had authority to issue only an initial positive credible fear determination, after which the alien would be detained for further consideration of his asylum application on the merits—a process that, since 1997, has occurred through an adversarial proceeding before a DOJ EOIR immigration judge. *See* 87 Fed. Reg. 18,090; 86 Fed. Reg. 46,908.

To support the implementation of a system that evaluates asylum applicants without the involvement of immigration judges or other constitutionally appointed officers, the IFR points to an alleged ambiguity in 8 U.S.C. § 1225. This ambiguity is illusory. A reasonable reading of § 1225 requires the involvement of immigration judges in nearly all asylum proceedings.

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Here, HSA provides the proper context and eliminates any possible ambiguity. Transferring the authority to make a final adjudication on the merits from DOJ to DHS violates the HSA.

The HSA created DHS, largely by transferring agencies from other governmental departments into DHS. But the HSA did not transfer into DHS every federal function related to homeland security or immigration. Where it maintained certain functions in other Departments, it specifically delineated how those functions would be divided between the Departments. Thus, the HSA states that DOJ retains "authorities and functions . . . relating to the immigration and

naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002." 8 U.S.C. § 1103(g)(1). In other words, by law, authority that EOIR exercised when the HSA entered into force on March 1, 2003, remains with EOIR. At that time, EOIR had final authority to make the asylum determination, so, by law, the authority to render a final decision on the merits remains with EOIR.

The Defendants are not authorized to change by regulation the allocation of authority that Congress decided by statute. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."); *see also* U.S. Dep't of Justice, Office of Legal Counsel, *Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch . . . .").

This regulatory transfer of authority also violates the HSA's specific enumeration of USCIS's authorities. The HSA empowers USCIS to perform only those "adjudications performed by the [INS] immediately before" those authorities were transferred from DOJ to DHS. 6 U.S.C. § 271(b). This provision reinforces the separation of authority set out in § 1103(g)(1)—DHS does not have authority over adjudications that EOIR performed on the HSA's effective date. On that date, EOIR performed final asylum adjudications, so, through the HSA, Congress vested this power in EOIR alone. It cannot be transferred except by statute. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 583 (2000) ("When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.") (cleaned up).

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) further confirms Congress's intentional separation of these authorities. In the TVPRA, Congress created a narrow exception allowing Asylum Officers to issue final decisions in asylum applications filed by unaccompanied alien children. 8 U.S.C. § 1225(b)(3)(C). This confirms two

key facts: (1) Congress knows how to vest final authority for asylum adjudications in DHS when it wants to, and (2) Congress recognized that DHS does not have this authority over asylum claims generally, so Congress needed to act affirmatively to confer such authority.

DHS's efforts to accomplish the same result for expedited removal through regulation contradicts Congress's judgment that only unaccompanied minors should receive a specific carve-out from the EOIR process. Because "[t]he expression of one thing implies the exclusion of others," *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018), Congress's vesting of limited final DHS asylum-officer authority over one class of aliens is further confirmation that it withheld such authority from DHS over aliens generally, and over aliens subject to expedited removal.

Finally, if any doubt remained that EOIR must have the final say over whether an alien who receives a credible fear determination is to be granted asylum, the INA itself dispels it. The INA requires that a "proceeding under [8 U.S.C. § 1229a] shall be the *sole and exclusive procedure* for determining whether an alien may be admitted to the United States." 8 U.S.C. § 1229a(a)(3) (emphasis added). Only an immigration judge may conduct a proceeding under § 1229a. *See* 8 U.S.C. § 1229a(a)(1) ("[a]n immigration judge shall conduct proceedings" under § 1229a). Defendants cannot ignore the INA's plain text and create a system for making final asylum determinations that facially conflicts with at least four statutory provisions.

That makes this a straightforward case: Congress said that DOJ's EOIR retains the immigration functions it performed when the HSA was enacted. EOIR, not DHS, exercised the final authority on credible-fear determinations. Thus, EOIR—not DHS—must continue to perform that function until Congress says otherwise.

DHS responds by ignoring the HSA entirely. Defendants' analysis of the term "further consideration" would sunder it from the statutory framework and authorize them to override the remainder of the INA—including § 1229a, which mandates that immigration judges must make admissibility determinations; and the HSA, which mandates that EOIR must have final authority over whether to admit an alien who has received a positive credible-fear determination. When read together, the statutory regime is coherent and unambiguous: DHS asylum officers may make initial

20

positive credible fear determinations, but immigration judges within EOIR must conduct the "further consideration"—as they did when the HSA was enacted.

The question is thus not the meaning of the term "further consideration," but instead whether such "further consideration" was an "authorit[y]" or "function[]" "exercised by" EOIR when the HSA was enacted. The Defendants cannot dispute that EOIR exercised final review over positive credible fear determinations when the HSA was enacted. Accordingly, there is no ambiguity here—EOIR must retain final authority over whether to admit aliens who have received a positive credible fear determination. The IFR, which relies on its unlawful reallocation of authority, must, therefore, be held unlawful and set aside.

**B.  The IFR is unlawful because it violates the parole authority in 8 U.S.C. § 1182(d)(5).**

The Interim Rule is also contrary to law and should be held unlawful and set aside because it violates the parole authority in 8 U.S.C. § 1182(d)(5). Parole is a narrow authority granted to the executive to deal with emergent situations that are not otherwise addressed in the country's immigration laws. *See Cruz-Miguel v. Holder*, 650 F.3d 189 (2d Cir. 2011) ("'[P]arole into the United States' under § 1182(d)(5)(A) is narrowly circumscribed."). Yet the Defendants treat it as a limitless opportunity to parole aliens into the United States merely because their continued detention is inconvenient. Section 1182(d)(5) authorizes parole "temporarily" and "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." But the IFR offers a presumption that the "continued detention of a noncitizen who has been found not to be a flight risk or a danger to the community is not in the public interest," and may therefore "serve 'urgent humanitarian reasons' or achieve 'significant public benefit.'" This is contrary to the plain text and manifest purpose of the parole statute.

The plain text of the statute is unambiguous: paroling into the country an alien detained under § 1225(b), even one who has applied for asylum or would be inconvenient to detain, is unlawful unless there is an urgent humanitarian reason or significant public benefit applicable to *that specific alien*. As the Supreme Court has explained, the requirement that parole serve "urgent

humanitarian reasons" or achieve a "significant public benefit" precludes the use of parole for other purposes, including the Defendants' convenience. *See Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) ("That express exception to detention implies that there are no *other* circumstances under which aliens detained under § 1225(b) may be released."). But, even if there were ambiguity in the statutory text, the congressional record eliminates it.

Congress amended the parole statute with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) specifically because of abuses by the Executive Branch. Before 1996, parole was authorized "for emergent reasons or for reasons strictly in the public interest," but these provisions were often interpreted as conveying a broad discretionary power on Executive officials beyond what Congress had ever intended. So, to appropriately constrain the use of parole, Congress added a "case-by-case" requirement, changed "emergent reasons" to "urgent humanitarian reasons," and changed "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009-689 (1996). Congress explained its intent clearly: "The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy." H.R. Rep. No. 104-469, at 140 (1996). But Executive officials have often used parole "to admit entire categories of aliens who do not qualify for admission," contravening "the intent of section 212(d)(5)" and "illustrat[ing] why further, specific limitations on the Attorney General's discretion are necessary." *Id.*

Congress chose not to define in IIRIRA the terms "significant public benefit" and "urgent humanitarian reasons." And Congress did not explain its decision to remove the term "public interest" and instead use the term "public benefit," but it is likely that the change has little legal consequence, as "[a]bstract, often interchangeably used terms such as 'public benefit,' [and] 'public interest,' . . . are often used in public policy." Mary D. Fan, *The Right to Benefit from Big Data as a Public Resource*, 96 N.Y.U. L. Rev. 1438, 1473 (2022); *see also, e.g., State of N.C. v. Hudson*, 665 F. Supp. 428, 445 (E.D.N.C. 1987) (using "public interest" and "public benefit" as

synonyms); *Enhanced Commc'ns of N. New England, Inc. v. Pub. Utils. Comm'n*, 2017 Me. 178, 169 A.3d 408, 413 n.4 (same).

