# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

STATE OF TEXAS

    *PLAINTIFF,*

V.

MARKWAYNE MULLIN, *et al.*

    *DEFENDANTS.*

CASE NO. 2:22-CV-00094-Z

### STATE OF TEXAS'S MEMORANDUM IN SUPPORT OF ITS RENEWED[1] MOTION FOR SUMMARY JUDGMENT

---

[1] Texas has filed today its Renewed Motion for Summary Judgment pursuant to the Court's Order dated July 2, 2026. ECF No. 196. Texas incorporated by reference in that Renewed Motion for Summary Judgment the Administrative Record (ECF No. 139-141) and the Appendix (ECF No. 155-1) filed with its previous Motion for Summary Judgment. ECF No. 155.

TABLE OF CONTENTS

Table of Contents ........................................................................................................................ ii

Index of Authorities .................................................................................................................... 4

Introduction ............................................................................................................................... 9

Statement of Issues ...................................................................................................................12

Background ...............................................................................................................................12

    I.    Congress's Expedited-Removal And Asylum Framework .............................................12

    II.   The 2022 Asylum Officer Rule .....................................................................................14

    III.  This litigation and Defendants' unfulfilled rescission representations ..........................16

    IV.  DHS's recent 2026 affirmative-asylum rule does not rescind, supersede, or cure the 2022 Rule. ...........................................................................................................................16

Legal Standard .........................................................................................................................17

Argument ..................................................................................................................................18

    I.    The 2022 Rule Is Final Agency Action, And This Case Presents A Live Controversy. 18

    II.   Texas Has Standing, An Apa Cause Of Action, And A Proper Forum ..........................19

        A. Texas has established concrete fiscal injury .................................................................19

        B. Texas's injury is fairly traceable to the Rule. .......................................................... 20

        C. Vacatur and related relief will redress Texas's injury ................................................21

        D. *United States v. Texas* does not bar standing. ...........................................................21

        E. The Laken Riley Act expressly authorizes this action and removes any remaining doubt about Texas's standing. ................................................................................... 22

        F.  Texas's interests fall within the relevant statutory zone ...........................................25

        G.  The INA does not strip this Court's jurisdiction ..................................................... 26

        H.  Texas's standing evidence is properly before the Court ......................................... 26

    III.  The 2022 Rule Exceeded The Departments' Statutory Authority. ...............................27

        A.  Section 1225 authorizes credible-fear screening, not a USCIS merits-adjudication system .................................................................................................................27

        B.  The HSA preserved EOIR's merits-adjudication function. ................................. 28

        C.  Congress's targeted grants of USCIS jurisdiction confirm that general rulemaking language is insufficient. ....................................................................................... 29

        D.  The Rule unlawfully constrains immigration judges' independent adjudication.. 30

        E.  Persuasive authority has rejected the Departments' reading. ...............................31

    IV.  The Rule's Parole Provisions Exceed 8 U.S.C. § 1182(D)(5)(A). ................................32

        A. Congress deliberately narrowed parole in 1996 ......................................................32

B. Congress' choice of mandatory detention made parole a narrow exception, not an administrative default. ...............................................................................33

C. Preexisting regulations do not validate the Rule's expansion. ..............................34

V.    The Rule Raises An Independent Appointments Clause Defect.....................................34

VI.   The Rule Is Arbitrary And Capricious..........................................................................36

    A.   The Departments dismissed rather than considered State reliance interests...........36

    B.   The Departments failed to reasonably assess costs to Texas and other States.........37

    C.   The Departments failed to consider obvious lawful alternatives.............................38

    D.   The Departments failed to justify the departure from longstanding adversarial adjudication.............................................................................................................39

    E.   The Rule's "efficiency" rationale does not account for its own acknowledged consequences. ........................................................................................................39

    F.   Defendants' parole analysis was arbitrary for the same reasons it is contrary to law. ..................................................................................................................... 40

    G.   Post hoc developments cannot repair the broken 2022 rationale. ...........................41

VII.  The Rule was Promulgated Without the Notice and Comment Required By the APA. 41

    A.   The Rule is substantive, not an exempt housekeeping measure ..............................41

    B.   The final § 1240.17 system was not a logical outgrowth of the NPRM. .................. 42

    C.   The Departments did not adequately respond to significant State comments. ....... 42

    D.   Defendants' procedural error was prejudicial. .......................................................43

VIII. The Court Should Declare The Rule Unlawful, Vacate It, And Grant Necessary Injunctive Relief.............................................................................................................43

    A.   Vacatur is the appropriate APA remedy .................................................................43

    B.   Remand without vacatur would be unwarranted. ................................................... 44

    C.   Texas satisfies the requirements for a permanent injunction. .................................45

Conclusion .................................................................................................................................45

Certificate of Service.................................................................................................................47

## INDEX OF AUTHORITIES

### Cases

*Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*,
 988 F.2d 146 (D.C. Cir. 1993) ............................................................................... 44

*American Federation of Labor & Congress of Industrial Organizations v. NLRB*,
 57 F.4th 1023 (D.C. Cir. 2023) ............................................................................ 42

*Arizona v. Garland*,
 730 F. Supp. 3d 258 (W. D. La. 2024) ...................................................... 27, 31, 32

*Bennett v. Spear*,
 520 U.S. 154 (1997) ............................................................................................. 18

*Central & South West Services, Inc. v. EPA*,
 220 F.3d 683 (5th Cir. 2000) ............................................................................... 43

*City of Mesquite v. Aladdin's Castle, Inc.*,
 455 U.S. 283 (1982) ............................................................................................. 19

*Davis v. FEC*,
 554 U.S. 724 (2008) ............................................................................................. 19

*Department of Commerce v. New York*,
 588 U.S. 752 (2019) ............................................................................................. 21

*Department of Homeland Security v. Regents of the University of California*,
 591 U.S. 1 (2020) ................................................................................................. 37

*eBay Inc. v. MercExchange, L.L.C.*,
 547 U.S. 388 (2006) ............................................................................................. 45

*Edmond v. United States*,
 520 U.S. 651 (1997) ............................................................................................. 35

*Encino Motorcars, LLC v. Navarro*,
 579 U.S. 211 (2016) ....................................................................................... 37, 40

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) ....................................................................................... 37, 40

*Freytag v. Commissioner*,
 501 U.S. 868 (1991) ............................................................................................. 35

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
 528 U.S. 167 (2000) ............................................................................................. 19

*General Land Office v. Biden,*
      71 F.4th 264 n.12 (5th Cir. 2023) ................................................................................20, 21

*In re Crocker,*
      941 F.3d 206 (5th Cir. 2019) ...................................................................................................33

*Jennings v. Rodriguez,*
      138 S. Ct. 830 (2018).............................................................................................................. 30

*Jennings v. Rodriguez,*
      583 U.S. 281 (2018)........................................................................................................... 11, 34

*Kaufman v. Mukasey,*
      524 F.3d 1334 (D.C. Cir. 2008)........................................................................................... 29

*Kennedy v. Braidwood Management, Inc.,*
      606 U.S. 748 (2025)........................................................................................................... 35, 36

*Lexmark International, Inc. v. Static Control Components, Inc.,*
      572 U.S. 118 (2014) .............................................................................................................. 26

Loper Bright Enterprises v. Raimondo,
      603 U.S. 369 (2024) ....................................................................................................11, 18, 28

*Lucia v. SEC,*
      585 U.S. 237 (2018)..................................................................................................................35

*Manufacturers v. United States Consumer Product Safety Commission,*
      989 F.3d 368 (5th Cir. 2021) ........................................................................................... 42, 44

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
      567 U.S. 209 (2012) ............................................................................................................. 26

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,*
      463 U.S. 29 (1983)........................................................................................................37, 39, 40

*MTD I,*
      2024 WL 455337, at \*4–7 ............................................................................................ passim

*MTD II,*
      2024 WL 3173296, at \*2–5 ......................................................................................... passim

*National Federation of Independent Business v. Department of Labor,*
      595 U.S. 109 (2022) ............................................................................................................. 28

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
      566 U.S. 639 (2012)............................................................................................................... 29

*Robinson v. Shell Oil Co.,*
      519 U.S. 337 (1997)............................................................................................................... 28

5

*Sanchez v. R.G.L.*,
    761 F.3d 495 (5th Cir. 2014)................................................................................. 22

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943).................................................................................... passim

*Sturgeon v. Frost*,
    577 U.S. 424 (2016)............................................................................................. 28

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................................19

*Texas Medical Association v. United States Department of Health & Human Services*,
    110 F.4th 762 (5th Cir. 2024)........................................................................44, 45

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019)..............................................................................19

*Texas v. Mayorkas*,
    No. 2:22-CV-094-Z, 2024 WL 455337 (N.D. Tex. Feb. 6, 2024) ....................... 17, 20, 21, 26

*Texas v. United States*,
    126 F.4th 392 (5th Cir. 2025)......................................................................... passim

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .............................................................................. 26

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)............................................................................................. 24

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ...........................................................................................45

*United States v. Texas*,
    599 U.S. 670 (2023) ..................................................................................... passim

## Constitutional Provisions & Statutes

U.S. Const. art. II, § 2, cl. 2 ...............................................................................35

5 U.S.C. § 553(b).................................................................................................41

5 U.S.C. § 704.....................................................................................................18

5 U.S.C. § 706.....................................................................................................43

5 U.S.C. § 706(2) ............................................................................................... 44

5 U.S.C. § 706(2)(A) ..........................................................................................18

5 U.S.C. § 706(2)(A) & (C) ................................................................................32

6

6 U.S.C. § 271(b)(3), (5) ................................................................................14, 29

8 U.S.C. §§ 1101(a)(18), 1225(b)(1)(E) ..............................................................36

8 U.S.C. § 1103(g)(1) ......................................................................................14, 29

8 U.S.C. § 1158(b)(1)(A) ....................................................................................... 29

8 U.S.C. §§ 1158(b)(1)(B), 1229a(c)(4) ........................................................ 14, 31

8 U.S.C. § 1158(b)(3)(C) ..................................................................................11, 15

8 U.S.C. § 1158(d)(1), (5)(B) ............................................................................... 29

8 U.S.C. § 1182(D)(5)(A) ................................................................................ passim

8 U.S.C. § 1182(d)(5)(C) ...................................................................................23, 24

8 U.S.C. §§ 1182(d)(5)(C), 1225(b)(3) ................................................................ 24

8 U.S.C. § 1225(b) .................................................................................................23

8 U.S.C. § 1225(b)(1)(A)(i) ...................................................................................13

8 U.S.C. § 1225(b)(1)(A)(ii), 1225(b)(1)(B) ......................................................13

8 U.S.C. § 1225(b)(1)(B) ....................................................................................... 28

8 U.S.C. § 1225(b)(1)(B)(ii) ........................................................................... passim

8 U.S.C. § 1225(b)(1)(B)(iii) ............................................................................14, 28

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) .........................................................................23