However, Congress provided a strong direction as to their intended meaning by coupling the word "significant" with the phrase "public benefit." Thus, interpreting the import of IIRIRA's amendment to the parole statute hinges on the meaning of "significant." "[I]n the absence of a statutory definition [courts] 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47 (1989) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). Black's Law Dictionary defines "significant" as meaning "[o]f special importance; momentous, as distinguished from insignificant." *Significant*, *Black's Law Dictionary* (11th ed. 2019). Similarly, the American Heritage Dictionary defines "significant" to mean "[h]aving or likely to have a major effect; important," and also "[f]airly large in amount or quantity." *Significant*, *American Heritage Dictionary* (5th ed. 2018).

Since the prior version of the statute already limited the grant of parole to situations "in the public interest," Congress's decision to add "significant" means that post-IIRIRA, the benefit to the public must be greater than it used to be. Before IIRIRA was enacted, Congress and the executive branch had both provided specific examples of situations in which an alien would qualify for parole under the old, more forgiving "public interest" standard. An INS rulemaking from 1982 summarizes those examples:

> The legislative history of the parole provision shows a Congressional intent that parole be used in a restrictive manner. The drafters of the Immigration and Nationality Act of 1952 *gave as examples situations where parole was warranted in cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution*. H. Rep. No. 1365, 82nd Cong., 2d Sess., at 52 (1952). In 1965, a Congressional committee stated that the parole provisions "were designed to authorize the Attorney General to act only in emergent, individual, and *isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law*." S. Rep. No. 748, 89th Cong., 1st Sess., at 17 (1965). Finally, in the Refugee Act of 1980,

Congress removed the Attorney General's authority to parole groups of aliens as refugees. Pub L. 96-212,96th Cong., 2d Sess., 94 Stat. 108 (1980).

Detention and Parole of Inadmissible Aliens; Interim Rule with Request for Comments, 47 Fed. Reg. 30044, 30044-45 (July 9, 1982) (emphasis added) (available at https://tinyurl.com /3drwn2ex).

Thus, under the prior, less stringent standard, Congress gave as paradigmatic examples of valid exercises of the parole power "cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution" and "isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law." *Id.*

The IFR's use of parole falls far outside what would have been allowed even pre-IIRIRA, let alone the stricter standard imposed by IIRIRA.

Post-IIRIRA court decisions illustrate that the IFR falls miles outside the carefully circumscribed boundary of allowable situations where the parole statute is properly applied. When describing "Congress' provision of parole," Justice Breyer provided two examples of what Congress had in mind: "release for the purpose of medical care or to testify in a court proceeding." *Jennings v. Rodriguez*, 138 S. Ct. 830, 872 (2018) (Breyer, J., dissenting).

The Fifth Circuit has explained, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *MPP*, 20 F.4th at 947.

The District of Maine explained that "there are various types of parole, including port of entry parole, which applies to a wide variety of situations and is used at the discretion of the supervisory immigration inspector, usually to allow short periods of entry. Other types of parole include humanitarian parole, granted in instances of medical emergency; and public interest parole, granted for aliens participating in legal proceedings." *Hornof v. United States*, No. 2:19-CV-

00198, 2023 WL 5627631, at *25 n.49 (D. Me. Aug. 31, 2023) (cleaned up) (quoting *Succar v. Ashcroft*, 394 F.3d 8, 15 n.7 (1st Cir. 2005)).

"The Government often utilizes significant public benefit parole to secure testimony from noncitizens—who otherwise would not have legal status to be in the United States—in criminal proceedings." *Id.* at *25 (granting summary judgment to the federal government in action by aliens who were paroled into the United States against their will and then detained to compel their testimony); *see United States v. Jumaev*, 20 F.4th 518, 548 n.17 (10th Cir. 2021) (referring to "Significant Public Benefit Parole so that [a witness] could remain in the U.S."); *United States v. Calderon-Lopez*, 268 F. App'x 279, 289 (5th Cir. 2008) (explaining that an ICE special agent had "requested Significant Public Benefit Paroles in order to facilitate . . . reentry into the United States" for witnesses); *Garcia v. Peery*, No. CV 15-6273, 2016 WL 6304647, at *5 (C.D. Cal. Aug. 26, 2016) (describing efforts by DHS special agent to obtain testimony of crime victim by "secur[ing] a 'Significant Public Benefit Parole'"); *Amador v. Meeker*, No. 8:11-CV-1977, 2011 WL 4502092, at *1 (M.D. Fla. Sept. 28, 2011) (explaining that alien who had "agreed to cooperate with [a] federal investigation and testify against" defendants "was granted 'significant public benefit' parole"); *United States v. Kahre*, No. CR-S-05-0121, 2007 WL 9757487, at *1 (D. Nev. Apr. 20, 2007) (noting that "the I.R.S. is attempting to obtain a significant public benefit parole into the U.S. for" a "Special Circumstances Witness" in criminal trial). The government also paroles into the United States the family members of cooperating witnesses. *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011) (explaining that the U.S. government "brought the children [of a cooperating witness] and [the witness's] mother to the United States temporarily under Significant Public Benefit Parole.").

Aliens have also been granted "'significant public benefit parole' to remain in the country because of . . . work as a confidential source" for the FBI. *United States v. Williams*, 571 F. App'x 887, 890 (11th Cir. 2014); *see United States v. Clements*, 686 F. App'x 849, 851 (11th Cir. 2017) (referring to "Significant Public Benefit Parole program, which allows illegal aliens who are informants for law enforcement to gain lawful status in the United States"); *Torres-Balderas v.*

*Lynch*, 806 F.3d 1157, 1158 (8th Cir. 2015) (stating that alien who had assisted "the St. Louis Police Department as well as the FBI in matters concerning false documents" received "[i]n exchange . . . a one-year Significant Public Benefit Parole"); *United States v. Mills*, 334 F. App'x 946, 947 (11th Cir. 2009) (referring to "application for a Significant Public Benefit Parole" filed by DEA on behalf of informant); *United States v. Blanco*, 392 F.3d 382, 392 (9th Cir. 2004) (referring to "public benefit parole" received by paid confidential informant).

Perhaps the most telling examples of public benefit parole come from DHS's own explanations. One such example is from *Milardo v. Kerilikowske*, in which two "deportees seeking to comply with the legislative subpoenas" from the Connecticut legislature sued to contest ICE's denial of their parole applications. No. 3:16-MC-00099, 2016 WL 1305120, at *1 (D. Conn. Apr. 1, 2016), *aff'd sub nom. Giammarco v. Kerlikowske*, 665 F. App'x 24, 25 (2d Cir. 2016). ICE provided to the aliens a letter that explained that "Significant public benefit parole 'is a temporary measure generally used to provide a legal mechanism for informants, witnesses, criminals, and defendants' to 'assist with ongoing investigations, prosecutions or testify as witnesses in proceedings.'" *Id.* at *2 (quoting text of ICE letter).