8 U.S.C. § 1225(b)(1)(E) ........................................................................................13

8 U.S.C. § 1225(b)(3) .............................................................................................23

8 U.S.C. § 1229a ....................................................................................................14

8 U.S.C. § 1229a(a)(1), (3) ...............................................................................14, 28

8 U.S.C. § 1229a(a), (c)(4) .................................................................................... 31

8 U.S.C. § 1252(e) ..................................................................................................32

8 U.S.C. § 1252(e)(3) ............................................................................................. 26

8 U.S.C. § 1252(f)(1) ..............................................................................................25

8 U.S.C. § 1252(f)(3) ..............................................................................................25

8 U.S.C. § 1612(a)(2)(A) ....................................................................................... 20

8 U.S.C. § 1641(b)(2) ............................................................................................. 20

8 U.S.C. § 1641(b)(4) ........................................................................................... 20

8 USC 1225(b)(1) ..................................................................................................32

**Rules & Regulations**

8 C.F.R. §§ 208.2(a)(1)(ii), 208.3(a)(2) ............................................................... 44

8 C.F.R. §§ 208.2(a)(1)(ii), 208.30(f).............................................................. 16, 18

8 C.F.R. § 208.3(a)(2) ...........................................................................................16

8 C.F.R. §§ 208.4(a), 208.9(a)(2), 208.10, 208.14(c), 208.19.......................................17

8 C.F.R. §§ 208.9, 208.14(b) .................................................................................16

8 C.F.R. § 208.14(b) .............................................................................................35

8 C.F.R. 2 ............................................................................................................17

8 C.F.R. §§ 208.14(c), 208.16.................................................................................16

8 C.F.R. § 212.5(b)......................................................................................... 16, 34

8 C.F.R. §§ 212.5(b), 235.3(b), (c).................................................................... 18, 33

8 C.F.R. § 235.3(b)(2)(iii), (b)(4)(ii), & (c)(2) ..........................................................35

8 C.F.R. § 235.3(b)(2)(iii), (b)(4)(ii), (c)(2) ............................................................16

8 C.F.R. § 1240.17.......................................................................................... passim

8 C.F.R. § 1240.17(a) ..................................................................................22, 39, 45

8 C.F.R. § 1240.17(d), (f)(2)(i)(B), (i)(2) .........................................................16, 30, 31

Fed. R. Civ. P. 26(a)(1)(B)(i) .................................................................................27

Fed. R. Civ. P. 56(a) .............................................................................................18

Fed. R. Civ. P. 56(c)(4) .........................................................................................27

Fed. R. Civ. P. Rule 56 ..........................................................................................18

Fed. R. Evid. 803(8)..............................................................................................27

87 Fed. Reg. 18,078 (Mar ch 29 ..............................................................................10

87 Fed. Reg. 18,078 (Mar ch 2022)...........................................................................10

86 Fed. Reg. 46,906 (Aug. 20, 2021) .........................................................................15

91 Fed. Reg. 47,101................................................................................................17

91 Fed. Reg. 47,101–04, 47,110–11 ...........................................................................18

## INTRODUCTION

Texas challenges the Defendants' adoption and implementation of the "Interim Final Rule: Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers," 87 Fed. Reg. 18,078 (March 29, 2022) (the "Asylum Officer Rule," "Rule," or "IFR"). This case presents a question of statutory authority that is answered by the plain language Congress adopted. Congress created a specific process for aliens placed in expedited removal who establish a credible fear of persecution or torture. An asylum officer conducts the threshold screening. If the alien establishes "credible fear", the statute commands detention of the  alien "for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). For the quarter-century preceding the challenged 2022 Rule, that further consideration occurred in removal proceedings before an immigration judge in EOIR—the forum Congress preserved when it divided immigration functions between DHS and DOJ.

The challenged 2022 Rule replaced that congressionally structured sequence with an administrative system of the Departments' own design. Under that new system created through Executive fiat, USCIS may now retain the case, treat the credible-fear record as the asylum application, conduct a non-adversarial Asylum Merits interview, and grant asylum without any immigration-court proceeding. If USCIS does not grant asylum, the case proceeds under a new regulation, 8 C.F.R. § 1240.17, which imposes special deadlines, evidentiary rules, continuance restrictions, and constraints on immigration-judge reconsideration of certain asylum-officer determinations.

The challenged Rule also expands parole regulations for the affected expedited-removal population based on a legal premise that the absence of flight risk or danger—and the administrative burden of detention—can itself satisfy Congress's requirement of "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

None of the general rulemaking provisions invoked by the Departments authorized that

dramatic restructuring of the country's asylum system. Section 1225 assigns asylum officers a screening role and says nothing about a USCIS merits-adjudication system after a positive credible-fear determination. Section 1158 authorizes both the Secretary and Attorney General to grant asylum, but only through requirements and procedures consistent with the INA's more specific provisions and the HSA's allocation of functions. The Homeland Security Act (HSA) expressly preserved with EOIR the authorities and functions the Executive Office for Immigration Review (EOIR) exercised before DHS was created. It never granted such authority to DHS. And Congress has shown that, when it wants USCIS to exercise special initial jurisdiction over asylum applications that would otherwise proceed in immigration court, it says so expressly—as it did for unaccompanied alien children in 8 U.S.C. § 1158(b)(3)(C).

The Supreme Court's intervening decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), removed any possible premise for deference to the Departments' interpretation. This Court must exercise independent judgment. Id. at 412–13. The best reading of the INA and HSA is the reading reflected in the statutory structure, the history of the expedited-removal provisions, and the pre-2022 division of functions: asylum officers' screen; and immigration judges conduct the further merits adjudication for cases arising from expedited removal.

The Rule's parole provisions independently exceed statutory authority. Congress narrowed parole in 1996 because the Executive had used it to admit broad categories outside Congress's immigration system. Congress now permits parole only "temporarily," "on a case-by-case basis," and for an urgent humanitarian reason or significant public benefit specific to the individual. 8 U.S.C. § 1182(d)(5)(A). A purportedly case-specific review cannot cure an unlawful categorical premise creating a presumption in favor of parole.

The challenged Rule effectively revived the discarded pre-1996 "public interest" standard by presuming that detention is not in the public interest for broad categories of persons who are not dangerous or likely to abscond. But Congress separately commanded detention after a positive credible-fear determination and made parole the narrow exception. *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018).

**10**

The Administrative Procedure Act supplies additional grounds for judgment in favor of Texas. The Departments summarily declared that they perceived "no serious reliance interests" on the part of any State or local government, 87 Fed. Reg. at 18,109, despite detailed comments describing substantial fiscal burdens on Texas and other States. The Departments did not meaningfully evaluate those costs, the risk of increased incentives to enter and claim asylum, lawful alternatives such as increasing immigration-judge capacity, or the loss of adversarial safeguards. And the final Rule was not a logical outgrowth of the proposal. The NPRM did not give fair notice of the detailed § 1240.17 system ultimately adopted. The Departments' decision to solicit comments only after the new system became effective did not satisfy § 553.

The change in Administrations in 2025 does not alter the legal analysis. Defendants repeatedly obtained stays by representing that DHS had decided to rescind the challenged asylum merits, parole, credible-fear, and streamlined-proceeding provisions. But the Rule remains in force today, and Defendants still cannot identify a publication date. This Court, therefore, rightly reopened the case on July 2, 2026. A separate rule DHS issued on July 28, 2026, addresses affirmative asylum referrals without interview. It does not amend the expedited-removal provisions challenged here. Nor can a later rule or a litigation promise to supply the contemporaneous reasoning missing from the 2022 administrative record. SEC v. Chenery Corp., 318 U.S. 80, 87 (1943).

The Court should grant summary judgment, declare the Rule unlawful, and vacate it. Remand without vacatur would be particularly inappropriate. The defects are statutory, constitutional, and procedural—not merely an inadequately explained policy choice. The prior framework operated for decades; the Rule itself contains a fallback permitting ordinary EOIR proceedings if the Asylum Merits system is enjoined or vacated; and DHS has already announced its intention to rescind the challenged provisions. Vacatur therefore restores the lawful status quo without the disruption that sometimes warrants withholding the APA's ordinary remedy.

### STATEMENT OF ISSUES

1.      Whether the 2022 Rule is final agency action and whether this controversy remains live, notwithstanding Defendants' stated intention to rescind the Rule and DHS's separate July 28, 2026, rule concerning affirmative asylum referrals.

2.      Whether Texas has Article III standing, falls within the relevant zone of interests for an APA cause of action, and may pursue this programmatic challenge in this Court.

3.      Whether the 2022 Rule exceeds the authority conferred by the INA and conflicts with the HSA's allocation of asylum-adjudication functions between USCIS and EOIR.

4.      Whether the Rule's parole provisions exceed what is permissible under 8 U.S.C. § 1182(d)(5)(A).

5.      Whether the Rule violates the Appointments Clause to the extent it authorizes unappointed line-level asylum officers to exercise final decisional authority.

6.      Whether the Rule is arbitrary, capricious, or procedurally invalid under the APA.

7.      Whether Texas is entitled to declaratory relief, vacatur, and appropriately tailored permanent injunctive relief.

### BACKGROUND

### I.    CONGRESS'S EXPEDITED-REMOVAL AND ASYLUM FRAMEWORK

Congress enacted the current expedited-removal framework in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). When an arriving alien is inadmissible for fraud, misrepresentation, or lack of valid entry documents, an immigration officer generally may order expedited removal without ordinary removal proceedings. 8 U.S.C. § 1225(b)(1)(A)(i). But if the person indicates an intention to apply for asylum or a fear of persecution, the officer must refer the person to an asylum officer for a +credible-fear interview. *Id*. § 1225(b)(1)(A)(ii), 1225(b)(1)(B).