A public-facing DHS website providing information to aliens about the evidence required for "humanitarian or significant public benefit parole requests" provides the following list of the "Most Common Types of Parole Requests":

      a.  Requests Based on Medical Reasons
      b.  Requesting Parole for Children
      c.  To Receive Medical Treatment in the United States
      d.  To Be an Organ Donor to an Individual in the United States
      e.  To Reunite With Family in the United States for Urgent Humanitarian Reasons
      f.  To Care For or Otherwise Provide Support to a Seriously or Terminally Ill Relative in the United States
      g.  To Attend a Funeral or Settle the Affairs of a Deceased Relative in the United States
      h.  To Come to the United States for Protection from Targeted or Individualized Harm

26

      i.   To Participate in Civil Legal Proceedings in the United States

      j.   To Return to the United States After: Failing to get a travel document before departure from the United States; OR Failing to return to the United States before a travel document expired

Dep't of Homeland Sec., *Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests* (May 23, 2022), https://tinyurl.com/bp59audc. Notably, under the bullet point for "Protection from Targeted or Individualized Harm," DHS specifically informs aliens that "[p]arole is generally not intended to be used to avoid normal refugee processing or to provide protection to individuals at generalized risk of harm around the world." *Id.*

The IFR's use of parole does not fit within any of these established examples of the lawful exercise of the parole power. The IFR does not fit because it is illegal. The amendment made in IIRIRA was explicitly enacted to avoid categorical or policy-based uses of parole; parole is not an opportunity to bypass Congressional policy, but a stop-gap measure to address emergencies. As the House report explained:

> Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, such as life-threatening humanitarian medical emergencies, or for specified public interest reasons, such as assisting the government in a law-enforcement-related activity. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

H.R. Rep. No. 104-469, at 141. But the IFR blows entirely through these limitations, ignoring the restrictions IIRIRA placed on the parole power and treating the federal government's convenience as a "significant public benefit" or "urgent humanitarian reason" to parole massive numbers of aliens into the country.

Indeed, the IFR implicitly acknowledges the Defendants' limited response to IIRIRA's amendments. It explains that, "prior to the 1996 amendment to the INA . . . the former INS had paroled individuals 'whose continued detention' was 'not in the public interest.'" 87 Fed. Reg. 18,108. "After the 1996 amendment, the agency incorporated the new 'case-by-case' requirement into its regulation, while also providing, similar to prior regulatory authority, that parole of certain

noncitizens, including those who pose neither a security risk nor a risk of absconding and whose 'continued detention is not in the public interest' would generally be justified for 'significant public benefit' or 'urgent humanitarian reasons.'" *Id.*

"When Congress makes a significant change in language when it amends an existing statute, it presumptively connotes a change in meaning." *In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019); *see also United States v. Wilson*, 503 U.S. 329, 335 (1992) ("We have no difficulty with the general presumption that Congress contemplates a change whenever it amends a statute."). But the IFR ignores much of what changed with IIRIRA, acknowledging only the "new 'case-by-case' requirement," while merely conflating the prior "not in the public interest standard" with the new "significant public benefit" or "urgent humanitarian reasons" standard. 87 Fed. Reg. 18,108. Indeed, the IFR fails to even discriminate between those two standards, leaving it an open question whether paroling aliens whose continued detention is "not in the public interest" serves a "significant public benefit" or is for "urgent humanitarian reasons." Applying such a presumption to a broad swath of aliens and refusing even to identify the statutory justification is not using the parole power to serve "*specified* urgent humanitarian reasons" or "*specified* public interest reasons." Instead, it's a violation of § 1182(d)(5) enshrined in regulation.

Further, it is not plausible that detaining aliens whose detention is deemed "not in the public interest" even *could* provide a "significant public benefit." On the contrary, as relevant to this context, Congress decreed that if an alien is found to have a credible fear of persecution, "the alien *shall be detained* for further consideration of the application for asylum," without reference to flight risk or danger to the community. 8 U.S.C. § 1225(b)(1)(B)(ii) (emphasis added). It can hardly be said that ignoring Congressionally established policy for the purpose of convenience provides a "significant public benefit" as that phrase is understood by Congress.

Finally, as it pertains to practicability, the Defendants have options that do not involve granting affirmative immigration benefits and eligibility to apply for an adjustment of status to

lawful permanent resident[3] to aliens who might be more appropriately removed. Indeed, Congress has provided explicitly for practicability considerations when an alien poses little or no risk of flight or danger to the community.

The IFR conflates two types of parole power, 87 Fed. Reg. 18,107 ("This includes DHS's authority to parole noncitizens detained under section 235 of the act, 8 U.S.C. 1225."), but these are very different uses of the term "parole," *compare* 8 U.S.C. § 1182(d)(5)(A) (parole *into the United States*) *with* 8 U.S.C. § 1226(a) (conditional parole). Conditional parole under § 1226(a) does not come with the benefits of parole into the country under § 1182(d)(5)(A), such as eligibility to apply for adjustment of status or eligibility for public benefits as a "qualified alien." *See Cruz-Miguel*, 650 F.3d at 198–99 (distinguishing the types of parole and clarifying that aliens released on conditional parole are not eligible for adjustment of status); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116–17 (9th Cir. 2007) (same). But, under appropriate circumstances, conditional parole does provide an opportunity to alleviate detention over-crowding or other resource constraints under appropriate circumstances when an alien poses little to no risk of flight or danger to the community. At a minimum, it shows that Congress knows perfectly well how to provide for practicability issues, and it's not by granting § 1182(d)(5)(A) parole.

The prior regulation permits parole only when it "is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. §§ 235.3(b)(2)(iii), (b)(4)(ii) (2017). This limitation is consonant with Congress's intent to strictly limit use of the parole power to *specific* urgent humanitarian needs and significant public interests. The new, vastly broader authority violates Congress's intent and the plain language of the statute. Because the IFR's application of the parole authority violates the clear language and any reasonable interpretation of the parole statute, the Interim Rule should be held unlawful and set aside.

---

[3] Parole makes an alien "qualified" for certain public benefits and can serve as a basis for an adjustment of status to lawful permanent residency. See, e.g., 8 U.S.C. § 1225(a).

**C. The IFR is unlawful because it violates the Appointments Clause of the U.S. Constitution.**

The IFR also violates the Appointments Clause of the U.S. Constitution by vesting the power of an officer in an employee, and so should be held unlawful and set aside.

The Interim Rule empowers asylum officers to preside over hearings, and, at the end of the hearings, decide whether an alien is granted or denied asylum. 87 Fed. Reg. 18,097. If the alien is denied, then he or she "would have the ability to seek prompt, de novo review with an immigration judge ('IJ') in EOIR through a newly established procedure, with appeal available to the Board of Immigration Appeals ('BIA') and the Federal Courts." 87 Fed. Reg. at 18,080. But if the application for asylum is granted, there is no provision for review. *Id.* ("[I]ndividuals granted protection by USCIS would be entitled to asylum, statutory withholding of removal, or protection under the CAT, as appropriate, without further adjudication.").

The Appointments Clause sets forth the "exclusive means of appointing 'Officers.' Only the President, a court of law, or a head of department can do so." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (citing U.S. CONST. art. II, § 2, cl. 2). Officers have duties that are "continuing and permanent," have positions that are "continuing," and exercise "significant authority pursuant to the laws of the United States." *Id.* at 2051; *see also Edmond v. United States*, 520 U.S. 651, 662–63 (1997). Conversely, employees are lesser functionaries subordinate to officers of the United States that have duties that are only "occasional or temporary." *Buckly v. Valeo*, 424 U.S. 1, 125–26 & n.162 (1976).