The credible-fear interview is a threshold screening. An "asylum officer" is an immigration officer trained in country conditions, interview techniques, and asylum law and supervised by an experienced asylum officer. *Id*. § 1225(b)(1)(E). If the asylum officer finds no credible fear, the

alien may obtain review by an immigration judge. *Id.* § 1225(b)(1)(B)(iii). If the asylum officer finds a credible fear, the statute provides that "the alien shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii).

The INA separately provides that an immigration judge "shall conduct proceedings for deciding the inadmissibility or deportability of an alien," and that, "[u]nless otherwise specified" in the INA, a proceeding under 8 U.S.C. § 1229a "shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." *Id.* § 1229a(a)(1), (3). In those proceedings, the applicant bears the burden to establish eligibility for asylum or other relief, and the immigration judge assesses testimony, credibility, corroboration, and the evidentiary record. *Id.* §§ 1158(b)(1)(B), 1229a(c)(4).

Congress's contemporaneous explanation of IIRIRA confirms how the provisions fit together. The conference report explained that, after a positive credible-fear finding, "the alien shall be detained for further consideration of the application for asylum under normal non-expedited removal proceedings." H.R. Conf. Rep. No. 104-828, at 209–10 (1996). That is how the system operated from implementation of IIRIRA until the 2022 Rule: asylum officers screened for credible fear, and positive cases proceeded to ordinary removal proceedings before EOIR immigration judges.

Congress later enacted the Homeland Security Act of 2002 ("HSA"), which created DHS and divided the former Immigration and Naturalization Service's functions between DHS and DOJ. The HSA transferred to USCIS asylum and refugee adjudications formerly performed by INS, as well as other INS adjudications. 6 U.S.C. § 271(b)(3), (5). But Congress simultaneously preserved with DOJ "such authorities and functions" relating to immigration "as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review," immediately before the HSA took effect. 8 U.S.C. § 1103(g)(1). Read together, those provisions preserved the pre-HSA division: USCIS performs the asylum functions formerly performed by INS, including affirmative asylum adjudication and

credible-fear screening; EOIR retains the immigration-court functions it previously exercised, including merits adjudication of defensive applications arising from the credible-fear process.

Congress has also demonstrated that it legislates expressly when it wants to alter that forum allocation. Under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, "[a]n asylum officer . . . shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child," even where that child otherwise would be in removal proceedings. 8 U.S.C. § 1158(b)(3)(C). This confirms two relevant facts: (1) Congress knows how to vest final authority for asylum adjudications in DHS when it wants to, and (2) Congress recognized that DHS does *not* have this authority over asylum claims generally, so Congress needed to act affirmatively to confer such authority.

## II.    THE 2022 ASYLUM OFFICER RULE

On August 20, 2021, DHS and DOJ published an Notice of Proposed Rulemaking (NPRM) proposing substantial changes to credible-fear screening and the adjudication of asylum, withholding, and Convention Against Torture claims for persons in expedited removal. 86 Fed. Reg. 46,906 (Aug. 20, 2021). Sixteen States, including Texas, submitted detailed comments addressing statutory authority, State costs, reliance interests, migration incentives, parole, federalism, and procedural safeguards. The Defendants ignored much of the States' comments and, for the aspects of the comment that they purported to address, they summarily disposed of the States' comment in a cursory, dismissive fashion that refused to offer any substantive legal or factual basis for dismissing the States' comment. For example, the Defendants cursorily rejected the States' NEPA and federalism concerns and failed to offer any substantive legal or factual justification for that rejection. 87 Fed. Reg. at 18,193-18,194. Instead, the Defendants merely claimed, without justification, that the Asylum IFR will not increase the asylum grant rate. The Defendants' failure to address the States' comment was arbitrary and capricious.

The Departments published the 2022 Rule on March 29, 2022, with an effective date of May 31, 2022. 87 Fed. Reg. at 18,078. The challenged Rule made twenty-three identified changes

from the NPRM and adopted a new regulatory architecture. Three parts of these changes are particularly relevant.

*First*, after a positive credible-fear determination, USCIS may retain the case for "further consideration" through an Asylum Merits interview rather than placing the alien directly into ordinary § 1229a proceedings before an immigration judge. 8 C.F.R. §§ 208.2(a)(1)(ii), 208.30(f). The written credible-fear record is treated as satisfying the asylum-application filing requirements. *Id*. § 208.3(a)(2). USCIS conducts a non-adversarial interview and may grant asylum. *Id*. §§ 208.9, 208.14(b).

*Second*, if USCIS does not grant asylum, the asylum officer determines whether the applicant is eligible for withholding of removal or CAT protection and refers the case to EOIR. *Id*. §§ 208.14(c), 208.16. The Rule created 8 C.F.R. § 1240.17 to govern those proceedings. Section 1240.17 imposes specialized hearing schedules, filing deadlines, continuance standards, and evidentiary procedures. In specified circumstances, an immigration judge must give effect to an asylum officer's withholding or CAT eligibility determination unless DHS presents qualifying new, respondent-specific evidence. *Id*. § 1240.17(d), (f)(2)(i)(B), (i)(2).

*Third*, the Rule amended parole regulations governing persons in expedited removal. It authorizes case-by-case parole under 8 C.F.R. § 212.5(b) for persons awaiting credible-fear review, subject to expedited-removal orders, or awaiting Asylum Merits adjudication. *Id*. § 235.3(b)(2)(iii), (b)(4)(ii), (c)(2). In defending the change, the Departments treated the conclusion that continued detention is "not in the public interest," coupled with the absence of security and absconding risks, as generally sufficient to fit the post-IIRIRA statutory requirement of "urgent humanitarian reasons or significant public benefit". 87 Fed. Reg. at 18,107–09.

The Departments implemented the Rule in phases. But phased implementation did not make the regulation tentative. The Rule changed binding regulations, took legal effect, and has now governed agency conduct for more than four years.

III.    **THIS LITIGATION AND DEFENDANTS' UNFULFILLED RESCISSION REPRESENTATIONS**

Texas filed this action on April 28, 2022. ECF No. 1. The Court denied Defendants' motions to transfer and reconsider transfer. ECF Nos. 68, 78. It later denied Defendants' motion to dismiss and motion for reconsideration. ECF 121, *Texas v. Mayorkas*, No. 2:22-CV-094-Z, 2024 WL 455337 (N.D. Tex. Feb. 6, 2024) ("MTD I"); ECF 134, *Texas v. Mayorkas*, No. 2:22-CV-094-Z, 2024 WL 3173296 (N.D. Tex. June 25, 2024) ("MTD II"). Defendants filed the administrative record at ECF Nos. 139–141. Texas filed its motion for summary judgment, memorandum, and appendix at ECF Nos. 154, 155, and 155-1; Defendants cross-moved at ECF Nos. 159–161; and Texas filed its response and reply at ECF Nos. 163–164.

After the change in Administrations in January 2025, Defendants represented in a series of Joint Status Reports that DHS, in consultation with EOIR, had decided to rescind the challenged provisions, including the provisions creating Asylum Merits interviews, amending expedited-removal parole regulations, establishing streamlined immigration-judge proceedings, and changing credible-fear procedures. *E.g.*, ECF No. 195 at 1–2. The Court stayed the case repeatedly to permit that rulemaking to proceed. *Id.* at 2; ECF No. 196 at 1.

By July 1, 2026, however, the challenged Rule remained in full force and effect and Defendants still would not commit to a date to rescind the Rule as they had promised. ECF No. 195 at 2. The Court on July 2 therefore reopened the case, denied the prior cross-motions as moot, and authorized renewed motions addressing intervening legal and factual developments. ECF No. 196.

IV.    **DHS'S RECENT 2026 AFFIRMATIVE-ASYLUM RULE DOES NOT RESCIND, SUPERSEDE, OR CURE THE 2022 RULE.**

On July 28, 2026, DHS published *Affirmative Asylum Referrals Without Interview*, 91 Fed. Reg. 47,101. The 2026 rule permits USCIS to refer certain affirmative asylum applications to EOIR without an interview, removes regulatory references to a "right" to an affirmative-asylum interview, and removes a requirement that a referral letter include a credibility assessment. *Id.* at 47,101–03; 8 C.F.R. §§ 208.4(a), 208.9(a)(2), 208.10, 208.14(c), 208.19. USCIS still conducts an

interview before granting or denying asylum. 91 Fed. Reg. at 47,101–02.

The 2026 rule does *not* moot or even affect Texas's claims in this because the 2026 rule regulates a different pathway. It repeatedly describes its subject as "affirmative asylum" processing and separately discusses credible-fear interviews under § 1225(b)(1). *Id*. at 47,101–04, 47,110–11. It does not rescind or amend the 2022 provisions creating USCIS jurisdiction over credible-fear-derived Asylum Merits cases, 8 C.F.R. §§ 208.2(a)(1)(ii), 208.30(f); the challenged parole provisions, *id*. §§ 212.5(b), 235.3(b), (c); or the streamlined EOIR process, *id*. § 1240.17. The challenged 2022 Rule, therefore, remains operative in every respect material to Texas's claims.

The 2026 rule also cannot cure defects in the 2022 administrative record. Judicial review must rest on the grounds the agency invoked when it acted. *Chenery*, 318 U.S. at 87. A later administration's policy judgment, a separate rulemaking addressing a different population, and litigation representations about a future rescission cannot retroactively supply statutory authority, notice, consideration of reliance interests, or reasoned decision-making that was absent in 2022.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an APA action, the Court resolves the legality of agency action on the administrative record; Rule 56 provides the procedural mechanism for deciding those legal issues. The APA directs the Court to "decide all relevant questions of law," interpret statutory provisions, and "hold unlawful and set aside" agency action that is arbitrary or capricious, contrary to constitutional right, in excess of statutory authority, or adopted without required procedure. 5 U.S.C. § 706(2)(A)–(D). After Loper Bright, the Court must exercise independent judgment on statutory meaning. 603 U.S. at 412–13.

ARGUMENT

## I.    THE 2022 RULE IS FINAL AGENCY ACTION, AND THIS CASE PRESENTS A LIVE CONTROVERSY.

The APA authorizes review of "final agency action." 5 U.S.C. § 704. Agency action is final when it marks the consummation of the agency's decision-making process and determines rights or obligations or produces legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

The challenged 2022 Rule easily satisfies both requirements. It amended the Code of Federal Regulations, took effect on May 31, 2022, binds USCIS and EOIR, authorizes grants of asylum, changes parole eligibility procedures, and imposes a new adjudicatory system. The Departments described it as making "important changes" and have implemented it for more than four years. ECF No. 102 at 1; 87 Fed. Reg. at 18,078–88. The fact that the Departments labeled the rule "interim" and invited additional comments does not make its operative legal requirements tentative. An immediately effective legislative rule that governs agency personnel and changes legal consequences is final agency action. *Texas v. EEOC*, 933 F.3d 433, 441–42 (5th Cir. 2019).