Asylum officers are officers with significant authority and discretion that they exercise "pursuant to the laws of the United States." *Id.* They "hold a continuing office established by law," not a temporary appointment. *Lucia*, 138 St. Ct. at 2053. Their positions are career positions created and defined by statute and regulation. 8 U.S.C. § 1225(b)(1)(E); 8 C.F.R. § 208.1(b). Asylum Officers' actions are not subject to oversight by a properly appointed officer; rather, they are supervised by other asylum officers with "substantial experience adjudicating asylum

applications." 8 U.S.C. § 1225(b)(1)€. Under the IFR, an asylum officer's decision to grant asylum after a merits hearing is not supervised or subject to oversight by anyone.

Unlike immigration judges, who are appointed by the Attorney General, asylum officers, other than supervisory officers, are not appointed by the Director of USCIS or the Secretary of Homeland Security. And while supervisory asylum officers are appointed by the Secretary of Homeland Security, he does not direct or supervise them. Supervisory officers, Supp-0007-17 (redacted documents produced by the Defendants on October 16, 2024 showing appointment of supervisory asylum officers, by Secretary Mayorkas, but which never establish that the Secretary directs or supervises them). Additionally, as further explained below, Congress has established by statute that *all* asylum officers are employees. 8 U.S.C. §§ 1101(a)(18), 1225(b)(1)(e). Therefore, supervisory asylum officers do not qualify as inferior officers. *See Lucia*, 138 S. Ct. at 2051; *Edmond*, 520 U.S. at 663. Thus, no asylum officers are supervised by or directly accountable to other officers of the United States. They are mere employees.

Furthermore, even if supervisory asylum officers could be properly characterized as inferior officers, their subordinates (who are *not* appointed by the DHS Secretary) are still employees. The Rule does not require that adjudications be performed by supervisory asylum officers appointed by the DHS Secretary, nor does it require that supervisory asylum officers approve the decisions of lower-level asylum officers (who are not appointed by the DHS secretary). Rather, the Rule merely states that "an asylum officer, *subject to review within USCIS*, may grant, in the exercise of his or her discretion, asylum to an applicant 87 Fed. Reg. at 18,218 (creating 8 C.F.R. § 208.14(b) (emphasis added). The phrase "subject to review within USCIS" does not require that the decisions of employees be reviewed by an officer. The Rule claims that DHS currently "requires supervisory review of all cases," 87 Fed. Reg. at 18,148, but it never *requires* that this be done. The plain text of the rule allows for asylum adjudications to be performed by employees and to be done without any supervision by officers.

Unfortunately, asylum officers have a checkered history of finding credible fear in non-meritorious cases. Historical analysis by EOIR from 2008–2019 shows asylum officers finding a

credible fear of persecution in over 80% of cases. But, of those found to have a credible fear, just over half actually filed an asylum claim and fewer than a third of those were granted asylum by an IJ. Appx. 153. In short, the historical asylum approval rate of approximately 14% contrasts sharply against the asylum officer credible fear finding rate of over 80%.[4] This may be why the statutory scheme established by Congress requires *final* review by a properly appointed officer—an IJ—rather than an employee like an asylum officer. Nonetheless, the IFR gives asylum officers the power of officers, including the power to adjudicate claims after a positive credible fear finding.

The IFR imbues them with even greater authority. The IFR empowers them to grant asylum without being subject to oversight or review, and to "administer oaths, verify the identity of the applicant . . . , present and verify the identity of any interpreter, present evidence, receive evidence, and question the applicant and any witnesses." 87 Fed. Reg. 18,217; 8 C.F.R. §§ 208.4(c); 208.14(b). In deciding whether to grant asylum, in addition to the above-mentioned powers, asylum officers make credibility determinations, issue written declarations, and determine whether applicants have met their burden of proof. 8 C.F.R. § 208.9(b)–(c). The Supreme Court has held that such quasi-judicial functions require appointment as an officer, *see Lucia*, 138 S. Ct. at 2053–54; *Freytag v. Commr.*, 501 U.S. 868, 881 (1991), and, indeed, Defendants have yet to dispute that the IFR gives career civil servants the power of officers.[5]

---

[4] *Id.* Also, the Defendants misleadingly tout an alleged reduction in approval rates, from a 26%–37% range under the prior system to approximately 22% under the IFR (already an increase over the long-term historical 14% rate), without accounting for the massive shift in how many applicants found to have a credible fear actually go on to pursue asylum through final decision. The historical rate is approximately 54%. Under the IFR, over 80% of applicants found to have a credible fear pursue asylum through to final adjudication. See ECF No. 102 at 13–14 (1,824 merits-interview cases handled by asylum officers out of 2,265 positive credible fear findings). In other words, the approval rate for final adjudications may have gone down, but the rate at which applications proceed to final adjudication has gone up by a much greater margin.

[5] The closest Defendants have come is a footnote denying that they have conceded this point, without going on to dispute it in any way, including by bare assertion. See ECF No. 114 at 23 n.8.

But asylum officers are not officers. They are not principal officers⊞—which are appointed by the President with the advice and consent of the Senate—nor are they inferior officers appointed, directed, and supervised by principal officers. *See Lucia*, 138 S. Ct. at 2051; *Edmond*, 520 U.S. at 663. As the IFR explains, they are "career government employees." 87 Fed. Reg. 18,110. They are "only empowered to grant asylum[ ] as an exercise of the Secretary's authority." *Id.* at 18,113. Their decisions are allegedly "subject to supervisory review" by other employees, and only reviewed by an actual officer of the United States upon certification by the USCIS Director herself. *Id.* at 18,112.

Indeed, Congress has made clear that asylum officers *are not* inferior officers—they are merely employees. Congress defined by statute that "'asylum officer' means an immigration officer who" has received specified training and who "is supervised by an officer who" is also an asylum officer and has also received such training, but who "has had substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E). Thus, an asylum officer is a specially trained immigration officer; Congress has specified that "[t]he term 'immigration officer' means any *employee or class of employees* of the Service or of the United States designated by the [DHS Secretary], individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title." 8 U.S.C. § 1101 (a)(18) (emphasis added).

Asylum officers are mere employees, but the IFR imbues them with the power of inferior officers. The IFR, therefore, violates the Appointments Clause of the U.S. Constitution and should be held unlawful and set aside. Defendants have not disputed that asylum officers are employees, nor have they disputed that asylum officers exercise the authority of inferior officers, nor do they claim that all asylum officers are appointed in accordance with the Appointments Clause of the Constitution. The only point Defendants have disputed thus far is whether a facial challenge is appropriate where nonexistent hypotheticals that run contrary to law and current agency practices might be constitutional.

Formally, "a plaintiff can only a succeed in a facial challenge by 'establishing that no set of circumstances exists under which the Act would be valid,'" or at least that the statute does not

have "a plainly legitimate sweep." *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) (cleaned up). However, as this Court has recognized, "informally, courts alter the scrutiny implicit in this standard depending on the rule, statute, or provision before them." ECF No. 121 at 8; *see also, e.g.*, *United States v. Stevens*, 559 U.S. 460, 473 (2010); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 n.6 (1992) (approving a facial challenge without reference to the "no circumstances" standard).

Indeed, courts relax the 'no circumstances' standard and allow a facial attack when it identifies unconstitutional applications so "substantial" as to overshadow the law's "plainly legitimate sweep." *Stevens*, 559 U.S. at 473; *see also Okpalobi v. Foster*, 190 F.3d 337, 358 (5th Cir. 1999), *on reh'g en banc*, 244 F.3d 405 (5th Cir. 2001) ("law that chills the exercise of a constitutional right will succumb to a facial challenge '*even when* [*the law*] *could have had some legitimate application*.'") (emphasis added). Courts do not need to abandon their sense of reality when they review facial challenges but should assess the constitutionality of new rules based on the likely set of circumstances in which they will apply. *See Ctr. for Individual Freedom v. Carmouche*, 449 F. 3d 655, 659-60 (5th Cir. 2006); *Patel*, 576 U.S. at 419.