Nor has anything displaced the Rule. Defendants' stated intention to rescind it is not rescission. The challenged regulations remain in the Code of Federal Regulations and continue to authorize the conduct Texas challenges. A defendant's voluntary cessation moots a case only when it is "absolutely clear" that the challenged conduct cannot reasonably recur. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000). A nonbinding plan to undertake future rulemaking does not meet that demanding standard. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

The 2026 affirmative-asylum rule confirms rather than eliminates the controversy. DHS was able to complete a separate asylum rulemaking, and make it immediately effective, yet it chose to leave every challenged 2022 provision intact. The new 2026 rule does not amend the credible-fear-derived Asylum Merits system, expedited-removal parole, or § 1240.17. Because the challenged Rule continues to govern and Texas continues to seek relief from it, this case is not moot.

## II.    TEXAS HAS STANDING, AN APA CAUSE OF ACTION, AND A PROPER FORUM

### A.  Texas has established concrete fiscal injury.

Standing is assessed when suit is filed. *Davis v. FEC*, 554 U.S. 724, 734 (2008). Texas filed this suit after the Departments promulgated the binding Rule and before its announced effective date. At that point, Texas faced a substantial risk of concrete fiscal injury from an operative regulation certain to take effect absent judicial relief. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The later evidence does not manufacture standing; it confirms that the prospective injury Texas identified at filing was real and substantial. See *General Land Office v. Biden*, 71 F.4th 264, 272 n.12 (5th Cir. 2023).

Texas bears substantial, concrete costs when federal immigration policies increase the number of aliens present in Texas, alter their legal classifications, or make them eligible for programs administered or funded by the State. The summary-judgment record documents costs to Texas for public education, emergency health care, criminal justice, and benefit administration. ECF No. 155-1, Exs. 1–3, 5. Those are pocketbook injuries, not generalized grievances.

The Rule aggravates those injuries in two direct ways. *First*, it expands the regulatory availability of § 1182(d)(5)(A) parole for persons in expedited removal and awaiting credible-fear or Asylum Merits processing. Parole increases the period during which released persons impose public education, emergency-health-care, corrections, and administrative costs; and parole for at least one year is itself a "qualified alien" classification under federal benefits law. 8 U.S.C. § 1641(b)(4). *Second*, the Rule permits USCIS asylum grants that terminate the case without immigration-court adjudication. An asylee is a "qualified alien," *id*. § 1641(b)(2), and asylees receive specific statutory eligibility for federal means-tested benefits, id. § 1612(a)(2)(A). Texas's evidence shows that each additional person who receives or retains a classification triggering State-administered services imposes incremental administrative and program costs to Texas.

The Fifth Circuit's intervening DACA decision confirms that this form of injury is cognizable after *United States v. Texas*, 599 U.S. 670 (2023). In *Texas v. United States*, 126 F.4th 392, 407-13 (5th Cir. 2025), the court held that Texas had standing to challenge a federal

immigration rule because the rule's conferral of lawful presence and associated benefit eligibility caused Texas to spend money. The same principle applies here: the challenged Rule does more than prioritize enforcement. It affirmatively authorizes parole and asylum adjudications that have legal and fiscal consequences.

This Court has already twice rejected Defendants' attempts to characterize Texas's injuries as non-cognizable. *MTD I*, 2024 WL 455337, at *4–7; *MTD II*, 2024 WL 3173296, at *2–5. At summary judgment, Texas has supplied the evidentiary support that was not required at the pleading stage. ECF No. 155-1. The injury is actual, ongoing, and independently sufficient without relying solely on a broad "incentive" theory about future migration.

### B.  Texas's injury is fairly traceable to the Rule.

Traceability requires a causal connection, not proximate causation. *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019). Injuries remains traceable to government action when third parties predictably respond to the incentives and legal consequences it creates. *Id.*; *General Land Office v. Biden*, 71 F.4th 264, 272–74 (5th Cir. 2023). Here, Texas's injuries are clearly traceable to the challenged 2022 Rule.

The causal chain here begins with binding regulations. The Rule broadens the population processed under parole regulations, authorizes USCIS to grant asylum through the new Asylum Merits process, and changes the forum and procedural safeguards governing claims. Those legal changes predictably alter releases, adjudications, and the number and duration of persons present in Texas. The declarations in ECF No. 155-1 connect increased presence and qualifying status to Texas's public education, healthcare, corrections, and administrative expenditures.

The Rule's own rationale confirms the relevant incentives. The Departments promoted as benefits of the challenged Rule faster adjudication, earlier resolution, cost savings for applicants, and earlier access to the labor market for successful applicants. 87 Fed. Reg. at 18,088, 18,202–13. Defendants' own expert acknowledged that changes in asylum processing can contribute to migration behavior when combined with other policies. MTD I, 2024 WL 455337, at *2. Texas

need not prove that the Rule is the sole cause of every border encounter. Texas must show only that the Rule causes or exacerbates some of the fiscal injury for which it seeks relief, and it has done so. *Texas*, 126 F.4th at 413 n.26.

### C.  Vacatur and related relief will redress Texas's injury.

Redressability is likewise satisfied. Vacating the Rule will eliminate the challenged Asylum Merits pathway and parole provisions, restore the pre-Rule process, and reduce at least some releases, status changes, and resulting State costs. A favorable judgment need not eliminate every cost Texas incurs from illegal immigration; it needs only to lessen the injury. *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014).

The Rule itself forecloses any claim that vacatur would leave the Departments unable to process cases. Section 1240.17 expressly provides a fallback if USCIS's Asylum Merits process is enjoined or vacated: cases proceed under ordinary removal procedures rather than the special streamlined system. 8 C.F.R. § 1240.17(a). Thus, the requested relief has a direct legal effect: it removes the unlawful pathway and restores the prior one.

### D.  *United States v. Texas* does not bar standing.

The Supreme Court's 2023 decision in *United States v. Texas* addressed a narrow challenge seeking to compel the Executive to make more arrests and prosecutions under statutory "shall" provisions. 599 U.S. at 676–78. The Court repeatedly limited its holding to that context and emphasized that it was maintaining the traditional rule against private suits to compel prosecution. *Id.* at 686. It specifically distinguished policies that combine nonenforcement with the conferral of legal benefits or status. *Id.* at 677–78.

Texas does not ask the Court to order more arrests or prosecutions. It challenges affirmative legislative rules that assign adjudicatory authority, grant asylum, prescribe parole criteria, bind immigration judges, and confer legal consequences. The post-*United States v. Texas* DACA decision specifically confirmed that State standing remains available for such benefit-conferring rules. *Texas*, 126 F.4th at 408-13.

Other district-court decisions denying standing in challenges to different asylum or parole policies do not control. Standing is record specific. Here, this Court has twice addressed this Rule, this Plaintiff, and this record and has held that Texas's alleged fiscal injury is cognizable and traceable. Texas's summary-judgment evidence now proves that injury.

Texas also satisfies ordinary standing without special solicitude. If the Court reaches the doctrine, Texas has a congressionally conferred procedural right under the APA and asserts quasi-sovereign interests in its public fisc, lawmaking, and administration of State programs. But no relaxed standard is necessary.

### E. The Laken Riley Act expressly authorizes this action and removes any remaining doubt about Texas's standing.

Congress has now spoken directly to the standing question presented here. In January 2025, Congress enacted the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). Section 3(a) of that Act added a new paragraph to 8 U.S.C. § 1225(b) providing that the attorney general of a State, or another authorized State officer, who alleges a violation of the detention or removal requirements in § 1225(b)(1) or (2) that harms the State or its residents "shall have standing" to sue the Secretary of Homeland Security on behalf of the State or its residents for "appropriate injunctive relief." 8 U.S.C. § 1225(b)(3); Laken Riley Act § 3(a), 139 Stat. at 4. Congress also expressly defined the requisite harm to include "financial harm in excess of $100." 8 U.S.C. § 1225(b)(3).

Texas falls squarely within that authorization. This action was brought by Texas through its Attorney General on behalf of the State against the Secretary of Homeland Security. Texas alleges that the Asylum Officer Rule violates the detention requirements imposed by § 1225(b)(1), including the command that a noncitizen who receives a positive credible-fear determination "shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii); see also id. § 1225(b)(1)(B)(iii)(IV). The Rule expressly governs aliens processed under § 1225(b)(1), routes those who receive positive credible-fear determinations into the new Asylum Merits process, and changes the regulations governing their release from detention while credible-fear and Asylum Merits proceedings remain pending. See 87 Fed. Reg. at 18,082, 18,085, 18,088.

Those provisions violate § 1225's detention requirements by authorizing releases beyond the narrow case-by-case parole exception Congress enacted.

Congress enacted an additional provision directed even more precisely at Texas's parole claim. The Laken Riley Act added 8 U.S.C. § 1182(d)(5)(C), which provides that a State attorney general alleging a violation of § 1182(d)(5)(A)'s limitations—that parole "solely be granted on a case-by-case basis and solely for urgent humanitarian reasons or a significant public benefit"—"shall have standing" to sue the Secretary for appropriate injunctive relief when the violation harms the State or its residents. 8 U.S.C. § 1182(d)(5)(C); Laken Riley Act § 3(d), 139 Stat. at 5. That provision tracks Texas's claim nearly word for word. Texas alleges that the Rule converts the narrow, individualized parole authority in § 1182(d)(5)(A) into a broad release mechanism based on administrative convenience and a generalized determination that continued detention is not in the public interest. Congress has now expressly clarified that a State suffering financial harm from that alleged violation is a proper plaintiff to seek judicial relief.