One such alteration to the *Salerno* rule that the Supreme Court has recognized is where literal application of the "no set of circumstances" standard would render it impossible to enforce a constitutional provision by facial challenge. In *City of Los Angeles v. Patel*, the Court endorsed a facial challenge where the petitioners' contrary logic would have precluded facial relief for an entire category of Fourth Amendment challenges. 576 U.S. at 418.

In their motion to dismiss, the Defendants argued that *Patel* was inapplicable because "the city's argument rested on scenarios involving conduct the law did not actually authorize or prohibit." ECF No. 114 at 25 (citing *City of Los Angeles v. Patel*, 576 U.S. at 418–19 (2015)). But this characterization is incomplete. The Supreme Court held that the City's logic entirely precluding facial challenges was an independently sufficient reason to permit a facial challenge in that case. As the Court put it: "[Petitioner's] logic would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches. *For this reason alone, the City's*

*argument must fail*: The Court's precedents demonstrate not only that facial challenges to statutes authorizing warrantless searches can be brought, but also that they can succeed." *Patel*, 576 U.S. at 418 (emphasis added).

Defendants posit that it is theoretically possible that the Secretary could appoint all asylum officers in compliance with the Appointments Clause, so a facial challenge to the IFR should fail. The same could be said of almost *any* mere employee—their principal officer could appoint them as an inferior officer. The Defendants' logic, therefore, would preclude the possibility of *any* facial challenge based on the Appointments Clause, and "the Court has never held that these claims [facial challenges] cannot be brought under any otherwise enforceable provision of the Constitution." *Patel*, 576 U.S. at 415.

This Court should treat with reality. Asylum officers are mere employees empowered by the IFR as officers. This is unconstitutional. Indeed, to this day, USCIS continues to hire asylum officers without input from any principal officer or constitutionally sufficient appointment. Appx. 154–161. There is no "plainly legitimate sweep" of the IFR that includes giving the power of officers to constitutionally appointed officers; the foreseeable sweep of the IFR is to imbue mere employees with officer authority despite the clear contrary command of the Appointments Clause.

Even if a literal application of the *Salerno* standard were appropriate, the statutory and regulatory context make clear that, if there is any mere employee who could not, in theory, be appointed an inferior officer, the asylum officer would be it. By statute, asylum officers are supervised by and accountable to other, more experienced, asylum officers, not principals or other properly appointed officers.

Further, Congress has defined, by statute, that "'asylum officer' means an immigration officer who' has received specified training and who "is supervised by an officer who" has also received such training and who "has had substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E). Thus, an asylum officer is a certain type of "immigration officer," and Congress has specified that "[t]he term 'immigration officer' means any *employee or class of employees* of the Service or of the United States designated by the [DHS Secretary], individually or

35

by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title." 8 U.S.C. § 1101(a)(18) (emphasis added).

It is thus incorrect for the Defendants to argue that the Rule is not facially unconstitutional because "nothing in the IFR precludes the Secretary of Homeland Security from appointing asylum officers, which he is plainly authorized to do under the Department's organic statute." ECF No. 102 at 39. The Defendants never claim that the DHS Secretary does appoint all Asylum Officers, nor do they point to any authority establishing that he does so. But even if he did personally appoint each Asylum Officer, it would not transform them into constitutional officers. Congress has specified that Asylum Officers are employees. The Defendants may not amend the INA through regulation. As a matter of law, asylum officers are mere employees, not appointed officers as described in the Appointments Clause. That the IFR gives these mere employees the power of officers is, therefore, facially unconstitutional. This court should, therefore, hold the IFR unlawful and set it aside.

### D. The IFR is unlawful because it is arbitrary and capricious, in violation of the Administrative Procedure Act

The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). In the Fifth Circuit, "[t]his review 'is not toothless.'" *MPP,* 20 F.4th at 989. Quite the contrary: "after *Regents*, it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). To withstand scrutiny, an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The IFR fails to adequately explain its promulgated policies, both in its asylum-review procedures and parole provision, so each is arbitrary and capricious.

### 1. Asylum Procedures

The asylum procedure provisions are arbitrary and capricious for at least thirteen independently sufficient reasons.

*First*, Defendants fail to consider State reliance interests. Indeed, Defendants rely explicitly on the same legal premise that the Fifth Circuit expressly rejected in *Texas v. Biden*—that State reliance interests are nonexistent in the asylum context. The Defendants declare they "perceive no serious reliance interests on the part of any State, county, or local governmental entity in the currently existing provisions." 87 Fed. Reg. at 18,109. And the Defendants simply declare— without any support—that "[e]ven if such reliance interests exist, the Departments would nevertheless promulgate this regulation for the reasons stated in this rule." *Id.*

The Fifth Circuit rebuffed this precise reasoning as "astonishing[ ]" in the MPP asylum case. *See Texas v. Biden* (*Texas MPP*), 20 F.4th 928, 990 (5th Cir. 2021), *rev'd on other grounds* 597 U.S. 785 (2022). As the court there observed, States have overwhelming reliance interests in how the federal government executes its immigration laws: "Given the Supreme Court's explanation that border states 'bear[ ] many of the consequences of unlawful immigration,' one would expect a 'reasonable and reasonably explained' memo to mention the issue at least once." *Texas*, 20 F.4th at 989 (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)). That is precisely the case here—the Defendants fail to consider even once the States' interests in preventing unlawful immigration. As in *Texas MPP*, the Defendants merely deny that states have *any* "serious reliance interests," 87 Fed. Reg. 18,109, despite the Fifth Circuit's repeated, unambiguous rulings to the contrary: "that 'contention is squarely foreclosed by *Regents*.'" *Texas MPP*, 20 F.4th at 990 .

The Defendants' cursory one-sentence dismissal (without reasoning) comes nowhere close to meeting their obligation to reasonably explain why State interests are not relevant. *See Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) ("'Stating that a factor was considered. . . is not a substitute for considering it.'"). The Defendants' analysis fails to account for the actual real-world effects of the current asylum system and how States might have legitimately relied on it. Texas has overwhelming reliance interests in federal enforcement of immigration law. *See Arizona*, 567 U.S.

at 398 ("The problems posed to the State by illegal immigration must not be underestimated."). For example, 16 states, including Texas, submitted a comment explaining that the IFR will incentivize additional illegal immigration and thus "affect[] State finances and resources, public safety, and public health . . . .". ECF No. 106-3 Appx. 150–168. The States correctly pointed out that that the IFR would "encourage[] more asylum seekers to travel to the United States [and] will only make matters worse for an already overwhelmed Southwest Border." *Id.*, Appx. 161. They urged that "this extraordinary shift in immigration policy will have a deleterious effect on the States' public fisc," citing the costs set forth in *Texas v. United States*, 524 F.Supp.3d 598, 619–28 (S. D. Tex. 2021). *Id.*

Texas's budgets and resource allocations are determined in reliance on the Defendants' continued enforcement of immigration law. The Defendants did not consider whether Texas relied on the current asylum system continuing when Texas determined how it would marshal and distribute its resources to deal with the number of unauthorized aliens entering the state. Nor did they consider how a policy perceived to be friendly to illegal aliens would incentivize unlawful border crossings, nor how an asylum system more likely to grant asylum[6] would increase the strain on states' resources. The Asylum IFR utterly ignores these reliance interests. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020).