The Laken Riley Act thus supplies the statutory features that the Supreme Court identified as absent in *United States v. Texas*, 599 U.S. 670 (2023). There, the Court explained that the standing analysis might differ if Congress specifically authorized a defined class of plaintiffs suffering concrete harms to sue the Executive Branch and specifically authorized courts to enter appropriate relief. *Id.* at 682. The Court found no such authorization in the statutes before it: those provisions merely directed that DHS "shall" arrest certain noncitizens without identifying an authorized plaintiff, defining an actionable injury, or creating a judicial remedy. *Id.* at 682–83. The Laken Riley Act does each of those things. It identifies the authorized plaintiff; specifies the statutory violations that may be challenged; requires harm; defines financial harm exceeding $100 as sufficient; designates the proper defendant; identifies the forum; authorizes injunctive relief; and directs courts to expedite the action. 8 U.S.C. §§ 1182(d)(5)(C), 1225(b)(3).[2]

---

[2] To be sure, *United States v. Texas* reserved whether statutory authorization, standing alone, would necessarily satisfy Article III. 599 U.S. at 683. But Texas does not rely on statutory authorization alone. Texas has produced evidence of actual monetary harm far exceeding the Act's

Monetary injury is a paradigmatic concrete injury under Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). And courts must afford due respect to Congress's decision both to impose a statutory obligation and to authorize an injured plaintiff to sue over its violation. *Id*. at 425–26. The Laken Riley Act therefore does not attempt to transform an abstract disagreement into an injury. It attaches an express cause of action to the same traditional pocketbook harm that Texas has demonstrated throughout this litigation.

This case also presents two circumstances that *United States v. Texas* expressly distinguished from the arrest-and-prosecution policy before it. *First*, this case concerns the continued detention and release of noncitizens who have already been apprehended and placed in expedited removal. The Supreme Court recognized that policies governing "continued detention of noncitizens who have already been arrested" may present a different standing question from policies governing whether arrests should occur in the first place. 599 U.S. at 683–84. *Second*, the challenged Rule does more than merely decline enforcement. It affirmatively grants parole, creates a new asylum-adjudication process, and permits asylum grants carrying substantial legal and fiscal consequences. The Court likewise recognized that policies combining non-enforcement with the conferral of legal benefits or legal status may produce a different standing analysis. *Id*. at 683. The Laken Riley Act confirms that both distinctions matter and that States suffering concrete harm from unlawful detention and parole policies may invoke the jurisdiction of the federal courts.

Congress also eliminated any argument that 8 U.S.C. § 1252(f)(1) bars appropriate injunctive relief on Texas's § 1225 claim. The Laken Riley Act added § 1252(f)(3), which expressly provides that § 1252(f)(1)'s limitation on injunctive relief "shall not apply" to an action brought under § 1225(b)(3). 8 U.S.C. § 1252(f)(3); Laken Riley Act § 3(f), 139 Stat. at 5–6. Congress thus authorized both the suit and the prospective remedy Texas requests. Vacatur remains independently available under the APA, while the Laken Riley Act expressly authorizes any

---

$100 threshold, including costs for public education, emergency health care, criminal justice, and the administration of public-benefit programs. ECF No. 155-1, Exs. 1–3, 5.

additional injunctive relief necessary to prevent continuing violations and redress Texas's continuing financial harm.

Texas does not invoke the Laken Riley Act to retroactively manufacture standing that was absent when this action commenced. Texas had Article III standing when it filed suit for the reasons established above and previously recognized by this Court. The Act is nevertheless independently relevant to this renewed motion because the challenged Rule remains in force, the Rule continues to cause post-enactment injury, and Texas seeks prospective relief against ongoing violations. At a minimum, the Act eliminates any plausible contention that Texas's financial injuries are legally noncognizable, that Congress intended to preclude States from enforcing the relevant detention and parole limits, or that the resulting dispute is categorically inappropriate for judicial resolution. The Laken Riley Act, therefore, independently confirms Texas's standing on its detention and parole claims, while the preceding sections establish Texas's standing to pursue its remaining challenges to the Rule.

### F.  Texas's interests fall within the relevant statutory zone.

The zone-of-interests inquiry asks whether the plaintiff's interests are "arguably within the zone of interests to be protected or regulated by the statute" invoked. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012). The test is not especially demanding. *Id.*; *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

Texas's fiscal and sovereign interests are at least arguably related to the INA provisions limiting parole, structuring expedited removal, allocating asylum adjudication, and regulating the legal consequences of immigration classifications. The Fifth Circuit has held that State fiscal interests in avoiding costs generated by unlawful immigration programs fall within the INA's zone of interests. *Texas v. United States*, 809 F.3d 134, 162–63 (5th Cir. 2015); *Texas*, 126 F.4th at 415-16. The relevant provisions are read in the context of the INA's integrated scheme, not atomized to ask whether each subsection was enacted principally for State treasuries. Texas's interests are

neither marginally related to nor inconsistent with Congress's design.

### G. The INA does not strip this Court's jurisdiction

This Court has already rejected Defendants' 8 U.S.C. § 1252(e)(3) jurisdictional argument four times. ECF Nos. 68, 78; MTD I, 2024 WL 455337, at *8–11; MTD II, 2024 WL 3173296, at *5–6. Nothing has changed.

Texas does not seek review of an individual expedited-removal order or a credible-fear determination. It brings a programmatic APA challenge to a regulation that exceeds the Departments' authority and creates proceedings outside the statutory scheme. The Fifth Circuit's current DACA decision likewise holds that § 1252's channeling provisions do not bar a State's programmatic APA challenge when the State is not contesting any individual removal proceeding. *Texas*, 126 F.4th at 416-17.

The Western District of Louisiana reached the same jurisdictional premise when considering this Rule. It held that determining whether § 1252(e)(3) applied required asking whether the Rule was actually issued under § 1225(b)(1), and concluded that the Rule was not a regulation issued under that provision. *Arizona v. Garland*, 730 F. Supp.3d 258, 270–71 (W. D. La. 2024), appeal pending as Case No. 24-30359 (5th Cir.). Although *Arizona* ultimately dismissed on standing grounds and did not enter a merits judgment, its statutory and jurisdictional reasoning reinforces this Court's prior rulings.

### H. Texas's standing evidence is properly before the Court

Defendants previously objected that Texas did not make Rule 26 disclosures concerning portions of its standing evidence. That objection failed at the threshold. Rule 26 expressly exempts "an action for review on an administrative record" from the initial-disclosure requirement. Fed. R. Civ. P. 26(a)(1)(B)(i). This is such an action. In any event, the declarations in ECF No. 155-1 were executed shortly before the prior summary-judgment filing and were filed promptly; Defendants have now long had the full opportunity to address them.

That evidence is also competent summary-judgment material. The declarations are based

on personal knowledge and agency records and set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). Official government records are admissible under Federal Rule of Evidence 803(8), and Defendants' own public statements and records are opposing-party statements under Rule 801(d)(2). Standing is a jurisdictional prerequisite the Court must determine, and evidence offered to establish standing is not confined to the agency's merits record. Defendants' prior blanket objections identified no valid basis for excluding the evidence on which Texas relies.

## III.    THE 2022 RULE EXCEEDED THE DEPARTMENTS' STATUTORY AUTHORITY.

Agency authority begins and ends with Congress's enactments. "Administrative agencies are creatures of statute" and possess only the authority Congress provides. *National Federation of Independent Business v. Department of Labor*, 595 U.S. 109, 117 (2022). Under *Loper Bright*, the Court—not the agency—must determine the best reading of the law. 603 U.S. at 412–13.

### A. Section 1225 authorizes credible-fear screening, not a USCIS merits-adjudication system

The 2022 Rule rested heavily on the phrase "further consideration of the application for asylum" in 8 U.S.C. § 1225(b)(1)(B)(ii). See 87 Fed. Reg. at 18,085, 18,096–97. But that phrase describes what follows a positive credible-fear determination; it does not identify a new decisionmaker, confer authority to grant asylum, or authorize the Departments to devise a substitute for removal proceedings.

The surrounding text makes the limited role clear. Section 1225 carefully specifies what an asylum officer does: conduct a credible-fear interview and make a threshold determination. 8 U.S.C. § 1225(b)(1)(B). It expressly provides immigration-judge review of a negative determination. Id. § 1225(b)(1)(B)(iii). For a positive determination, it commands detention for "further consideration." *Id.* § 1225(b)(1)(B)(ii). Congress did not say that USCIS may retain jurisdiction, treat the screening record as the application, conduct a non-adversarial merits interview, grant asylum, or make determinations that constrain an immigration judge.

Statutory language must be read in context and as part of the whole scheme. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016). The INA supplies the forum for the further merits adjudication. Unless the INA "otherwise specifie[s]," § 1229a proceedings are "the sole and exclusive procedure" for determining admissibility or removal, and an immigration judge conducts those proceedings. 8 U.S.C. § 1229a(a)(1), (3). Section 1225 specifies an alternative expedited process only through the credible-fear screen. It does not otherwise specify a USCIS merits track after a positive finding.

IIRIRA's conference report removes any residual doubt about Congress's design. It states that a person who establishes credible fear "shall be detained for further consideration of the application for asylum under normal non-expedited removal proceedings." H.R. Conf. Rep. No. 104-828, at 209–10. The 2022 Rule substituted the opposite: a new USCIS merits procedure followed, for non-grants, by specially streamlined proceedings foreign to the statute.

Defendants may invoke § 1158(b)(1)(A), which authorizes the Secretary or Attorney General to grant asylum. But that general authority does not erase the specific procedural allocation governing this population. Section 1158 permits grants only to applicants who apply "in accordance with the requirements and procedures established" under the INA. 8 U.S.C. § 1158(b)(1)(A). General rulemaking authority to establish asylum procedures and conditions, *id.* § 1158(d)(1), (5)(B), cannot override the specific sequence in §§ 1225 and 1229a or the HSA's preservation of EOIR functions. See *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (the specific governs the general).

### B.   The HSA preserved EOIR's merits-adjudication function.

The Rule also conflicts with the HSA. When Congress created DHS, it transferred to USCIS asylum and refugee adjudications formerly performed by INS, along with other INS adjudications. 6 U.S.C. § 271(b)(3), (5). But Congress preserved with DOJ the authorities and functions "exercised by" EOIR immediately before the HSA took effect. 8 U.S.C. § 1103(g)(1). The HSA thus "expressly provides that the Attorney General has authority over certain

immigration functions specifically relating to immigration courts." *Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008).

Those provisions must be harmonized. Section 271(b)(3) cannot mean that USCIS received every asylum adjudication function regardless of who performed it before the HSA; that would nullify § 1103(g)(1)'s express preservation of EOIR functions. The coherent reading preserves the historical division. INS asylum officers adjudicated affirmative applications and performed credible-fear screening. EOIR immigration judges adjudicated defensive asylum claims, including claims referred after positive credible-fear determinations. Congress transferred the former set of functions to USCIS and preserved the latter with EOIR.