Making matters worse, as in *Texas MPP*, the Defendants fail to account for the reliance interests recognized by the January 2021 Memorandum of Understanding (the "Agreement") between DHS and Texas. *See Texas MPP*, 20 F.4th at 944. In the Agreement, DHS stipulated that "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing or limiting immigration enforcement." *Id.* at 989 .

Despite the Defendants' explicit acknowledgment in the Agreement "that Texas would be 'irreparably damaged' by DHS policy changes that relaxed strictures on illegal border crossings,"

---

[6] As noted above, under the IFR an asylum officer's grant of asylum is unreviewable and asylum officers are notoriously bad at detecting non-meritorious claims. See supra Part III.

*id.* at 990, the Defendants now claim to be unaware of *any* reliance interests *at all*, and further argue that the irreparable damage they had once stipulated to is insufficient to give Texas standing to challenge an IFR that "[has] the effect of easing, relaxing or limiting immigration enforcement" by reducing the safeguards against non-meritorious asylum claims. On this point, the Fifth Circuit's *Texas MPP* holding controls: "the Agreement both demonstrates DHS's prior knowledge of the States' reliance interests and affirmatively created reliance interests all its own. DHS's failure to consider those interests when it terminated MPP was arbitrary and capricious." *Id.* at 989–90, The same holds true with regard to Texas's reliance interests in this context. The Defendants' position is meritless. Accordingly, "DHS's failure to consider those interests [is] arbitrary and capricious." *Id.*

*Second*, the Defendants failed to estimate or account for the costs to Texas of the Asylum IFR, such as increased healthcare costs for aliens carrying infectious disease or requiring emergency medical treatment, the cost of increased illegal immigration that the Asylum IFR will prompt, and the presence of many more paroled aliens with non-meritorious asylum claims, including both those who, by statute should be detained and the additional influx of those who were induced to enter the United States because of the Asylum IFR. This failure to estimate cost is particularly egregious because of the IFR's infinitesimal claimed benefits. By DHS's own calculations, the IFR will reduce the number of cases referred to the Executive Office of Immigration Review by only 11,250 to 45,000 cases a year, not even a rounding error compared to the pending EOIR caseload of approximately 3 million cases. Appx. 121–23. The "benefit" works out to a backlog reduction of between .375% and 1.5%.

*Third*, the Defendants failed to consider or arbitrarily rejected obvious alternatives to the IFR, such as hiring more Immigration Judges (IJs) or reimplementing the Migrant Protection Protocols (MPP) (and thus sending most aliens from third countries back to Mexico to await asylum decisions). *See* 87 Fed. Reg. at 18,115 (acknowledging comments proposing the hiring of IJs and more effective implementation of MPP, but cursorily rejecting them without analysis). To be sure, "[a]gencies are not compelled to explore every alternative device and thought conceivable of

the mind of man." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020) (quotation omitted). But here, the Defendants were "not writing on a blank slate." *Id.* Agencies "must consider the alternatives that are within the ambit of the existing policy." *Id* at 30 (cleaned up). Defendants' "fail[ure] to consider any alternative within the ambit of the [current] policy. . . alone renders their decision arbitrary and capricious." *Texas MPP*, 20 F.4th at 992 (cleaned up) .

*Fourth*, Defendants failed to consider important statutory factors and relied upon factors Congress didn't direct them to consider. Congress in IIRIRA and the Secure Fence Act elevated controlling the border and reducing unlawful crossings above all other factors, including administrative convenience. *See* IIRIRA, Pub. L. 104–208, 110 Stat 3009, Div. C § 302 (1996); Secure Fence Act, Pub. L. No. 109–367, 120 Stat 2638 (2006) (codified as 8 U.S.C. § 1701). Yet the IFR ignores these statutory goals, and instead incentivizes illegal border crossings.

*Fifth*, the Defendants failed to justify their deviation from prior practice. The APA prohibits the Defendants from "whistl[ing] past [this] factual graveyard" to "evade[]" their "established pattern of agency conduct and formalized positions." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923-27 (D.C. Cir. 2017). For decades, the Defendants have recognized that EOIR properly has final decisional authority over asylum requests. *See, e.g.*, 86 Fed. Reg. at 46,908. Yet in switching that authority from EOIR's immigration judges to mere asylum officers, the Defendants fail to grapple with the underlying reasoning for their prior actions and act as though their prior positions do not exist. Because the APA requires that an agency's "prior policies and standards are being deliberately changed" rather than "causally ignored," the Defendants' failure to grapple with their longstanding polices is arbitrary and capricious. *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009).

*Sixth*, the Asylum IFR is arbitrary and capricious because its rationales are flagrantly pretextual. The actions of the President, Secretary Mayorkas, and other Administration officials have made clear that the intent of the Administration's immigration policies is to incentivize illegal immigration. Indeed, that the Administration's immigration policies incentivize high amounts of illegal immigration is widely recognized internationally. For example, the President of Mexico

called President Biden the "migrant president" and observed that the Biden Administration's policies and rhetoric greatly incentivize illegal immigration. Appx. 162–64. Human traffickers and cartels recognized this as well. Internal Mexican government assessments "state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize migration.'" *Id*. Defendants focused on incentivizing illegal immigration and open borders, not on modifying the asylum system to create alleged marginal efficiencies.

There is also evidence of a "significant mismatch" between the decision made and the rulemaking record. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019). Defendants claim the IFR promotes efficiency and reduces caseload, but the record shows the IFR would reduce EOIR's caseload by as little as 11,250 (leaving over three million backlogged cases still pending), effectively failing in its alleged purpose by Defendants' own estimates. Such blatant pretext renders the Asylum IFR arbitrary and capricious. *New York*, 139 S. Ct. at 2575–76. Because accepting Defendants' description of the IFR requires this Court to "'exhibit a naiveté from which ordinary citizens are free,'" *id.*, it should reject the Defendants' fabricated reasoning.

*Seventh*, the Asylum IFR fails to consider the effect it will have as part of the Biden Administration's large-scale policy changes that incentivize and facilitate greater illegal immigration into the United States. See Appx. 216–224, ¶¶ 41–68. The Biden Administration's abdication of its duties has led to a collapse in border security. The IFR contributes to perceptions among aliens that they will be able to enter the United States, claim asylum, be released and get work authorization, and remain indefinitely. The explosion in the EOIR backlog makes this obvious. As of November 2023, that backlog was 3 million, whereas in late 2020 it was only 1.3 million. Appx. 121–23.

*Eighth*, the IFR fails to account for the significant planning and additional funding required to implement it and fails to justify these costs versus maintaining the status quo. For example, the IFR required Defendants to redraft all training materials, retrain existing officers, and ultimately hire hundreds (if not thousands) of new asylum officers. This failure is particularly egregious

because DHS only recently narrowly escaped financial ruin in the COVID-19 pandemic and major elements of DHS are pleading poverty in the face of their disaster relief obligations. Appx. 165–67.

*Ninth*, the Asylum IFR fails fully to consider the effects of eliminating the adversarial nature of asylum proceedings and the salutary nature of adversarial proceedings for determining the true facts of a situation. This failure warrants special mention because the Asylum IFR would place asylum adjudications solely in the hands of asylum officers who have an established and documented track record of naïve credulity in the face of spurious asylum claims, which has led to their abysmal record at the credible-fear stage. Between FY2008 and FY2023, the grant rate for asylum matters originating from credible fear referrals made by asylum officers was only 15%. Appx. 171. Furthermore, *in absentia* removal-order rates for such cases are very high. Appx. 259. This means that most aliens being placed into immigration court proceedings following a positive credible-fear determination by asylum officers are being ordered removed. Rather than hone the system to limit the number of improvidently granted fraudulent or frivolous claims, the Asylum IFR inexplicably relaxes requirements even further, thus making it even easier for aliens with meritless claims to gain improper entry into the United States and remain here indefinitely while their cases slowly wend through an ever-increasing backlog. Appx. 230–31, ¶ ¶ 88–91.