The 2022 Rule transgressed that statutory boundary. It stated that a USCIS asylum officer may enter an operative grant of asylum without any EOIR proceeding. And when USCIS does not grant asylum, the Rule gave asylum-officer determinations concerning withholding and CAT protection presumptive binding effect in immigration court unless DHS produced qualifying new evidence. 8 C.F.R. § 1240.17(d), (f)(2)(i)(B), (i)(2). That is not mere assistance to EOIR. It transferred or constrained adjudicatory functions that Congress preserved with EOIR.

The HSA did not freeze every procedural detail in place. But it did preserve identified agency functions. The Departments may modernize procedures within their assigned authority; but they may not do what they in fact did: move the decisive function from one Department to another without statutory authorization.

### C. Congress's targeted grants of USCIS jurisdiction confirm that general rulemaking language is insufficient.

Congress knows how to assign special asylum jurisdiction to USCIS. Section 1158(b)(3)(C) directs an asylum officer to exercise initial jurisdiction over asylum applications filed by unaccompanied alien children. That provision is important precisely because such children may be in removal proceedings in which EOIR otherwise would possess jurisdiction.

DHS's efforts to accomplish the same result for expedited removal through regulation contradicted Congress's judgment that only unaccompanied minors should receive a specific

carve-out from the EOIR process. Because "[t]he expression of one thing implies the exclusion of others," *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018), Congress's vesting of limited final DHS asylum-officer authority over one class of aliens is further confirmation that it withheld such authority from DHS over aliens generally, and particularly over aliens subject to expedited removal.

The 2022 Rule identified no comparable provision giving USCIS merits jurisdiction over all covered adults and families after positive credible-fear determinations. The Departments cannot manufacture that jurisdiction from the undefined phrase "further consideration."

**D.  The Rule unlawfully constrains immigration judges' independent adjudication.**

The statutory problem extends beyond USCIS grants. Congress assigns immigration judges responsibility to decide removability and applications for relief in § 1229a proceedings. 8 U.S.C. § 1229a(a), (c)(4). The applicant bears the burden, and the immigration judge evaluates testimony, credibility, corroboration, and the record. *Id*. §§ 1158(b)(1)(B), 1229a(c)(4).

Yet § 1240.17 directs immigration judges to give effect to certain asylum officer determinations of eligibility for withholding or CAT protection unless DHS presents new, respondent-specific evidence meeting the regulation's conditions. 8 C.F.R. § 1240.17(d), (f)(2)(i)(B), (i)(2). The Rule thus limits the immigration judge's ability to decide the application based on the full record and the parties' arguments. Nothing in the INA authorizes DOJ and DHS to make an unappointed or differently appointed USCIS adjudicator's protection determination binding in a § 1229a proceeding.

This feature also defeats Defendants' possible mischaracterization of the Rule as merely adding an initial administrative step. A preliminary recommendation that leaves the immigration judge free to decide *de novo* might raise a different question. The 2022 Rule does more: it creates final USCIS asylum grants and legally constrains parts of the subsequent immigration-court adjudication.

### E. Persuasive authority has rejected the Departments' reading.

In *Arizona v. Garland*, the court considered for jurisdictional purposes whether the Rule was issued under § 1225(b)(1). 730 F. Supp. 3d 258, 270 (W.D. La. 2024). It concluded that the Rule's new Asylum Merits procedure was not authorized by—and therefore was not a regulation issued under—that provision; any asylum-rulemaking authority instead would arise under § 1158 and remain subject to that statute's terms and limitations. *Id.* at 270–71. *Arizona* did not enter a merits judgment because it found the plaintiff States lacked standing on their record. But its reading of § 1225 is persuasive, and Texas's record independently establishes standing here.

The Asylum Officer Rule does not implement Section 1225. Therefore, it is unlawful. In *Arizona v. Garland*, the Western District of Louisiana made a merits determination that the Asylum IFR is contrary to law. The defendants in *Arizona* were substantially the same parties as the Defendants here. The reasoning of *Arizona* establishes that Texas should also prevail on the merits here. Therefore, the only remaining issue for adjudication in *this* case should be determining remedies.

As here, the Defendants in *Arizona* argued that the court did not have jurisdiction under 8 U.S.C. § 1252(e), which limits "[j]udicial review of orders under section 1225(b)(1)." Because the Asylum Officer Rule claims that it was issued under the authority of 8 USC 1225(b)(1), the *Arizona* court had to "determine whether the Asylum IFR was properly issued under the Defendants' claimed authority" to determine whether Section 1252(e) stripped jurisdiction. *Arizona*, 730 F. Supp. 3d at 270. The court found, in no uncertain terms, that the Asylum Officer Rule was *not* issued under Section 1225(b)(1):

> Defendants have represented to the Court in this litigation that Congress intended for the phrase mandating that aliens "shall be detained for further consideration of the application for asylum," § 1225(b)(B)(ii), as granting the Executive Branch the authority to create out of whole cloth a new and alternate asylum procedure and requirements. *The Court finds this position disingenuous and completely unsupportable.* Congress did not grant the Executive Branch this authority in § 1225(b). Rather, Congress specifically and explicitly permitted the Executive Branch to issue asylum-related regulations in the Asylum Statute (§ 1158(b)(1)(A)), subject to the terms and limitations of that statute.

*Arizona*, 730 F. Supp. 3d at 271 (emphasis added).

The only claimed statutory authority for the Asylum Officer Rule is Section 1225(b)(1), and *Arizona* decided that it is contrary to law and violates the APA. This Court should apply the same reasoning as *Arizona* and hold that Section 1225 does not grant authority to the Defendants to adopt the Asylum Officer Rule. Because the 2022 Rule exceeds the Departments' authority and conflicts with Congress's allocation of functions, it is unlawful and must be set aside under 5 U.S.C. § 706(2)(A) and (C).

## IV.   THE RULE'S PAROLE PROVISIONS EXCEED 8 U.S.C. § 1182(D)(5)(A).

Congress permits the Secretary to parole an alien into the United States "temporarily" and "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Each phrase limits the parole power. Parole must be temporary, individualized, and justified by one of two specified substantive grounds.

The challenged Rule's parole framework is inconsistent with that text. The Departments reasoned that, for covered categories of persons in expedited removal, continued detention may be considered "not in the public interest" when the person presents neither a security risk nor a risk of absconding, and that this circumstance generally can justify parole under the statutory standards. 87 Fed. Reg. at 18,107–09; 8 C.F.R. §§ 212.5(b), 235.3(b), (c).

That approach fails even if an officer completes an individual checklist. "Case-by-case" review is necessary, but it is not sufficient. The substantive reason for parole must itself be an urgent humanitarian reason or significant public benefit attributable to the individual case. A regulation cannot satisfy the statute by applying an individualized process to a categorical legal premise – especially one that Congress rejected.

### A.  Congress deliberately narrowed parole in 1996.

Before IIRIRA, § 1182(d)(5) permitted parole "for emergent reasons or for reasons deemed strictly in the public interest." Congress amended the provision to require parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." IIRIRA § 602,

Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009-689 (1996). A material change in statutory language presumptively changes meaning. *In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019).

The legislative history confirms the purpose. Congress explained that parole was intended for specific individual needs, not "as a supplement to Congressionally established immigration policy," and criticized the use of parole to admit entire categories outside lawful admission channels. H.R. Rep. No. 104-469, pt. 1, at 140–41 (1996). The Senate likewise described the bill as "tightening" parole authority and addressing abuse of asylum and parole. S. Rep. No. 104-249, at 2–3 (1996).

The challenged Rule's reliance on the old "not in the public interest" formulation collapses the amended statute back into the pre-IIRIRA standard. It treats the absence of danger and flight risk, plus operational convenience, as enough to establish one of the new statutory grounds. But Congress replaced "public interest" with "significant public benefit" and added urgency and individualized limitations precisely to prevent policy-based release from becoming a substitute for the immigration system Congress enacted.

## B. Congress' choice of mandatory detention made parole a narrow exception, not an administrative default.

Section 1225(b)(1)(B)(ii) provides that a person with a positive credible-fear determination "shall be detained" for further consideration of the asylum application. The Supreme Court has read the parole provision in § 1182(d)(5)(A) as the express exception to that detention command, implying that there are no other release circumstances under § 1225(b). *Jennings*, 583 U.S. at 300 ("That express exception to detention implies that there are no other circumstances under which aliens detained under § 1225(b) may be released.").

The challenged Rule reversed that relationship. It started from a broad regulatory judgment that detention may be contrary to the "public interest" for non-dangerous, non-flight-risk persons and then fits that judgment into parole. Congress did not authorize parole merely because detention is costly, capacity is constrained, or the person can potentially be supervised in the

33

community. Those considerations may inform administration, but they are *not* themselves the "urgent humanitarian reasons" or "significant public benefit" Congress specified.

The point is not that parole is limited to a closed list of medical emergencies or critical witnesses. The statutory terms can apply to varied individual circumstances. But the benefit must be significant, public, and particularized; the humanitarian reason must be urgent and particularized. An agency-wide interest in reallocating detention resources cannot alone transform every low-risk detainee into a qualifying parole case. Yet the challenged Rule is based on just such a wholesale transformation.

### C. Preexisting regulations do not validate the Rule's expansion.

Defendants previously argued that 8 C.F.R. § 212.5(b) already used similar concepts for other classes, so extending the regulation to additional expedited-removal populations was permissible. That reasoning assumed the validity of the very premise that Texas challenges. Longstanding executive practice cannot create statutory authority that Congress withheld, especially where Congress amended the statute to constrain prior practice. And after *Loper Bright*, the Court owes no deference to DHS's construction.

The Rule also changes legal consequences. Parole under § 1182(d)(5)(A) is a congressionally recognized classification that affects eligibility for benefits and other immigration consequences. The Departments cannot use that status as a general detention-management mechanism when Congress supplied a narrower substantive standard.

Because the Rule's parole provisions rest on an impermissible categorical premise and dramatically expanded parole beyond the statute's limits, it is unlawful. The Court should vacate 8 C.F.R. § 235.3(b)(2)(iii), (b)(4)(ii), and (c)(2), together with related provisions that depend on that expansion.

## V.    THE RULE RAISES AN INDEPENDENT APPOINTMENTS CLAUSE DEFECT.

The Appointments Clause distinguishes "Officers of the United States," who must be appointed in a constitutionally prescribed manner, from employees who may assist them. U.S.