*Tenth*, the Asylum IFR's claimed justification that it would help to address this backlog is pretextual. Only 17% of EOIR's pending caseload is credible-fear referrals. And because about 45% of all aliens referred to EOIR for a credible-fear determination never actually bother to file an application, the proportion of "real" asylum cases before EOIR is even smaller. Appx. 231–32 ¶ 94. Furthermore, the Asylum IFR's claimed justification makes little sense, as the USCIS case backlog within DHS is significantly worse than EOIR's. Appx. 168–69. And as discussed throughout this brief, the IFR exacerbates the existing incentives to raise non-meritorious asylum claims that only worsen the system's backlog. Appx. 221 ¶ 56.

*Eleventh*, the Asylum IFR eliminates the requirement that aliens arriving at the border complete a full complete asylum application on paper.  87 Fed. Reg. at 18,085, 18,097, and 18,139. Instead, the Asylum IFR treats an alien's oral asylum claim as a complete asylum application. *Id.*

In contrast, aliens already inside the United States who file an asylum application would still be required to submit a full asylum application on paper. *Id.* at 18,146. This improperly provides more favorable treatment to aliens who cross the border illegally and creates significant administrative problems—as judicial review of such oral asylum applications will be nearly impossible in the absence of a clear record of the alien's asylum claims. The IFR offers no consideration to how conferring this unfair advantage on illegal border-crossers will impact unlawful border crossings, nor how this lack of a paper trail will impact judicial reviewability.

*Twelfth*, the Asylum IFR makes it significantly easier for aliens with non-meritorious asylum claims to get paroled into the United States and receive work authorization, and it fails to consider this change's effect on illegal immigration rates, unemployment rates for citizens and authorized aliens, wages, and on costs to Texas to provide public benefits to paroled aliens (all of whom are considered "qualified aliens" for public benefits purposes). *Id.* at 18,085, 18,090, 18,095, and 18,138-18,139. The Asylum IFR treats a positive credible-fear finding—which has little relation to whether an individual will ultimately qualify for asylum—as a properly filed asylum application that starts the clock for eligibility to file for work authorization. Because a large percentage of aliens who meet the credible-fear bar never even apply for asylum, this change makes it significantly easier for aliens with non-meritorious asylum claims to get work authorization, and to get it sooner. This change greatly incentivizes aliens who lack meritorious asylum claims to enter the United States illegally and falsely claim asylum. Appx. 230–31 ¶ 91.

### 2. The Parole Provision

The Asylum IFR's parole provisions are also arbitrary and capricious for several independently sufficient reasons.

*First*, Defendants utterly neglect to consider State reliance interests on the previous regime and the harm to Texas from the *en masse* parole of aliens. The Agreement with Texas expressly recognized such reliance interests, but Defendants purport to have withdrawn from that agreement and in the IFR pretend their prior acknowledgements never existed at all.

*Second*, the Defendants have failed to analyze and consider how their own failure to maintain detention capacity affects the purported need to parole aliens into the United States. For example, at the same time Defendants claimed that their detention facilities are over capacity, the Defendants submitted a budget request to Congress that would *decrease* DHS's alien detention capacity by 25%. Appx. 172–175. Defendants have degraded their own detention capacity by cancelling contracts with private detention facilities and by closing detention facilities. *Id.* Moreover, the Defendants have refused to employ the capacity they do have. The DHS Inspector General, for example, concluded in an April 12, 2022 report that DHS abused its authority in securing hotel space as detention capacity through no-bid contracts, and then allowed that dubiously obtained capacity to remain fallow. See Appx 153–206.

*Third*, the Defendants have failed to explain their deviation from prior practice. Specifically, current regulations strictly limit when the executive branch can parole aliens pending a credible-fear interview or in expedited removal, such that parole is permitted only when it "is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii), (b)(4)(ii). This limitation is consonant with Congress's intent to strictly limit Defendants' use of the parole power. The Defendants claim that eliminating these constraints on the parole authority will allow them to process more families through expedited removal proceedings and "facilitat[e] their expeditious removal." 87 Fed. Reg. at 18,109. But this justification is obviously pretextual, as the Defendants have issued guidance strictly limiting the removal of such aliens, and the number of removals under the Biden Administration has dropped precipitously. *See, e.g.*, September 30, 2021 DHS Permanent Guidance Memo; *Arizona v. Biden*, 593 F. Supp. 3d 676 (S.D. Ohio 2022), rev'd and remanded, 40 F.4th 375 (6th Cir. 2022)1, ECF No. 4-11 at 12 (S.D. Ohio Nov. 23, 2021) (deposition testimony of Acting Phoenix ICE Director Albert Carter noting a "big drop off in removals" beginning in February 2021).

Because the Defendants have again "failed to reasonably consider [their] own factual findings regarding the benefits," the IFR is arbitrary and capricious. *See Texas*, 20 F.4th at 990.

**E. The IFR is unlawful because it was promulgated without adequate notice and opportunity to comment in violation of the APA.**

### 1. The IFR is Not a Logical Outgrowth of the Proposed Rule.

With certain exceptions not applicable here, the APA requires rulemaking to be conducted through notice-and-comment procedures. 5 U.S.C. § 553(b)-(c). A notice of proposed rulemaking must include "the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b). The public must be given a chance to comment on the proposed rule, *id.*, § 553(c), and the agency must then respond to comments received, *see*, *e.g.*, *HBO v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.").

To evaluate whether the notice provided is sufficient when a promulgated rule differs from a proposed rule, federal courts use the "logical outgrowth" test. "Final rules under APA notice-and-comment rulemaking must be the 'logical outgrowth' of the proposed rule. The objective is fair notice." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021) (citation omitted). "If interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period, then the rule is deemed to constitute a logical outgrowth of the proposed rule." *Id.* at 381–82 (citation omitted). A "final rule" that is "'surprisingly distant' from the proposed rule" fails the logical outgrowth test. *UMW v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005). "'[I]f the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal,'" and the rule thus violates the APA. *City of Waukesha*, 320 F.3d at 245.

Here, the Asylum IFR is "surprisingly distant" from the proposed rule and "deviates too sharply from the proposal" under any reasonable assessment. The Asylum IFR makes a remarkable 23 substantive changes to the NPRM, fundamentally altering it. Defendants' *3,100-plus-word summary* of the *23 major changes* they made from the proposed rule amply justifies the conclusion that the deviations exceed the "deviates too sharply" standard. For example, the IFR creates a

45

previously unmentioned new regulation at 8 C.F.R. 1240.17, which establishes new "streamlined" section 240 removal procedures and imposes procedural requirements on IJs and substantive limits on their discretion to independently evaluate certain claims. *See* 87 Fed. Reg. 18,082–83. The result is an IFR that is radically different from what was proposed to the public and on which the public submitted comments. This does not comport with 5 U.S.C. § 553.

The Defendants offer the bland claim that they "are in compliance with the APA's notice-and-comment requirements with respect to these changes because each change is a logical outgrowth of the proposals set forth in the NPRM." 87 Fed. Reg. at 18,195. That denial reads more like a confession than a defense of the Rule, especially as the Defendants failed to follow it up by connecting any of the 23 changes to specific aspects of the NPRM of which they were supposedly "logical outgrowths." The notice also misleadingly characterizes the 23 changes generally as "procedural," without acknowledging that, for example, they include substantive limitations on Immigration Judges' discretion. In any event, even if all 23 major changes were individually logical outgrowths (they are not), the *cumulative effect* of all 23 changes renders the interim-final rule "surprisingly distant" and "deviat[ing] too sharply" from the proposal, thereby violating the APA.