Const. art. II, § 2, cl. 2; *Lucia v. SEC*, 585 U.S. 237, 245–48 (2018). A continuing position established by law that exercises significant federal authority is an office. *Id*. Inferior officers may be supervised and directed by properly appointed principal officers, but the constitutional inquiry turns on actual appointment, review, removal, and control. *Edmond v. United States*, 520 U.S. 651, 662–63 (1997); *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748, 759-62 (2025).

The 2022 Rule authorizes "an asylum officer, subject to review within USCIS," to grant asylum. 8 C.F.R. § 208.14(b). This grant is operative without any adjudication by an immigration judge. The adjudicator administers oaths, takes testimony, evaluates evidence, makes credibility findings, applies legal standards, and issues a decision conferring asylum. Those are substantial adjudicatory functions comparable to functions the Supreme Court has treated as significant authority. *Lucia*, 585 U.S. at 247–51; *Freytag v. Commissioner*, 501 U.S. 868, 881–82 (1991).

Defendants' prior summary-judgment position was that line-level asylum officers conduct the interviews and prepare proposed decisions, while supervisors appointed by the Secretary review the result. ECF No. 161 at 60; ECF No. 161-5. That implementation raises two problems.

*First*, the regulation does *not* reserve final decisional authority to a properly appointed supervisor. It authorizes "an asylum officer" to grant asylum and says only that the decision is "subject to review within USCIS." The statutory definition of "asylum officer" includes line-level immigration employees. 8 U.S.C. §§ 1101(a)(18), 1225(b)(1)(E). An internal practice of supervisory review cannot rewrite the regulation or cure its authorization of final adjudicative action by an unappointed employee.

*Second*, Defendants' evidence showed that relevant supervisory appointments occurred after the supervisors entered duty, with several appointments made after this litigation began and stated to be retroactive. ECF No. 161-5 ¶¶ 14, 16–19. Defendants identified no authority permitting retroactive appointments to validate prior exercises of officer authority. At minimum, decisions made before constitutionally sufficient appointments cannot be defended by later paperwork.

*Kennedy v. Braidwood Mgmt.*, 606 U. S. 748 (2025). makes supervision central, but it does not eliminate the defect in the challenged Rule. There, the Supreme Court relied on the

Secretary's power to appoint, remove, review, and control the inferior officers' work. *Braidwood*, 606 U.S. at 759-62. Here, if appointed supervisors truly make every final grant and possess effective review and control, line-level employees may assist them. But the Rule's text must require that constitutionally valid arrangement. It does not. The Court should therefore hold that the Rule is unlawful because it authorizes final asylum grants without the final decision being made by an officer appointed in conformity with Article II and subject to constitutionally adequate supervision and control.

Texas's statutory and APA grounds independently require vacatur, so the Court need not reach the constitutional claim if it grants complete relief on nonconstitutional grounds. But the Appointments Clause provides an additional reason that the Rule cannot remain operative.

## VI.    THE RULE IS ARBITRARY AND CAPRICIOUS.

Agency action is arbitrary and capricious when the agency relies on factors Congress did not intend it to consider; entirely fails to consider an important aspect of the problem; contradicts the evidence before it; or offers an explanation that is implausible or inconsistent with the record. *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). When an agency changes longstanding policy, it must acknowledge the change, provide a reasoned explanation, and consider serious reliance interests. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 30–33 (2020).

The 2022 Rule fails those requirements in multiple, independent respects.

### A.  The Departments dismissed rather than considered State reliance interests.

The Departments stated: "The Departments perceive no serious reliance interests on the part of any State, county, or local governmental entity" in the prior regulations and practices. 87 Fed. Reg. at 18,109. They added that, even if reliance interests existed, they would promulgate the Rule anyway. *Id*.

That is not meaningful consideration. Texas and fifteen other States submitted detailed comments describing billions of dollars in public education, healthcare, law enforcement, and border security costs that would result from the challenged Rule and explaining how changes that increase releases, asylum grants, or migration incentives affect State budgeting and administration. The States also explained that border States (like Texas) necessarily structure budgets and programs against the federal government's existing immigration framework.

An agency may ultimately conclude that countervailing policy considerations outweigh reliance interests. But it first must identify and assess them. *Regents*, 591 U.S. at 30–33. A categorical statement that no serious reliance exists—without engaging the States' submitted evidence or the fiscal mechanisms they identify-- does not satisfy that duty. Nor does the sentence stating that the Departments would reach the same result regardless. That is a conclusory statement devoid of any analysis. It speaks loudly of administrative arrogance and disregard of the serious reliance interests Congress commanded agencies to consider.

The current Administration's asserted (but not implemented) decision to rescind the challenged provisions does not retroactively cure the omission. APA review is confined to the agency's contemporaneous rationale. *Chenery*, 318 U.S. at 87. And the 2026 affirmative-asylum rule addresses a different process; its own federalism discussion cannot substitute for analysis missing from the 2022 record.

### B. The Departments failed to reasonably assess costs to Texas and other States.

The challenged Rule's regulatory analysis quantified federal implementation costs and projected transfers and benefits to applicants, but it did not meaningfully estimate or account for State fiscal effects. The Departments acknowledged that immigration can have first- and second-order fiscal effects and that those effects are methodologically difficult to estimate. 87 Fed. Reg. at 18,116–17. Difficulty, however, does not permit an agency to ignore a concededly important effect—especially after States supplied concrete evidence and identified specific programs to the agency.

Texas's declarations establish the relevant mechanisms and costs. ECF No. 155-1, Exs. 1–3, 5. The Rule expands parole processing, changes the decisionmaker and procedure for asylum grants, and lengthens or alters the period during which affected persons may remain in the United States. Each feature has foreseeable consequences for education, emergency medical care, corrections, and benefit administration. The Departments did not quantify those effects, provide a reasoned qualitative assessment, or explain why they were immaterial relative to the claimed federal efficiencies invoked.

The omission is particularly stark because the Rule expressly discussed benefits to applicants—reduced delays, earlier resolution, potential labor-market participation, and cost savings—while discounting State costs as too uncertain. 87 Fed. Reg. at 18,088, 18,202–13. Reasoned decision-making does not permit an agency to count difficult-to-quantify putative benefits and disregard difficult-to-quantify burdens.

### C. The Departments failed to consider obvious lawful alternatives.

An agency must consider significant and obvious alternatives raised during rulemaking. *State Farm*, 463 U.S. at 46–48. Commenters proposed increasing EOIR capacity and immigration-judge resources, retaining ordinary § 1229a proceedings while improving scheduling, and using other lawful tools to reduce the backlog. The Rule largely treated broader policy options as outside the scope of the rulemaking and considered additional immigration judges as a supplement rather than a true alternative.

That was inadequate. The asserted problem was adjudicatory delay and workload. Increasing the capacity of the congressionally assigned adjudicator is an obvious alternative to transferring the function to another agency. The Departments was required to compare the costs, accuracy, statutory fit, and expected backlog effects of those options with the proposed Rule. Defendants did not do so. They did not explain why a new USCIS adjudicatory system was preferable to additional EOIR resources or why the Rule could not await or accompany targeted reforms within the existing statutory forum.

38

The Rule's own fallback provision confirms that ordinary proceedings are administratively feasible. If the Asylum Merits process is enjoined or vacated, § 1240.17 directs cases into regular removal proceedings. 8 C.F.R. § 1240.17(a). The Departments therefore cannot credibly claim that the unlawful alternative was indispensable.

### D. The Departments failed to justify the departure from longstanding adversarial adjudication.

For decades, positive credible-fear cases proceeded to immigration judges in adversarial removal proceedings. The Rule acknowledged that its new process assigned to USCIS a role "previously carried out only by IJs." 87 Fed. Reg. at 18,096. Yet the Departments did not squarely identify the reasons the prior forum and adversarial structure had been used or explain why those reasons no longer mattered.

That omission matters greatly. Adversarial proceedings permit DHS counsel to test claims, cross-examine, present evidence, identify inconsistencies, and appeal. Immigration judges possess adjudicatory experience and institutional independence from the agency that conducted the threshold screening. The new system asked USCIS to conduct both the initial credible-fear screen and the first merits adjudication through a non-adversarial interview, then constrained parts of subsequent immigration-judge review.

The Rule asserted that asylum officers are trained and that streamlined processing would be efficient. But alleged competence and speed do not answer the comparative question. The agency had to weigh putative efficiency against accuracy, error costs, institutional checks, and the reasons Congress and the agencies had long used EOIR proceedings for this population. FCC v. *Fox*, 556 U.S. at 515; *Encino Motorcars*, 579 U.S. at 221–22.

### E. The Rule's "efficiency" rationale does not account for its own acknowledged consequences.

The Departments justified the Rule principally as a way to reduce delay and workload. But the challenged Rule acknowledged that it could shift costs to EOIR, increase referrals to immigration court, and cause some applications that USCIS might have granted to be referred

instead. 87 Fed. Reg. at 18,103–06. It also created a second merits-level process, required transcripts and record transfer, and imposed new administrative demands on both agencies.

The Departments did not adequately reconcile those acknowledged costs with the projected efficiencies. Nor did they explain how the Rule would materially improve a rapidly growing EOIR backlog if its own changes *increased* referrals and if external migration volumes overwhelmed the projected gains. An agency need not solve every problem, but it must demonstrate a rational connection between the problem identified, the evidence, and the solution selected. *State Farm*, 463 U.S. at 43.

The Rule likewise failed to assess the risk that easier or faster processing, expanded parole availability, and reduced adversarial safeguards would affect migration behavior or claim volume. The Departments denied identifying a causal mechanism for a systematic increase, but commenters identified several: faster access to merits adjudication, greater likelihood of release, fewer procedural burdens, and a less adversarial initial merits forum. The agency was entitled to disagree, but not to ignore or dismiss the concern without a reasoned evaluation of the mechanisms and evidence presented. Yet that is what Defendants did.

### F.  Defendants' parole analysis was arbitrary for the same reasons it is contrary to law.

The parole provisions in the challenged Rule rest on an unexplained and insupportable equation: if a person is not dangerous or likely to abscond and continued detention is not in the "public interest", parole generally can satisfy "urgent humanitarian reasons" or "significant public benefit." The Rule does not identify which statutory ground applies, explain why administrative convenience is "significant," or account for Congress's 1996 decision to *replace* the old "public-interest" formulation.