Any other outcome would undermine the logical outgrowth test's purpose of ensuring "fair notice." *Texas Ass'n of Mfrs.*, 989 F.3d at 381. Again, the "'essential inquiry' . . . 'is whether the commentators have had a fair opportunity to present their views on the contents of the final plan.'" *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985) (citation omitted). No such "fair opportunity" was present here. The final IFR deviates so profoundly from the proposed rule that no one could fairly have commented on anything that remotely looked like the former without having to "divine [DHS's and DOJ's] unspoken thoughts." *International Union*, 407 F.3d at 1260. The APA prevents agencies from engaging in those kinds of tactics.

### 2. The IFR Doesn't Adequately Address Comments on the Proposed Rule.

The Asylum IFR failed to take account of the States' comments to the NPRM, either summarily rejecting them without substantive explanation, or outright ignoring them. For

example, as discussed above, a coalition of 16 states, including Plaintiff Texas, submitted an 18-page comment that raised general concerns, as well as 10 specific comments about serious deficiencies in the proposed rule. ECF No. 106-3 Appx. 150–168. The Defendants ignored much of the States' comment and, for the aspects of the comment that they purported to address, they summarily disposed of the States' comment in a cursory, dismissive fashion that refused to offer any substantive legal or factual basis for dismissing the States' comment. For example, the Defendants cursorily rejected the States' NEPA and federalism concerns and failed to offer any substantive legal or factual justification for that rejection. 87 Fed. Reg. at 18,193–94. Instead, the Defendants merely claimed, without justification, that the Asylum IFR will not increase the asylum grant rate. The Defendants' failure to address the States' comment is arbitrary and capricious.

## V.     This Court should enjoin the implementation of the Asylum Officer Rule.

Texas has established every element for a permanent injunction. A permanent injunction is proper when a plaintiff prevails on the merits, there is no adequate remedy at law for plaintiff's injury, the balance of harms favors the plaintiff, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### A.  Texas succeeds on the merits.

As explained above, Texas has succeeded on the merits of its claims.

### B.  Texas is suffering irreparable harm.

Texas is suffering significant irreparable harm from the Asylum Officer Rule. In certain cases, a "'substantial financial injury' may be 'sufficient to show irreparable injury.'" *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)). Generally, it is "well established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). That is the case here.

Here, Texas suffers substantial financial injuries due to the costs it has incurred and will incur due to the IFR. Appx. 3 ¶¶ 12–14, 5–6 ¶¶ 5–7, 11–12 ¶¶ 10–11. Moreover, because the federal government "generally enjoy[s] sovereign immunity for any monetary damages," *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142, Texas cannot compel the federal government to reimburse it. Accordingly, the injuries to Texas's financial interests are irreparable and an injunction from this Court is warranted.

### C. The balance of the equities and public interest favor Texas.

When the government is a party, the balance-of-equities and public-interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas v. United States (DAPA)*, 809 F.3d 134, 187 (5th Cir. 2016). The Court must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997). Defendants have no legitimate interest "in enforcing an unlawful" agency action. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Because the Asylum Officer Rule is unlawful, an injunction that redresses Texas's injuries serves the public interest and does not harm Defendants. The balance of equities and the public interest favor Texas.

### D. Injunctive relief should apply throughout the nation.

The injunction should also be nationwide. Both the Constitution and Congress have directed that the Nation needs a uniform, nationwide immigration policy. *See DAPA*, 809 F.3d at 187–88. Specifically, "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *DACA*, 50 F.4th at 531. In contrast, a more limited remedy would "detract[] from the integrated scheme of regulation[] created by Congress." *Id.* (internal quotations omitted). In particular, since aliens can move freely within the United States, nationwide relief is appropriate because nothing would prevent them from moving to Texas and causing the harms described above. Thus, a nationwide injunction is warranted.

## VI.    This Court should vacate the challenged agency action.

Vacatur under Section 706 is the "default remedy for unlawful agency action." Section 706 has "nationwide effect, is not party-restricted, and affects persons in all judicial districts equally." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951–52 (5th Cir. 2024) (cleaned up)). In general, the propriety of vacatur is based on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Texas v. United States (DACA)*, 50 F.4th 498, 529 (5th Cir. 2022).

Vacatur is necessary because "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remanding without vacatur would "invite[] agency indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). And "[b]ecause vacatur is the default remedy ... defendants bear the burden to prove that vacatur is unnecessary." *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:23-CV-59-JDK, 2023 WL 4977746, at *13–14 (E.D. Tex. Aug. 3, 2023) (Kernodle, J.) (citation omitted).

Here, the Asylum Officer Rule suffers from severe deficiencies that cannot be cured on remand, and no disruptive consequences will result from vacatur. Regarding the first factor of vacatur, the federal government could not justify on any remand its decision to create law that Congress did not pass and that the Supreme Court did not allow. Broadly speaking, remand to an agency "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U. S. Cons. Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (citing *Central and South West Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).

Remand without vacatur is proper only where the agency failed "adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule." *Texas Med. Ass'n*, 2023 WL 4977746, at *13–14, (E.D. Tex. Aug. 3, 2023). That is not this case. And a total "failure to provide the required notice and to invite public comment . . . is a fundamental flaw that normally requires vacatur of the rule." *Wheeler*, 955 F.3d at 85; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("[A]n agency that bypassed required notice and comment rulemaking obviously could not ordinarily keep in place a regulation while it completed that fundamental procedural prerequisite.").

And because the challenged agency actions here are contrary to law, there is no possibility that Defendants could correct the fundamental errors on remand. In *DACA*, the Court found "no possibility that DHS could obviate the[] conflicts on remand" because DACA had "severe" deficiencies and "fundamental substantive defects" that "contradict[ed] significant portions of the INA." *DACA*, 50 F.4th at 529. The same holds here. Vacatur will not cause disruptive consequences. Defendants may not rely on the "uncertainty that typically attends vacatur of any rule." *Nat. Res. Def. Council*, 955 F.3d at 85 (rejecting agency's disruption argument). And "the threat of disruptive consequences cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same standards on remand.'" *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008). Asserted disruptiveness cannot save the IFR from vacatur.

**CONCLUSION**

The Court should grant Plaintiff summary judgment on all its claims, set aside and vacate the Asylum Officer Rule, permanently enjoin it, and declare the Asylum Officer Rule unlawful under the APA, HSA, and INA, and contrary to the Appointments Clause of the Constitution.

Dated: October 18, 2024.

GENE P. HAMILTON
Virginia Bar No. 80434

JAMES K. ROGERS
Arizona Bar no. 027287

RYAN GIANNETTI
DC Bar no. 1613384

AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
james.rogers@aflegal.org
ryan.giannetti@aflegal.org

Respectfully submitted,

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 254105085

/s/ *David Bryant*
DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

MARK A. CSOROS
Assistant Attorney General
Texas Bar No. 24142814

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
ryan.walters@oag.texas.gov
david.bryant@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
mark.csoros@oag.texas.gov

COUNSEL FOR THE STATE OF TEXAS

**CERTIFICATE OF SERVICE**

I certify that on October 18, 2024, this document was filed through the Court's CM/ECF system, which served it upon all counsel of record.

/s/ *David Bryant*
DAVID BRYANT
Senior Special Counsel