The analysis also failed to meaningfully consider State costs, appearance rates, the consequences of granting a status with collateral legal effects, or narrower detention-management alternatives. An agency acts arbitrarily when it treats a statutory limitation as a flexible policy preference without confronting the text and history that made the limitation restrictive.

Defendants did so in this instance.

### G.  Post hoc developments cannot repair the broken 2022 rationale.

Defendants may point to current policy priorities, changed border conditions, the alleged planned rescission, or the 2026 affirmative-asylum rule. Those developments may inform a new rulemaking. They cannot defend the old one. Courts may uphold agency action only on the basis articulated by the agency when it acted. *Chenery*, 318 U.S. at 87. Because the 2022 record fails to show reasoned consideration of the foregoing issues, the Rule is arbitrary and capricious under § 706(2)(A).

## VII.    THE RULE WAS PROMULGATED WITHOUT THE NOTICE AND COMMENT REQUIRED BY THE APA.

The APA requires an NPRM stating the terms or substance of the proposed rule or describing the subjects and issues involved, an opportunity for interested persons to submit comments, and a reasoned response to significant comments. 5 U.S.C. § 553(b)–(c). A final rule may differ from the proposal only if it is a "logical outgrowth" that interested parties reasonably should have anticipated. *Texas Association of Manufacturers v. U. S. Consumer Product Safety Comm'n*, 989 F.3d 368, 381–82 (5th Cir. 2021).

### A.  The Rule is substantive, not an exempt housekeeping measure

Defendants previously characterized parts of the Rule as procedural. But § 553's exception for rules of agency organization, procedure, or practice is narrowly construed. *A. F. of L. & C. I. O. v. NLRB*, 57 F.4th 1023, 1034–36 (D.C. Cir. 2023). A rule is substantive when it encodes value judgments, substantially affects regulated parties' rights and interests, or changes the standards governing adjudication. *Id.*

The challenged 2022 Rule did all of those things. It authorized USCIS to grant asylum to a new population; expanded parole procedures and their legal consequences; changed what counts as an asylum application; restricted continuances and filing deadlines; altered the government's ability to contest protection determinations; and directed immigration judges to give effect to

certain asylum-officer findings. Those are not internal docket-management details. They determine liberty, status, adjudicatory rights, evidentiary burdens, and agency authority.

### B.  The final § 1240.17 system was not a logical outgrowth of the NPRM.

The final Rule made twenty-three identified changes from the NPRM. 87 Fed. Reg. at 18,081; ECF 1 ¶¶ 48-51. The number alone is not dispositive, but the nature of the changes is. The NPRM proposed a different form of immigration-judge review following USCIS adjudication. The final IFR abandoned that model and created a new regulation governing "streamlined" § 1229a proceedings, with detailed schedules, filing rules, continuance limits, provisions for DHS participation or nonparticipation, rules for deciding cases without merits hearings, and binding effect for certain asylum-officer protection determinations. 8 C.F.R. § 1240.17.

Interested parties could not reasonably anticipate those specific legal consequences from the proposal. The final framework was not merely a choice among options expressly presented. It was a new adjudicatory system with different rights, burdens, and institutional consequences. *Texas Association of Manufacturers*, 989 F.3d at 381–82.

The Departments' own conduct confirms the notice defect. They issued the rule as an interim final rule and solicited post-effective-date comments specifically because the final changes and streamlined EOIR procedures warranted additional input. 87 Fed. Reg. at 18,080–81, 18,195. Inviting comments after a legislative rule has become effective is not a substitute for giving the public a meaningful opportunity to influence the agency *before* it acts.

### C.  The Departments did not adequately respond to significant State comments.

An agency must respond to significant comments that raise relevant, material issues. *Central & South West Services, Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000). Texas and the other States raised statutory, fiscal, federalism, reliance, migration-incentive, parole, and procedural objections. The final Rule often answered by denying the premise—asserting no serious State reliance interests, treating fiscal effects as too difficult to estimate, and stating that no systematic migration incentive had been identified—without engaging the evidence and mechanisms

presented.

A response need not accept the comment or discuss every sentence. But it must reveal reasoned consideration. The Rule's conclusory treatment deprived the comments of practical effect and independently supports vacatur under § 706(2)(D).

### D. Defendants' procedural error was prejudicial.

The APA directs courts to take due account of prejudicial errors. 5 U.S.C. § 706. Prejudice is evident here. Had the Departments provided notice of the final § 1240.17 system, Texas and other commenters could have addressed its binding-effect provisions, hearing schedules, evidentiary limits, continuance standards, costs to EOIR and States, and interaction with the HSA and § 1229a. But Defendants did not do so. Thus, Texas and other commenters had no fair opportunity to do so before the Rule took effect.

The post-effective comment period did not cure the violation. More than four years later, the Departments have never issued a final rule responding to those comments and completing the process they said would follow. The challenged Rule remains an operative agency rule adopted without the required pre-promulgation procedure.

## VIII. THE COURT SHOULD DECLARE THE RULE UNLAWFUL, VACATE IT, AND GRANT NECESSARY INJUNCTIVE RELIEF.

### A. Vacatur is the appropriate APA remedy

Section 706 directs that a reviewing court "shall" hold unlawful and set aside agency action that violates the APA. 5 U.S.C. § 706(2). Binding Fifth Circuit precedent recognizes vacatur as the ordinary, statutorily prescribed remedy for an unlawful regulation. *Texas Med. Ass'n v. U. S. Dept. of Health & Human Services*, 110 F.4th 762, 779-80 (5th Cir. 2024).

Vacatur is appropriate for the entire challenged Rule because the statutory-authority, arbitrary-and-capricious, and notice-and-comment defects infect its central integrated design. The Asylum Merits process, parole amendments, credible-fear changes, and § 1240.17 proceedings were adopted as a coordinated system intended to alter the path from expedited removal through

43

final protection adjudication.

At minimum, the Court should vacate the provisions creating or implementing that system: 8 C.F.R. §§ 208.2(a)(1)(ii), 208.3(a)(2) to the extent it applies to the Asylum Merits process, § 208.9 provisions governing Asylum Merits interviews, §§ 208.14(c) and 208.16 provisions governing Asylum Merits determinations, § 208.30(f), the challenged amendments to § 235.3(b) and (c), related reliance on § 212.5(b), corresponding provisions in 1208, and § 1240.17.

### B.  Remand without vacatur would be unwarranted.

Courts considering remand without vacatur generally examine the seriousness of the deficiencies and the disruptive consequences of vacatur. *Allied-Signal, Inc. v. U. S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993); *Texas Association of Manufacturers*, 989 F.3d at 389–90.

Both factors favor vacatur. The defects are serious and not curable by supplying a better explanation. The Departments lack statutory authority to create the challenged adjudicatory and parole systems; the Rule includes an Appointments Clause defect; and the notice-and-comment process failed. An agency cannot cure those defects on remand while leaving the same rule operative.

Disruption by reason of vacatur is minimal. The pre-2022 process governed for decades. The Rule itself anticipates vacatur and directs cases into ordinary EOIR proceedings if the Asylum Merits process is enjoined or vacated. 8 C.F.R. § 1240.17(a). Most importantly, the current Administration asserts it has already decided to rescind the challenged Asylum Merits, parole, credible-fear, and streamlined-proceeding provisions. ECF No. 195 at 1–2. Defendants therefore cannot plausibly claim reliance on the continued operation of a scheme they say they intend to abolish.

The history of this case also weighs against an open-ended remand. The Court repeatedly stayed adjudication to permit voluntary rescission, yet Defendants still cannot provide a publication date. A remand without vacatur would reproduce the delay the Court ended by

reopening the case and would leave an unlawful rule in effect indefinitely.

### C. Texas satisfies the requirements for a permanent injunction.

A permanent injunction requires: (1) irreparable injury; (2) inadequate remedies at law; (3) a balance of hardships favoring equitable relief; and (4) consistency with the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Texas satisfies those requirements for the same reasons already discussed above. The Rule causes ongoing sovereign and fiscal injury to Texas. Damages are unavailable against the federal government under the APA and cannot, in any event, remedy continuing interference with Texas's budgeting and administration. The federal government has no legitimate interest in enforcing a regulation that exceeds statutory authority or was adopted unlawfully. And the public interest favors adherence to Congress's commands and constitutionally proper administration.

The Supreme Court's intervening decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), requires any injunction to be no broader than necessary to afford complete relief to Texas. That limitation on equitable injunctions does not displace the APA's distinct command to "set aside" unlawful agency action, as recognized by binding Fifth Circuit precedent. *Texas Medical Association*, 110 F.4th at 779-80.

Texas, therefore, requests vacatur as the primary remedy and asks for an injunction applicable to Texas to ensure complete relief — for example, to prevent Defendants from continuing to apply vacated provisions of the Rule in a manner that causes the Texas-specific injuries established by the record. This is not a request for an injunction merely to protect nonparties.

CONCLUSION

The unlawful 2022 Asylum Officer Rule remains in effect. Neither the current Administration's stated intention to rescind it, nor DHS's separate 2026 affirmative asylum rule, eliminate the controversy or cure the Rule's defects. The Rule creates an asylum-adjudication and parole system Congress did not authorize; conflicts with the HSA's allocation of functions; creates an Appointments Clause defect; disregards important costs and reliance interests; and was

45

promulgated without the notice and comment required by law.

Texas respectfully requests that the Court grant its renewed motion for summary judgment, declare the Rule unlawful, vacate and set it aside, enter appropriately tailored permanent injunctive relief, and grant all other relief to which Texas is entitled.

Dated: August 3, 2026

**JAMES ROGERS**
Utah Bar No. 18783
America First Legal Foundation
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(480) 570-4988
James.Rogers@aflegal.org

Respectfully submitted.

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**ROB FARQUHARSON**
Deputy Attorney General for Legal Strategy

**RYAN G. KERCHER**
Chief, Special Litigation Division

*/s/ David Bryant*
**DAVID BRYANT**
Senior Special Counsel
Attorney-in Charge
Texas Bar No. 03281500

**OFFICE OF THE ATTORNEY GENERAL**
Special Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
David.Bryant@oag.texas.gov

***Counsel for Plaintiff State of Texas***

### CERTIFICATE OF SERVICE

On August 3, 2026, I filed this document through the Court's CM/ECF system, which automatically serves it upon all counsel of record as follows:

Elissa Fudim
elissa.p.fudim@usdoj.gov
Michael Gerardi
michael.j.gerardi@usdoj.gov

/s/ *David Bryant*
DAVID BRYANT

47